# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS
See, attached.

**(b)** County of Residence of First Listed Plaintiff    Essex
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Essex
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Tracey M.A. Stockton
St. Paul's Foundation
22 Endicott Avenue, Marblehead, MA 01945

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Product Liability | |     28 USC 157 |     3729(a)) |
| ☐ 140 Negotiable Instrument |     Liability   ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
|     & Enforcement of Judgment |     Slander     Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |     Liability   ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
|     Student Loans | ☐ 340 Marine     Injury Product | |     New Drug Application | ☐ 470 Racketeer Influenced and |
|     (Excludes Veterans) | ☐ 345 Marine Product     Liability | | ☐ 840 Trademark |     Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |     Liability   **PERSONAL PROPERTY** | | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
|     of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | **LABOR** |     Act of 2016 |     (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract |     Product Liability   ☐ 380 Other Personal |     Act | **SOCIAL SECURITY** |     Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Property Damage | ☐ 720 Labor/Management | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise |     Injury   ☐ 385 Property Damage |     Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -     Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) |     Exchange |
| |     Medical Malpractice | ☐ 751 Family and Medical | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** |     Leave Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 790 Other Labor Litigation | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate |     Income Security Act | ☐ 870 Taxes (U.S. Plaintiff |     Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/     Sentence | |     or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability |     Accommodations   ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** |     26 USC 7609 |     Act/Review or Appeal of |
| |     Employment   **Other:** | ☐ 462 Naturalization Application | |     Agency Decision |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| |     Other   ☐ 550 Civil Rights |     Actions | |     State Statutes |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| |     Conditions of | | | |
| |     Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C.S. Sections 1983, 1985, and 1986

Brief description of cause:
Violation of Civil Rights

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
03.12.2025

SIGNATURE OF ATTORNEY OF RECORD
*Tracey M.A. Stockton*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. **Title of case (name of first party on each side only)** Egypt House, Plaintiff, v. John P. Kelley, et al., Defendants

2. **Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).**

   [✔]  **I.**   **160, 400, 410, 441, 535, 830\*, 835\*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.**

   [ ]   **II.**  **110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820\*, 840\*, 895, 896, 899.**

   [ ]   **III.** **120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.**
          **\*Also complete AO 120 or AO 121. for patent, trademark or copyright cases.**

3. **Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.**

4. **Has a prior action between the same parties and based on the same claim ever been filed in this court?**

   YES [ ]    NO [✔]

5. **Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)**

   YES [ ]    NO [✔]

   **If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?**

   YES [ ]    NO [✔]

6. **Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?**

   YES [ ]    NO [✔]

7. **Do all of the parties  in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? -  (See Local Rule 40.1(d)).**

   YES [✔]    NO [ ]

   **A.**   **If yes, in which division do all of the non-governmental parties reside?**

   Eastern Division [✔]       Central Division [ ]       Western Division [ ]

   **B.**   **If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?**

   Eastern Division [ ]       Central Division [ ]       Western Division [ ]

8. **If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)**

   YES [ ]    NO [✔]

**(PLEASE TYPE OR PRINT)**

**ATTORNEY'S NAME** _____

**ADDRESS** _____

**TELEPHONE NO.** _____

**(CategoryForm11-2020.wpd )**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| EGYPT HOUSE,<br>        Plaintiff,<br><br>v.<br><br>JOHN P. KELLEY, as an Individual and in his capacity as Chairman of the Board of Assessors, WILLIAM J. WILLIS, as an Individual and in his capacity as Member of the Board of Assessors, JONATHAN LEDERMAN, as an Individual and in his capacity as Member of the Board of Assessors, TODD LARAMIE, as an Individual and in his capacity as Assistant Assessor, KAREN D. BERTOLINO, as an Individual and former Assistant Assessor, MICHAEL TUMULTY, as an Individual, in his capacity as Assistant Assessor (ret.), and Consultant to the Town of Marblehead, DOUGLAS E. PERCY, as an Individual and in his capacity as Member of Board of Assessors, BOARD OF ASSESSORS, TOWN OF MARBLEHEAD, the TOWN OF MARBLEHEAD, a Massachusetts Township, THATCHER W. KEZER, III, as an Individual and in his capacity as Town Administrator, LISA L. MEAD, as an Individual and in her capacity as Town Counsel, ADAM J. COSTA of Mead, Talerman & Costa, LLC, as an Individual and in his capacity as counsel to the Town of Marblehead, MATTHEW D. PROVENCHER of Mead, Talerman & Costa, LLC, as an Individual and in his capacity as counsel to the Town of Marblehead, and MARK J. DeFRANCISCO, as an Individual as to claims arising under G.L. c. 12, § 11I and in his capacity as Chairman of the Appellate Tax Board (Equitable Relief Only as to Claims arising Under 42 U.S.C.S. § 1983 and 42 U.S.C.S. § 1985),<br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.: _____<br><br><br><br>**VERIFIED COMPLAINT**<br><br>1.    Violation of 42 U.S.C.S. § 1983 Civil Action for Deprivation of Rights (First Amendment)<br>2.    Violation of 42 U.S.C.S. § 1983 Civil Action for Deprivation of Rights (Fourteenth Amendment)<br>3.    Violation of 42 U.S.C.S. § 1983 (Failure to Train and Supervise — *Canton*)<br>4.    Violation of 42 U.S.C.S. § 1983 (Municipal Liability — *Monell*)<br>5.    Violation of 42 U.S.C.S. § 1985 Conspiracy to Interfere with Civil Rights (First Amendment)<br>6.    Violation of 42 U.S.C.S. § 1985 Conspiracy to Interfere with Civil Rights (Fourteenth Amendment)<br>7.    Violation of 42 U.S.C.S § 1986 Action for Neglect to Prevent Conspiracy<br>Supplemental State Claims<br>8.    G.L. c. 12, § 11I — Impairment of Civil Rights; Private Remedy<br><br>**JURY DEMAND** |

**VERIFIED COMPLAINT**

Plaintiff Egypt House seeks protection of the Court to prevent desecration of an Orthodox Catholic (colloquially, "Greek Orthodox" or "Russian Orthodox") chapel and monastic residence by members of the Board of Assessors, Town of Marblehead (the "Defendant Assessors") in violation of the Ku Klux Klan Act codified under 42 U.S.C.S. § 1983 and 42 U.S.C.S. § 1985, equal protection under law from capricious rulings of the Appellate Tax Board ("ATB") and the Defendant Assessors under the Fourteenth Amendment, and protection from a pattern and practice of harassment of religious practice and privacy from a series of governmental actions of the Town of Marblehead and the ATB that violate laws enacted in The Commonwealth of Massachusetts, constitute impermissible prior restraint under the First Amendment, and ignore all jurisprudence requiring a narrowly tailored solution when the state is in conflict with a right preserved under the United States Constitution.

Egypt House welcomes pilgrims from across the United States to pray in her chapel. Egypt House now seeks protection from a pattern of intimidation and harassment brought under color of law by the Defendants who stubbornly refuse all reasonable overtures to resolve questions of religious ownership and use of Egypt House's real property but instead seek to desecrate the holy objects and relics of a chapel, intimidate clergy and faithful, harass clergy, and otherwise invade the privacy enjoyed by a minority religious community, while at the same time refusing to assess other religious communities in the Town of Marblehead for whom all or a portion of real property owned by them is used for non-religious purpose. This harassment includes attempts to compel clergy to reveal the names of those who have come for confession and spiritual direction to disadvantage Egypt House for refusing to reveal those names and insistence on desecration of this sacred space as the only means to "verify" use, despite the

Defendant Assessors and the ATB being in possession of correspondence authored by Orthodox Catholic clergy and laity certifying to the use thereof.

## PARTIES

1.      Plaintiff is a religious nonprofit corporation formed under Title 29 of the District of Columbia Business Organizations Act. Egypt House is the fee simple owner of 12 Conant Road, Marblehead, Massachusetts 01945.

2.      Defendant John P. Kelley is the Chairman of the Board of Assessors of the Town of Marblehead. Defendant Kelley's address in his capacity as Chairman is Mary Alley Building, 7 Widger Road, Marblehead, Massachusetts 01945. In his individual capacity, Defendant Kelley resides at 22 Merritt Street, Marblehead, Massachusetts 01945.

3.      Defendant William P. Willis is a Member of the Board of Assessors of the Town of Marblehead. In his capacity as Member of the Board, Defendant Willis' address is Mary Alley Building, 7 Widger Road, Marblehead, Massachusetts 01945. In his individual capacity, Defendant Willis resides at 25 Spray Avenue, Marblehead, Massachusetts 01945.

4.      Defendant Jonathan Lederman is a Member of the Board of Assessors of the Town of Marblehead. In his capacity as Member of the Board, Defendant Lederman's address is Mary Alley Building, 7 Widger Road, Marblehead, Massachusetts 01945. In his individual capacity, Defendant Lederman resides at 8 Ida Rd., Marblehead, Massachusetts 01945.

5.      Defendant Todd Laramie is Assistant Assessor of the Board of Assessors of the Town of Marblehead. In his capacity as Assistant Assessor, Defendant Laramie's address is Mary Alley Building, 7 Widger Road, Marblehead, Massachusetts 01945. In his individual capacity, Defendant Laramie resides at 26 Summer Street, Apt. No.: 4, Marblehead, Massachusetts 01945.

6.      Defendant Karen Bertolino, is a former Assistant Assessor of the Board of Assessors of the Town of Marblehead. In her capacity as then-Assistant Assessor, Defendant Bertolino's address is Mary Alley Building, 7 Widger Road, Marblehead, Massachusetts 01945. In her individual capacity, Defendant Bertolino's address is 35 Mansfield Road, Lynnfield, Massachusetts 01940.

7.      Defendant Michael Tumulty, is a retired Assistant Assessor of the Board of Assessors of the Town of Marblehead and current consultant to the Town of Marblehead. In his capacities for the Town of Marblehead, Defendant Tumulty's address is Mary Alley Building, 7 Widger Road, Marblehead, Massachusetts 01945. In his individual capacity, Defendant Tumulty's address is not known at this time.

8.      Defendant Douglas E. Percy, is a former member of the Board of Assessors of the Town of Marblehead. Defendant Percy served on the Board of Assessors throughout 2018-2024. While serving as a member of the Board of Assessors, Defendant Percy's address was Mary Alley Building, 7 Widger Road, Marblehead, Massachusetts 01945. In his individual capacity, Defendant Percy's residence address is 12 Upland Road, Marblehead, Massachusetts 01945.

9.      Defendant Board of Assessors of the Town of Marblehead (the "Defendant Assessors") is an elected governing Board within the Town of Marblehead, a Massachusetts township. The Defendant Assessors' business address is 188 Washington Street, Marblehead, Massachusetts.

10.     Defendant Town of Marblehead ("Defendant Marblehead") is a Massachusetts township. The address for Defendant Marblehead is 188 Washington Street, Marblehead, Massachusetts 01945.

Verified Complaint - Page 4 of 30

11.     Defendant Thatcher W. Kezer, III, is Town Administrator to the Town of Marblehead. In his capacity as Town Administrator, Defendant Kezer's address is 188 Washington Street, Marblehead, Massachusetts 01945. In his personal capacity, Defendant Kezer's address is 92 Monroe Street, Amesbury, Massachusetts 01913.

12.     Defendant Lisa L. Mead is Town Counsel to the Town of Marblehead. As a member of Mead, Talerman & Costa, LLC, her address is 30 Green Street, Newburyport, Massachusetts 01950. In her individual capacity, Defendant Mead's address is 13 Purchase Street, Newburyport, Massachusetts 01950.

13.     Defendant Adam J. Costa is counsel to the Town of Marblehead. As a member of Mead, Talerman & Costa, LLC, his address is 30 Green Street, Newburyport, Massachusetts 01950. In his individual capacity, Defendant Costa's address is 4 Pond Edge Lane, Ipswich, Massachusetts 01938.

14.     Defendant Matthew D. Provencher is counsel to the Town of Marblehead. As an associate of Mead, Talerman & Costa, LLC, his address is 227 Union Street, No.:  610, New Bedford, Massachusetts 02740. In his individual capacity, Defendant Provencher's address is 1136 Chaffee Street, New Bedford, Massachusetts 02745.

15.     Defendant Mark J. DeFrancisco is Chairman of the ATB. In such capacity, his address is Appellate Tax Board, 100 Cambridge Street, Suite No.: 200, Boston, Massachusetts 02114. In connection with the claim arising under G.L. c. 12, § 11I, Defendant DeFrancisco's residential address is not known at this time.

## JURISDICTION AND VENUE

16.     This Court has personal jurisdiction over Defendants pursuant to USCS Fed Rules Civ Proc R 4.

17.    This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C.S. § 1331.

18.    Venue is proper in this Court under 28 U.S.C.S. § 1391.

## FACTUAL BACKGROUND

19.    Egypt House is the fee simple owner of a single family dwelling currently commonly known as 12 Conant Road, in the Town of Marblehead, Massachusetts ("12 Conant Road"). Egypt House is a religious non-profit corporation incorporated under Title 29 of the Business Corporation Act of the District of Columbia and a subordinate entity under Group Exemption Number 2090 pursuant to that certain Determination Letter dated effective May 26, 2011, conferred by the Internal Revenue Service pursuant to Section 501(c)3 of the Internal Revenue Code, as amended. Our faith life exists in the theology of the Orthodox Catholic faith. Egypt House acquired the real property located at 12 Conant Road on June 30, 2022. The subject property is contiguous to 22 Endicott Avenue owned by Emmaus House and a party related to Egypt House that serves as clergy housing. The two (2) properties serve the ministry in a manner similar to the use case set forth in *Trimount Foundation v. Board of Assessors of Newton,*[1] where appellant was an Opus Dei chapter and owner of a property providing housing to its numeraries and facilities for programming in keeping with its ministry. The *Trimount* Court, citing *Assessors of Boston v. Vincent Club,* 351 Mass. 10, 14, 217 N.E.2d 757 (1966), *quoting Babcock v. Leopold Morse Home for Infirm Hebrews & Orphanage,* 225 Mass. 418, 421, 114 N.E. 712 (1917), found "occupancy means something more than that which results from simple ownership and possession. It signifies an active appropriation to the immediate uses of the charitable cause for which the owner was organized," and "[b]y living together at the property, the Numeraries

---

[1]    *Trimount Found. v. Board of Assessors of Newton,* 98 Mass. App. Ct. 1108 (2020)

were able to have communal meals during which they planned the programs that were offered there and were also able to be present when those programs occurred." As found by the ATB in *Trimount,* "the Numeraries did not live at the property as a matter of convenience but instead to facilitate programs that served the mission of Opus Dei." Egypt House purchased 12 Conant Road for the purpose of providing a chapel area, library, space for religious education and instruction, Agape Meals and the celebration of liturgical feasts, as well as clergy and pilgrim's lodging. At all times since the conveyance of the property to Egypt House, it has been used for purposes of religious worship and instruction and purposes complementary thereto. At various times, Egypt House has been used as a place of retreat for couples and individuals undergoing counseling and spiritual direction; as a place of celebration of the Divine Services; and as lodging for one of the foremost iconographers in the world for the purpose of writing the holy icons for St. Nicholas. Egypt House has provided lodging to George Kordis, Ph.D., considered one of the foremost iconographers in the world. Egypt House will provide lodging to Ewan Craig and his wife while Mr. Craig is carving St. Nicholas' High Cross. *See,* Exhibit A, *attached.* Egypt House is also used for the storage of religious furnishings, icons, and holy relics (similar to the use of space by appellant in *Shrine of Our Lady of La Salette Inc.*[2]), and includes an indoor

---

[2]    In interpreting the scope of Clause Eleventh, we recognize that a house of religious worship is more than the chapel used for prayer and the classrooms used for religious instruction. It includes the parking lot where congregants park their vehicles, the anteroom where they greet each other and leave their coats and jackets, the parish hall where they congregate in religious fellowship after prayer services, the offices for the clergy and staff, and the storage area where the extra chairs are stored for high holy days. In some houses of religious worship, all of these portions of property (apart from the parking area) may be located with the chapel in a single building; in others with larger congregations, they may be located in multiple buildings, some adjoining the chapel, some standing alone. We have long recognized that all of these portions of property are exempt from taxation under Clause Eleventh even if no religious worship occurs within these spaces; it suffices that they are used for "purposes connected with" religious worship. *Assessors of Framingham Assessors of Framingham v. First Parish in Framingham,* 329 Mass. 212, 215, 107 N.E.2d 309 (1952). As the Court in *Proprietors of the S. Congregational Meetinghouse in Lowell v. Lowell,* 1 Met. 538, 541, 42 Mass. 538, 1 Metc. 538 (1840), found, [these activities constitute] purposes that "normally accompany and supplement the religious work of a parish."

area used for the cultivation and propagation of perennials for use in liturgical worship (hyssop, roses, and basil, among others) and the gardens at Egypt House and the Shrine of St. Nicholas, a related organization undergoing redevelopment as a monastic complex in Marblehead, Massachusetts ("St. Nicholas").

20.    Upon the acquisition of 12 Conant Road on June 30, 2022, Egypt House applied for an abatement of real property taxes under G. L. c. 59, § 5 (10) and (11)[3] (the "Statutory Exemptions"). On July 5, 2022, under cover of correspondence to Defendant Bertolino, Assistant Assessor,[4] Appellant notified Appellee of the conveyance of the subject property to Appellant; remitted its tax payment in the amount of $20.24 evidencing payment of taxes owing for the stub period from the date of sale; filed State Form 128, Application for Real Property Tax Abatement; and such other documentation as is germane to this type of notification. A copy of the July 5, 2022 correspondence is attached hereto as Exhibit B. On September 6, 2022, Appellee requested additional information relative to Egypt House and sought to deny the exemption because Egypt House was not incorporated in The Commonwealth of Massachusetts and, therefore, the exemption was unavailable (the "September 6th Correspondence"), among other reasons. A copy

---

[3]    Tenth, Personal property owned by or held in trust within the commonwealth for religious organizations, whether or not incorporated, if the principal or income is used or appropriated for religious, benevolent or charitable purposes.

    Eleventh, Notwithstanding the provisions of any other general or special law to the contrary, houses of religious worship owned by, or held in trust for the use of, any religious organization, and the pews and furniture and each parsonage so owned, or held in irrevocable trust, for the exclusive benefit of the religious organizations, and including the official residences occupied by district superintendents of the United Methodist Church and the Christian and Missionary Alliance and of the Church of the Nazarene, and by district executives of the Southern New England District of the Assemblies of God, Inc., Unitarian-Universalist Churches and the Baptist General Conference of New England, and the official residence occupied by the president of the New England Synod of the Lutheran Church in America, Inc., and the official residence occupied by a person who has been designated by the congregation of a Hebrew Synagogue or Temple as the rabbi thereof, but such exemption shall not, except as herein provided, extend to any portion of any such house of religious worship appropriated for purposes other than religious worship or instruction. The occasional or incidental use of such property by an organization exempt from taxation under the provisions of 26 USC Sec. 501(c)(3) of the Federal Internal Revenue Code shall not be deemed to be an appropriation for purposes other than religious worship or instruction. ALM GL ch. 59, § 5.

[4]    The Assistant Assessor role is filled by a professional, licensed staff member at the service of the Board of Assessors.

of the September 6th Correspondence is attached hereto as Exhibit C. The September 6th

Correspondence also questioned use of the property by Egypt House, inferring that the property

would not be used for a religious purpose. Our response to the September 6th Correspondence,

dated September 22, 2022 (the "September 22nd Correspondence"), refuted the allegations made

therein and cited the preferential treatment afforded other religious and charitable organizations

in the Town of Marblehead, as follows:

> We hereby take special notice, in addition to the actions of the Town of
> Marblehead Board of Assessors in recognizing pro-rated abatements for the
> YMCA and St. Michael's properties, it has declined to request pro-rated real
> estate taxes from Grace Community Church's unaffiliated Pleasant Street School,
> St. Andrew's Nursery Coop, as well as those churches and synagogues in
> Marblehead which have installed cell phone masts inside their structures, among
> no less than 30 other similarly situated properties in Marblehead. While a request
> for more information relative to the religious use of Egypt House may appear
> reasonable on its face, we find it troubling, given our experiences with the Office
> of the Assessor, in particular, and the Town of Marblehead, generally.

The September 22nd Correspondence is attached hereto as Exhibit D.

21.    During a conversation in August of 2024 by and between Fr. Andrew (Bushell)

and Defendant Laramie, Defendant Laramie stated he discussed the issue of disparate treatment

with Defendant Kelley, who stated "he didn't want to take money from religious organizations,"

or words to that effect; thereby admitting, despite all evidence to the contrary, Defendant

Assessors refuse to recognize the religious use of Egypt House. The minority Orthodox Catholic

community in the form of the community using Egypt House, as well as St. Nicholas, also the

subject of a pending appeal before the ATB as well as a suit in the Superior Court, Essex County

District, continue to be disparately treated, as one example of the persecution by the Defendant

Assessors and Defendant Marblehead of the Orthodox Catholic faith and its faithful. Defendant

Kelley's statement is prima facie evidence of Defendant Kelley's bias against the Orthodox

Catholic faith and the failure of Defendant Kelley and the Defendant Assessors to adhere to the

rules of professional conduct required of assessors, generally, as set forth at G.L. c. 41, § 29, G.L. c. 59, § 21, *et seq,.* and the regulations promulgated thereunder.

22.     Despite offers of availability for discussions relative to use of the property by Egypt House, no further questions were asked of Egypt House, nor was a site visit requested by a member of the assessing staff or the Defendant Assessors three (3) years ago when the initial request for recognition was denied. We now know the Defendant Assessors had already decided to deny an exemption for Egypt House and the perception of the Defendant Assessors was that receipt of a request for abatement for Fiscal Year 2023 was a low probability. *See,* Exhibit E, *attached.* Rather than use objective criteria to evaluate the use of the property, the Defendant Assessors sought personal information relative to Fr. Andrew (Bushell), the Superior of Egypt House, in an effort to attack him in order to deny the request for abatement. Malicious attacks and negative bias on the part of Defendant Marblehead and Defendant Assessors were the elements used for the evaluation of the abatement in this instance. *See,* Exhibit F, *attached.* We note the actions and omissions of Defendants under this Complaint fall within the exceptions to qualified immunity more particularly described at G.L. c. 258, § 10.[5]

23.     On December 5, 2022, Egypt House filed its appeal of the Fiscal Year 2023 denial. The Fiscal Year 2023 appeal was before ATB under Docket No.: F-347637 (the "Fiscal

---

[5]     The provisions of sections one to eight, inclusive, shall not apply to: —
. . .
        (c)     any claim arising out of an intentional tort, including assault, battery, false imprisonment, false arrest, intentional mental distress, malicious prosecution, malicious abuse of process, libel, slander, misrepresentation, deceit, invasion of privacy, interference with advantageous relations or interference with contractual relations;
        (d)     any claim arising in respect of the assessment or collection of any tax, or the lawful detention of any goods or merchandise by any law enforcement officer;
        (e)     any claim based upon the issuance, denial, suspension or revocation or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authorization; . . ..
G.L. c. 258, § 10.

Year 2023 Appeal"). Despite timely and fulsome responses to discovery under the Fiscal Year 2023 Appeal, during the August 1, 2024 hearing on motion for a speedy trial with respect to Docket No.: F-351238 (the "Fiscal Year 2024 Appeal"), Defendant Provencher, counsel to Defendant Marblehead, stated Egypt House refused to respond to discovery with respect to the Fiscal Year 2023 Appeal and Defendant Marblehead needed to perform its "due diligence" relative to the Fiscal Year 2024 Appeal, despite the fact no aspect of the use or ownership of Egypt House had changed in the intervening *less than* twelve (12) month period. S*ee*, Exhibit G, *attached.* Included within the discovery delivered to the Defendant Assessors under the Fiscal Year 2023 Complaint was correspondence from an Orthodox Catholic bishop and a priest; in each case, defending the religious use and the sound decision rooted in canon law of Fr. Andrew (Bushell) to refuse to disclose the name of the persons who participate in the faith life at Egypt House, as requested by Defendant Provencher in discovery. When Fr. Andrew (Bushell) refused to violate the seal of the confessional, disclosure was compelled on two (2) occasions (unsuccessfully). The actions of Defendant Provencher were illegal and designed to harass, intimidate, and coerce Egypt House and her clergy. *See,* Exhibit H, *attached.* The discovery responses of Egypt House under the Fiscal Year 2023 Appeal are attached hereto as Exhibit I. Despite duly responding to discovery under the Fiscal Year 2023 Appeal, Egypt House was late in remitting its 2nd quarter tax installment; therefore, the Fiscal Year 2023 Appeal was dismissed by the ATB for want of jurisdiction.

24.    To provide historical perspective, Defendant Marblehead and Defendant Assessors have engaged and continue to engage in the pattern and practice of actively conspiring to discredit, defame, destroy, willfully injure, intimidate, and interfere with the Superior of Egypt House, Rev. Fr. Andrew (Bushell) ("Fr. Andrew"), those persons who are catechumans,

numeraries, and the faithful in the tradition of the Orthodox Catholic faith, in each case, under color of state law. These practices are well-documented and have been on-going for over a decade. *See,* Exhibit J, *attached.* These actions incite local citizens against Fr. Andrew, the local Orthodox Catholic community, and cast this ancient and beautiful faith in a poor light, all attributable to the hands of bigoted local government, its officials and employees, and the local community incited by their actions. A graphic and timely incident that illustrates a recent example of the violence and persecution experienced by clergy and the faithful, in June of 2024, John J. Fedas came upon the rectory property and, when asked the nature of his visit, proceeded to assault Fr. Andrew, referring to him as a fraud and a "monkey".[6] *See,* Exhibit K, provided under separate cover. Mr. Fedas has been charged for his crimes under Docket No.: 2513CR343, currently pending in the District Court of the Commonwealth of Massachusetts, Lynn District. This behavior should not occur in a civilized society, let alone a sleepy community of 20,000 people. Free speech is allowed in our society, but free speech to incite a mob is not.

25.     As confirmed in a federal complaint, for which a grand jury was never impaneled, the unlawful hate crimes committed by Defendant Marblehead aided in the issuance of a federal complaint that lead to the illegal arrest of Fr. Andrew and Tracey M.A. Stockton on October 13, 2022, as reflected by the criminal complaint styled, "*United States of America v. Brian Andrew Bushell and Tracey Stockton,*" in the United States District Court for the District of Massachusetts under Case No.:  22-MJ-4506-DHH) (the "Complaint"). Defendant Marblehead misled the federal authorities in executing the wrongful prosecution. *See,* page 27 of the Complaint, to-wit:  "[b]ased on the investigation to date and interviews of Town of Marblehead

---

[6]     This expression vis-à-vis Fr. Andrew is derived from the defamatory reporting in quarterly magazine entitled, "01945 The Magazine," owned by the Essex Media Group. *See,* Ted Grant, From the Publisher, "Monk-y Business," and Charlie McKenna, *Beer, Salt, and Federal Charges,* 01945 The Magazine, Winter 2022, at Page i and Page 9.

personnel, . . .." On November 8, 2023, the Complaint was dismissed "in the interests of justice." Neither defendant was indicted. In construing the implications of a dismissal in the interests of justice, in *People v. Insignares*, 109 A.D.2d 221 (App. Div. 1985) [interior citations omitted], the Court stated, "discretion to dismiss in the interest of justice, should be 'exercised sparingly' and only in that 'rare' and 'unusual' case where it 'cries out for fundamental justice beyond the confines of conventional considerations.'" Another Court, commenting on the nature of a dismissal in the interests of justice, stated "[t]he power to dismiss an indictment in furtherance of justice is to be exercised sparingly, in those cases where there is 'some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such indictment . . . would constitute or result in injustice.'" *People v. Rahmen,* 302 A.D.2d 408, 409 (App. Div. 2003).

26.    When invited by Fr. Andrew (Bushell) to discuss the matter, Defendant Kezer has either ignored numerous requests to speak or merely states, "I'll continue to follow the advice of my lawyer." The Chairman of the Select Board of the Town of Marblehead, Erin M. Noonan, also declined to resolve the matter, despite request to meet for that purpose. Over the past ten (10) years, the only constant in leadership at the Town of Marblehead, including the Defendant Assessors, on matters affecting the Orthodox Catholic Christian minority is Defendant Kelley and Defendant Mead, the employer of Defendant Provencher, counsel to Defendant Assessors in this matter. Defendant Provencher serves as opposing counsel to Egypt House on this matter; St. Nicholas relative to an ATB appeal (Docket No.:  F-351239); St. Nicholas on a state court matter currently pending before Superior Court of The Commonwealth of Massachusetts, Essex District, under Case No.:  CV237700813. Mr. Provencher is the *de facto* public records officer. Kyle Wiley, is the true Public Records Access Officer designee for the Town of Marblehead,

who defers to Mr. Provencher. Mr. Provencher controls all information provided by the Town of Marblehead, including the Defendant Assessors. Mr. Provencher has refused disclosure of documentation requested under the public records access laws of The Commonwealth of Massachusetts and discovery in pending lawsuits. Defendant Mead is Defendant Provencher's employer and the legal strategy advisor to the Town of Marblehead in its efforts to persecute the minority religion of Orthodox Catholic Christianity in Marblehead, Massachusetts.[7]

27.     Discovery in the Fiscal Year 2024 Appeal has been propounded by the Defendant Assessors and responded to by Egypt House, inclusive of correspondence from one Orthodox Catholic Bishop and two (2) Orthodox Catholic priests, in each case, defending the use of Egypt House. Despite having been before the ATB on this identical set of circumstances on three (3) separate occasions,[8] the Defendant Assessors have *never stated a reason* for any denial of recognition of the abatement under the Statutory Exemptions. In every published case previously heard by the ATB on matters of religious organization exemption, the appellee municipal assessing body states a reason for exemption denial. Despite *repeated requests* (over years) to discuss this matter, Defendant Marblehead and the Defendant Assessors, by and through the employees, elected officials, and advisors of each of them (recognizing Egypt House intends the Defendant Assessors are included with and in the defined term, "Defendant Marblehead"), have categorically denied any opportunity for dialogue with Egypt House — or even provided a written explanation stating concerns. For recent examples of outreach, *see,* Exhibit L, *attached.*

---

[7]     Interesting and timely, it appears as though other residents of the Town of Marblehead are beginning to see how the power of Mead, Talerman & Costa LLC over the Town of Marblehead adversely affects its citizenry. Local residents are petitioning for a disinterested third-party Parliamentarian in the face of the biased manner in which Defendant Mead steers questions arising in local Town Meetings (*see,* Will Dowd, *Let the Debate Begin,* MARBLEHEAD CURRENT, March 5, 2025, at A12).

[8]     In addition to the Fiscal Year 2024 Appeal, Docket Nos.: F-347636 and F-347637 before the Appellate Tax Board.

The objective, verifiable evidence supporting religious use by Egypt House is comprehensive. Egypt House filed its Motion for Summary Judgment in October 2024 under the Fiscal Year 2024 Appeal. Summary Judgments before the ATB are governed by 831 CMR 1.17. 2(b) to Section 1.17 provides as follows:

> (2)    The moving party shall file with the motion and serve on the opposing party:
> (a) a brief statement of the applicable law; and
> (b) *affidavits* and/or copies of those portions of deposition transcripts, pleadings, admissions, or other documents demonstrating that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. [Emphasis added.] 831 CMR 1.17.

Egypt House prepared and delivered numerous affidavits for signature by Defendant Kezer, Jason Gilliland, Chief of the Fire Department, Town of Marblehead, Stephen Cummings, Building Commissioner, Town of Marblehead, and Joseph Kowalik, Manager of the Marblehead, Municipal Light Department. Defendant Provencher, who advised the affiants by email "not to circumvent the normal course of discovery" or words to like effect, the Mead Talerman firm, and Defendant Kezer prohibited the affiants from signing the affidavits, despite the fact the statements to be sworn to in the affidavits are objectively verifiable as true and such instruments would be typically issued in the ordinary course of their prospective roles. *See,* Exhibit M, *attached.* Defendant DeFrancisco refused to hear the matter, stating there was an issue of fact, entering his Order dated October 31, 2024 (the "October 31st Order"). Without a hearing on the Egypt House Motion for Summary Judgment, nor the submission of any objection or response to the subject Motion by the Defendant Assessors, neither the ATB, nor Defendant DeFrancisco would have any objective basis for finding there "was an issue of fact." The October 31st Order is attached hereto as Exhibit N. As the Supreme Judicial Court stated in *Dorchester Mut. Ins. Co. v. Miville,* 491 Mass. 489, 492 (2023), *citing Dorchester Mut. Ins. Co.*

*v. Krusell,* 485 Mass. 431, 439-440, 150 N.E.3d 731 (2020), *quoting Augat, Inc. v. Liberty Mut. Ins. Co.,* 410 Mass. 117, 120, 571 N.E.2d 357 (1991), "[t]he standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law." Egypt House is unaware of how the ATB could have arrived at its finding, unless the ATB and Defendant DeFrancisco are biased or engaging in *ex parte* conversations with the Defendant Assessors, clearly outside of the quasi-judicial, statutorily mandated, role held by Defendant DeFrancisco.

28.    Following a hearing on the G.L. c. 58A, § 8A[9] inspection at issue here, the ATB ordered Egypt House to allow people into our sacred space who, according to our religious teachings, will, by their presence, desecrate this consecrated space. The Order issued on January 7, 2025 (the "January 7th Order") is attached hereto as <u>Exhibit O</u>. Egypt House has no objection to others performing the inspection; however, as will be discussed below, forcing us to allow the individuals named herein to perform the G.L. c. 58A, § 8A inspection infringes upon the First Amendment rights of Egypt House with no compelling government interest. No tribunal within The Commonwealth of Massachusetts, whether administrative or judicial, has the ability to overturn well-settled principles of Constitutional law. As the Court stated in *Fed. Election Com. v. Mass. Citizens for Life, Inc.,* 479 U.S. 238, 107 S. Ct. 616, 93 L. Ed. 2d 539 (1986), "[w]hen statutory provision burdens First Amendment rights, it must be justified by compelling state interest." In *Massachusetts Coalition for the Homeless v. Fall River,* 486 Mass. 437 (2020),

---

[9]    Before the hearing of a petition for the abatement of a tax upon real estate, machinery or other tangible property, the appellant shall permit the appellee personally or by attorneys, experts or other agents, to enter upon such real estate or upon any premises where such personal property is situated and examine and inspect such real estate or personal property, including any property which the appellant claims is exempt from taxation. . . .. G.L. c. 58A, § 8A.

*citing, Sable Communications of Cal., Inc. v. Federal Communications Comm'n.,* 492 U.S. 115, 126, 109 S. Ct. 2829, 106 L. Ed. 2d 93 (1989), the Court held: "[i]n the context of strict scrutiny, a regulation is not narrowly tailored unless 'it chooses the least restrictive means to further the articulated interest.'" The boundaries between secular rights imposed by statute and the Bill of Rights, specifically the First Amendment, separation of church and state, remain a cornerstone of our society and the law of the land.

29.     In a similar vein, Egypt House filed a Motion for Reconsideration of the January 7th Order. The Motion for Reconsideration was denied without a hearing (the "January 21st Order"). Upon receipt of the January 21st Order, Egypt House sought to appeal the January 7th Order in the Supreme Judicial Court, Single Justice System, pursuant to ALM Sup. Jud. Ct. Rule 2:20.[10] The Supreme Judicial Court denied the appeal on jurisdictional grounds as documented in the Judgment entered February 20, 2025 (the "February 20th Judgment"). During this period, ATB joined a pending matter mentioned hereinabove, *Shrine of St. Nicholas v. Board of Assessors, Town of Marblehead* (Docket No.: F-351239), a matter arising pursuant to the illegal revocation of a valid and subsisting Statutory Exemption as to St. Nicholas, with the Fiscal Year 2024 Appeal. Thereafter, St. Nicholas filed its Motion to Sever, as Docket No.: F-351239 is available for a G.L. c. 58A, § 8A inspection at the convenience of the parties without impediment, *i.e.,* the Enjoined Provisions. The joinder by Defendant DeFrancisco of Docket No. F-351239 with the Fiscal Year 2024 Appeal greatly damages St. Nicholas, as it will now be required to remit taxes payment illegally assessed and collected by Defendant Marblehead until this Complaint is heard, at a minimum. A speedy hearing has always been the desire of each of

---

[10]     Interlocutory matters arising in appeals from the decisions of the Appellate Tax Board and questions of final disposition thereof when further proceedings appear unnecessary may be presented to a single justice, who may after notice hear and determine the same both as to questions of law and of fact or reserve and report the case. ALM Sup. Jud. Ct. Rule 2:20.

Egypt House and St. Nicholas; however ATB, the Defendant Assessors, Defendant Provencher, and Defendant DeFrancisco pursue a slower, more punitive to the taxpayer, pace to effectively satisfy their objectives. The various Order, Judgment, and Motions discussed in this Paragraph 31 are attached hereto as <u>Exhibit P</u>.

30.    Egypt House respectfully requests this Court restrain and enjoin the ATB, Defendant DeFrancisco, the Defendant Assessors, and Defendant Marblehead from enforcing four (4) specific provisions contained in the January 7th Order — only one of the four (4) is a narrowly tailored limitation to the statutory requirements set out at G.L. c. 58A, § 8A. It is not within the purview of the ATB to establish unfettered guidelines with respect to inspection of property by the state when the property is owned and used by a religious organization. The guidelines established by the ATB in the January 7th Order are contrary to the dictates of the Constitution and the theology and beliefs of this minority religious organization. If allowed to proceed, certain aspects of the G.L. c. 58A, § 8A inspection to which the January 7th Order applies will cause irreparable harm to Egypt House, as such practices are in direct contravention of the church autonomy/ecclesiastical abstention doctrine. As expressed by the Supreme Court in *Seattle's Union Gospel Mission v. Woods,* 142 S. Ct. 1094 (2022), *citing, Watson v. Jones,* 80 U.S. 679, 13 Wall. 679, 733, 20 L. Ed. 666 (1872), and *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America,* 344 U. S. 94, 116, 73 S. Ct. 143, Ed. 97 L. 120 (1952):

> Our church-autonomy cases explained that 'civil courts exercise no jurisdiction' over matters involving 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them.' . . . That is so because the Constitution protects religious organizations 'from secular control or manipulation.'

As the Supreme Court opined in *Watson v. Jones,* ". . . in a broad and sound view of the relations of church and state under our system of laws, . . . civil courts are to defer to religious authorities on questions of [church] discipline, or of faith, or ecclesiastical rule, custom, or law." 80 U.S. 679, 727 (1871). The actions and omissions of Defendants also run afoul of another important concept given deference in this area — unnecessary entanglement. As the Supreme Court stated in *Lemon v. Kurtzman,* 403 U.S. 602 (1971), "political division along religious lines was one of the principal evils against which the First Amendment was intended to protect." In the matter at issue, Defendant Marblehead, inclusive of the Defendant Assessors, now joined by the ATB and Defendant DeFrancisco pursuant to his entry of the January 7th Order, are unnecessarily entangled in Orthodox Catholic religious practices.

31.     While this is not the correct forum and the relief offered is not of the type Egypt House is seeking at this time, the actions and omissions of Defendants hereunder *are crimes* under 18 U.S.C.S. § 245, *in pertinent part:*

> (2)     any person because of his race, color, religion or national origin and because he is or has been—
> . . .
> (B)     participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof;
> . . .
> (F)     enjoying the goods, services, facilities, privileges, advantages, or accommodations of any . . . other establishment which provides lodging to transient guests, . . .;

as well as 18 U.S.C.S. § 247, *in pertinent part:*

> (a)     Whoever, in any of the circumstances referred to in subsection (b) of this section —
> (1)     intentionally defaces, damages, or destroys any religious real property, because of the religious character of that property, or attempts to do so; or

(2)     intentionally obstructs, by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so;
. . .
(b)     The circumstances referred to in subsection (a) are that the offense is in or affects interstate or foreign commerce.
(c)     Whoever intentionally defaces, damages, or destroys any religious real property because of the race, color, or ethnic characteristics of any individual associated with that religious property, or attempts to do so, shall be punished as provided in subsection (d). . . .

18 U.S.C.S. §§ 245 and 247. Here, Egypt House merely requests that two (2) named individuals be precluded from performing the subject c. 58A, § 8A inspection. The remaining requests (no photography or handling of the holy objects) are matters that are not prescribed by statute and, thereby, not statutorily mandated with respect to the inspection at law in the first instance. These provisions of the January 7th Order are the result of the enlargement of the statutory G.L. c. 58A, § 8A obligation at the hands of Defendant DeFrancisco in violation of the First and Fourteenth Amendments to the Constitution.

### CLAIMS FOR RELIEF

**Count I:  Violation of 42 U.S.C.S. § 1983**
**Civil Action for Deprivation of Rights**
**The First Amendment of the United States Constitution**
**Freedom of Religion, Prior Restraint**

32.     Plaintiff incorporates the allegations of paragraphs 1-31 of this Verified Complaint as if fully set forth herein. The actions of each Defendant manifestly evidences the deprivation of rights, privileges, and immunities secured by the First Amendment and at law in favor of Egypt House in accordance with the provisions of 42 U.S.C.S. § 1983, which provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. . . .

By and through their actions, Defendants, and each of them, have deprived Egypt House of the right at law to recognition of the Statutory Exemptions for a period in excess of four (4) years. The actions and omissions of Defendants are a prior restraint upon the ministry of Egypt House. The requirements of the January 7th Order willfully overreach the norms arising under the Constitution when evaluating separation of church and state. In a desire to intimidate, bully, and control Egypt House, the ATB, by and through Defendant DeFrancisco, asserted itself into an inspection arising at law as arbiter of disagreements arising relative to the treatment of the holy objects — a role emphatically conferred upon the clergy in well-settled case law in the United States reflecting several hundred years of jurisprudence. G.L. c. 58A, § 8A is broadly drafted with no less than four (4) separate categories authorizing inspectors by role; none of which identify an inspector's role with specificity or by given name. The actual Board of Assessors is comprised of three (3) individuals — two (2) of whom *are not* Defendant Kelley. Similarly, Defendant Provencher is employed by a firm comprised of sixteen (16) lawyers in addition to Defendant Provencher. If the true intent of Defendants was to determine religious use of Egypt House, Defendant DeFrancisco, Defendant Provencher, and the Defendant Assessors would have taken the letters authored by priests and bishops attesting to the religious use of Egypt House as objective, third-party confirmation as to use and allow recognition of the exemptions to advance after three (3) previous attempts to appeal and the expenditure of countless monies, in filing fees, legal fees, and illegal tax assessments paid by Egypt House. *See,* Exhibit Q, *attached.* To the

extent an inspection remained truly necessary thereafter, Defendants would have been able to

identify two (2) inspectors who *are not* Defendant Kelley and Defendant Provencher.

<div align="center">

**Count II:  Violation of 42 U.S.C.S. § 1983**
**Civil Action for Deprivation of Rights**
**The Fourteenth Amendment of the United States Constitution**
**Due Process, State Actions Prohibited, Equal Protection**

</div>

33.     Plaintiff incorporates the allegations of paragraphs 1-32 of this Verified

Complaint as if fully set forth herein. The actions of each of the Defendant Assessors, Defendant

Kelley, Defendant Willis, Defendant Lederman, Defendant Laramie, Defendant Bertolino,

Defendant Tumulty, Defendant Marblehead, Defendant Kezer, Defendant Mead, Defendant

Provencher, Defendant Costa and, solely in the capacity of Chairman, Defendant DeFrancisco,

evidenced by and through (a) the imposition and collection of real estate tax on an exempt

property by the Defendant Assessors in direct opposition to the exempt status enjoyed by all

other religious and non-profit organizations in the Town of Marblehead, inclusive of the

structures and uses ancillary to each of them, and (b) the performance of a site-inspection arising

at law without narrowly tailoring the guidelines relative to such inspection, given that the

inspection site is a church, in each case, rises to the level of a state action by Defendant

Marblehead and a direct violation of the privilege of equal protection, in each case, as each of

such principles are enshrined under the Fourteenth Amendment of the United States

Constitution.  U. S. CONST. amend. XIV.

<div align="center">

**Count III:  Violation of 42 U.S.C.S. § 1983**
**Civil Action for Deprivation of Rights**
**Failure to Train and Supervise -** *Canton*

</div>

34.     Plaintiff incorporates the allegations of paragraphs 1-33 of this Verified

Complaint as if fully set forth herein. The actions of Defendant Assessors, Defendant Kelley,

Defendant Willis, Defendant Lederman, Defendant Marblehead, Defendant Kezer, Defendant

<div align="right">Verified Complaint - Page 22 of 30</div>

Silva, and Defendant Mead show the damage caused by persons holding roles requiring such persons to advise, train, and supervise employees, volunteers, and elected officials when they abjectly fail to train and supervise. In *City of Canton v. Harris,* 489 U.S. 378 (1989), the Supreme Court found in favor of plaintiff when the failure of the Police Department of the City of Canton, Ohio failed to appropriately train and supervise its staff. Recognizing an additional method of municipal culpability under 42 U.S.C.S. § 83, the Court found that a failure to train and supervise can give rise to a "deliberate indifference" to the constitutional rights of the petitioner. The Court specifically stated "it is only when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under § 1983."[11] Each of Defendant Assessors, Defendant Kelley Defendant Willis, Defendant Lederman, Defendant Marblehead, Defendant Kezer, Defendant Silva, and Defendant Mead have failed on numerous occasions to train those persons who seek their advice and for which they are required to supervise and train in the basic tenets of customer service, common courtesy, honesty, integrity, the duty of a fiduciary, use of the internet, interactions with the press, and various other behaviors required of municipal employees for the purpose of establishing and maintaining trust with the very community members they support. On numerous occasions, Fr. Andrew (Bushell) has brought to the attention of municipal leadership the need for training of municipal employees, yet calls remain unanswered and requested meetings are declined. While not the subject of this Complaint, a local police officer, should be instructed it is inappropriate to refer to a bearded member of the local clergy as a "dirty Muslim," it should not be condoned that a municipal employee can parody the local clergy on the internet, nor should it be tolerated that a member of the Board of Selectman states in public the facts disclosed on a financial statement.

---

[11]     *City of Canton v. Harris,* 489 U.S. 378 (1989).

These are just a few of the many behaviors encountered by the Orthodox Catholic faithful related to actions of municipal employees in the Town of Marblehead. The *Canton* court found:

> The 'deliberate indifference' standard the court adopts for 42 U.S.C.S. § 1983 'failure to train' claims does not turn upon the degree of fault (if any) that a plaintiff must show to make out an underlying claim of a constitutional violation. . . . While claims alleging that a city's failure to provide training to municipal employees resulted in constitutional deprivation are cognizable under 42 U.S.C.S. § 1983, they can only yield liability against a municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants. *City of Canton v. Harris*, 489 U.S. 378, 380 (1989).

Examples of the behaviors at issue in *Canton* as the same relate to the Town of Marblehead are exemplified by the numerous exhibits attached hereto. Through discovery hereunder, Egypt House will fully show the pattern and practice of the Defendant Assessors, Defendant Kelley, Defendant Willis, Defendant Lederman, Defendant Marblehead, Defendant Kezer, and Defendant Mead in deflecting responsibility, tolerating discriminatory behavior, and inciting its employees to behave in a bigoted manner toward Egypt House.

<div align="center">

**Count IV:  Violation of 42 U.S.C.S. § 1983**
**Civil Action for Deprivation of Rights**
**Municipal Liability — *Monell***

</div>

35.    Plaintiff incorporates the allegations of paragraphs 1-34 of this Verified Complaint as if fully set forth herein. The actions and omissions of Defendant Assessors and Defendant Marblehead have resulted in "the deprivation of [any] rights, privileges, or immunities secured by the Constitution and laws of the United States. By continually refusing to acknowledge the legal right to the Statutory Exemptions accruing in favor of Egypt House, Defendant Assessors and Defendant Marblehead have made Defendant Assessors and Defendant Marblehead liable to Egypt House in violation of its First Amendment right to freely assemble to worship God in accordance with the religion and theology of the Orthodox Catholic faith. In *Monell v. Department of Social Servs.,* 436 U.S. 658 (1978), the Supreme Court recognized the

complicity of a municipal entity and its constituent board and departments in committing civil

rights violations. The *Monell* court held as follows:

> United States Supreme Court analysis of the legislative history of the Civil Rights
> Act of 1871, 17 Stat. 13, compels the conclusion that Congress did intend
> municipalities and other local government units to be included among those
> persons to whom 42 U.S.C.S. § 1983 (§ 1983) applies. Local governing bodies,
> therefore, can be sued directly under § 1983 for monetary, declaratory, or
> injunctive relief where the action that is alleged to be unconstitutional implements
> or executes a policy statement, ordinance, regulation, or decision officially
> adopted and promulgated by that body's officers. Moreover, although the
> touchstone of the § 1983 action against a government body is an allegation that
> official policy is responsible for a deprivation of rights protected by the
> Constitution, local governments, by the very terms of the statute, may be sued for
> constitutional deprivations visited pursuant to governmental custom *even though
> such a custom has not received formal approval through the body's official
> decisionmaking channels*. [Emphasis added.] *Monell v. Department of Social
> Servs.,* 436 U.S. 658 (1978).

The liability of Defendant Marblehead and Defendant Assessors in continually refusing to

recognize the deprivation of rights caused by the failure to grant the Statutory Exemptions

egregious and unbounded by the principles of integrity, honesty, and trustworthiness typically

demonstrated by responsible municipal governance.

### COUNT V:  Violation of 42 U.S.C.S. § 1985
### Conspiracy to Interfere with Civil Rights
### The First Amendment of the United States Constitution
### Freedom of Religion, Prior Restraint

36.    Plaintiff incorporates the allegations of paragraphs 1-35 of this Verified

Complaint as if fully set forth herein. The actions of Defendant Assessors, Defendant Kelley,

Defendant Willis, Defendant Lederman, Defendant Laramie, Defendant Bertolino, Defendant

Tumulty, Defendant Marblehead, Defendant Kezer, Defendant Silva, Defendant Mead,

Defendant Provencher, Defendant Costa and, solely in the capacity of Chairman, Defendant

DeFrancisco, manifestly evidence coordinated, conspiratorial activities resulting, and designed to

result, in the deprivation of rights, privileges, and immunities secured by the First Amendment

and at law in favor of Egypt House in accordance with the provisions of 42 U.S.C.S. § 1985,

which provides as follows:

> (3)    Depriving Persons of Rights or Privileges. If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice-President, or as a member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

The conspiracy participated in by the Defendants and others within the Town of Marblehead

objectively evidence the coordinated participation by Defendants in furthering the actionable

objectives described in 42 U.S.C.S. § 1985. Defendants seek to deny Egypt House recognition

under the Statutory Exemptions, while desecrating its sacred space and thereby damaging Egypt

House and the minority Orthodox Catholic religious practices of its faithful, all in an effort to

bully, intimidate, control, and subjugate the clergy and adherents of the Orthodox Catholic faith

in the Town of Marblehead.

### Count VI:  Violation of 42 U.S.C.S. § 1985
### The Fourteenth Amendment of the United States Constitution
### Due Process, State Actions Prohibited, Equal Protection

37.    Plaintiff incorporates the allegations of paragraphs 1-36 of this Verified

Complaint as if fully set forth herein. The actions of each of the Defendants, including Defendant

DeFrancisco solely limited to his role as Chairman, evidenced by and through (a) the imposition and collection of real estate tax on an exempt property by Defendant Marblehead in direct opposition to the exempt status enjoyed by all other religious organizations in the Town of Marblehead, inclusive of the structures and uses ancillary to each of them, and (b) the performance of a site-inspection arising at law without narrowly tailoring the guidelines relative to such inspection, given that the inspection site is a church, in each case, rises to the level of a state action by Defendant Marblehead and a direct violation of the privilege of equal protection, in each case, as each of such principles are enshrined under the Fourteenth Amendment of the United States Constitution.  U. S. CONST. amend. XIV. Congregationalist, Methodist, Roman Catholic, and Baptist churches in the Town of Marblehead obtain revenues from other enterprises without an allocation of tax exemptions between profit and non-profit uses. The Defendant Assessors refuse to assess all but Orthodox Churches. Egypt House and the Orthodox Catholic faith are simply not recognized by any aspect of the Town of Marblehead in contravention of the First Amendment and well-settled case law construing its contours.

### Count VII:  Violation of 42 U.S.C.S. § 1986
### Action for Neglect to Prevent Conspiracy

38.     Plaintiff incorporates the allegations of paragraphs 1-37 of this Verified Complaint as if fully set forth herein. The actions and omissions of Defendants Kezer, Silva, Kelley, Bertolino, Tumulty, Mead, Costa, and Provencher in refraining from prohibiting the defamatory, malicious, and destructive actions of the Defendant Assessors and Defendant Marblehead against Egypt House, Fr. Andrew (Bushell), and the adherents to the Orthodox Catholic faith in the Town of Marblehead have given the Defendant Assessors and others within Town of Marblehead governance license to persecute the faithful. Defendant Kezer consistently refused to liaise with Fr. Andrew offering to resolve this matter through discussion. These calls

were never returned. With respect to Defendants Mead, Costa, and Provencher, they are called to

a higher ethical standard as licensed attorneys before the Bar of The Commonwealth of

Massachusetts.

### Count VIII:  Violation of G.L. c. 12, § 11I
### Impairment of Civil Rights; Private Remedy

39.    Plaintiff incorporates the allegations of paragraphs 1-38 of this Verified

Complaint as if fully set forth herein. The actions and omissions of each of the Defendants under

color of law have interfered and continue to interfere, through threats, intimidation, and coercion,

with the exercise and enjoyment of rights accruing in favor of Egypt House, as secured by the

Constitution or laws of the United States and of rights secured by the Constitution or laws of The

Commonwealth of Massachusetts. In *Planned Parenthood League v. Blake,* 417 Mass. 467, 468

(1994), the Supreme Judicial Court defined the qualities inherent in the three (3) acts necessary

to sustain a claim arising under G.L. c. 12, § 11I, as follows:

> 'Threat' involves the intentional exertion of pressure to make another fearful or
> apprehensive of injury or harm. 'Intimidation' involves putting in fear for the
> purpose of compelling or deterring conduct. 'Coercion' is defined as the
> application to another of such force, either physical or moral, as to constrain him
> to do against his will something he would not otherwise have done.

The actions of the Defendant Assessors, Defendant Provencher, and Defendant DeFrancisco in

forcing Egypt House to allow the subject G.L. c. 58A, § 8A inspection to proceed upon the terms

mandated by the January 7th Order are designed to threaten, intimidate, and coerce Egypt House

to bend to the will of the state in an arbitrary exercise of its power, without any consideration for

the Constitutional prohibitions required to be considered. In addition to the foregoing, the actions

of Defendant DeFrancisco in (a) denying a hearing on the Motion for Summary Judgment put

forward by Egypt House; (b) ruling on the Motion for Summary Judgment outside of the

regulatory requirements therefor; and (c) joining the Fiscal Year 2024 Appeal and the pending

appeal under Docket No. F-351239 and denying the Motion to Sever of appellants greatly

disadvantage the Docket No.: F-351239 plaintiff, all in an attempt to coerce, intimidate, and

threaten Egypt House and St. Nicholas is clearly in violation of the civil rights of each of them.

<div align="center">

**JURY DEMAND**

</div>

40.    Plaintiff Egypt House hereby demands a jury.

<div align="center">

**REQUEST FOR RELIEF**

</div>

Executive Order issued on February 6, 2024, under Executive Order No.: 14202

evidences the need for protection of Christianity in our country. A copy of Executive Order No.:

14202 is attached hereto as Exhibit R.

WHEREFORE, Plaintiff respectfully prays for the following relief:

As to all Defendants, except Defendant DeFrancisco in his official capacity relative to

actions arising under 42 U.S.C.S. §§ 1983, 1985, and 1986, for compensatory damages,

including general and special damages, according to proof;

As to all Defendants, except Defendant DeFrancisco in his official capacity, for punitive

damages pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, and any other applicable laws or

statutes in an amount sufficient to deter and make an example of each Defendant;

As to all Defendants, except Defendant DeFrancisco in his official capacity relative to

actions arising under 42 U.S.C.S. §§ 1983, 1985, and 1986, prejudgment interest, according to

proof;

Except as to Defendant DeFrancisco in his official capacity relative to actions arising

under 42 U.S.C.S. §§ 1983, 1985, and 1986, for reasonable attorney's fees pursuant to 42 U.S.C.

§ 1983, 42 U.S.C. § 1985, 42 U.S.C.S. § 1988, and all other applicable laws and statutes;

Order equal application of the laws under the Fourteenth Amendment relative to real

property tax exemptions of religious organizations in the Town of Marblehead, to include the

appointment of a special master to review all religious and non-profit real property tax

exemptions in the Town of Marblehead for completeness, accuracy, and legality;

For costs of suit; and

For such further relief this Court deems just and proper.

DATED:  March 12, 2025               /s/Tracey M.A. Stockton
                                     Tracey M.A. Stockton (MA Bar No.: 568495)
                                     Admitted before the United States District Court,
                                     Massachusetts District

                                     *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify a copy of the above Verified Complaint was mailed and delivered electronically on March ___, 2025, to the following parties:

John P. Kelley
Chairman of the Board of Assessors
Mary Alley Building
7 Widger Road
Marblehead, Massachusetts 01945

John P. Kelley
22 Merritt Street
Marblehead, Massachusetts 01945

William P. Willis
Board of Assessors
Mary Alley Building
7 Widger Road
Marblehead, Massachusetts 01945

William P. Willis
25 Spray Avenue
Marblehead, Massachusetts 01945

Jonathan Lederman
Board of Assessors
Mary Alley Building
7 Widger Road
Marblehead, Massachusetts 01945

Jonathan Lederman
8 Ida Road
Marblehead, Massachusetts 01945

Todd Laramie
Board of Assessors
Mary Alley Building
7 Widger Road
Marblehead, Massachusetts 01945

Todd Laramie
26 Summer Street, Apt. No.: 4
Marblehead, Massachusetts 01945

Karen Bertolino
Board of Assessors
Mary Alley Building
7 Widger Road
Marblehead, Massachusetts 01945.

Karen Bertolino
35 Mansfield Road
Lynnfield, Massachusetts 01940

Michael Tumulty
Board of Assessors
Mary Alley Building
7 Widger Road
Marblehead, Massachusetts 01945

Michael Tumulty
Town of Marblehead
Abbott Hall
188 Washington Street
Marblehead, Massachusetts 01945

Michael Tumulty
Residence Address TBD

Douglas E. Percy
Board of Assessors
Mary Alley Building
7 Widger Road
Marblehead, Massachusetts 01945

Douglas E. Percy
12 Upland Road
Marblehead, Massachusetts 01945

Board of Assessors
Town of Marblehead
Abbott Hall
188 Washington Street
Marblehead, Massachusetts 01945

Town of Marblehead
Abbott Hall
188 Washington Street
Marblehead, Massachusetts 01945

Thatcher W. Kezer, III
Town Administrator
Abbott Hall
188 Washington Street,
Marblehead, Massachusetts 01945

Thatcher W. Kezer, III
92 Monroe Street
Amesbury, Massachusetts 01913

Lisa L. Mead
Mead, Talerman & Costa, LLC
30 Green Street
Newburyport, Massachusetts 01950

Lisa L. Mead
13 Purchase Street
Newburyport, Massachusetts 01950

Adam J. Costa
Mead, Talerman & Costa, LLC
30 Green Street
Newburyport, Massachusetts 01950

Adam J. Costa
4 Pond Edge Lane
Ipswich, Massachusetts 01938

Matthew D. Provencher
Mead, Talerman & Costa, LLC
227 Union Street, No.:  610
New Bedford, Massachusetts 02740

Matthew D. Provencher
1136 Chaffee Street
New Bedford, Massachusetts 02745

Mark J. DeFrancisco
Chairman
Appellate Tax Board
100 Cambridge Street, Suite No.: 200
Boston, Massachusetts 02114

Mark J. DeFrancisco
Residence Address TBD

/s/Tracey M.A. Stockton

Certificate of Service - Page 3 of 3

EXHIBIT A

*See,* attached.





## Re: Rose Garden Carvings for St Nicholas

| | |
|---|---|
| From | Ewan Craig <ewancraig@hotmail.co.uk> |
| To | Fr. Andrew Bushell (St. Paul's)<ab@stpaulsfoundation.org> |
| Date | Tuesday, September 10th, 2024 at 1:59 PM |

Dear Fr Andrew,

It was wonderful to meet you today and to chat things over. I greatly look forward to how this all may unfold and to be a part of creating something beautiful for St.Nicholas. Thank you again for your time and for the beer! It is greatly appreciated.

Please find attached two recent carvings that show the level of refinement in stones which allow it. The Theotokos is carved in alabaster and the Pensive Christ is finished in slate, to show the quality of a darker stone.

Do keep in touch and we can slowly fathom how best to approach the High Cross.

In Christ,

Ewan

---

**From:** Fr. Andrew (Bushell) <ab@stpaulsfoundation.org>
**Sent:** 10 September 2024 11:25
**To:** Ewan Craig <ewancraig@hotmail.co.uk>
**Subject:** Re: Rose Garden Carvings for St Nicholas

The Windsor Castle opens at Noon, Ewan. I'll meet you there then.  I'm looking forward to meeting you.

With great love in Christ,

Fr. Andrew

On Mon, Sep 9, 2024 at 7:43 PM, Ewan Craig <ewancraig@hotmail.co.uk> wrote:
> Let us hope, I look forward to meeting tomorrow Fr Andrew!
>
> ---
>
> **From:** Fr. Andrew (Bushell) <ab@stpaulsfoundation.org>

**Sent:** 09 September 2024 18:53
**To:** Ewan Craig <ewancraig@hotmail.co.uk>
**Subject:** Re: Rose Garden Carvings for St Nicholas

That sounds great. I'll make sure that they have the cask bitter on tap. Some of the pubs have been out.


On Mon, Sep 9, 2024 at 6:31 PM, Ewan Craig <ewancraig@hotmail.co.uk> wrote:
How does 11:45am at the Windsor Castle sound? Serving Sam Smith!


**The Windsor Castle**

23 Francis St,
London
SW1P 1DN

The address, around a 12 minute walk from Parliament


---

**From:** Fr. Andrew (Bushell) <ab@stpaulsfoundation.org>
**Sent:** 09 September 2024 18:04
**To:** Ewan Craig <ewancraig@hotmail.co.uk>
**Subject:** Re: Rose Garden Carvings for St Nicholas

I've been going meeting to meeting and haven't had time to research. I'm in Westminster by Parliament if you want to look it up.


On Mon, Sep 9, 2024 at 5:56 PM, Ewan Craig <ewancraig@hotmail.co.uk> wrote:
Any thoughts on location?

---

**From:** Fr. Andrew (Bushell) <ab@stpaulsfoundation.org>
**Sent:** 09 September 2024 14:35
**To:** Ewan Craig <ewancraig@hotmail.co.uk>
**Subject:** Re: Rose Garden Carvings for St Nicholas

Excellent. Let me take a look and revert.

On Mon, Sep 9, 2024 at 12:23 PM, Ewan Craig <ewancraig@hotmail.co.uk> wrote:

Dear Fr Andrew,

Fantastic! How about a Sam Smith pub near you? Let me know the location and I'll be able to work out how long it will take to get there from Paddington.

Kindest,

Ewan

---

**From:** Fr. Andrew (Bushell) <ab@stpaulsfoundation.org>
**Sent:** 09 September 2024 09:14
**To:** Ewan Craig <ewancraig@hotmail.co.uk>
**Subject:** Re: Rose Garden Carvings for St Nicholas

Dear Ewan,

Excellent. We can meet at my hotel or a pub. It's your choice. If it's a pub I'd suggest one of the Sam Smith pubs since they are more well suited.

With great love in Christ,

Fr. Andrew

On Mon, Sep 9, 2024 at 8:39 AM, Ewan Craig <ewancraig@hotmail.co.uk> wrote:

Hi Fr Andrew,

I can get into London Paddington tomorrow for 11AM. Do let me know where you would like to meet.

Thank you

Kindest,

Ewan

---

**From:** Fr. Andrew (Bushell) <ab@stpaulsfoundation.org>

**Sent:** 08 September 2024 17:40
**To:** Ewan Craig <ewancraig@hotmail.co.uk>
**Subject:** Re: Rose Garden Carvings for St Nicholas

Ewan,

Thank you for your note.

I'm very sorry if I have created confusion. Unfortunately, I cannot come to Oxford as I have no meetings in Oxford, I tried but they all ended up in London, but I can meet you in London on Monday afternoon or Tuesday morning if that's better for you.

Thank you.

With great love in Christ,

Fr. Andrew

On Sun, Sep 8, 2024 at 5:04 PM, Ewan Craig <ewancraig@hotmail.co.uk> wrote:

> Dear Fr Andrew,
>
> A Tuesday visit to Oxford would be great, if that works for you? I am unable to bring the Trinity with me, but I can bring another piece to give an idea.
>
> Kindest,
>
> Ewan
>
> ────────────────────────────────
>
> **From:** Fr. Andrew (Bushell) <ab@stpaulsfoundation.org>
> **Sent:** 08 September 2024 12:19
> **To:** Ewan Craig <ewancraig@hotmail.co.uk>
> **Subject:** Re: Rose Garden Carvings for St Nicholas
>
> Dear Ewan,
>
> Happy Sunday.
>
> Sadly, it seems I am in Westminster tomorrow, as I would have rathered Oxford.  But I am not in control of these things.  I can meet you in the afternoon anytime after 2 PM if you wish or we can visit on Tuesday if that's easier for you.  If you want to bring your holy trinity carving so we can discuss differences and depths, etc. That would be an idea.

I do not have a budget number in mind.  Budget is a function of the work. Once we get a better understanding of scope cost will follow as a natural consequence.

With great love in Christ,

Fr. Andrew


On Sun, Sep 8, 2024 at 11:48 AM, Ewan Craig <ewancraig@hotmail.co.uk> wrote:

Dear Fr. Andrew,

I am looking forward to meet you tomorrow. If you are still planning to be in Oxford that would be the preferable option for me, I can come in the morning and meet you when may suit. But do keep in touch with your plans. My number is 07447454597  if it is easier for you to contact me via phone.

In regards to your previous email, it would be good to know the budget you have, and I'm sure we shall be able to negotiate a price that shall work well for the both of us. A brief thought on the cost of composing and completing a relief carving this size would be around the £8,000-£10,000 range, and this is depending on the complexity of design. I expect something of this size to take around 4 months per slab. I think if we were to treat the fixing of these slabs akin to a large gravestone we should be in the clear stability wise, also the thicker the slab allows for a deeper carving, which would have more shadow and thus more clarity.

Kindest,

Ewan

---

**From:** Fr. Andrew (Bushell) <ab@stpaulsfoundation.org>
**Sent:** 05 September 2024 19:10
**To:** Ewan Craig <ewancraig@hotmail.co.uk>
**Subject:** Re: Rose Garden Carvings for St Nicholas

Let's also think about the cost of the two local icons for either side of the altar. You have the photos of the egg tempera ones we have. Imagine they are life size standing: Christ the Philanthropist and Our Lady of the Way. So it would be 3 feet wide and six feet high from grade but the slab would be perhaps four feet below grade. My concern is they not crack and fall over. I don't know the recommended thickness of slab. Would it be 6 inches?

Remember, the stone might be dark but we'll gild the halos.

On Thu, Sep 5, 2024 at 11:33 AM, Ewan Craig <ewancraig@hotmail.co.uk> wrote:

Oxford or London I can make it to on Monday.

Yes this is for definite. And that is great to know.

Limestones are still sturdy and do have great strength, yet marble is slightly more. I suppose it will come down to your preference.

In Christ,

Ewan

---

**From:** Fr. Andrew (Bushell) <ab@stpaulsfoundation.org>
**Sent:** 05 September 2024 16:17
**To:** Ewan Craig <ewancraig@hotmail.co.uk>
**Subject:** Re: Rose Garden Carvings for St Nicholas

Ewan,

I don't yet have a hotel.  They are things best done at the last minute and I might start the day in Oxford.  But I'll let you know.

There is no doubt you'll have to be here to carve it -- as you would have to do for the local icons for the outdoor altar.  The good news is we have a guesthouse where you can stay.

Limestone is possible, but it's soft.  Wouldn't marble be better as its harder?  It can also be a lighter green shade.  There are all sorts of shades.  These crosses are mostly only about 1,200 years old at the oldest and they're already too worn to make out.

With great love in Christ,

Father Andrew

_____

Father Andrew Bushell
Protos (Executive Chairman)
St. Paul's Foundation

Shrine of St. Nicholas
120-124 Pleasant Street
Marblehead, MA 01945
(Please Note: St. Nicholas is still under construction.  Services are being held in the chapel at Egypt House, after the Holy Family's Flight to Egypt, at 12 Conant Rd. in the meanwhile)

On Thursday, September 5th, 2024 at 11:08 AM, Ewan Craig
<ewancraig@hotmail.co.uk> wrote:

> Dear Fr Andrew,
>
> Monday afternoon in London works for me. Whereabouts will you be located?
>
> The High Cross to start, good to know. I think the first important step is figuring out the size and the composition of the cross, this would give a good idea of surface space, thus allowing a gauge of how to compose the imagery and how much carving is required. This would also help gauge the cost for the work needed in drawing and carving, going from the list, this would be many months of work.
>
> Working with a stone as large as 10ft-25ft I think it would be best to get the silhouette/shape of the cross cut by a masonry yard and then I could come and carve the scenes and details on site. It would be a very hefty piece of stone to move multiple times.
>
> I think for exterior carvings to be seen from a distance requires simplicity and boldness, particularly with a darker stone. If limestone is a possibility, there would be greater clarity due to its light shade.
>
> I look forward to discussing all this in greater detail in person,
>
> In Christ,
>
> Ewan
>
> _____
>
> **From:** Fr. Andrew (Bushell) <ab@stpaulsfoundation.org>
> **Sent:** 05 September 2024 14:25
> **To:** Ewan Craig <ewancraig@hotmail.co.uk>
> **Subject:** Re: Rose Garden Carvings for St Nicholas

Dear Ewan,

I can see you in the later afternoon on Monday in London if that suits you.  I had not seen any of these crosses, but I have looked them up since.  Most are made from sandstone.

The Muiredach High Cross is the best preserved.  I actually wonder if the circle is a support for the transverse part of the cross and then got "theologized" into a nimbus.

The idea of stelae in the roses is nice, but I think that if we're going to do something, if we're going to start, then we have to start with a stone High Cross.  Our High Cross in Marblehead will tell the story of the founding of St. Nicholas through the interventions of the saints, not the personal story, for example, I won't figure in it, but the story of how God works for His Glory.  So on one side we'll have the story of God's people leading up to the Crucifixion and on the other side we'll have the Resurrection or Christ in Glory and the Evangelisation of the apostles and saints and their miracles.  We'll pick scenes relevant to the life of St. Nicholas, the Forty Martyrs of Sebaste, the North American saints, the Kollyvades Fathers and the struggles to establish our little plot of Orthodoxy here.  I'll come up with the list of scenes and send you an email.

The size of the cross will be a function of the number of scenes to tell the story and how large the figures have to be in order to be intelligible to someone looking at it from a distance of about 5-10 feet I should think.  Farther than that they'll know it's a carved cross.  I don't know if this means it will be 10 feet high or twenty-five feet high, but somewhere in there I would imagine is the correct size.

In terms of the stone, most (all?) of the crosses in Great Britain and Ireland are sandstone, we can get sandstone and limestone all over America, but granite and serpentinite (verde antique) are the typical stones around here in New England.  My preference would be for serpentinite.  It's hard enough to withstand the elements over the centuries and green is a traditional color for St. Nicholas, monasticism and repentance.  Plus you get some nice veining which can add visual interest.

This is all I have time for today.  I'll try to work on this on the plane and send something else tomorrow.

With great love in Christ,

Father Andrew


_____

Father Andrew Bushell

Protos (Executive Chairman)
St. Paul's Foundation
Shrine of St. Nicholas
120-124 Pleasant Street
Marblehead, MA 01945
(Please Note: St. Nicholas is still under construction.  Services are being held in the chapel at Egypt House, after the Holy Family's Flight to Egypt, at 12 Conant Rd. in the meanwhile)

On Tuesday, September 3rd, 2024 at 3:06 AM, Ewan Craig <ewancraig@hotmail.co.uk> wrote:

Dear Fr Andrew,

Thank you for your quick response and thorough email. Unfortunately I won't be able to make this Friday as I have prior arrangements, I would be able to do any other day onwards from Friday if that works for you?

I am very fond of these ideas, I particularly think the Stelae settled amongst the roses would be visually awesome, the term used in the correct manor! One gift of stone allows the art to merge with the nature it is surrounded by.

I have come across Dr. George Kordis' work before and have greatly admired his delicacy of line work and subtlety of colour. I do hope that the carvings would sit harmoniously alongside these wonderful icons.

I admire the strength by the grace of God that has been granted to you all over in Marblehead to endure these troubles of state officials. I do think I understand your thoughts on the gentle love of Christ. One thing which I have heard people say about my work is the serenity of it, so this does sound like a good fit.

It is good to know the plans, this does indeed sound like years worth of commitment, which I would gladly accept, I would be the first to support the raising of such stone works! I suppose the key thing is to know which works will come first, and establishing a clear, numbered list of the work to be done. This way I will be able to give you a good gauge of costs and amount of work that is needed from my behalf, including time spent on drawing, carving and costs of material. It would be good also to see which ones would be best completed here in the UK and for the larger ones across the pond. Lugging giant bits of stone is certainly

no easy feat.

The first steps once establishing costs and detailed plans of the works, is the drawing stage. I suppose we could come to discuss this over a coffee and some lunch.

In Christ,

Ewan

P.S. Have you ever come across Saxon standing crosses? Examples such as the Ruthwell Cross, the Sandbach Crosses, Bewcastle Cross, Easby Cross, Muiredach Cross. They are truly remarkable, and from a time when the West would have been more in keeping with Orthodox tradition. These are wonderful examples of a carved standing Cross that can be seen from all angles.

---

**From:** Fr. Andrew (Bushell) <ab@stpaulsfoundation.org>
**Sent:** 02 September 2024 20:50
**To:** Ewan Craig <ewancraig@hotmail.co.uk>
**Subject:** Re: Rose Garden Carvings for St Nicholas

Dear Ewan,

Thank you for your message.  I think this Friday would be the best day if you can make it up to London.  I arrive very early morning and we can have a good chat and then perhaps have lunch and then you can give it a think and if you have some concepts you want to sketch out we might have time to revisit in person before I depart on Wednesday next.  I will get an early check in at an hotel -- I just don't yet know where I'll be -- my schedule is still a little fluid.

I don't know if Mr. Kingsnorth as forwarded the documents I sent because I haven't heard from him.  So I am attaching two of them here as PDFs for your review.  Some of them appear to be similar but you'll get the layout possibilities for the garden from the seating charts in the "Alteration of Licenses Premises" files.  From the other you'll see how the pieces fit together -- iconography, scale drawings of the furnishings (everything in the drawings is to size), and even the fixtures.  Plus you'll see the altar furniture which I have designed.  You also see from the drawings that we'll be serving beer and food in the garden after services and allow people to rest there.

Also attached are several very quick snaps of some of our icons all by Dr. George Kordis.  Dr. Kordis will also be our illustrator for the websites.  You can see more

of his work on kordis.gr.  It is at the same time both deeply traditional and modern.

There are different aspects which are possible.

1) We will have one large fireplace in the first building in the refectory, and two large and one small fireplace in common areas of the second building. We'll install stone mantels.  So this may be an opportunity;

2) Currently the baptistry is ground level, but eventually we will create an enclosure, this is years in the future;

3) We will have outdoor services in the garden, eventually we'll want a permanent stone altar and at least the two local icons rising out of the earth in front of it -- I think of these icons as stelae -- whatever thickness is appropriate to protect them, but rising out of the grass cleanly without additional support although of course they'll be a third underground typically as above ground -- maybe six feet above and three or four feet below -- the eyes of the local icons must be eye level with the priest;

4) there are opportunities for saints in the garden borders, stelae rising out of the roses if you will,

5) a High Cross -- this might even be the first thing after the fireplace mantels if we decide to do something with them as it's a sort of stand alone project -- but it also seems like the most ambitious as it would be a massive piece of stone with many figures deeply carved -- but boy, a High Cross featuring not only Christ both in Glory as the True Vine connected with Our Lady (Tree of Jesse), the Apostles and then the saints of North America would really be something (one of my goals is to mainstream Orthodox Christianity, I like to call it Orthodox Catholicism which is more correct, here in America -- which is why the altar furniture is simple and made of cherry and the icons' titles are in English, etc.) or perhaps Christ as the Good Shepherd uniting all of the different flocks would be another option.  We would also need to think about placement.  Perhaps behind the altar is not a great place since no one would see the back of the cross.  Perhaps it should be in the middle of the garden or at the entrance and somehow related to the Holy Water font (which is another possible item....).

Finally, as you will see from the timeline in the end of one of the PDFs there has been steady resistance to establishing St. Nicholas' shrine.  At one point, spurred on by false derogatory information from Town officials, the FBI raided the monastic houses with rifles and body armor and a now disgraced former US Attorney defamed me and our general counsel to the press before realizing that they didn't have what they thought they had.  I don't think it's wrong to call it demonic.  Their slanders were baseless.  And as we just saw last week, the Town of Marblehead's Select Board gave us our final approvals for St. Nicholas that they had been preventing us from receiving for years.  We treated them with great love, but they could not look us in the eyes.

We are past this opposition; nevertheless, this has two knock on consequences for the stonework here.

First, this job, whether with stone mantels, or icons, or an altar, will be to try to share the gentle love of Christ.  Love does not fight.  It does not insist.  It both caresses while it conveys equanimity and imperturbability.  The saints are immovable.  Evil is defeated with a gentle touch and a kiss of peace.  It whispers, it does not insist.  Does this make sense?

Second, as with any commission, we have to understand costs and cost drivers.  One of the consequences of this seven year opposition is we have to plan with money otherwise we would not have survived.  We have enough to accomplish what we need to do and perhaps one or two grace notes but I will be fundraising for this.  This implies two further things.  First, this is a marathon, not a sprint, so together we have to understand how to approach the costs and how to think about this as a cohesive whole rather than a series of one offs.  It will take years to get everything done and the construction will be part of the rhythm.  Also, to take the iconostasis as just one example, an icon carved on a three by nine foot piece of stone which might be five inches thick (and there would be two of these at minimum) is a very different thing than a small stone icon, you'd either have to carve it here or we'd have to crate and ship it.  So there are logistics.  The good news is that we have a very comfortable guesthouse, Egypt House, which you could stay at and work out of if you were here.  Dr. Kordis does this with the larger icons.  It's also probably not a terrible idea to see where these things will be installed.  Second, you'll have to produce some concept drawings for me to share with our friends who will be paying for these things.

There are other considerations, but I think that this is a good start.  If this does not terrify you, does Friday morning work for you?

With great love in Christ,

Father Andrew


_____

Father Andrew Bushell
Protos (Executive Chairman)
St. Paul's Foundation
Shrine of St. Nicholas
120-124 Pleasant Street
Marblehead, MA 01945
(Please Note: St. Nicholas is still under construction.  Services are being held in the chapel at Egypt House, after the Holy Family's Flight to Egypt, at 12 Conant

Rd. in the meanwhile)

On Monday, September 2nd, 2024 at 9:43 AM, Ewan Craig
<ewancraig@hotmail.co.uk> wrote:

> Dear Fr Andrew,
>
> I have just received an email from Paul regarding this very exciting
> Rose Garden development. I have no idea why I didn't get your
> email from the website, for some reason it hasn't come through. I
> would of replied in heartbeat to it, given the nature of the
> commission.
>
> I am keen to hear more about what you may have in mind, I would
> love to discuss this further. I see you are coming to the UK soon,
> would you like to arrange to meet? I am currently based in Bath. But
> can be flexible in travel.
>
> I look forward to hearing from you,
>
> In Christ,
>
> Ewan

**6.44 MB**   2 files attached

IMG_89112.jpg 4.72 MB     IMG_8897.jpg 1.72 MB

EXHIBIT B

*See,* attached.

# EGYPT HOUSE

5 July 2022

<u>Via Certified Mail</u>
Ms. Karen D. Bertolino, M.A.A.
Town Assessor
Town of Marblehead
Mary Alley Building
7 Widger Road
Marblehead, Massachusetts  01945

Re:     Egypt House, 12 Conant Road, Marblehead, Massachusetts

Dear Ms. Bertolino:

On June 30, 2022, the referenced improved real property was conveyed to Egypt House, a District of Columbia religious non-profit corporation.  Pursuant to the conveyance, please note the following:

<u>Fiscal Year 2022</u>

1.     enclosed is our Money Order in the amount of $21.24, evidencing payment of tax assessed against the subject property relative to June 30, 2022; and

2.     enclosed is State Form 128, Application for Real Property Tax Abatement, in re: Fiscal Year 2022, with respect to assessment of any real property tax relative to June 30, 2022.

<u>Fiscal Year 2023</u>

3.     please direct your invoice for fiscal year 2023 real property taxes, as follows:

> Egypt House
> Post Office Box  Two
> Marblehead, Massachusetts  01945
> Attn.:  Tracey M.A. Stockton

4.     enclosed are the following documents and instruments:

a.  State Form 128, Application for Real Property Tax Abatement, in re Fiscal Year 2023;

b.  copy of file-marked Quitclaim Deed;

c.  copy of file-marked Articles of Incorporation of Domestic Nonprofit Corporation of Egypt House;

d.  copy of Certificate of Good Standing issued by the District of Columbia;

e.  copy of Certificate of Subordination;

Ms. Karen D. Bertolino, M.A.A.
July 5, 2022
Page 2 of 2

    f.  copy of Group Ruling issued by the Internal Revenue Service; and

    g.  guidance provided by the Commonwealth of Massachusetts Department of Revenue relating to exemptions for Churches.

Thank you.

             Sincerely,

             EGYPT HOUSE

             Tracey M.A. Stockton
             General Counsel

Enclosures

cc:    John P. Kelly, Chair, Board of Assessors, w/o Enclosures
       Douglas E. Percy, Member, Board of Assessors, w/o Enclosures
       William J. Willis, Member, Board of Assessors, w/o Enclosures

EXHIBIT C

*See,* attached.



**BOARD OF ASSESSORS**
**Town of Marblehead**
7 Widger Road
Marblehead, MA 01945



Spirit of '76

John P. Kelley, Chairman
William J. Willis, Jr., Secretary
Douglas E. Percy, Board Member
Karen D. Bertolino, M.A.A., Asst. Assessor

September 6, 2022

Ms. Tracey Stockton, General Counsel
St. Paul's Foundation
c/o 22 Endicott Avenue
Marblehead, MA 01945

**RE:    Egypt House – 12 Conant Road**
**Follow up to abatement applications for FY2022 & FY2023**

Dear Ms. Stockton,

The Board of Assessors is in receipt of the abatement applications for Fiscal Years 2022 and 2023 for the address listed above. After a review of the information provided here is the status of each:

1. Fiscal Year 2022-
   The postal money order in the amount of $21.24 is being returned to you. The fourth quarter tax was paid in full prior to the execution of the quitclaim deed. This should have been addressed by the closing attorneys.

2. Fiscal Year 2023 –
   The abatement application states that Egypt House is seeking exemption as a religious non-profit corporation under M.G.L. c. 59, sect. 5, Clauses 10 & 11.

   Please detail what the property will be used for as well as a list of activities to be held there. Unfortunately the Articles of Incorporation does not provide any clarity.

Please respond on or before September 16, 2022. Feel free to contact me directly with any questions you may have.

Sincerely,

Karen D. Bertolino, M.A.A.
Town Assessor

CC: Board of Assessors

P: 781. 631. 0236  /  F: 781. 631. 2617

EXHIBIT D

*See,* attached.

Thursday, 22 September, 2022

Via Hand Delivery and Electronic Mail
Ms. Karen D. Bertolino
Town Assessor
Town of Marblehead
7 Widger Road
Marblehead, Massachusetts  01945

RE:    Egypt House, 12 Conant Road, Marblehead, Massachusetts
       Fiscal Years 2022 and 2023 Request for Abatement
       Request for Additional Information

Dear Ms. Bertolino:

Thank you for your letter of 6 September 2022 acknowledging receipt of abatement applications for each of fiscal years 2022 and 2023 regarding the referenced property, each of which were dated 5 July 2022.

### Fiscal Year 2022

Given that the fourth quarter tax was paid in full, we are requesting an abatement and refund of real estate taxes since 1 July 2022.  This request is consonant with past practices of the Marblehead Board of Assessors, *e.g.,* relative to the YMCA property located at 30 Leggs Hill Road as well as the purchase of a two-family residence at 18 Pleasant Street, Marblehead, in trust for St. Michael's church, among other actions of forbearance by the Town in favor of its houses of worship.

### Fiscal Year 2023

Egypt House is entitled to an exemption as a religious non-profit corporation under M.G.L. ch. 59, Section 5, Clauses 10th and 11th, as a matter of law.

Your correspondence states, "[u]nfortunately the Articles of Incorporation does [sic] not provide any clarity;" however, Section 6(a), to the file-marked attachment to the Articles of Incorporation states: "Egypt House is a Religious Corporation within the meaning of Section 29-401.02(32) of the Non-Profit Corporation Act of 2010," and, at Section 6(f), the attachment states, "the assets of the corporation are held and administered to by the Office of the Protos of St. Paul's Foundation."  Your department is familiar with the activities of the Office of the Protos of St. Paul's Foundation since the Office of the Protos of St. Paul's Foundation administers two other properties in Marblehead:  the Shrine of St. Nicholas the Wonderworker located at 120-124 Pleasant Street and Emmaus House located at 22 Endicott Avenue.  Both organizations currently receive exemption as religious non-profit corporations under M.G.L. ch. 59, Section 5, Clauses 10th and 11th, as a matter of law. Each house of worship in Marblehead is exempted from the payment of real property tax by virtue of these statutory exemptions; our properties are no different. Egypt House, named after the Holy Family's Flight to Egypt, shares a 90'

Ms. Karen D. Bertolino
Town Assessor
September 22, 2022
Page Two

border contiguous to Emmaus House at 22 Endicott Avenue. The contiguity of the properties is beneficial to our ministry. We note each of St. Michael's (4 properties), Old North Church (3 properties), and Our Lady Queen of the Sea (3 properties) house their ministries in a similar fashion.

Your office further requested detail as to what the property will be used for, *as well as a list of activities to be held there.*" Since her purchase, Egypt House has been, and will continue to be, used for small group religious services, bible studies, religious retreats, and gatherings to support the fundamentally evangelical, religious, and educational work of St. Paul's Foundation. It will also be used as housing for seminarians, visiting clergy, couples participating in marriage retreats preparatory to marriage in the Orthodox Church, and those specialized ministers involved in the consecration and building of the Shrine of St. Nicholas the Wonderworker. For example, Dr. George Kordis, a world renowned iconographer, will be in residence writing the Holy Icons for our chapels. Orthodox believe the creation of a Holy Icon, which is "written", rather than "painted", because the work is a product of the Holy Spirit, is itself a religious service that must be performed in a consecrated space. Egypt House has been accordingly consecrated.

We hereby take special notice, in addition to the actions of the Town of Marblehead Board of Assessors in recognizing pro-rated abatements for the YMCA and St. Michael's properties, it has declined to request pro-rated real estate taxes from Grace Community Church's unaffiliated Pleasant Street School, St. Andrew's Nursery Coop, as well as those churches and synagogues in Marblehead which have installed cell phone masts inside their structures, among no less than 30 other similarly situated properties in Marblehead. While a request for more information relative to the religious use of Egypt House may appear reasonable on its face, we find it troubling, given our experiences with the Office of the Assessor, in particular, and the Town of Marblehead, generally.

We respectfully request (a) your office confirm the exemption from real property taxes as a religious non-profit corporation under M.G.L. ch. 59, Section 5, Clauses 10 and 11, as to Egypt House, and (b) return of fourth quarter real estate taxes pursuant to issuance of the abatement requested, in keeping with past practice relative to house of worship abatements in Marblehead. Please do not hesitate to contact me via email at ts@stpaulsfoundation.org or telephone at (617) 800-3979, should you have any questions.

Sincerely,

EGYPT HOUSE

Tracey M. A. Stockton, Esq.
General Counsel

cc:     Via Electronic Mail
        Rev. Andrew Bushell, Protos of St. Paul's Foundation
        Theane Evangelis, Esq., Gibson, Dunn & Crutcher, LLP
        James P. Hoban, Esq., Mirick, O'Connell, DeMallie & Lougee, LLP
        Thatcher W. Kezer, III, Town Administrator, Town of Marblehead
        Kevin P. Martin, Esq., Goodwin Procter LLP
        Rabbi David Meyer, Convener, Marblehead Ministerial Association

EXHIBIT E

*See,* attached.

| | |
|---|---|
| **From :** | Victoria Kelley <jandtkelley@hotmail.com> |
| **To :** | Karen Bertolino <bertolinok@marblehead.org> |
| **Subject :** | Re: Docket No.: F345665 - Emmaus House v. Town of Marblehead |
| **Received On :** | 12/7/2022 10:57 AM |
| **Attachments :** | 12_06_22 Transmittal to MA Appellate Tax Board.pdf    F345665 Withdrawal.pdf |

Me too! John
Sent from my iPhone

On Dec 7, 2022, at 9:59 AM, Karen Bertolino wrote:


Fyi – I will be surprised if they file an abatement application on the new property 12 Conant Rd.

I'll keep you posted.

Karen

**From:** Tracey M.A. Stockton
**Sent:** Tuesday, December 6, 2022 5:45 PM
**To:** Mastropietro, Lisa M (ATB) ; Karen Bertolino
**Subject:** Docket No.: F345665 - Emmaus House v. Town of Marblehead

For your further handling.  Thank you.
_____
Tracey M.A. Stockton
General Counsel
St. Paul's Foundation
124 Pleasant Street
Marblehead, Massachusetts   01945
617.800.3979

EXHIBIT F

*See,* attached.

| | |
|---|---|
| **From :** | Leandro Difilippo <DifilippoL@marblehead.org> |
| **To :** | Karen Bertolino <bertolinok@marblehead.org> |
| **Subject :** | links |
| **Received On :** | 9/14/2023 10:01 AM |

https://www.ft.com/content/15a9f79f-76d9-4990-92c2-a5836ad15e61

https://www.salemnews.com/news/local_news/marian-court-may-become-home-for-monks-beer-and-cider/article_3abdce5f-8d0a-5829-ac98-f6f68470fbe8.html

https://www.nbcboston.com/news/local/monks-battle-swampscott-mass-over-beer/58009/

https://www.wickedlocal.com/story/swampscott-reporter/2016/12/09/residents-largely-embrace-monastary-eyed/64688810007/

https://patch.com/massachusetts/swampscott/swampscott-estate-could-become-monastic-community

https://www.salemnews.com/news/florida-woman-sues-over-investment-in-brewery-owned-by-monk/article_c3805636-d30d-11ed-aa53-a7b1f66633cb.html

https://www.wickedlocal.com/story/marblehead-reporter/2014/06/05/salt-earth-marblehead-man-funds/35208549007/

United States v. Bushell, 1:22-mj-04506 – CourtListener.com

EMMAUS HOUSE SUFFIX in Washington, DC | Company Info & Reviews (bizapedia.com)

EGYPT HOUSE SUFFIX in Washington, DC | Company Info & Reviews (bizapedia.com)

https://interiordesignsociety.org/blog/id/29

https://slate.com/author/andrew-bushell

**Anti-Christian bigotry in Massachusetts**

by Jeff Jacoby

IF YOU WERE looking for someone to successfully manage a promising company, it would be hard to find a candidate with a better array of credentials and know-how than Andrew Bushell.

He's a natural-born entrepreneur, with wide and varied experience both in and out of the business world. He founded and successfully managed a $2.5 billion investment firm. He worked as a management consultant for McKinsey & Co. After 9/11, he took a hiatus from the high-pressure world of finance and venture capital, immersing himself instead in the high-pressure world of war-zone journalism to cover Afghanistan and Pakistan for The Economist. And when, after years abroad, he returned to his New England hometown, he came up with an idea for a unique local business: making and selling gourmet salt from Atlantic seawater. Like Bushell's other endeavors, the Marblehead Salt Company flourished, with annual sales growing at a 25 percent clip and the salt winning raves from foodies.

So when Bushell approached the Massachusetts Development Finance Agency last year with an application for loans to grow yet another Marblehead business venture — a craft brewery and taproom — officials might

have been expected to welcome him with open arms. According to MassDevelopment's website, after all, the agency was created to "help foster real estate and business projects that generate economic benefits for local communities and the state." Given Bushell's stellar track record, financing for Marblehead Brewing Co. should have been a no-brainer.

It wasn't.

The brewery applied for two loans. It intended to use the funds from one to improve its property in downtown Marblehead, and the other to purchase additional brewing equipment, in order to increase production from 700 barrels of beer in 2018 to 2,500 barrels by 2023. MassDevelopment said no. It demanded that the brewery enlist private backers who would personally guarantee the repayment of any loans. Bushell and Marblehead Brewing did so, providing the state with guarantees equal to three times the value of the loans applied for. The state demanded that the company's brewing equipment, worth $1.6 million, be put up as collateral. Bushell agreed to that too.

And still the agency says no.

Why? Because Bushell — more accurately, Father Andrew Bushell — is an Orthodox Christian monk. And the Commonwealth of Massachusetts is flummoxed by a loan applicant whose business chops are everything a state development agency dreams of, but whose mission and appearance are not at all what it's used to.

Marblehead Brewing is a for-profit corporation. Like any other commercial brewery, it pays taxes and must keep its federal, state, and municipal licenses current. It won't survive if it can't turn a profit. But turning a profit isn't its highest purpose. Supporting the work of the church is.

Bushell is the 192nd chairman of the St. Paul's Foundation, a monastic Christian charity more than 1,000 years old. Under Bushell, it has focused in recent years on easing the misery of Syrian refugees, providing food for 2 million displaced people, and supplying hundreds of thousands of tents and blankets for the homeless. The foundation also supports the Guitars Project, a charitable endeavor that provides guitars and musical instruction to hundreds of mostly Muslim children in the Middle East who have been displaced by violence. (Profits from Marblehead Salt have been donated to local causes as well, including the Marblehead Festival of the Arts and the anti-addiction work of the Marblehead Health Department.)

Marblehead Brewing is located at the Shrine of St. Nicholas, the first Orthodox Christian church in Marblehead. The church and the brewpub share the same building — the drinking establishment with its tables and tap is in the front room; the church, complete with altar and icon, is in a more private interior space — but they are separate entities, with different tax ID numbers, bank accounts, and legal profiles. The brewery is a secular, for-profit business. The church and the foundation are nonprofit religious entities that are among Marblehead Brewing's shareholders. In launching a commercial brewery to sustain the work of his church, Bushell is following the classic example of Trappist and Benedictine monks who for centuries have supported themselves through brewing and winemaking.

MassDevelopment has no problem with beer companies. It has provided financing for quite a few of them, including Notch Brewing in Salem, Tree House Brewing in Charlton, and Night Shift Brewing in Everett. But a brewing company run by an Orthodox monk who wears a black cassock, lives under a vow of poverty, and has devoted his life — and exceptional business talents — to God appears to give state officials the heebie-jeebies. According to Bushell, agency officials have told him his loan will not be approved "because you're a church" and the state doesn't want to be in the position of suing a church if a loan weren't repaid. Through a spokeswoman, MassDevelopment declined to comment for this column.

Rejecting Bushell's application because of his religious vocation may well be illegal under the First Amendment. It is unquestionably short-sighted.

"Entrepreneurs come in many shapes and sizes, and not all fit the typical business model," says Glenn Hutchins, a tech investment superstar who is a director of the New York Fed and sits on the executive committee of the Boston Celtics. In a phone conversation the other day, Hutchins sang the praises of Bushell's beer, Marblehead Ale No. 2. He was even more enthusiastic about the monk's ability to "take a blank sheet and turn it into something impressive."

To a talented financier like Hutchins, hardheaded business acumen isn't to be discounted because it serves a larger, spiritual devotion. He knows better than to judge an entrepreneur by his cassock. If only Massachusetts bureaucrats were as clear-sighted.

SOURCE

*Lee DiFilippo*
Administrative Assessor
Town of Marblehead
Mary Alley Municipal Building
7 Widger Road, Marblehead, MA 01945
Email: difilippol@marblehead.org
P: 781.631.0236 | F: 781.631.2617
https://www.marblehead.org/assessors-office

 **Johnny Ray** is 🥪 eating **lunch** at **Three Cod Tavern**.

January 17, 2021 · Marblehead, MA · 👥

Sunday Confession with Friar Tumma Tumulty Sundays 11AM-3PM By appointment only



Lesli Mead
Diane DeBettencourt Vigneron
Ralph Khouri
Haley Paster Scimone
Frank Simard
Mike Dowling
Mary Grant Boucher
T Michael Rockett
Brad Levin
Molly Booth Waniak
Darlene Ligor
JoAnne Buswell
Richard A Genest II
Jim Hazell
John Foster
Tom Regis
Michael Kirby
Michael Butler
Dawne Troupe
and 29 more...

 **Lesli Mead and 47 others**

18 comments

 Like

Depicted individual is Defendant Michael Tumulty.

Comment



**Marblehead Beacon's Post** ✕

 **Anything Marblehead 01945**
Marblehead Beacon · November 4, 2022 · 🌐                    •••

Are Marblehead's most famous monk and his co-defendant lawyer friend working on plea deals?



MARBLEHEADBEACON.COM
**Defendants in Massive Fraud Scam Appear Via Zoom in Federal Court**
At today's preliminary hearing in federal court, defendants Brian Bushell and Tracy Stockton–...

👍😆😮 Michael Tumulty and 3 others                    13 comments

👍 Like          💬 Comment          ✈ Send

**Top comments** ▾

 **Michael Tumulty**
No deals until he repays the taxpayers for all the taxes he was exempted from. It's bullsht.. clearly his crimes would disqualify him as a legitimate clergyman          •••
1y   Like   Reply                              3 👍

**Ronny Knight**

Write an answer...

😊 🙂 📷 GIF 🗨


👍 3
Ronny Knight
Kristin Mavragis Percy
Chicki Curtis

**Marblehead Beacon's Post**    ✕



MARBLEHEADBEACON.COM
**Defendants in Massive Fraud Scam Appear Via Zoom in Federal Court**
At today's preliminary hearing in federal court, defendants Brian Bushell and Tracy Stockton–...

👍😂😮 Michael Tumulty and 3 others          13 comments

👍 Like          💬 Comment          ✈ Send

Top comments ▾

**Michael Tumulty**
No deals until he repays the taxpayers for all the taxes he was exempted from. It's bullsht.. clearly his crimes would disqualify him as a legitimate clergyman

1y   Like   Reply                                         3 👍

**Ronny Knight**
Over under on when the buildings catch fire??????

1y   Like   Reply                              👍

**Michael Tumulty**
**Ronny Knight** sooner than later. Depends on which one sells out the other in the plea deal                                                          ⋯

1y   Like   Reply                                        👍

**Sue Hogan**
**Ronny Knight**🤣🤣

1y   Like   Reply

Reply to Michael Tumulty...                       😎 ☺ 📷 GIF 🧸

**Chicki Curtis**
Sell off all the "supplies" he had,saw them carry out 4 huge TVs still in boxes and that was just while I was stopped at light

1y   Like   Reply

👍 1
Matthew Martin

Write an answer...

😎 ☺ 📷 GIF 🧸                                                ➤

**Pam's Post** 

19w   **Like   Reply**

 **Paul Broderick**
First of all I have to confess I love their 14 different beers. Second, because the FBI raids your house or establishment doesn't make it fact. (Richard Jewel ATL bombing). When the FBI comes in with the clowns and elephants and makes a big splash that should make you ask, why. They "The Monk" was charged with 100+ counts and the disgraced prosecutor was let go and the new prosecutor dismissed all counts. Because Monks are strange because they spend their days praying for US and making great brandy, beer and salt doesn't make them bad people. Just odd. Why wouldn't we question their intentions when they're not interested in sex , drugs and rockin roll. I have bought my beer from him and I have never had conversations about the Russians, Chinese, or reverting money. They say always follow the money, but monks swear a vow to poverty???

19w   **Like   Reply**                                        3 

 **Tom McMahon**
**Paul Broderick** so what were all the big screen TVs for? Monk stuff?

19w   **Like   Reply**                                        3 

 **Michael Tumulty**
**Tom McMahon** and they were poverty Rolexes

19w   **Like   Reply**                        

 **Paul Broderick**
**Tom McMahon** Im truly impressed with your hard work and dedication to the town. And I appreciate your progressive thinking but big screen TVs for a library and media center at 120 Pleasant St should not be suspicious. As you know Facebook makes it to easy to bash someone with progressive thinking and unique solutions, stay on the high road

19w   **Like   Reply**

 **Tom McMahon**
**Paul Broderick** appreciate you following what I've been doing. There is significant history on this situation for people to weigh in. And not just history in Marblehead.

19w   **Like   Reply**

 **Cheryl Razin**
**Tom McMahon** And all those covid payments

## Marblehead Beacon's Post 

 **Chicki Curtis**
Sell off all the "supplies" he had, saw them carry out 4 huge TVs still in boxes and that was just while I was stopped at light

1y   Like   Reply

 **James Arthur Full**
GUILTY on all charges......GUILTY.

1y   Like   Reply

 **Matthew Martin**


1y   Like   Reply   

 **Ronny Knight**
Buttercup😎

1y   Like   Reply

 **Michael Tumulty**
POS

1y   Like   Reply   

 **Ronny Knight**
**Michael Tumulty** "Ten Pounds of S&@T in a five pound bag "

1y   Like   Reply   

 **Ronny Knight**
**Michael Tumulty** still waiting for the buildings to mysteriously catch fire 🎯🤔 😉😎‼️

1y   Like   Reply   

 **Michael Tumulty**
**Ronny Knight** 😊. I think the Monkey is waiting to see how the plea deal goes. I'm guessing he'll have to get a real job now. Like collecting rocks from Goldthwait to make door stops.

1y   Like   Reply

 Reply to Michael Tumulty...      

Write an answer...

 **Michael Tumulty**
October 19, 2022 · 

So I'm thinking the Fake Monk defrauded the Massachusetts Secretary of State to recieve an illegal exemption for his properties.  He was granted exemption for his 3 properties and multiple cars.  He paid no real estate taxes or excise taxes. I think the taxpayers of Marblehead are entitled to the tens of thousands in real taxes and excise taxes. Just saying. Mr Francis Galvin you have some splainin to do.

 15                                                    4 comments

👍 Like                                    💬 Comment

 **Anything Marblehead 01945**

Marblehead Beacon · October 13, 2022 · 😩    • • •

Read our latest story on the FBI's raids this morning on a purported monk's (and that of his organizations' attorney) dwellings/businesses.

Also follow our Facebook page for video capturing part of the raid.



MARBLEHEADBEACON.COM

**Multi-Million $ Wire Fraud Conspiracy Scheme Alleged by Feds Against Purported Orthodox Monk and His Organizations' Attorney**

👍😮 11                                                    8 comments

| Jayne Madigan Patten |
| Tara McDonald Segee |
| Katherine Keyes Millett |      Comment          Send |
| Cheryl Razin |
| Arthur McGeown |
| Roger Fallon |
| JD Lausier |
| Mir Valkenburg |
| Sharman Pollender |
| Heather Tobin |
| Irina Litvak |

Tommy Ray is 🍴 eating **lunch** at **Three Cod Tavern**.    • • •

February 17, 2021 · Marblehead, MA · 👥

Sunday nutrition with Friar Tumma Tumulty Sundays 11AM-3PM By appointment only



## Marblehead Beacon's Post

1y   Like   Reply

**Chicki Curtis**    Town of Marblehead Harbors & Water Board Member, Alternate.
Sell off all the "supplies" he had, saw them carry out 4 huge TVs still in boxes and that was just while I was stopped at light

1y   Like   Reply

**James Arthur Full**
GUILTY on all charges......GUILTY.

1y   Like   Reply

**Matthew Martin**
💩💩💩

1y   Like   Reply

**Ronny Knight**
Buttercup😎

1y   Like   Reply

**Michael Tumulty**
POS

1y   Like   Reply

**Ronny Knight**
Michael Tumulty "Ten Pounds of S&@T in a five pound bag "

1y   Like   Reply

**Ronny Knight**
Michael Tumulty still waiting for the buildings to mysteriously catch fire 🎯🤔😉😎‼️

1y   Like   Reply

**Michael Tumulty**
Ronny Knight 😄. I think the Monkey is waiting to see how the plea deal I'm guessing he'll have to get a real job now. Like collecting rocks from Goldthwait to make door stops.

1y   Like   Reply

Write an answer...

**Michael Tumulty**
October 14, 2022 · 👥

· · ·

Words the funky Monk lives by 😂



**theseinfeldfeeds**
· Reels · Oct 9 · 📷

if you believe it.

📷 @THESEINFELDFEEDS

6x16

Costanza words of wisdom!!
Follow @theseinfeldfeeds ... **See more**

⑈ ⑈ · Original audio    these

😄 2                                          2 comments

👍 Like        💬 Comment        �forward Share

 **Michael Tumulty**
October 14, 2022 · 👥

• • •

https://interiordesignsociety.org/blog/id/29



INTERIORDESIGNSOCIETY.ORG
**Member Spotlight: Father Andrew Bushell**
When church meets interior design, that's where Father Andrew comes in. Read more belo…

 Michael Tumulty and 13 others          30 comments

 Like           Comment           Share

## Michael's Post



**INTERIORDESIGNSOCIETY.ORG**
**Member Spotlight: Father Andrew Bushell**
When church meets interior design, that's where Father Andrew comes in. Read more below ...

😆👍😮 Michael Tumulty and 13 others          30 comments

👍 Like          💬 Comment          ↗ Share

Most relevant ▾

**Michael Tumulty**
He will have the nicest cell on the block 😆
1y    Like    Reply                    4 👍😆

**Michael Tumulty**
You can't make this shit up.
1y    Like    Reply          👍

**Michael Tumulty**
I heard his most recent design was a mattress with a hidden pouch to stash cash
1y    Like    Reply                    2 👍

**Member Spotlight: Father Andrew Bushell**

When church meets interior design, that's where Father Andrew comes in. Read more below ...

😆👍😮 Michael Tumulty and 13 others                    30 comments

👍 Like          💬 Comment          ↪ Share

Most relevant ▾

**Michael Tumulty**
He will have the nicest cell on the block 😆

1y    Like    Reply                    4 👍😆

**Michael Tumulty**
You can't make this shit up.

1y    Like    Reply                    👍

**Michael Tumulty**
I heard his most recent design was a mattress with a hidden pouch to stash cash

1y    Like    Reply                    2 👍

**JoAnne Buswell**
**Michael Tumulty**                    •••

*you know it!*

1y    Like    Reply

**Michael Tumulty**




1y  Like  Reply

**Johnny Ray**
Just the kind of baffling bullshit sheep love to consume and believe. It's hilarious.

  2

Michael Tumulty

  1
  1

1y  Like  Reply

**Anne Rodgers**
What is Frankincense



1y  Like  Reply

**Cheryl Razin**
From reading the guy's websites, he was a total snake oil salesman. Too slick. I can't believe he sold salt. And people bought not only the salt, but the idea salt could be somehow special. Hysterical! Glad he got too greedy.

  3

1y  Like  Reply

**Maureen Sheehan**
He will have time to pound salt now. #themarbleheadsaltcom

  2

1y  Like  Reply  Edited


 JoAnne Buswell replied · 4 Replies

**Marblehead Beacon's Post**





MARBLEHEADBEACON.COM
## Defendants in Massive Fraud Scam Appear Via Zoom in Federal Court
At today's preliminary hearing in federal court, defendants Brian Bushell and Tracy Stockton–...

 Michael Tumulty and 3 others                                      13 comments

 Like          Comment         Send

Top comments ▾

 **Michael Tumulty**
No deals until he repays the taxpayers for all the taxes he was exempted from. It's bullsht.. clearly his crimes would disqualify him as a legitimate clergyman

1y   Like   Reply                                                           3 

     **Ronny Knight**
    Over under on when the buildings catch fire??????

    1y   Like   Reply                                    

     **Michael Tumulty**
    **Ronny Knight** sooner than later. Depends on which one sells out the other in the plea deal

    1y   Like   Reply                                    

     **Sue Hogan**
    **Ronny Knight** 

    1y   Like   Reply

Write an answer...

## Marblehead Beacon's Post

**Ronny Knight** 🤣🤣
1y   **Like**   **Reply**

**Chicki Curtis**
Sell off all the "supplies" he had,saw them carry out 4 huge TVs still in boxes and that was just while I was stopped at light
1y   **Like**   **Reply**

**James Arthur Full**
GUILTY on all charges......GUILTY.
1y   **Like**   **Reply**

**Matthew Martin**
💩💩💩   ···
1y   **Like**   **Reply**   👍

👍 1
Chicki Curtis

**Ronny Knight**
Buttercup😎
1y   **Like**   **Reply**

**Michael Tumulty**
POS
1y   **Like**   **Reply**   👍

**Ronny Knight**
**Michael Tumulty** "Ten Pounds of S&@T in a five pound bag "
1y   **Like**   **Reply**   👍

**Ronny Knight**
**Michael Tumulty** still waiting for the buildings to mysteriously catch fire 🎯🥴😉😎‼️
1y   **Like**   **Reply**   😄

**Michael Tumulty**
**Ronny Knight** 😋. I think the Monkey is waiting to see how the plea deal goes. I'm guessing he'll have to get a real job now. Like collecting rocks from Goldthwait to make door stops.
1y   **Like**   **Reply**

Write an answer...

😎  ☺  📷  GIF  🏷

**Johnny Ray**
October 13, 2022 · 👥

## Michael Tumulty was right all along about the fake Monk!

👍😂❤️ Michael Tumulty, Lisa Stetler Hull and 24 others          16 comments

👍 Like                    💬 Comment

Michael Tumulty
Lisa Stetler Hull
Marc Liebman
Hope Carpenter
Yunita Pittard Farrar
Tum Mike
Cheryl Razin
Adam Silver
Kris W Enscoe
Jamie Hare
Vin Conte
Enid Cherry Laganas
Amy Renee Hallman
Caitlyn Buswell
Bonnie Buckley
Anne Rodgers
Tess Jam
Amy Bucher
Sam Easthope
and 7 more...

**Anything Marblehead 01945**
Marblehead Beacon · October 13, 2022 · 😩

FBI raids and arrest early this morning in Marblehead.



**Member Spotlight: Father Andrew Bushell**

When church meets interior design, that's where Father Andrew comes in. Read more below …

😆👍😮 Michael Tumulty and 13 others                    30 comments

👍 Like                    💬 Comment                    ↗ Share

Most relevant ▾

**Michael Tumulty**
He will have the nicest cell on the block 😆

1y    Like    Reply                    4 👍😆

**Michael Tumulty**
You can't make this shit up.

1y    Like    Reply                    👍

**Michael Tumulty**
I heard his most recent design was a mattress with a hidden pouch to stash cash

1y    Like    Reply                    2 👍

**JoAnne Buswell**
**Michael Tumulty**                    •••

*you know it!*

1y    Like    Reply

## Michael's Post

**Michael Tumulty**
October 19, 2022 · 👥

So I'm thinking the Fake Monk defrauded the Massachusetts Secretary of State to recieve an illegal exemption for his properties. He was granted exemption for his 3 properties and multiple cars. He paid no real estate taxes or excise taxes. I think the taxpayers of Marblehead are entitled to the tens of thousands in real taxes and excise taxes. Just saying. Mr Francis Galvin you have some splainin to do.

👍❤️😆 15                                                      4 comments

👍 Like                          💬 Comment

**Mike Ruotolo**
BOYCOTT THE BITCH
1y    Like    Reply

**Ronny Knight**
As stated earlier with NO cash flow of Government COVID Funding for the "FM" aka "POS", and his side kick code name "Matilda". What is the date on the "careless use of smoking material of all properties owed? ⏰🤱
1y    Like    Reply                                              😄

**David Donahue**
Town officials bent over backwards for father fraud
1y    Like    Reply                                              3 👍

**Anne Rodgers**
It really wasn't on the news much - I figure the FBI has more raids lined up and they don't want people fleeing before they can be brought in ...??? This father fraud money man could have taken the money and pulled a Whitey Bulger 🤥😂
1y    Like    Reply                                              👍

Write a comment...







1y   **Like**   **Reply**


**Johnny Ray**
Just the kind of baffling bullshit sheep love to consume and believe. It's hilarious.

1y   **Like**   **Reply**                                                2 




**Anne Rodgers**
What is Frankincense 

1y   **Like**   **Reply**        


**Cheryl Razin**
From reading the guy's websites, he was a total snake oil salesman. Too slick. I can't believe he sold salt. And people bought not only the salt, but the idea salt could be somehow special. Hysterical! Glad he got too greedy.

1y   **Like**   **Reply**                                                3 


**Maureen Sheehan**
He will have time to pound salt now. **#themarbleheadsaltcom**[OBJ]

1y   **Like**   **Reply**   Edited                                       2 

 **JoAnne Buswell replied · 4 Replies**

**Michael's Post** 

Wonderworker

**Patron of Sailors, Brewers & Repentant Thieves**

**124 Pleasant Street**

**Marblehead, MA 01945**

E-Mail:    theo@marbleheadsalt.com

1y    Like    Reply    

 Maureen Sheehan



As St. Nicholas is currently undergoing renovations we are completely web-based until they are complete. We'll announce opening for salt sales in the Shrine's hall soon!

Annual closures (orders placed during this period will be filled when we return):

**Closed for Christmas Feasts** December 24 through January 7 every year.

**Closed for the Annunciation** March 25

**Closed for Orthodox Holy Week, Easter and Easter Monday** every year.

2019 - Closed April 20 - 29

2020 - Closed April 11th - 20th

2021 - Closed April 24th - May 3rd

2022 - Closed April 16- 25th

**Closed for the Transfiguration** August 6

1y    Like    Reply    

 **Michael Tumulty**
I'm giddy

1y    Like    Reply    

 **JoAnne Buswell**
**Maureen Sheehan**    • • •



1y    Like    Reply    2 

 Write a reply...      

 Richard A Genest II

 Write a comment...

   

EXHIBIT G

*See,* attached.

Page 1

```
 1              COMMONWEALTH OF MASSACHUSETTS
 2                   APPELLATE TAX BOARD
                         Volume I
 3
 4              Docket Nos. F351238 and
                          F351239
 5
 6   ***************************************************
     SHRINE OF ST. NICHOLAS THE WONDERWORKER, ET AL
 7        Appellant,
 8        vs.
 9   TOWN OF MARBLEHEAD,
          Appellee.
10
11   ***************************************************
12
13
14
15   Before:    Commissioner Mark J. DeFrancisco
16
17   Clerk:     William Doherty
18   Held at:   Appellate Tax Board
                100 Cambridge Street
19              Boston, Massachusetts 02114
20   Date Held: Thursday, August 1, 2024
21
22
23            COPLEY COURT REPORTING
              71 Commercial Street, Suite 700
24              Boston, Massachusetts 02109
                     (617) 423-5841
                    www.copleycourt.com
```

COPLEY COURT REPORTING, INC.

---

Page 2

```
 1   REMOTE APPEARANCES:

 2   ST. PAUL'S FOUNDATION
     BY:  Tracey M. Stockton, Esq.
 3   22 Endicott Avenue
     Marblehead, Massachusetts 01945
 4   617-800-3979
     On behalf of the Appellant.
 5

 6

 7   MEAD TALERMAN & COSTA, LLC
     BY:  Matthew D. Provencher, Esq.
 8   227 Union Street
     New Bedford, Massachusetts 02740
 9   774-206-6857
     matt@mtclawyers.com
10   On behalf of the Appellee.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

COPLEY COURT REPORTING, INC.

---

Page 3

```
 1                  I N D E X
 2
 3   Testimony of:   Direct  Cross  Redirect  Recross
 4
 5
 6
 7
 8              E X H I B I T S
 9
10   Exhibit No.    Description       Page No.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

COPLEY COURT REPORTING, INC.

---

Page 4

```
               P R O C E E D I N G S
01:11:02   1
01:11:02   2        CLERK:  Good afternoon, Everyone.
01:11:06   3   Today is Thursday, August 1, 2024.  Presiding today
01:11:12   4   is Chairman Mark DeFrancisco.  We are here for
01:11:14   5   Appellant's motion for a speedy hearing for Docket
01:11:17   6   Nos. F351238 and F351239 for Egypt House and Shrine
01:11:17   7   of St. Nicholas versus the Town of Marblehead.
01:11:17   8   Representing the Appellant is Attorney Tracey
01:11:17   9   Stockton, and representing the town is Attorney Matt
01:11:17  10   Provencher.
01:11:36  11        Mr. Chairman, you can take it away.
01:11:37  12        COMMISSIONER:  Thank you and good
01:11:39  13   afternoon.  I have read Ms. Stockton's motion and
01:11:49  14   Mr. Provencher's opposition.  Let me just say at the
01:11:51  15   outset, this is a scheduling matter.  The level of
01:11:57  16   paperwork and phone calls and other communications
01:12:03  17   is completely unwarranted.  I am familiar with this
01:12:09  18   case having dealt with it in the prior fiscal year,
01:12:15  19   and noticed a similar exchange of what can only be
01:12:17  20   termed as animosity between the parties.  I'm not
01:12:21  21   asking you to be friends.  I am asking you and
01:12:27  22   admonishing you that we're not going to tolerate
01:12:29  23   this level of discourse and pleadings on preliminary
01:12:37  24   basic matters.  I will hear the motion to dismiss --
```

COPLEY COURT REPORTING, INC.

Page 5

01:12:42 1 sorry, motion for a speedy hearing, but we're just
01:12:45 2 going to set a hearing date. I would just caution
01:12:50 3 the parties that in the future you ought be able to
01:12:56 4 deal with each other on basic issues, and leave to
01:13:00 5 the Board issues that simply can't be resolved.
01:13:04 6        A hearing in 14 days is an unreasonable
01:13:07 7 request. No one is going to be ready, and I doubt
01:13:09 8 the Appellant would be ready in 14 days for a
01:13:12 9 hearing.
01:13:13 10       I would also point out, Ms. Stockton, that
01:13:15 11 you should be careful about what you put in your
01:13:18 12 pleadings. I don't think anyone at the Appellate
01:13:18 13 Tax Board would have said that, due to our crowded
01:13:24 14 docket you're case can't be heard in a timely
01:13:31 15 fashion. Our docket is our docket. We do get over
01:13:37 16 3,000 cases a year, but do hear cases daily, and we
01:13:41 17 do hear them in an expeditious fashion and get our
01:13:45 18 decisions out in an expeditious fashion. If you
01:13:47 19 think that this is a crowded docket and that cases
01:13:54 20 are not heard in a timely fashion, you should
01:13:59 21 explore the district court and the superior court
01:14:00 22 where you'll have years of waiting.
01:14:03 23       With that said, I'll hear what you have to
01:14:07 24 say Attorney Stockton and then I'll hear

COPLEY COURT REPORTING, INC.

Page 6

01:14:10 1 Mr. Provencher. But we're going to move forward and
01:14:14 2 at the end of this session, we're going to establish
01:14:17 3 a trial date and we're going to establish a
01:14:22 4 discovery cutoff date and move this case along. I
01:14:26 5 would suggest that rather this kind of back and
01:14:30 6 forward that has already started in this case, the
01:14:33 7 parties ought to work toward an agreed statement of
01:14:37 8 facts. It is an exemption case. I don't know how
01:14:39 9 many facts are going to be disputed, but it seems to
01:14:46 10 me there's a fundamental legal issue that we need to
01:14:46 11 reach and the parties would be better served working
01:14:49 12 toward that and reducing the cost to the Town, to
01:14:54 13 the taxpayer and reducing the drain on our schedule
01:14:57 14 to deal with this kind of thing.
01:15:00 15       So, go ahead Ms. Stockton and then I'll
01:15:04 16 hear from Mr. Provencher.
01:15:04 17       MS. STOCKTON: Well, in this
01:15:05 18 instance the last time that we pursued the Egypt
01:15:12 19 House matter, it perhaps was dealing more with a
01:15:13 20 Covid backlog. But really the period given for the
01:15:19 21 hearing I think was 18 months or so. So it was
01:15:22 22 suggested to me at that time that I file for a
01:15:25 23 speedy hearing. It is true that I have not yet been
01:15:29 24 assigned a trial date relative to either of the two

COPLEY COURT REPORTING, INC.

Page 7

01:15:37 1 matters that are the subject of these particular
01:15:37 2 hearings. However, I had assumed that they would
01:15:41 3 not be forthcoming in the immediately near term, so
01:15:46 4 I did file the motion for a speedy trial
01:15:48 5 immediately. I regret that I've inconvenienced the
01:15:52 6 Court in any matter by doing it that way.
01:15:53 7       COMMISSIONER: Just to interrupt
01:15:54 8 you. You're free to ask for a speedy hearing, and
01:15:57 9 that's what you've done. I think the better course
01:16:03 10 is check with counsel. I understand counsel has
01:16:09 11 just come on the case, but I don't know if you've
01:16:10 12 had any prior discussions with the assessors office,
01:16:12 13 but agree on a date. This kind of case, formal case
01:16:17 14 for this fiscal year ordinarily would have been
01:16:22 15 reached for trial in the early spring. I don't
01:16:27 16 think that's an unreasonable length of time given
01:16:27 17 the fact that there's probably going to be
01:16:29 18 discovery. But I will entertain an earlier date of
01:16:33 19 something in the December range. So, you know, it
01:16:38 20 would be a lot easier to just do this on a
01:16:42 21 professional basis rather the acrimonious basis.
01:16:49 22       MS. STOCKTON: Well, to shed a
01:16:50 23 little color on the reason why I'm so in tune with
01:16:53 24 opposing counsel's strategy of delay. I'm sure you

COPLEY COURT REPORTING, INC.

Page 8

01:16:56 1 may remember the timeline we have from the prior
01:16:59 2 exercise relative to Egypt House, where we were able
01:17:02 3 to depict the timeline showing that Town of
01:17:05 4 Marblehead has delayed construction of our monastic
01:17:05 5 community for a period of seven years.
01:17:12 6       In keeping with that same scene of delay,
01:17:15 7 there are currently at the present time two pending
01:17:19 8 matters that have facts that are complementary. One
01:17:24 9 of them deals with facts that are far greater in
01:17:25 10 breadth than just the subject taxation matters. But
01:17:25 11 in the Superior Court matter that is currently
01:17:33 12 pending relative to the Shrine of St. Nicholas and
01:17:37 13 the illegal revocation of an exemption there, I have
01:17:38 14 given Mr. Provencher, this was -- discovery was
01:17:44 15 propounded, I believe, in February or the beginning
01:17:44 16 of March.
01:17:49 17       I just received last Thursday a paltry
01:17:49 18 response filled with caveats, this, that and the
01:17:55 19 other, after giving the Town of Marblehead three
01:17:57 20 separate extensions. The dates were not calendared
01:18:03 21 tightly. They slipped a couple of times. We gave
01:18:05 22 them another one. Very, very accommodating.
01:18:07 23 Finally after the third date slipped and there was
01:18:09 24 no response or no conversation whatsoever, I did

COPLEY COURT REPORTING, INC.

Page 9

01:18:14 1  file a motion to compel.  Now that has helped the
01:18:18 2  Town of Marblehead come to a decision about how to
01:18:21 3  respond to a couple of interrogatories.  But we
01:18:24 4  still received a request that they need an
01:18:25 5  additional 60 days to do the request for production.
01:18:30 6  I find this amazing.  In this day and --
01:18:33 7          COMMISSIONER:  That is something
01:18:36 8  you -- that is something you can take up with the
01:18:36 9  Superior Court judge --
01:18:36 10         MS. STOCKTON:  Is it.
01:18:36 11         COMMISSIONER:  -- hearing date?
01:18:36 12         MS. STOCKTON:  I understand that.
01:18:42 13         COMMISSIONER:  Does December,
01:18:45 14  first week or two of December something that would
01:18:49 15  be with consistent the Appellant's desires then I'll
01:18:53 16  see what counsel for the Town as to say.
01:18:59 17         MS. STOCKTON:  If you think the
01:19:00 18  first week of December provides the party with ample
01:19:03 19  time to take care of their discovery needs and fully
01:19:06 20  flush out the matters at hand, I'm certainly in
01:19:09 21  agreement with that.
01:19:10 22         COMMISSIONER:  How much discovery
01:19:12 23  do you need?  It sounds like you're already engaged
01:19:14 24  in discovery in the superior court on an exemption.

COPLEY COURT REPORTING, INC.

Page 10

01:19:17 1  Is it --
01:19:17 2          MS. STOCKTON:  There is no
01:19:18 3  response.  The Town of Marblehead, we're now getting
01:19:22 4  ready to file some subpoenas and take some further
01:19:28 5  more aggressive steps to obtain some discovery,
01:19:30 6  because the Town of Marblehead either doesn't keep
01:19:32 7  records in accordance with the statute, or they just
01:19:36 8  prefer not to share them with the public or perhaps
01:19:39 9  just this plaintiff.
01:19:44 10         COMMISSIONER:  Is exemption an
01:19:45 11  issue in the Superior Court matter?
01:19:47 12         MS. STOCKTON:  Yes, sir.  It is
01:19:49 13  about the illegal revocation of the exemption at 120
01:19:52 14  Pleasant Street, for which there was a valid and
01:19:55 15  subsisting exemption yet we were taxed on that
01:19:59 16  building.
01:20:00 17         COMMISSIONER:  All right, I'm not
01:20:02 18  going to get into the merits of it --
01:20:02 19         MS. STOCKTON:  There's no need to,
01:20:03 20  sir.  I'm just trying to provide you with context.
01:20:05 21         COMMISSIONER:  I'm suggesting that
01:20:07 22  you might run into a situation where the Superior
01:20:10 23  Court says you haven't exhausted your administrative
01:20:10 24  remedies.  In any event, why don't go to

COPLEY COURT REPORTING, INC.

Page 11

01:20:10 1  Mr. Provencher.
01:20:20 2          We're thinking of December a -- first or
01:20:22 3  second week of December for a hearing.  Does that
01:20:23 4  give sufficient time for whatever discovery is
01:20:27 5  necessary and just move forward and hear the case?
01:20:33 6          MR. PROVENCHER:  Thank you,
01:20:33 7  Mr. Chair.  I anticipate that this will involve some
01:20:37 8  degree of discovery.  I know that Ms. Stockton
01:20:40 9  alleged in her initiating pleading that she intends
01:20:42 10 to propound both interrogatories and seek leave to
01:20:44 11 conduct depositions.  I don't know how much time it
01:20:48 12 would take to coordinate and schedule those.  I can
01:20:48 13 tell you that amongst some of the discovery issues
01:20:53 14 to come up, is that Ms. Stockton propounds very
01:20:54 15 broad discovery requests that take time to respond
01:20:58 16 to.  I don't want to get into the nitty-gritty on
01:21:01 17 that.  But I can tell you the Town works in good
01:21:02 18 faith to comply with our discovery requests.  And I
01:21:05 19 can tell you that one of the issues that we've had,
01:21:07 20 which I think will bear upon the conduct of this
01:21:07 21 case, and has affected some of the other proceedings
01:21:11 22 that I've had with Ms. Stockton, is the Board of
01:21:15 23 Assessors voted to place the principal assessor for
01:21:19 24 the Town of Marblehead, Ms. Karen Bertolino, on

COPLEY COURT REPORTING, INC.

Page 12

01:21:19 1  administrative leave.  So I don't have an assessor
01:21:22 2  staff member who is ready and capable of immediately
01:21:26 3  responding to every request.  I know that that's not
01:21:28 4  up to her, that is not something she has any control
01:21:31 5  over, but I equally cannot get everything out on the
01:21:34 6  same timeframe were that person not on leave and
01:21:34 7  their duties currently are unfulfilled.
01:21:43 8          So, what I think what you initially
01:21:43 9  suggested Mr. Chair, a normal spring deadline for a
01:21:45 10 hearing on this matter seems reasonable and
01:21:45 11 appropriate.  I don't think that's an unusual delay.
01:21:50 12 I think it is an appropriate course of action and
01:21:51 13 provide the parties the time to both engage in
01:21:53 14 whatever discovery they feel appropriate and bring
01:21:55 15 this matter to a reasonable end.
01:21:58 16         COMMISSIONER:  Just to -- I don't
01:22:03 17 know if you're aware of this, but there are news
01:22:04 18 accounts just today that the assessor has left the
01:22:08 19 office.  The Board has voted to terminate her.  So
01:22:13 20 it is not even a leave of absence anymore.
01:22:17 21         Also, I can tell you Ms. Stockton, if
01:22:23 22 you're contemplating filing motions to depose any
01:22:27 23 one at the assessor's office, we have never allowed
01:22:31 24 deposition of assessors.  What the assessors may

COPLEY COURT REPORTING, INC.

Page 13

| | |
|---|---|
| 01:22:35 | 1 have done in taxing the property is really not |
| 01:22:40 | 2 relevant, especially in an exemption matter. |
| 01:22:43 | 3 Question is whether or not the taxpayer is |
| 01:22:49 | 4 charitable organization, or in this case, a |
| 01:22:49 | 5 religious organization and whether or not they |
| 01:22:58 | 6 occupy the property in furtherance of that religious |
| 01:23:00 | 7 exemption. So what the assessors may have done is |
| 01:23:02 | 8 largely irrelevant to the question. |
| 01:23:05 | 9 So that will help streamline the matter. |
| 01:23:09 | 10 And I don't know -- |
| 01:23:10 | 11 MS. STOCKTON: If I may, sir. |
| 01:23:12 | 12 We've already responded to each of those topics in |
| 01:23:15 | 13 the prior matters that have been before the Board. |
| 01:23:14 | 14 I would submit to you that none of the factual data |
| 01:23:22 | 15 that we have has changed significantly in the year |
| 01:23:26 | 16 lapse. So I believe that the December timeframe |
| 01:23:30 | 17 should suit us well. |
| 01:23:31 | 18 COMMISSIONER: I don't understand |
| 01:23:32 | 19 what you mean you. You're not going to seek any |
| 01:23:36 | 20 further discovery? |
| 01:23:37 | 21 MS. STOCKTON: It would be very |
| 01:23:39 | 22 limited. But I have low confident level as to what |
| 01:23:41 | 23 it is I'd even receive. I could go forward, you |
| 01:23:45 | 24 know, certainly next week. |

COPLEY COURT REPORTING, INC.

Page 14

| | |
|---|---|
| 01:23:49 | 1 COMMISSIONER: Well, again, that's |
| 01:23:51 | 2 unreasonable. It's a formal case -- |
| 01:23:53 | 3 MS. STOCKTON: Certainly, and I |
| 01:23:54 | 4 don't want to be unreasonable, but I do know that |
| 01:23:57 | 5 everything that we have we need right now. |
| 01:24:01 | 6 COMMISSIONER: Well, I would think |
| 01:24:04 | 7 so. As the Appellant it is your burden to establish |
| 01:24:05 | 8 that the property is exempt. So you certainly have |
| 01:24:09 | 9 everything you need. |
| 01:24:11 | 10 Attorney Provencher, what sort of discovery |
| 01:24:13 | 11 are you contemplating? |
| 01:24:17 | 12 MR. PROVENCHER: So Mr. Chairman, |
| 01:24:17 | 13 as you may be familiar from previous proceedings, as |
| 01:24:19 | 14 you indicated, this is an exemption case, and the |
| 01:24:22 | 15 basic issue at the heart of these two things is the |
| 01:24:26 | 16 Shrine of St. Nicholas and Egypt House both claim |
| 01:24:28 | 17 that the two properties that are at issue here, |
| 01:24:30 | 18 which were formally single family residential |
| 01:24:34 | 19 properties in the Town or Marblehead, are variously |
| 01:24:34 | 20 used as a house of worship or a parsonage which |
| 01:24:34 | 21 qualifies under the religious clause of the |
| 01:24:42 | 22 exemption statute. The difficulty the town has had |
| 01:24:44 | 23 and the Board of Assessors has had, is both the |
| 01:24:46 | 24 Shrine and Egypt House are very reluctant to provide |

COPLEY COURT REPORTING, INC.

Page 15

| | |
|---|---|
| 01:24:49 | 1 any information concerning what activities actually |
| 01:24:51 | 2 take place at the property. We were here on motion |
| 01:24:55 | 3 in a previous matter in which the Shrine -- Egypt |
| 01:25:00 | 4 House, excuse me, reserved the right to withhold the |
| 01:25:03 | 5 identity under a claim of privilege of any of the |
| 01:25:03 | 6 individuals who actually resided at the property. |
| 01:25:06 | 7 Whether they were renters, whether they were |
| 01:25:07 | 8 leasing. |
| 01:25:08 | 9 So, frankly, from my perspective, this is a |
| 01:25:12 | 10 case in which the Board of Assessors has been trying |
| 01:25:15 | 11 to do its due diligence. It is seeking information |
| 01:25:17 | 12 on what the actual use of the properties are. And |
| 01:25:18 | 13 my sister, Ms. Stockton, has taken the position that |
| 01:25:21 | 14 she is essentially entitled to claim the exemption, |
| 01:25:24 | 15 assert that it is a religious organization, and |
| 01:25:27 | 16 that's the end of the matter. There can be no |
| 01:25:29 | 17 further investigations to what actually takes place |
| 01:25:32 | 18 on the property. |
| 01:25:34 | 19 So that's why I think discovery is |
| 01:25:35 | 20 necessary, because even in the previous case, we |
| 01:25:36 | 21 weren't given a clear idea as to what actually |
| 01:25:38 | 22 transpires on the property. Whether services are |
| 01:25:41 | 23 held. How often they are held. If there's any |
| 01:25:45 | 24 attendance. I think that's a matter for another |

COPLEY COURT REPORTING, INC.

Page 16

| | |
|---|---|
| 01:25:46 | 1 day, but that's why we need to do discovery in this |
| 01:25:48 | 2 case. |
| 01:25:50 | 3 COMMISSIONER: Well, it certainly |
| 01:25:52 | 4 seems to be relevant. Whether or not individuals |
| 01:25:52 | 5 have to identified is another question. But |
| 01:26:00 | 6 certainly I would think any leases that are in place |
| 01:26:05 | 7 giving people a right to live in the property, even |
| 01:26:09 | 8 if you redacted their names, that's certainly |
| 01:26:13 | 9 relevant information. |
| 01:26:15 | 10 MS. STOCKTON: Neither of the |
| 01:26:17 | 11 properties are leaseholds, sir. |
| 01:26:20 | 12 COMMISSIONER: Okay. Well, I am |
| 01:26:22 | 13 going to establish a discovery cutoff date and a |
| 01:26:28 | 14 trial date. I'll take the matter under advisement |
| 01:26:34 | 15 and I'll discuss with the clerks the appropriate |
| 01:26:39 | 16 timeline from our point of view and we'll issue the |
| 01:26:39 | 17 appropriate order. |
| 01:26:44 | 18 Is there anything further from either |
| 01:26:46 | 19 party. |
| 01:26:46 | 20 MS. STOCKTON: No, sir. I |
| 01:26:47 | 21 appreciate the accommodation of the Board in moving |
| 01:26:49 | 22 the time period today, and I regret any |
| 01:26:53 | 23 inconvenience. |
| 01:26:53 | 24 COMMISSIONER: No worries. We're |

COPLEY COURT REPORTING, INC.

Page 17

| | | |
|---|---|---|
| 01:26:55 | 1 | here. We're always here to hear motions, even on an |
| 01:26:59 | 2 | emergency basis. It is just appropriate that basic |
| 01:27:07 | 3 | sort of procedural matters get at least discussed |
| 01:27:10 | 4 | between the parties before it is brought to the |
| 01:27:13 | 5 | board. Certainly a hearing date is kind of a |
| 01:27:17 | 6 | procedural issue that should be discussed between |
| 01:27:20 | 7 | the parties before it is brought to the Board. |
| 01:27:23 | 8 | So we'll take the matter under advisement |
| | 9 | and we'll issue the appropriate ruling. |
| | 10 | MR. PROVENCHER: Thank you, |
| | 11 | Mr. Chair. |
| | 12 | MS. STOCKTON: Thank you. |
| | 13 | (Whereupon, the motion was |
| | 14 | concluded at 1:28 p.m.) |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |

COPLEY COURT REPORTING, INC.

Page 18

1    C E R T I F I C A T E
2
3
4    COMMONWEALTH OF MASSACHUSETTS
5    Middlesex, ss.
6              I, Denise M. Rizzari, Professional
7    Court Reporter, do hereby certify that the foregoing
8    Pages 1 to 17 to be a true, complete and accurate
9    transcript of hearing of Shrine of St. Nicholas vs.
10   Marblehead, held at the time and place hereinbefore
11   set forth, to the best of my knowledge, skill and
12   ability.
13
14
15
16
17
18              _____
19              Notary Public
                My Commission Expires:
20              May 24, 2030
21
22
23
24
COPLEY COURT REPORTING, INC.

**01945** [1] - 2:3
**02109** [1] - 1:23
**02114** [1] - 1:17
**02740** [1] - 2:8
**1** [3] - 1:18, 4:3, 18:8
**100** [1] - 1:16
**120** [1] - 10:13
**14** [2] - 5:6, 5:8
**17** [1] - 18:8
**18** [1] - 6:21
**1:28** [1] - 17:14
**2024** [2] - 1:18, 4:3
**2030** [1] - 18:20
**22** [1] - 2:3
**227** [1] - 2:7
**24** [1] - 18:20
**3,000** [1] - 5:16
**423-5841** [1] - 1:23
**60** [1] - 9:5
**617** [1] - 1:23
**617-800-3979** [1] -
2:4
**700** [1] - 1:22
**71** [1] - 1:22
**774-206-6857** [1] -
2:8
**ability** [1] - 18:12
**able** [2] - 5:3, 8:2
**absence** [1] - 12:20
**accommodating** [1]
- 8:22
**accommodation** [1]
- 16:21
**accordance** [1] -
10:7
**accounts** [1] - 12:18
**accurate** [1] - 18:8
**acrimonious** [1] -
7:21
**action** [1] - 12:12
**activities** [1] - 15:1
**actual** [1] - 15:12
**additional** [1] - 9:5
**administrative** [2] -
10:23, 12:1
**admonishing** [1] -
4:22
**advisement** [2] -
16:14, 17:8
**affected** [1] - 11:21
**afternoon** [2] - 4:2,
4:13
**aggressive** [1] - 10:5
**agree** [1] - 7:13
**agreed** [1] - 6:7
**agreement** [1] - 9:21
**ahead** [1] - 6:15
**AL** [1] - 1:5
**alleged** [1] - 11:9

**allowed** [1] - 12:23
**amazing** [1] - 9:6
**ample** [1] - 9:18
**animosity** [1] - 4:20
**anticipate** [1] - 11:7
**APPEARANCES** [1] -
2:1
**Appellant** [5] - 1:5,
2:4, 4:8, 5:8, 14:7
**Appellant's** [2] - 4:5,
9:15
**APPELLATE** [1] - 1:2
**Appellate** [2] - 1:16,
5:12
**Appellee** [2] - 1:8,
2:9
**appreciate** [1] -
16:21
**appropriate** [7] -
12:11, 12:12, 12:14,
16:15, 16:17, 17:2,
17:9
**assert** [1] - 15:15
**assessor** [3] - 11:23,
12:1, 12:18
**assessor's** [1] -
12:23
**assessors** [4] - 7:12,
12:24, 13:7
**Assessors** [3] -
11:23, 14:23, 15:10
**assigned** [1] - 6:24
**assumed** [1] - 7:2
**attendance** [1] -
15:24
**Attorney** [4] - 4:8,
4:9, 5:24, 14:10
**August** [2] - 1:18,
4:3
**Avenue** [1] - 2:3
**aware** [1] - 12:17
**backlog** [1] - 6:20
**basic** [4] - 4:24, 5:4,
14:15, 17:2
**basis** [3] - 7:21, 17:2
**bear** [1] - 11:20
**Bedford** [1] - 2:8
**beginning** [1] - 8:15
**behalf** [2] - 2:4, 2:9
**Bertolino** [1] - 11:24
**best** [1] - 18:11
**better** [2] - 6:11, 7:9
**between** [3] - 4:20,
17:4, 17:6
**BOARD** [1] - 1:2
**board** [1] - 17:5
**Board** [10] - 1:16,
5:5, 5:13, 11:22,
12:19, 13:13, 14:23,
15:10, 16:21, 17:7

**Boston** [2] - 1:17,
1:23
**breadth** [1] - 8:10
**bring** [1] - 12:14
**broad** [1] - 11:15
**brought** [2] - 17:4,
17:7
**building** [1] - 10:16
**burden** [1] - 14:7
**BY** [2] - 2:2, 2:7
**calendared** [1] - 8:20
**Cambridge** [1] - 1:16
**cannot** [1] - 12:5
**capable** [1] - 12:2
**care** [1] - 9:19
**careful** [1] - 5:11
**case** [16] - 4:18,
5:14, 6:4, 6:6, 6:8,
7:11, 7:13, 11:5,
11:21, 13:4, 14:2,
14:14, 15:10, 15:20,
16:2
**cases** [3] - 5:16, 5:19
**caution** [1] - 5:2
**caveats** [1] - 8:18
**Certainly** [2] - 14:3,
17:5
**certainly** [6] - 9:20,
13:24, 14:8, 16:3,
16:6, 16:8
**certify** [1] - 18:7
**Chair** [3] - 11:7, 12:9,
17:11
**Chairman** [3] - 4:4,
4:11, 14:12
**changed** [1] - 13:15
**charitable** [1] - 13:4
**check** [1] - 7:10
**claim** [3] - 14:16,
15:5, 15:14
**clause** [1] - 14:21
**clear** [1] - 15:21
**CLERK** [1] - 4:2
**Clerk** [1] - 1:15
**clerks** [1] - 16:15
**color** [1] - 7:23
**Commercial** [1] -
1:22
**Commission** [1] -
18:19
**COMMISSIONER**
[16] - 4:12, 7:7, 9:7,
9:11, 9:13, 9:22,
10:10, 10:17, 10:21,
12:16, 13:18, 14:1,
14:6, 16:3, 16:12,
16:24
**Commissioner** [1] -
1:14
**COMMONWEALTH**

[2] - 1:1, 18:4
**communications** [1]
- 4:16
**community** [1] - 8:5
**compel** [1] - 9:1
**complementary** [1] -
8:8
**complete** [1] - 18:8
**completely** [1] - 4:17
**comply** [1] - 11:18
**concerning** [1] -
15:1
**concluded** [1] -
17:14
**conduct** [2] - 11:11,
11:20
**confident** [1] - 13:22
**consistent** [1] - 9:15
**construction** [1] -
8:4
**contemplating** [2] -
12:22, 14:11
**context** [1] - 10:20
**control** [1] - 12:4
**conversation** [1] -
8:24
**coordinate** [1] -
11:12
**COPLEY** [1] - 1:22
**cost** [1] - 6:12
**COSTA** [1] - 2:6
**counsel** [3] - 7:10,
9:16
**counsel's** [1] - 7:24
**couple** [2] - 8:21, 9:3
**course** [2] - 7:9,
12:12
**court** [3] - 5:21, 9:24
**COURT** [1] - 1:22
**Court** [6] - 7:6, 8:11,
9:9, 10:11, 10:23,
18:7
**Covid** [1] - 6:20
**Cross** [1] - 3:3
**crowded** [2] - 5:13,
5:19
**cutoff** [2] - 6:4, 16:13
**daily** [1] - 5:16
**data** [1] - 13:14
**Date** [1] - 1:18
**date** [11] - 5:2, 6:3,
6:4, 6:24, 7:13, 7:18,
8:23, 9:11, 16:13,
16:14, 17:5
**dates** [1] - 8:20
**days** [3] - 5:6, 5:8,
9:5
**deadline** [1] - 12:9
**deal** [2] - 5:4, 6:14

**dealing** [1] - 6:19
**deals** [1] - 8:9
**dealt** [1] - 4:18
**December** [7] - 7:19,
9:13, 9:14, 9:18, 11:2,
11:3, 13:16
**decision** [1] - 9:2
**decisions** [1] - 5:18
**DeFrancisco** [2] -
1:14, 4:4
**degree** [1] - 11:8
**delay** [3] - 7:24, 8:6,
12:11
**delayed** [1] - 8:4
**Denise** [1] - 18:6
**depict** [1] - 8:3
**depose** [1] - 12:22
**deposition** [1] -
12:24
**depositions** [1] -
11:11
**Description** [1] -
3:10
**desires** [1] - 9:15
**difficulty** [1] - 14:22
**diligence** [1] - 15:11
**Direct** [1] - 3:3
**discourse** [1] - 4:23
**discovery** [16] - 6:4,
7:18, 8:14, 9:19, 9:22,
9:24, 10:5, 11:4, 11:8,
11:13, 11:15, 11:18,
12:14, 13:20, 14:10,
15:19, 16:1, 16:13
**discuss** [1] - 16:15
**discussed** [2] - 17:3,
17:6
**discussions** [1] -
7:12
**dismiss** [1] - 4:24
**disputed** [1] - 6:9
**district** [1] - 5:21
**Docket** [1] - 4:5
**docket** [4] - 5:14,
5:15, 5:19
**Doherty** [1] - 1:15
**done** [3] - 7:9, 13:1,
13:7
**doubt** [1] - 5:7
**drain** [1] - 6:13
**due** [2] - 5:13, 15:11
**duties** [1] - 12:7
**early** [1] - 7:15
**easier** [1] - 7:20
**Egypt** [6] - 4:6, 6:18,
8:2, 14:16, 14:24,
15:3
**either** [3] - 6:24,
10:6, 16:18

emergency [1] - 17:2
end [3] - 6:2, 12:15, 15:16
Endicott [1] - 2:3
engage [1] - 12:13
engaged [1] - 9:23
entertain [1] - 7:18
entitled [1] - 15:14
equally [1] - 12:5
especially [1] - 13:2
Esq [2] - 2:2, 2:7
essentially [1] - 15:14
establish [4] - 6:2, 6:3, 14:7, 16:13
ET [1] - 1:5
event [1] - 10:24
exchange [1] - 4:19
excuse [1] - 15:4
exempt [1] - 14:8
exemption [11] - 6:8, 8:13, 9:24, 10:10, 10:13, 10:15, 13:2, 13:7, 14:14, 14:22, 15:14
exercise [1] - 8:2
exhausted [1] - 10:23
Exhibit [1] - 3:10
expeditious [2] - 5:17, 5:18
Expires [1] - 18:19
explore [1] - 5:21
extensions [1] - 8:20
F351238 [1] - 4:6
F351239 [1] - 4:6
fact [1] - 7:17
facts [4] - 6:8, 6:9, 8:8, 8:9
factual [1] - 13:14
faith [1] - 11:18
familiar [2] - 4:17, 14:13
family [1] - 14:18
far [1] - 8:9
fashion [4] - 5:15, 5:17, 5:18, 5:20
February [1] - 8:15
file [4] - 6:22, 7:4, 9:1, 10:4
filing [1] - 12:22
filled [1] - 8:18
Finally [1] - 8:23
first [3] - 9:14, 9:18, 11:2
fiscal [2] - 4:18, 7:14
flush [1] - 9:20
foregoing [1] - 18:7
formal [2] - 7:13,

14:2
formally [1] - 14:18
forth [1] - 18:11
forthcoming [1] - 7:3
forward [4] - 6:1, 6:6, 11:5, 13:23
FOUNDATION [1] - 2:2
frankly [1] - 15:9
free [1] - 7:8
friends [1] - 4:21
fully [1] - 9:19
fundamental [1] - 6:10
furtherance [1] - 13:6
future [1] - 5:3
given [4] - 6:20, 7:16, 8:14, 15:21
greater [1] - 8:9
gritty [1] - 11:16
hand [1] - 9:20
hear [8] - 4:24, 5:16, 5:17, 5:23, 5:24, 6:16, 11:5, 17:1
heard [2] - 5:14, 5:20
hearing [13] - 4:5, 5:1, 5:2, 5:6, 5:9, 6:21, 6:23, 7:8, 9:11, 11:3, 12:10, 17:5, 18:9
hearings [1] - 7:2
heart [1] - 14:15
held [3] - 15:23, 18:10
Held [2] - 1:16, 1:18
help [1] - 13:9
helped [1] - 9:1
hereby [1] - 18:7
hereinbefore [1] - 18:10
House [6] - 4:6, 6:19, 8:2, 14:16, 14:24, 15:4
house [1] - 14:20
idea [1] - 15:21
identified [1] - 16:5
identity [1] - 15:5
illegal [2] - 8:13, 10:13
immediately [3] - 7:3, 7:5, 12:2
inconvenience [1] - 16:23
inconvenienced [1] - 7:5
indicated [1] - 14:14
individuals [2] - 15:6, 16:4
information [3] -

15:1, 15:11, 16:9
initiating [1] - 11:9
instance [1] - 6:18
intends [1] - 11:9
interrogatories [2] - 9:3, 11:10
interrupt [1] - 7:7
investigations [1] - 15:17
involve [1] - 11:7
irrelevant [1] - 13:8
issue [7] - 6:10, 10:11, 14:15, 14:17, 16:16, 17:6, 17:9
issues [4] - 5:4, 5:5, 11:13, 11:19
judge [1] - 9:9
Karen [1] - 11:24
keep [1] - 10:6
keeping [1] - 8:6
kind [4] - 6:5, 6:14, 7:13, 17:5
knowledge [1] - 18:11
lapse [1] - 13:16
largely [1] - 13:8
last [2] - 6:18, 8:17
leaseholds [1] - 16:11
leases [1] - 16:6
leasing [1] - 15:8
least [1] - 17:3
leave [5] - 5:4, 11:10, 12:1, 12:6, 12:20
left [1] - 12:18
legal [1] - 6:10
length [1] - 7:16
level [3] - 4:15, 4:23, 13:22
limited [1] - 13:22
live [1] - 16:7
LLC [1] - 2:6
low [1] - 13:22
MARBLEHEAD [1] - 1:7
Marblehead [10] - 2:3, 4:7, 8:4, 8:19, 9:2, 10:3, 10:6, 11:24, 14:19, 18:10
March [1] - 8:16
Mark [2] - 1:14, 4:4
MASSACHUSETTS [2] - 1:1, 18:4
Massachusetts [4] - 1:17, 1:23, 2:3, 2:8
Matt [1] - 4:9
matt@mtclawyers.com [1] - 2:9
matter [14] - 4:15,

6:19, 7:6, 8:11, 10:11, 12:10, 12:15, 13:2, 13:9, 15:3, 15:16, 15:24, 16:14, 17:8
matters [7] - 4:24, 7:1, 8:8, 8:10, 9:20, 13:13, 17:3
Matthew [1] - 2:7
MEAD [1] - 2:6
mean [1] - 13:19
member [1] - 12:2
merits [1] - 10:18
Middlesex [1] - 18:5
might [1] - 10:22
monastic [1] - 8:4
months [1] - 6:21
motion [8] - 4:5, 4:13, 4:24, 5:1, 7:4, 9:1, 15:2, 17:13
motions [2] - 12:22, 17:1
move [3] - 6:1, 6:4, 11:5
moving [1] - 16:21
MR [3] - 11:6, 14:12, 17:10
MS [14] - 6:17, 7:22, 9:10, 9:12, 9:17, 10:2, 10:12, 10:19, 13:11, 13:21, 14:3, 16:10, 16:20, 17:12
names [1] - 16:8
near [1] - 7:3
necessary [2] - 11:5, 15:20
need [7] - 6:10, 9:4, 9:23, 10:19, 14:5, 14:9, 16:1
needs [1] - 9:19
never [1] - 12:23
New [1] - 2:8
news [1] - 12:17
next [1] - 13:24
NICHOLAS [1] - 1:5
Nicholas [4] - 4:7, 8:12, 14:16, 18:9
nitty [1] - 11:16
nitty-gritty [1] - 11:16
none [1] - 13:14
normal [1] - 12:9
Nos [1] - 4:6
Notary [1] - 18:19
noticed [1] - 4:19
obtain [1] - 10:5
occupy [1] - 13:6
OF [4] - 1:1, 1:5, 1:7, 18:4
office [3] - 7:12, 12:19, 12:23

often [1] - 15:23
one [4] - 5:7, 8:22, 11:19, 12:23
One [1] - 8:8
opposing [1] - 7:24
opposition [1] - 4:14
order [1] - 16:17
ordinarily [1] - 7:14
organization [3] - 13:4, 13:5, 15:15
ought [2] - 5:3, 6:7
outset [1] - 4:15
p.m [1] - 17:14
Page [1] - 3:10
Pages [1] - 18:8
paltry [1] - 8:17
paperwork [1] - 4:16
parsonage [1] - 14:20
particular [1] - 7:1
parties [7] - 4:20, 5:3, 6:7, 6:11, 12:13, 17:4, 17:7
party [2] - 9:18, 16:19
PAUL'S [1] - 2:2
pending [2] - 8:7, 8:12
people [1] - 16:7
perhaps [2] - 6:19, 10:8
period [3] - 6:20, 8:5, 16:22
person [1] - 12:6
perspective [1] - 15:9
phone [1] - 4:16
place [5] - 11:23, 15:2, 15:17, 16:6, 18:10
plaintiff [1] - 10:9
pleading [1] - 11:9
pleadings [2] - 4:23, 5:12
Pleasant [1] - 10:14
point [2] - 5:10, 16:16
position [1] - 15:13
prefer [1] - 10:8
preliminary [1] - 4:23
present [1] - 8:7
Presiding [1] - 4:3
previous [3] - 14:13, 15:3, 15:20
principal [1] - 11:23
privilege [1] - 15:5
procedural [2] - 17:3, 17:6

COPLEY COURT REPORTING, INC.

08/19/2024 03:26:57 PM

**proceedings** [2] - 11:21, 14:13

**production** [1] - 9:5

**professional** [1] - 7:21

**Professional** [1] - 18:6

**properties** [4] - 14:17, 14:19, 15:12, 16:11

**property** [8] - 13:1, 13:6, 14:8, 15:2, 15:6, 15:18, 15:22, 16:7

**propound** [1] - 11:10

**propounded** [1] - 8:15

**propounds** [1] - 11:14

**Provencher** [7] - 2:7, 4:10, 6:1, 6:16, 8:14, 11:1, 14:10

**PROVENCHER** [3] - 11:6, 14:12, 17:10

**Provencher's** [1] - 4:14

**provide** [3] - 10:20, 12:13, 14:24

**provides** [1] - 9:18

**Public** [1] - 18:19

**public** [1] - 10:8

**pursued** [1] - 6:18

**put** [1] - 5:11

**qualifies** [1] - 14:21

**range** [1] - 7:19

**rather** [2] - 6:5, 7:21

**reach** [1] - 6:11

**reached** [1] - 7:15

**read** [1] - 4:13

**ready** [4] - 5:7, 5:8, 10:4, 12:2

**really** [2] - 6:20, 13:1

**reason** [1] - 7:23

**reasonable** [2] - 12:10, 12:15

**receive** [1] - 13:23

**received** [2] - 8:17, 9:4

**records** [1] - 10:7

**Recross** [1] - 3:3

**redacted** [1] - 16:8

**Redirect** [1] - 3:3

**reducing** [2] - 6:12, 6:13

**regret** [2] - 7:5, 16:22

**relative** [3] - 6:24, 8:2, 8:12

**relevant** [3] - 13:2, 16:4, 16:9

**religious** [4] - 13:5, 13:6, 14:21, 15:15

**reluctant** [1] - 14:24

**remedies** [1] - 10:24

**remember** [1] - 8:1

**renters** [1] - 15:7

**Reporter** [1] - 18:7

**REPORTING** [1] - 1:22

**Representing** [1] - 4:8

**representing** [1] - 4:9

**request** [4] - 5:7, 9:4, 9:5, 12:3

**requests** [2] - 11:15, 11:18

**reserved** [1] - 15:4

**resided** [1] - 15:6

**residential** [1] - 14:18

**resolved** [1] - 5:5

**respond** [2] - 9:3, 11:15

**responded** [1] - 13:12

**responding** [1] - 12:3

**response** [3] - 8:18, 8:24, 10:3

**revocation** [2] - 8:13, 10:13

**Rizzari** [1] - 18:6

**ruling** [1] - 17:9

**run** [1] - 10:22

**scene** [1] - 8:6

**schedule** [2] - 6:13, 11:12

**scheduling** [1] - 4:15

**second** [1] - 11:3

**see** [1] - 9:16

**seek** [2] - 11:10, 13:19

**seeking** [1] - 15:11

**separate** [1] - 8:20

**served** [1] - 6:11

**services** [1] - 15:22

**session** [1] - 6:2

**set** [2] - 5:2, 18:11

**seven** [1] - 8:5

**share** [1] - 10:8

**shed** [1] - 7:22

**showing** [1] - 8:3

**SHRINE** [1] - 1:5

**Shrine** [6] - 4:6, 8:12, 14:16, 14:24, 15:3, 18:9

**significantly** [1] - 13:15

**similar** [1] - 4:19

**simply** [1] - 5:5

**single** [1] - 14:18

**sister** [1] - 15:13

**situation** [1] - 10:22

**skill** [1] - 18:11

**slipped** [2] - 8:21, 8:23

**sorry** [1] - 5:1

**sort** [2] - 14:10, 17:3

**sounds** [1] - 9:23

**speedy** [5] - 4:5, 5:1, 6:23, 7:4, 7:8

**spring** [2] - 7:15, 12:9

**ss** [1] - 18:5

**ST** [2] - 1:5, 2:2

**St** [4] - 4:7, 8:12, 14:16, 18:9

**staff** [1] - 12:2

**started** [1] - 6:6

**statement** [1] - 6:7

**statute** [2] - 10:7, 14:22

**steps** [1] - 10:5

**still** [1] - 9:4

**Stockton** [10] - 2:2, 4:9, 5:10, 5:24, 6:15, 11:8, 11:14, 11:22, 12:21, 15:13

**STOCKTON** [14] - 6:17, 7:22, 9:10, 9:12, 9:17, 10:2, 10:12, 10:19, 13:11, 13:21, 14:3, 16:10, 16:20, 17:12

**Stockton's** [1] - 4:13

**strategy** [1] - 7:24

**streamline** [1] - 13:9

**Street** [4] - 1:16, 1:22, 2:7, 10:14

**subject** [2] - 7:1, 8:10

**submit** [1] - 13:14

**subpoenas** [1] - 10:4

**subsisting** [1] - 10:15

**sufficient** [1] - 11:4

**suggest** [1] - 6:5

**suggested** [2] - 6:22, 12:9

**suggesting** [1] - 10:21

**suit** [1] - 13:17

**Suite** [1] - 1:22

**superior** [2] - 5:21, 9:24

**Superior** [4] - 8:11, 9:9, 10:11, 10:22

**TALERMAN** [1] - 2:6

**TAX** [1] - 1:2

**Tax** [2] - 1:16, 5:13

**taxation** [1] - 8:10

**taxed** [1] - 10:15

**taxing** [1] - 13:1

**taxpayer** [2] - 6:13, 13:3

**term** [1] - 7:3

**termed** [1] - 4:20

**terminate** [1] - 12:19

**Testimony** [1] - 3:3

**THE** [1] - 1:5

**thinking** [1] - 11:2

**third** [1] - 8:23

**three** [1] - 8:19

**Thursday** [3] - 1:18, 4:3, 8:17

**tightly** [1] - 8:21

**timeframe** [2] - 12:6, 13:16

**timeline** [3] - 8:1, 8:3, 16:16

**timely** [2] - 5:14, 5:20

**Today** [1] - 4:3

**today** [3] - 4:3, 12:18, 16:22

**tolerate** [1] - 4:22

**topics** [1] - 13:12

**toward** [2] - 6:7, 6:12

**TOWN** [1] - 1:7

**Town** [11] - 4:7, 6:12, 8:3, 8:19, 9:2, 9:16, 10:3, 10:6, 11:17, 11:24, 14:19

**town** [2] - 4:9, 14:22

**Tracey** [2] - 2:2, 4:8

**transcript** [1] - 18:9

**transpires** [1] - 15:22

**trial** [5] - 6:3, 6:24, 7:4, 7:15, 16:14

**true** [2] - 6:23, 18:8

**trying** [2] - 10:20, 15:10

**tune** [1] - 7:23

**two** [5] - 6:24, 8:7, 9:14, 14:15, 14:17

**under** [4] - 14:21, 15:5, 16:14, 17:8

**unfulfilled** [1] - 12:7

**Union** [1] - 2:7

**unreasonable** [4] - 5:6, 7:16, 14:2, 14:4

**unusual** [1] - 12:11

**unwarranted** [1] - 4:17

**up** [3] - 9:8, 11:14, 12:4

**valid** [1] - 10:14

**variously** [1] - 14:19

**versus** [1] - 4:7

**view** [1] - 16:16

**Volume** [1] - 1:2

**voted** [2] - 11:23, 12:19

**vs** [2] - 1:6, 18:9

**waiting** [1] - 5:22

**week** [4] - 9:14, 9:18, 11:3, 13:24

**whatsoever** [1] - 8:24

**William** [1] - 1:15

**withhold** [1] - 15:4

**WONDERWORKER** [1] - 1:5

**works** [1] - 11:17

**worries** [1] - 16:24

**worship** [1] - 14:20

**www.copleycourt. com** [1] - 1:24

**year** [4] - 4:18, 5:16, 7:14, 13:15

**years** [2] - 5:22, 8:5

EXHIBIT H

*See,* attached.

## COMMONWEALTH OF MASSACHUSETTS
## APPELLATE TAX BOARD

EGYPT HOUSE,                          )
                                      )
    Appellant                )
                                      )
v.                                    )        No. F-347637
                                      )
BOARD OF ASSESSORS OF                 )
TOWN OF MARBLEHEAD                    )
                                      )
    Appellee                 )
                                      )

RECEIVED
2013 SEP 12 A 10: 15
APPELLATE TAX BOARD

## APPELLEE BOARD OF ASSESSORS OF TOWN OF MARBLEHEAD'S MOTION TO COMPEL MORE RESPONSIVE ANSWERS TO INTERROGATORIES FROM APPELLANT EGYPT HOUSE

Now comes the Appellee, the Board of Assessors of the Town of Marblehead (the Board), and, pursuant to 831 CMR 1.25 and G.L. c. 231, § 64, moves for an order compelling more responsive answers to the interrogatories it propounded upon Appellant Egypt House. The Appellate Tax Board has the same power under 831 CMR 1.25 as courts of the Commonwealth do under G.L. c. 231, § 64, and "may make and enter such order, judgment or decree as justice requires" when a party fails to answer an interrogatory. The Board asks for a 7-day order, and seeks more responsive answers more specifically as follows:

## INTERROGATORY

3.      Please identify and state the corporate or entity status of Egypt House, including the state or territory in which it is organized, its principal place of business, the locations at which it conducts any activities or business, and any officers, directors, or controllers of the entity.

**ANSWER**

3.       Egypt House is a District of Columbia religious nonprofit corporation. Egypt House is the fee simple owner of 12 Conant Road, Marblehead, Massachusetts 01945. Rev. Fr. Andrew Bushell is the Superior of Egypt House.

**MOTION TO COMPEL**

3.       This answer is incomplete. The interrogatory seeks Egypt House's principal place of business, the locations it conducts activities and business, and the officers, directors, or controllers of the entity. The information is relevant and germane to the issues before this Board, and a further response should be compelled.

**INTERROGATORY**

4.       State the circumstances, manner, and means of Egypt House's acquisition of the Locus.

**ANSWER**

4.       The discovery and disclosures sought by the Requesting Party under the subject interrogatory are totally irrelevant, designed to harass, will not lead to the discovery of any admissible evidence, were designed to harass and serve ulterior motives to obtain information that is completely unrelated to the material issues of this litigation, and such discovery and disclosure exceeds the obligations imposed under the Rules of Court. The instant matter arises solely pursuant to the denial of municipal tax exemptions accorded religious organizations under Massachusetts General Laws at G. L. c. 59, § 5 (10) and (11) by the Requesting Party. The analysis with respect to challenges arising under G.L. c. 59, § 5 (10) and (11) looks at use of the property subjected to such challenge.

**MOTION TO COMPEL**

4.       This interrogatory seeks relevant and material information. The Appellant concedes that use of the property is at issue in this Appeal. The circumstances leading to acquisition of the

property provide relevant information about Egypt House's plans for the use of the property, a subject that is obviously relevant. There is no basis for the objection and refusal to answer, and a more responsive answer should be compelled.

## INTERROGATORY

5.    Describe in detail any and all activities conducted by Egypt House at the Locus at all times from Egypt House's acquisition of the Locus through the present.

## ANSWER

5.    A chapel is located within Egypt House. Egypt House is a consecrated site used for Divine Liturgy, vespers, and administration of the sacraments. Egypt House serves as a guest house to pilgrims undergoing spiritual counselling, a reading room with books on Orthodox Spirituality, and a place for evangelical work. An iconographer engaged in the writing of the Holy Icons for the Shrine of St. Nicholas the Wonderworker performed his sacred work within Egypt House. Egypt House has benefitted from repairs, cleaning, and maintenance since acquisition.

## MOTION TO COMPEL

5.    This answer is incomplete. The interrogatory seeks a description of any and all activities conducted by Egypt House at the property for which an exemption is claimed, a claim which in turn depends upon the actual use of the property by Egypt House. There is no information provided by the statement that a chapel is "located" within Egypt House—the Appellant must state under oath how often it is used, when, for what duration, etc. The same is true for all of the other activities referenced. The Appellant should be compelled to identify with specificity the activities that it conducts on the property.

## INTERROGATORY

6.    Identify any and all agents, servants, employees, officers, officials, directors, or personnel of any kind that conduct activities on behalf of Egypt House at the Locus, and which

activities each individual conducts.

**ANSWER**

6.      The discovery and disclosures sought by the Requesting Party under the subject interrogatory are totally irrelevant, will not lead to the discovery of any admissible evidence, seek to obtain information that is completely unrelated to the material issues of this litigation and are designed to harass Responding Party. The discovery and disclosures sought by Requesting Party hereunder exceed the obligations imposed under the Rules of Court.

**MOTION TO COMPEL**

6.      This information is plainly relevant and discoverable. As the Appellant concedes, an issue in this appeal is the use of the property by the Appellant, which includes the actions of its agents, servants, employees, and personnel. Determining who is present, and doing what, is a critical part of this appeal, in which the Appellant claims an exemption because it contends that the property is used for religious purposes. It cannot do so without identifying the individuals who do that activity, and describing what they do on site. The Board should compel a more responsive answer.

**INTERROGATORY**

7.      Please state whether the Locus is covered by any insurance policy, and, if so, the issuer of that policy and its policy number.

**ANSWER**

7.      The discovery and disclosures sought by the Requesting Party are totally irrelevant, are not reasonably calculated to lead to the discovery of any admissible evidence, and such discovery and disclosure exceed the obligations imposed under the Rules of Court.

**MOTION TO COMPEL**

7.      This interrogatory seeks relevant information. Insurance coverage is predicated upon use, and the information contained in an insurance policy is directly relevant to the issues in this appeal.

The Appellant has directly placed its own activity and conduct on the property at issue, and a responsive answer should be compelled.

## INTERROGATORY

8.      Please state whether the Locus is encumbered by a mortgage, and if so, identify the mortgagee and/or any other parties holding an interest in the Locus.

## ANSWER

8.      The discovery and disclosures sought by the Requesting Party are totally irrelevant and are not reasonably calculated to lead to the discovery of any admissible evidence, the requested documentation is just as easily obtainable by the Requesting Party, from third party sources, as they are from the Responding Party. The request constitutes an improper attempt by the Requesting Party to shift to the Responding Party the labor, cost, and responsibility for obtaining the requested documents. The instant matter arises solely pursuant to the denial of municipal tax exemptions accorded religious organizations under Massachusetts General Laws at G. L. c. 59, § 5 (10) and (11) by the Requesting Party. The analysis with respect to challenges arising under G.L. c. 59, § 5 (10) and (11) looks at use of the property subjected to such challenge.

## MOTION TO COMPEL

8.      This interrogatory seeks relevant information. It is relevant if any other person or entity holds an interest in the property, which can take the form of a mortgage interest and/or restriction on the use of the property. Any restrictions are directly relevant to the activity that occurs thereon, the central issue in this appeal. The Appellant has directly placed its own activity and conduct on the property at issue, and a responsive answer should be compelled.

**INTERROGATORY**

9.     Please identify any and all individuals who have, since the time Egypt House acquired the Locus, resided at, lived at, or inhabited the Locus for more than one day.

**ANSWER**

9.     Dr. George Kordis and Rev. Fr. Andrew Bushell. The identities of the remaining individuals are subject to the Clergyman-Penitent Privilege. (G.L. c. 233, § 20A (LexisNexis, Lexis Advance through Chapter 25 of the 2023 Legislative Session of the 193rd General Court)).

**MOTION TO STRIKE AND COMPEL**

9.     The objection and claim of privilege should be struck and a more responsive answer compelled. Massachusetts' priest-penitent privilege is established in G.L. c. 233, § 20A, which provides that

A priest, rabbi or ordained or licensed minister of any church or an accredited Christian Science practitioner shall not, without the consent of the person making the confession, be allowed to disclose a confession made to him in his professional character, in the course of discipline enjoined by the rules or practice of the religious body to which he belongs; nor shall a priest, rabbi or ordained or licensed minister of any church or an accredited Christian Science practitioner testify as to any communication made to him by any person in seeking religious or spiritual advice or comfort, or as to his advice given thereon in the course of his professional duties or in his professional character, without the consent of such person.

The priest-penitent privilege is "strictly construed and applies only to communications where a penitent seek[s] religious or spiritual advice or comfort." *Commonwealth v. Nutter*, 87 Mass. App. Ct. 260, 263 (quoting *Commonwealth v. Vital*, 83 Mass. App. Ct. 669, 672 (2013)). "Whether [a party's] communications are protected under the terms of the statute is a question of law." *Id.* (quoting *Commonwealth v. Kebreau*, 454 Mass. 287, 303 (2009)). By the terms of the statute, the privilege applies to communications, not to identities or the presence of individuals on a property. In fact, claiming the privilege "involves factual determinations concerning the defendant's intent." *Nutter*, 87 Mass. App. Ct. at 263 (citing *Kebreau*, 454 Mass. at 303). To claim the privilege, a person must identify themselves

as someone communicating with a priest, rabbi, or ordained or licensed minister of any church, and that they were making a confession or seeking religious or spiritual advice or comfort. The interrogatory seeks no information whatsoever about communications, and only the identities of individuals who have resided at the Locus in this matter. As the Appellant notes, this case involves a tax exemption claimed under G.L. c. 59, § 5, which requires the Appellant to prove that it has used the property for primarily religious purposes. The identities of individuals residing on the property is plainly relevant and not privileged. The assertion of privilege is ill founded and should be struck, and a responsive answer compelled.

## INTERROGATORY

10.     Please identify any and all individuals, entities, and persons who have leased, rented, or otherwise occupied space at the Locus.

## ANSWER

10.     Aside from the individuals referred to at Interrogatory 9, Egypt House has not been leased, rented, nor otherwise occupied.

## MOTION TO COMPEL

10.     The Appellee moves for an order compelling a more responsive answer. The answer to Interrogatory 10 refers to the answer to Interrogatory 9, which, as set forth above, withholds the identities of an unknown number of individuals. Those individuals' identities are not privileged, are relevant, and a responsive answer so indicating should be compelled.

## INTERROGATORY

11.     For each individual, entity, or person identified in the Answer to Interrogatory No. 10, please state the terms of the lease, rental, or other agreement for use of the Locus. The Board will accept the production of a lease, rental, or other agreement in response to this Interrogatory.

## ANSWER

11.    No lease, rental, or other agreement for the use of Egypt House has ever been effectuated. See attached relative to draft lease agreements, uneffectuated.

## MOTION TO COMPEL

11.    This interrogatory seeks relevant information related to use of the property. The Appellant's response states only that no written leases were executed. This does not preclude a lease, rental, or agreement for use, including a license by oral agreement. The Appellant must state in response whether any such agreements have ever existed, and what their terms are, separate from whether they were reduced to a writing. The Board stated that it would accept a written agreement *in lieu* of an answer; it did not limit the interrogatory to only written agreements.

Appellee,
The Board of Assessors of the Town of Marblehead,
By its attorneys,


/s/ Matthew D. Provencher
Matthew D. Provencher (BBO#694114)
**Mead, Talerman & Costa, LLC**
227 Union Street, Suite 609
New Bedford, MA 02740
774-206-6857
matt@mtclawyers.com

Date: September 6, 2023

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record for the Appellant, Egypt House, on the 6th day of September, 2023.

/s/ Matthew D. Provencher

# THE COMMONWEALTH OF MASSACHUSETTS
## APPELLATE TAX BOARD

| | | |
|---|---|---|
| EGYPT HOUSE, | ) | DOCKET NO.: F-347637 |
|     Appellant | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOARD OF ASSESSORS OF THE TOWN | ) | |
| OF MARBLEHEAD, | ) | |
|     Appellee | ) | |

## <u>APPELLANT'S RESPONSE AND OPPOSITION TO APPELLEE'S MOTION TO COMPEL</u>
## <u>FURTHER RESPONSES TO FIRST REQUEST</u>
## <u>FOR PRODUCTION OF DOCUMENTS TO APPELLANT</u>

### <u>Table of Authorities</u>

**Cases**

*Assessors of Boston v. Garland Sch. of Home Making*, 296 Mass. 378 (1937).
*Assessors of Boston v. Old South Society in Boston, 314 Mass. 364, 366 (1943).*
*Boston Chamber of Commerce v. Assessors of Boston, 315 Mass. 712 (1944).*
*Mt. Auburn Hospital v. Assessors of Watertown*, 55 Mass. App. Ct. 611, 622, n. 11 (2002).
*New Eng. Forestry Found., Inc. v. Board of Assessors*, 468 Mass. 138 (2014).
*New England Hospital for Women and Children v. City of Boston*, 113 Mass. 518 (1873).
*Superior Realty Company, Inc. v. Assessors of Quincy*, Mass. ATB Findings of Fact and Reports
    2016-436, 446.47.
*Trimount Foundation, Inc. v. Board of Assessors of the City of Newton*, 2019 Mass. Tax LEXIS
    1.
*Trinity Church v. City of Boston*, 118 Mass. 164 (1875).
*Trustees of Boston College, Mass.* ATB Findings of Fact and Reports at 2010-96, 123.
*Walz v. Tax Comm. of N.Y.*, 397 U.S. 664 (1970).

**Constitutions**
ALM Constitution Pt. 1, Art. II.
USCS Const. Amend. I.

**Statutes**

ALM R. Civ. P. Rule 26.

ALM G. Evid. § 510.

G.L. c. 59, § 2 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative Session of the 193rd General Court).

G.L. c. 59, § 5 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative Session of the 193rd General Court)

G.L. c. 233, § 20 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative Session of the 193rd General Court)

By and through its counsel, Appellant, Egypt House, respectfully submits this Response and Opposition to Appellee's Motion to Compel More Responsive Answers to Interrogatories from Appellant. For the reasons set forth herein, Appellant respectfully requests the Appellate Tax Board deny Appellee's Motion to Compel More Responsive Answers to Interrogatories from Appellant.

## I.    INTRODUCTION

Appellant is the fee simple owner of an approximately 1,900 square foot single-family residence situated on improved real property located at 12 Conant Road in the Town of Marblehead, Massachusetts (such property, "Egypt House"). Appellant is a District of Columbia religious non-profit corporation expressly because the laws of the District of Columbia allow for the consideration of canon law whereas the laws of the Commonwealth of Massachusetts do not. The premises owned by Appellant is contiguous to, and shares the same use with, a second single-family residence located at 22 Endicott Avenue of approximately 1,700 square feet, also used as a monastic house and incorporated in the District of Columbia for the same reasons, albeit incorporated separately for reasons of liability, as is normal practice. *See,* Exhibit 1, attached. Both houses, while separately titled and incorporated, together in harmony exist to serve the same religious purpose as one monastic complex which is a part of St. Paul's Foundation, an Orthodox Christian monastic institute, similar to how St. Joseph's Abbey, located in Spencer, Massachusetts, is comprised of several parcels forming St. Joseph's Abbey, a part of the Order of the Cistercians of the Strict Observance (the "Trappists"). There are three Massachusetts Department of Revenue exempt use codes for religious organizations, 960 for "Church, Mosque, Synagogue, Temple, etc.," 961 for "Rectory or Parsonage, etc.," and 962 for

"Other."  There is also a non-exempt use code, 124, for rectories, convents and monasteries, although it is difficult to understand how it would be applied.

We looked to St. Joseph's Abbey in Spencer, Massachusetts as an example.  The monks at St. Joseph's own 12 exempt properties: R48-10 listed as 962 although it is vacant land, R48-5 listed as 962 although it is vacant land, R49-1 listed as 962 although it is vacant land, R52-6 listed as 962, R53-2 listed as 962 although it is vacant land, R53-3 listed as 962 although it is a soccer field and vacant land, R53-5 listed as 962 although it is vacant land, R54-3 listed as 962 although it is a soccer field and vacant land, R54-4 listed as 962 although it is vacant land, R57-1 listed as 962 although it is vacant land, R59-1 listed as 960 described as antique residential clapboard, and R59-2 listed as 960 described as vacant land.

We recognize a tax exemption derives from "special grace and favor" and eligibility must be demonstrated by the applicant; in this case, Egypt House. We have demonstrated that Egypt House is contiguous to and shares the same use with Emmaus House. Prior to the purchase of Egypt House, Appellant met with an architect to develop plans to improve the property into a more suitable monastic property (with pricing plans therefor delivered on August 22, 2022), contacted two general contractors, scheduled meetings to renovate the property, and received one bid to renovate the property. In the meantime, while renovation work was being evaluated, designed, and workmen identified, the property was used for purposes exempted under Clause Eleventh, to wit:

(a)    as housing for Dr. George Kordis, a world-renowned iconographer (iconographers are a kind of cleric in the Orthodox Church specialized in writing the Holy Icons for churches, and receive special blessings from a bishop in order to write the Holy Icons with prayer and fasting);

(b)      a studio for the development of the Holy Icons for St. Nicholas the

Wonderworker, Egypt House, and Emmaus House – writing one of the Holy Icons is considered

analogous to a church service in the Orthodox Church;

(c)      celebration of religious liturgical services, including by clergy other than Fr.

Andrew, such as Bishop Theophan of Philomelion and Fr. Paul Zuniga;

(d)      housing for pilgrims seeking spiritual direction and confession of their sins; and

(e)      administrative work, such as reviewing construction documents and filing and

composing a seemingly endless stream of administrative appeals and legal defenses.

Appellant looked to other organizations whose exempted landholdings are comprised of

related parcels; organizations that acquired parcels, developed plans, and started construction

(*New England Hospital for Women and Children v. City of Boston*, 113 Mass. 518 (1873),

*Trinity Church v. City of Boston*, 118 Mass. 164 (1875), and *Mt. Auburn Hospital v. Assessors of*

*Watertown*, 55 Mass. App. Ct. 611, 622, n.11 (2002)); organizations that placed parcels under

temporary use in service to the organization while identifying the best and highest use for such

parcel within the subject organization (*Trustees of Boston College*, Mass. ATB Findings of Fact

and Reports at 2010-123); and organization owners that had not leased the property or derived

profit from it while identifying the best and highest use for such parcel within the subject

organization (*Mt. Auburn Hospital v. Assessors of Watertown*, 55 Mass. App. Ct. 611, 622, n.11

(2002)). We take each of these concepts and cases in turn.

In *New England Hospital for Women and Children v. City of Boston*, 113 Mass. 518

(1873), the Supreme Judicial Court found, "[w]ithin a period of about a month from its purchase

in April, 1871, the appellant had hired an architect, who had prepared plans and specifications

for the hospital, which the appellant approved, and by May 27, 1871, the architect had staked off

the property in preparation for digging the foundation. *Id*. The Supreme Judicial Court found that the appellant, as of the relevant determination date, was "diligently proceeding with the preliminary measures necessary to the erection" of the hospital and, accordingly, did "occupy" the property in accordance with the statute as of that time. *Id*. at 521. In *Trinity Church v. City of Boston*, 118 Mass. 164 (1875), "[i]t was then, and is now, the intention of the proprietors of the plaintiff corporation to use the lot on St. James Avenue for purposes of religious worship only; and they have caused the work of building the new church to be carried on with all reasonable diligence." *Mt. Auburn Hospital v. Assessors of Watertown*, citing *New England Hospital* as reflecting "a less rigid formulation [with respect to occupancy] focusing on the organization's intentions and diligence." *Mt. Auburn Hospital v. Assessors of Watertown*, 55 Mass. App. Ct. 611, 622, n.11 (2002): "although construction had not commenced yet, planning had been undertaken with due diligence and the hospital had not leased the premises or derived a profit therefrom; exemption allowed." In this instance, Egypt House purchased the subject property on June 30, 2022. Prior to June 30, 2022, it had already viewed the property with an architect and started developing the plans for the property. *See*, Exhibit 2, attached. In the interim, while bids for construction were being solicited and mortgages applied for, the subject property was being used for liturgical services, housing for retreatants for spiritual direction, and housing for the iconographer to beautify the chapel areas of St. Nicholas. Additionally, the garage building was used as storage for maintenance tools to maintain the property and the basement to store other items to extend the evangelical mission of the Orthodox Church such as fixtures and equipment to be installed at St. Nicholas. It is a common practice for parsonages and rectories to store various items to be used later at the actual houses of worship, particularly when there are renovations at the main house of worship.

The decision of the Board in *Trustees of Boston College*, Mass. ATB Findings of Fact and Reports at 2010-123, states: "where the property at issue had only recently been acquired by the college, and its long-term use was still being studied," the Board found the property at issue was exempt, as the college occupied it with interim uses, such as passive recreation, overflow parking, and buffer space, and concluded, the "fact that these uses may have been temporary, or that Boston College's future plans for the subject property continued to evolve during the fiscal years at issue, did not warrant a finding to the contrary." Based upon the foregoing one is able to understand the situation of Egypt House is not unique and is the subject of well settled determinations by both this Board and the Supreme Judicial Court.

In *Trustees of Boston College v. Assessors of Boston*, Mass. ATB Findings of Fact and Reports 2010-96, and *Superior Realty Company, Inc. v. Assessors of Quincy*, Mass. ATB Findings of Fact and Reports 2016-436, 446-47, the Board treated contiguous parcels as one where the evidence showed they were used in the same manner and put to the same economic use. This is directly on point with the situation at Egypt House which is contiguous to Emmaus House.

A definition for the term "parsonage" is not contained in the statutes. In *Assessors of Boston* v. *Old South Society in Boston*, 314 Mass. 364, 366 (1943), the court stated in pertinent part:

> . . . the English word 'parsonage' as derived from American usage must be read, not in a technical or ecclesiastical sense, but in the broad meaning of a ministerial residence used in connection with any place of worship of any denomination. It is but a house owned by, or held in trust for, a religious organization for religious uses in which a minister serving

those uses lives. . . . The word 'parsonage' is commonly used to denote a residence

furnished by a church to a minister."

But surely, if a house of worship is under construction and diligently seeking to complete its

construction, using a parsonage as a temporary place of worship, retreat and necessary

administrative workspace such uses should not violate the exempt purpose of the religious

organization in question under Clause Eleventh, otherwise that would provide an impermissible

establishment of religious organizations that are older, wealthier, and better accepted by the

community.

Ownership of multiple contiguous properties serving the same religious purpose is a

concept that exists in Marblehead at other houses of worship, as documented in the Marblehead

Assessor's own records: Our Lady Star of the Sea, a Roman Catholic Parish, has five real

properties, three contiguous (church listed as 960, a parking lot listed as 962, the rectory has no

property card at all) and two on separate lots (an educational center and function hall across the

street from the church listed as 954 and a cemetery across town listed as 962); St. Michael's

Episcopal Church has five (5) contiguous real properties and at least one, an investment property,

called Davenport House, is incorporated separately in a trust and listed as a two family use 124,

but its real estate tax status is unclear; Old North Church has perhaps three separate real

properties including the church, and across the street a parking lot contiguous to a rectory.

Several, including St. Andrew's Episcopal and, St. Stephen's Methodist have parsonages. Of

these local religious organizations, Star of the Sea's rectory is most analogous to the facts at

issue here, use with clergy residences and offices on the upper floors and offices, meeting rooms

and kitchen space on the ground floor – except the single Catholic rectory has individual suites

on the upper floors for priests, is larger than both 12 Conant Road and 22 Endicott Avenue put

together, and only has one full-time priest. Unfortunately, there is no digital record of the rectory of Our Lady Star of the Sea in the public Town of Marblehead portal on the Patriot Property website. The renovation plans for Egypt House, responsive to Appellee's Second Request for Production of Documents (to be provided, response not yet due), will eventually allow for clerical suites so each cleric can have a bedroom with ensuite bathroom. There are many examples of such usage within the practices of Orthodox Catholic and Roman Catholic countries, such as the Convent of St. Elizabeth in Obitel-Minsk (https://obitel-minsk.org/history). Because a religious organization is nascent and all of its ministries are not finally settled does not make the religious organization less religious. For example, the time I am now spending writing this response could be better spent writing on the Feast of the Holy Cross, but my work at Egypt House sitting and writing as a lawyer defending the religious practice of the church does not make Egypt House less occupied for religious use, just as pilings installed at Holy Trinity Church in Boston, or architectural plans and permits for renovations of other properties, are indicative of occupancy.

Because the Board considers related parcels in analyses of this nature and because there is likely an additional matter that will appear before the Board shortly, it makes sense to lay out the entirety of St. Paul's Foundation's subordinate holdings in Marblehead. Emmaus House is listed as 960. The two contiguous St. Nicholas properties at 120 and 124 Pleasant Street also in Marblehead are listed as 960. Egypt House should either be listed as 960 because it has a chapel and is used for religious instruction as well as a residence for clergy, or 961 as a parsonage, or 962 as other. Whatever the case, Egypt House should be listed as the same use since the uses are the same. We note the Town of Marblehead recently revoked an exemption it had previously granted to St. Nicholas' property at 120 Pleasant Street which complements the ministry of 124

Pleasant Street without any explanation. At the Pleasant Street location, *The Archbishops Damaskinos and Iakovos Educational Center*, currently undergoing renovations, inclusive of the installation of an outdoor baptistry in a garden where outdoor worship services can be celebrated, administrative offices for church staff, multipurpose educational and conference rooms (including a place where a video screen can be lowered to show a movie explaining the devotions at St. Nicholas), it is contemplated our church will have a public-facing home for our ministries. In a recent filing in Superior Court, we note the Town, in a filing by counsel hereunder, denies the religious character of St. Nicholas' property at 120 Pleasant Street. Appellant is still puzzled over this turn of events, since the subject site is clearly a house of worship undergoing over $1,000,000.00 in fully-permitted renovations subjected to inspection by the Town of Marblehead. This site is contiguous to property in which the Orthodox Christian chapel, refectory, monastic workshop, and pilgrims' quarters are to be located. Constant delays to St. Nicholas' construction program required expansion at Emmaus House; hence Egypt House, literally named after the Holy Family's Flight to Egypt.

　　Each of Egypt House and Emmaus House have consecrated chapel areas for liturgical worship, rooms used as a residence for clergy and those otherwise consecrated to the mission of the Orthodox Church, guest quarters for pilgrims and lay cooperators, office space for the administrative and ever increasing amount of legal work required to, for example, file this brief, develop evangelical and mission related work, assist the local bishop in his work, review the construction work  at the Shrine of St. Nicholas or the various legal and/or administrative challenges to the establishment of St. Nicholas mounted by the Town of Marblehead, or any other of a hundred different tasks required by the planting of a church, which cannot be performed at either of the two buildings commonly known as 120 and 124 Pleasant Street

mentioned hereinabove due to the fact the buildings remain a construction site due to construction work being regularly halted as the result of a number of administrative and legal actions by Town of Marblehead officials (as partially laid out in the timeline attached hereto as Exhibit 3).

In view of the foregoing, Egypt House has the characteristics of both a house of worship and a parsonage; neither term quite fits a monastic usage, yet all monastic houses share the characteristics of both. It would be contrary to the current interpretation of the law, and indeed verge on establishment territory, to impose what is clearly a Protestant concept of church, *e.g.*, the word "parsonage" is never used among Orthodox Catholics or Roman Catholics, relative to a monastic institute. As noted hereinabove, the word "parsonage" is commonly used to denote a residence furnished by a church to a minister; however, even this definition does not conform to an Orthodox Catholic or Roman Catholic usage for what are termed "religious", *e.g.,* those men and women who live according to a stricter standard as monks, nuns, other kinds of consecration, or simply dedicated faithful such as the Numeraries of Opus Dei, *cf. Trimount Foundation*[1]. Importantly, the word "parsonage", or phrase "ministerial residence" could also mean two houses together used for the same purpose, especially when the aggregate square footage of the two properties combined is about 3,600 square feet and that space must provide for liturgical worship and uses, religious education classes and retreats, administrative offices, storage space for goods for religious purposes, and as well as residential uses.

Egypt House is neither a public nor private for-profit enterprise.  Egypt House is not a secular charitable organization. Egypt House is not a property held by a religious organization for charitable purposes. Egypt House does not employ persons to conduct business operations.

---

[1]     *Trimount Foundation, Inc. v. Board of Assessors of the City of Newton*, 2019 Mass. Tax LEXIS 1.

Her function is to hold real property and provide usable space necessary for the religious use of a religious organization such as worship, mission, pilgrims housing, and that necessary administrative work to allow our ministry to survive while continuing with the construction of the Shrine of St. Nicholas the Wonderworker in downtown Marblehead. Where else would Appellee have Appellant house and provide for her clergy, religious workers, liturgical space, religious education, pilgrims, and administrative work whilst St. Nicholas is under construction, if not at two houses that share a common boundary? We direct the Board to our timeline which clearly illustrates a pattern on the part of the Appellee, to wit: despite the existence of fully-permitted building plans, the Town of Marblehead continually identifies new objections to work it had already permitted and, following the time consuming and costly exercises of filing and answering appeals, such objections were overturned at the State level. The process of researching, arguing, filing and applying for these appeals at the State level does more than give the residents of Emmaus House and Egypt House a backache, it actually constitutes occupancy under the decisions of this Board, even though it's not the occupancy Appellant would prefer; that is the celebration of more liturgical services, working on more evangelical materials, and confessing more sins to raise more souls to Heaven. The ability to acquire Egypt House to provide for space to pray, evangelize, minister, work, and live was a fortuitous event that solved an existential threat to our minority religious foundation.

Appellant does not possess a vast file of materials relative to a single-family dwelling acquired eighteen months ago in support of its mission. Appellee's counsel would love to mire and confuse the Appellate Tax Board in extraneous detail on the hunt for some salaciously underhanded scheme that simply does not exist. The facts and the law in this instance are not complex. Houses of worship and parsonages are allowed exemptions under Clause the Tenth and

Clause the Eleventh. While it's arguable as to whether a monastic property is more house of worship than parsonage or more parsonage than house of worship, it is not arguable that Egypt House has been used for one or the other uses, each of which are exempt under Clause Eleventh. While these properties might not be held by the same entities, they are all subordinate nonprofits under the IRS group ruling of St. Paul's Foundation, a Delaware religious non-stock non-profit, are under common control, and all together comprise the same fundamentally religious use as has been repeatedly demonstrated. How Churches choose to arrange, or not to arrange, since incorporation is not a necessary part of the statute.

### Legal Principles Underlying the Tax Exemptions Promulgated
### At Massachusetts General Laws, Chapter 59, Section 5, Clauses 10th and 11th

Separation of Church and State is a core tenet of the republic established by the Founding Fathers of the United States. Freedom of religion is enshrined in the First Amendment to the United States Constitution.[2] In similar fashion, the Constitution of the Commonwealth of Massachusetts protects its citizens from persecution resulting from the practice of religion.[3]

The Massachusetts Code provides: [a]ll property, real and personal, situated within the commonwealth, and all personal property of the inhabitants of the commonwealth wherever situated, unless expressly exempt, shall be subject to taxation; . . ." G.L. c. 59, § 2 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative Session of the 193rd General Court). The exemptions at issue here are the religious organization exemptions. The subject exemptions

---

[2]     Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. USCS Const. Amend. 1.

[3]     It is the right as well as the duty of all men in society, publicly, and at stated seasons to worship the SUPREME BEING, the great Creator and Preserver of the universe. And no subject shall be hurt, molested, or restrained, in his person, liberty, or estate for worshipping God in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession or sentiments; provided he doth not disturb the public peace, or obstruct others in their religious worship. ALM Constitution Pt. 1, Art. II.

are codified at G.L. c. 59, § 5 (LexisNexis, Lexis Advance through Chapter 27 of the 2023

Legislative Session of the 193rd General Court), to-wit:

Tenth, Personal property owned by or held in trust within the commonwealth for religious organizations, whether or not incorporated, if the principal or income is used or appropriated for religious, benevolent or charitable purposes.

Eleventh, Notwithstanding the provisions of any other general or special law to the contrary, houses of religious worship owned by, or held in trust for the use of, any religious organization, and the pews and furniture and each parsonage so owned, or held in irrevocable trust, for the exclusive benefit of the religious organizations, and including the official residences occupied by district superintendents of the United Methodist Church and the Christian and Missionary Alliance and of the Church of the Nazarene, and by district executives of the Southern New England District of the Assemblies of God, Inc., Unitarian-Universalist Churches and the Baptist General Conference of New England, and the official residence occupied by the president of the New England Synod of the Lutheran Church in America, Inc., and the official residence occupied by a person who has been designated by the congregation of a Hebrew Synagogue or Temple as the rabbi thereof, but such exemption shall not, except as herein provided, extend to any portion of any such house of religious worship appropriated for purposes other than religious worship or instruction. The occasional or incidental use of such property by an organization exempt from taxation under the provisions of 26 USC Sec. 501(c)(3) of the Federal Internal Revenue Code shall not be deemed to be an appropriation for purposes other than religious worship or instruction.

G.L. c. 59, § 5 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative Session of the 193rd General Court). In *New England Forestry Foundation*,[4] the Court articulated the burden placed upon an organization seeking an exemption from taxation within the Commonwealth of Massachusetts:  "[e]xemption statutes are strictly construed, and the burden lies with the party seeking an exemption to demonstrate that it qualifies according to the express terms or the necessary implication of a statute providing the exemption." *Boston Chamber of Commerce v. Assessors of Boston,* 315 Mass. 712 (1944), citing *Assessors of Boston v. Garland Sch. of Home Making,* 296 Mass. 378 (1937). With respect to the matter before this Court, Appellant has provided responsive information relative to the ownership and use of Egypt House by Appellant. Egypt House was purchased approximately eighteen months ago; it is not unusual that a wealth of documentation does not exist, given the short time frame since it was purchased. Appellee now requests information relative to the terms of sale of Egypt House, inquiries as to whether and how the property is insured, and the identities of persons worshipping at or benefitting from the ministry(ies) performed at Egypt House. Appellant wonders why any of this information is germane to *the use of Egypt House under ownership by Appellee*; indeed, why is the name of any person who worships at Egypt House a topic for disclosure to the Town of Marblehead? "*The Taxpayer's Guide to Property Tax Exemptions in Massachusetts - Religious and Charitable Organizations*," published by the Taxpayer's Bureau, provides the following guidance relative to analyzing exemption applications:

> The organization must provide whatever information is *reasonably required to establish eligibility*. This information may include, but is not limited to: Articles of incorporation,

---

[4]     *New Eng. Forestry Found., Inc. v. Board of Assessors*, 468 Mass. 138 (2014).

charter or declaration of trust, Organization by-laws, identification of officers, directors

or trustees, description of charitable activities, description of the use of the property,

including use by all lessees or other occupants. [Emphasis added.]

In construing the theory(ies) surrounding the use of tax exemptions for religious organizations, in

*Walz v. Tax Comm'n of City of New York*[5], the United States Supreme Court sums up the

attributes of the exemption treatment afforded religious organizations adopted by the legislatures

since the founding of our country:

The legislative purpose of the property tax exemption is neither the advancement nor the

inhibition of religion; it is neither sponsorship nor hostility. New York, in common with

the other States, has determined that certain entities that exist in a harmonious

relationship to the community at large, and that foster its 'moral or mental improvement,'

should not be inhibited in their activities by property taxation or the hazard of loss of

those properties for nonpayment of taxes. It has not singled out one particular church or

religious group or even churches as such; rather, it has granted exemption to all houses of

religious worship within a broad class of property owned by nonprofit, quasi-public

corporations which include hospitals, libraries, playgrounds, scientific, professional,

historical, and patriotic groups.

*Walz v. Tax Com. of N.Y.*, 397 U.S. 664 (1970). The actions of the Town of Marblehead in this

instance step very close to the entanglement boundary raised in *Walz*, "the exemptions for

religious organizations created only a minimal and remote involvement between church and

---

5       *Walz v. Tax Com. of N.Y.*, 397 U.S. 664 (1970).
                Appellant's Response and Opposition to Appellee's Motion to Compel Further Responses
                     to First Request for Production of Documents to Appellant - Page 16 of 27

state, and far less of an involvement than would be created by taxation of churches, and the effect of the exemptions was thus not an excessive government entanglement with religion." *Id.*

Egypt House is *not* a publicly- or privately- held *for-profit enterprise*. Egypt House does not employ persons to conduct its business operations, as its sole function is to support the work of St. Paul's in building the Orthodox Christian faith and providing a place of Christian sanctuary for the weary, the oppressed, the down-trodden, and those seeking to live their Christian values in our modern world:

> Let all guests who arrive be received like Christ, for He is going to say, 'I came as a guest, and you received Me' (Matt. 25:35). And to all let due honor be shown, especially to the domestics of the *faith* (Gal 6:10) and to pilgrims. . . . Let the Abbot give the guests water for their hands; and let both Abbot and community wash the feet of all guests. After the washing of the feet let them say this verse: '[w]e have received Your mercy, O God, in the midst of Your temple.' (Ps.47[48]:10) . . . . In the reception of the poor and of pilgrims the greatest care and solicitude should be shown, because it is especially in them that Christ is received . . . Let there be a separate kitchen for the Abbot and guests, that the brethren may not be disturbed when guests, who are never lacking in a monastery, arrive at irregular hours. [Emphasis added.]

*Rule of St. Benedict,* Chapter 53, On the Reception of Guests. To be clear, guest (pilgrim) lodging is provided at no charge.

## II.     MOTION TO COMPEL

Appellant states as follows relative to the assertions made by Appellee in the subject Motion to Compel:

<u>Request 1</u>     Any and all documents read, reviewed, consulted, examined, used, or relied upon in preparing your responses hereto or in connection with the Board's Interrogatories to you.

RESPONSE:     Request 1 is objectionable because the requested documentation is subject to the attorney-client privilege and the work product doctrine. Notwithstanding the foregoing, the requested material has already been obtained by the Requesting Party and such request is, therefore, duplicative. The requested documentation is just as easily obtainable by the Requesting Party, from third party sources, as it is for the Responding Party. The request constitutes an improper attempt by the Requesting Party to shift to the Responding Party the labor, cost, and responsibility for obtaining the requested documents.

2ND RESPONSE: The Appellant reviewed the Articles of Organization of Appellant. The Articles of Organization are attached hereto as <u>Exhibit 4</u>.

<u>Request 2</u>     Any and all documents relative to the relationship between each and every agent, servant, employee, or individual empowered by Egypt House to carry on any activities, business, religious, or otherwise at 12 Conant Road, including but not limited to the status of any such individuals as an officer, employee, director, lay worker, clergy, or other relationship and the usual and customary activities performed by such individuals on behalf of or as a representative or employee of Egypt House.

RESPONSE:    Request 2 is objectionable because the request is vague, overbroad, oppressive, and unduly burdensome. The request fails to describe with reasonable particularity any objective and it imposes obligations on the Responding Party beyond those set forth in the Rules of Court.

2ND RESPONSE: Fr. Andrew Bushell is the Superior of Egypt House. Pursuant to the Articles of Organization of Appellant, he is empowered to act with respect to Appellant.

Request 3    Any and all documents containing information about the facts, allegations, and conclusions introduced or made by you in your Petition.

RESPONSE:    Request 3 is objectionable because it is irrelevant and requires the production of documents already obtained by the Requesting Party.  Request 3 is, therefore, duplicative.

2ND RESPONSE: Each of Appellant's initial application for exemption, documentation provided in response to the queries of the Town of Marblehead Assessor with respect thereto, and documentation filed in connection with these proceedings are the sole documents responsive to this request. Egypt House is a single-family dwelling. It was purchased approximately eighteen months ago; it is not unusual that a wealth of documentation does not exist, given the short time frame since it was purchased.

Request 6    Any and all records of non -income or -revenue generating activity conducted on the Locus.

RESPONSE:    The request is objectionable because it imposes obligations on the Responding Party in excess of those promulgated under the Rules of Court. No such records

exist. Notwithstanding the foregoing, attached is documentation evidencing the non-income generating activities conducted at Egypt House.

2ND RESPONSE:  No records regarding income or non-revenue generating activities at Egypt House exist. Aside from images of the Liturgy, provided, no records exist. Appellant is a religious nonprofit corporation with no business activities. Appellant is a house of worship, place of evangelization and clergy and pilgrim lodging.

Request 7     Any and all documents which you intend to use as evidence at the hearing on your appeal.

RESPONSE:     Request 7 is objectionable because it requests documentation that is subject to the work product doctrine and prematurely seeks documents and information.

2ND RESPONSE: We respectfully disagree with counsel for Appellee. As we have communicated, relevant documentation has already been provided. As previously stated, hearing preparation is not near final.

Request 11     Any and all mortgage, financing, lending, or funding applications made with respect to Egypt House's acquisition and ownership of the Locus.

RESPONSE:     Request 11 is objectionable because (a) it is irrelevant and requires the production of documents that have no relation to the litigation, nor is it reasonably calculated to lead to the discovery of admissible evidence, and (b) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court. Notwithstanding the foregoing, if Requesting Party will stipulate to a protective order ensuring such documentation be ensealed and delivered to the Court for further handling by the

Court, Responding Party will produce such documentation into the registry of the Court. If Requesting Party is amenable to the proposed handling of the requested documentation, Responding Party will prepare a Motion and Order in keeping with the criteria so stated.

2ND RESPONSE: Appellant replied in the affirmative to the request. To the extent it exists, subject to the issuance of a protective order that provides that such disclosures will be under the care and custody of the Court, Appellant will disclose the requested materials. Appellant and its affiliates, Fr. Andrew Bushell, and Tracey M.A. Stockton, have been subjected to highly publicized media disclosures which have led to threats to safety and subjected to public indecency by citizens of the Town of Marblehead.[6] The slanders circulated by the employees of the Town of Marblehead are not without notice and it is well-documented that communications within the Town of Marblehead government are not secure, with deletions and self-serving modifications made to communications by Town board members, agents, and employees[7]. *Also, see*, Exhibit 5. In view of the fact many of the subject requests are not germane to the analysis at issue, "how is the subject property used by the party claiming the subject exemption," yet Appellant is willing to accommodate such requests, we respectfully request the Board enable such disclosures to proceed under cover of a protective order. In view of the fact Appellee was studiously incurious about the use of the property by the current

---

[6] https://www.bostonglobe.com/2022/10/13/metro/purported-christian-orthodox-monk-lawyer-arrested-federal-charges-35-million-covid-19-relief-scam/
https://www.marbleheadbeacon.com/search/node?keys=Andrew+Bushell
[7] https://marbleheadcurrent.org/2023/09/01/deleted-school-committee-texts-leave-gap-in-trove-of-communications-about-former-superintendent/

owner prior to its denial and deemed denial of the two applications for exemption presented to Appellee upon acquisition of the subject property, with all due respect, it is now before the Board to review the materials submitted and opine as to whether the Appellant is a religious organization entitled to the requested exemption(s).

Request 12    Any and all liability, property, or other type of insurance policies applicable to the Locus.

RESPONSE:    Request 12 is objectionable because (a) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court, and (b) it is irrelevant and requires the production of documents that have no relation to the litigation, nor are they reasonably calculated to lead to the discovery of admissible evidence.

2ND RESPONSE: The Massachusetts Rules of Civil Procedure provide as follows:

A party may obtain discovery of the existence and contents of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

ALM R. Civ. P. Rule 26. Under the subject circumstances, this request does not fit within the parameters of the Rule.

Request 13    Any and all insurance applications made regarding the Locus.

RESPONSE:    Request 13 is objectionable because it is irrelevant and requires the production of documents that have no relation to the litigation, nor are they reasonably calculated

to lead to the discovery of admissible evidence.

2ND RESPONSE: Request 13 is objectionable because (a) it is irrelevant and requires the production of documents that have no relation to the litigation, nor is it reasonably calculated to lead to the discovery of admissible evidence, and (b) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court. Notwithstanding the foregoing, if Requesting Party will stipulate to a protective order ensuring such documentation be ensealed and delivered to the Court for further handling by the Court, Responding Party will produce such documentation into the registry of the Court. If Requesting Party is amenable to the proposed handling of the requested documentation, Responding Party will prepare a Motion and Order in keeping with the criteria so stated.

Request 14     Any and all policies, procedures, protocols, or similar documents that relate to the use and management of the Locus by Egypt House.

RESPONSE:     Request 14 is objectionable because (a) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court, and (b) it is irrelevant and requires the production of documents that have no relation to the litigation, nor are they reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing, the texts most frequently used at Egypt House may be found at goarch.org/chapel/texts.

2ND RESPONSE: Appellant is a religious nonprofit corporation with no business activities.

Appellant is a house of worship, place of evangelization and clergy and pilgrim

lodging. Aside from the responses produced, there are no such responsive

materials.

Request 16    Any and all documents, writings, or unwritten materials of any kind that relate to,

list, show, or evidence in any fashion any tenants, renters, or occupants of the Locus.

RESPONSE:    There has been no tenancy at Egypt House. Request 16 is objectionable because

(a) the identity of any occupant of Egypt House is subject to the Clergyman-

Penitent Privilege (G.L. c. 233, § 20A (LexisNexis, Lexis Advance through

Chapter 25 of the 2023 Legislative Session of the 193rd General Court)), (b) it

imposes obligations on the Responding Party beyond those set forth in the Rules

of Court, and (c) it is irrelevant and requires the production of documents that

have no relation to the litigation, nor is it reasonably calculated to lead to the

discovery of admissible evidence.

2ND RESPONSE: Appellant responded to this request in its initial responses. Neither the identity of

the persons seeking spiritual guidance, nor the nature of any communications, are

disclosable. The canons of the Orthodox faith strictly prohibit such disclosures.

St. Nikodemos of Mount Athos, the same place where Fr. Andrew became a

monk, wrote the manual for confessors that is used by Father Andrew and the

Ecumenical Patriarchate today; wherein he writes:

> Nothing else remains after confession, Spiritual Father, except to keep the
>
> sins you hear a secret, and to never reveal them, either by word, or by
>
> letter, or by a bodily gesture, or by any other sign, even if you are in
>
> danger of death, for that which the wise Sirach says applies to you: '[h]ave

you heard a word? Let it die with you.' (Sir. 19:8); meaning, if you heard a

secret word, let the word also die along with you, and do not tell it to

either a friend of yours or an enemy of yours, for as long as you live. And

further still, that which the Prophet Micah says: '[t]rust not in friends . . .

beware of thy wife, so as not to commit anything to her. (Mic. 7:5).

In addition to the foregoing, the qualifications to the clergyman-penitent privilege

recognized in the Commonwealth of Massachusetts, provides as follows:

A clergyman shall not disclose a confession made to him in his

professional character *without the consent of the person making the

confession*. Nor shall a clergyman testify as to any communication made

to him by any person seeking religious or spiritual advice or comfort, or as

to his advice given thereon in the course of his professional duties or in his

professional character, *without the consent of such person.* ALM G. Evid.

§ 510.

Where "professional character" refers to the course of discipline prescribed by the

rules or practice of the religious body to which the clergy member belongs[8].Aside

from the responses produced, there are no such responsive materials.

<u>Request 17</u>    Any and all documents, writings, communications, or materials of any kind relating

to the listing of the Locus for sale or rent from your acquisition of the Locus through the present

time.

RESPONSE:    Egypt House was listed in February and March of 2023 on Zillow. The listing was

---

[8]    ALM G. Evid. § 510.

allowed to lapse with no transaction resulting therefrom.

2ND RESPONSE: Aside from the responses produced, there are no such responsive materials.

Zillow is a digital portal. There are no records for the listing, except the lapsed

listing on Zillow, previously disclosed.

## II.    CONCLUSION

Appellant is a religious organization under Chapter 59, Section 5, Clauses 10 and

11, of the General Laws of The Commonwealth of Massachusetts. The forefathers of each of the

United States and The Commonwealth of Massachusetts upheld a firm belief in religious liberty.

Federal and state law protects the free exercise of religion. One of the methods often used by

municipalities to chill the practice of religion is to cause the religious organization to publicly

identify its congregants and to spend its resources on lengthy and costly maneuvers by such

municipality, including the imposition of illegal taxes, forcing the religious organization to

pursue the costly and protracted exercise to establish its legal authority to congregate and pursue

its religious devotion.

EGYPT HOUSE

By:_____
        Tracey M.A. Stockton
        124 Pleasant Street
        Marblehead, Massachusetts   01945
        617.800.3979
        ts@stpaulsfoundation.org
        BBO Number:  568495

        Legal Counsel to Appellant

## CERTIFICATE OF SERVICE

I certify a copy of the above Appellant's Response to Appellee's Motion to Compel Further Responses to First Request for Production of Documents to Appellant was mailed and delivered electronically on September 11, 2023 to all counsel and self-represented parties of record.

Parties and/or attorneys served:

Karen D. Bertolino, M.A.A.
Marblehead Town Assessor

Adam J. Costa, Esq.
Mead, Talerman & Costa, LLC

Matthew D. Provencher, Esq.
Mead, Talerman & Costa, LLC

Brian Winner, Esq.
Mead, Talerman & Costa, LLC

_____

Tracey M. Stockton

Exhibit 1



Exhibit 2



DN

LINE OF 2ND
FLOOR OVERHANG
ABOVE

FRONT ENTRY

CLOSET

UP

MULTIPURPOSE ROOM/
CHAPEL EXTENSION/
BIBLE STUDY/
FELLOWSHIP GROUPS

CHAPEL

DN

FR

REFECTORY

KITCHEN

TOILET

DW

REAR ENTRY

GROSS FLOOR AREA 949 SF

## EXISTING USE FIRST FLOOR PLAN

SCALE: 1/4" = 1'-0"

EGYPT HOUSE
12 CONANT RD.
MARBLEHEAD, MA

EXISTING GARAGE USED FOR STORAGE OF TOOLS FOR
PROPERTY MAINTENANCE AND MINISTRY ACTIVITIES



TRUE
NORTH

PLAN NORTH



0        5        10        20



CLOSET

CLERGY/PILGRIM
BEDROOM/OFFICE 2

10'-3" x 11'-0"

CLERGY/PILGRIM
BEDROOM/OFFICE 1

10'-2" x 14'-6"

UP

DN

CLERGY/PILGRIM
BEDROOM/OFFICE 3

10'-0" x 11'-4"

CLOSET

CLOSET

SHARED BATH

MASTER
BATH

GROSS FLOOR AREA 726 SF

**EXISTING USE SECOND FLOOR PLAN**

SCALE: 1/4" = 1'-0"

**EGYPT HOUSE**
**12 CONANT ROAD**
**MARBLEHEAD, MA**



TRUE
NORTH

PLAN NORTH



0        5        10        20



5' HEADROOM

5' HEADROOM

DN

5' HEADROOM

GROSS USABLE FLOOR AREA
APPROX. 150 SF

### EXISTING USE THIRD FLOOR PLAN

SCALE: 1/4" = 1'-0"

**EGYPT HOUSE**
**12 CONANT ROAD**
**MARBLEHEAD, MA**

TRUE NORTH

PLAN NORTH



0          5          10          20

SITE UTILITY NOTES:
1. PROVIDE NEW NATURAL GAS
SERVICE FROM STREET TO SITE FOR
GAS FIREPLACE AND EXTERIOR GAS
FIRE PITS. COORDINATE LOCATION
IN FIELD WITH OWNER /
ARCHITECT

DOOR AND HARDWARE NOTES:
1. AT NEW DOORS, INSTALL
SALVAGED EXISTING OR NEW
MATCHING EXISTING INTERIOR
WOOD PANEL DOOR DESIGN,
PAINTED.
2. NEW DOOR HARDWARE TO BE
NICKEL FINISH AT BATHROOMS,
SATIN BRASS UNLAQUERED FINISH
ELSEWHERE, MANUFACTURER TBD.

WINDOW NOTES:
1. ALL EXISTING WINDOWS ON
SECOND AND FIRST FLOORS TO
REMAIN. WINDOWS ON THIRD
FLOOR TO BE ALUMINUM TRIPLE
PANE CASEMENT TILT/TURN TYPE
WINDOWS AS MANUFACTURED BY
ALUMGLASS.

INTERIOR FINISH NOTES:
1. AT BATHROOMS ON SECOND
AND THIRD FLOORS, PROVIDE NEW
CARRARA MARBLE TILE FLOORS IN
BASKETWEAVE PATTERN WITH
DARK DOTS. PROVIDE CARRARA
3X6 SUBWAY TILE WAINSCOTTING
WITH BULLNOSE TOP TO 4'
HEIGHT.

2. AT ALL OTHER RECONFIGURED
LIVING SPACES PATCH / REPAIR
EXISTING FINISHES TO MATCH,
INCLUDING PLASTER / PAINT AT
WALLS & CEILING AND WOOD
STRIP FLOORING WITH POLY AT
FLOORS. ALL NEW INTERIOR TRIM
PATTERN

3. INSTALL NEW LIQUID EPOXY
FLOOR THROUGHOUT BASEMENT.

4. ALL PAINT TO BE BRUSH
APPLIED, ONE COAT PRIMER AND
ONE FINISH COAT.

CABINETRY:
1. REPLACE ALL EXISTING COUNTERS
WITH CARRARA MARBLE W/ CARRARA
BACKSPLASH.

PLUMBING NOTES:
1. NEW BATHTUB.
2. NEW TOILETS.
3. NEW LAVATORIES: DURAVIT 1930'S
STYLE WITH PEDESTAL, PERRIN & ROWE
GEORGIAN BRIDGE BASIN MIX (SKU
3709 IN UK SCHEME), NICKEL FINISH.
4. PROVIDE ROUGH PLUMBING IN
BASEMENT FOR WASHER & DRYER
CONNECTION.

HVAC NOTES:
1. NEW HVAC SYSTEM TO BE NEW
DUCTED FORCED AIR WITH
GROUND (GEOTHERMAL) SOURCE
HEAT PUMP. SYSTEM TO BE DESIGN
/ BUILD BY HVAC
SUBCONTRACTOR.

ELECTRICAL NOTES:
1. PROVIDE NEW ROUGH AND
FINISH ELECTRICAL AT
RECONFIGURED BATHROOMS ON
SECOND FLOOR, STUDY AT
SECOND FLOOR, ENTIRE THIRD
FLOOR, AND AS REQUIRED FOR
INSTALLATION OF GAS FIREPLACE
ON FIRST FLOOR

# NOTES & SPECIFICATIONS
SCALE: NA

EGYPT HOUSE
12 CONANT ROAD
MARBLEHEAD, MA
JULY 18, 2022



DN

LINE OF 2ND
FLOOR OVERHANG
ABOVE

CLOSET

UP

LIVING ROOM

SUNROOM

DN

FR

DINING ROOM

KITCHEN

TOILET

DW

ENTRY

GROSS FLOOR AREA 949 SF

## EXISTING FIRST FLOOR PLAN

SCALE: 1/4" = 1'-0"

TRUE
NORTH

PLAN NORTH

HOUSE NEXT DOOR
12 CONANT ROAD
MARBLEHEAD, MA
JULY 13, 2022

0        5        10        20



LINE OF 2ND FLOOR OVERHANG ABOVE

DN

UP

DEMOLISH EXISTING CHIMNEY (BASEMENT TO ROOF), FIREPLACE AND HEARTH. INSTALL NEW ELEMENT4 SUMMUM 140 T ROOM DIVIDER FIREPLACE, INCLUDING NEW WALL SURROUND ENCLOSURE. PATCH WALL, FLOOR & CEILING FINISHES AS REQUIRED. INSTALL NEW MARBLE HEARTH

DN

VENT FIREPLACE TO EXTERIOR VIA DUCT WITHIN NEW SOFFIT

FR

PROVIDE NEW RANGE HOOD, DUCTED TO EXTERIOR ABOVE CABINETS

KITCHEN

DW

## NEW FIRST FLOOR PLAN

SCALE: 1/4" = 1'-0"

EGYPT HOUSE
12 CONANT ROAD
MARBLEHEAD, MA

JULY 18, 2022



TRUE NORTH

PLAN NORTH



0          5          10          20



CLOSET

UP

BEDROOM 2
10'-3" x 11'-0"

BEDROOM 1
10'-2" x 14'-6"

DN

CLOSET

BEDROOM 3
10'-0" x 11'-4"

CLOSET

BATH

MASTER
BATH

GROSS FLOOR AREA 726 SF

## EXISTING SECOND FLOOR PLAN

SCALE: 1/4" = 1'-0"

HOUSE NEXT DOOR
12 CONANT ROAD
MARBLEHEAD, MA
JULY 13, 2022

TRUE
NORTH

PLAN NORTH



0          5          10          20



AT STAIRS TO 3RD FLOOR REPLACE EXIST. TREADS AND RISERS WITH CLEAR HARDWOOD STAIRS, ADD WOOD HANDRAIL

REMOVE EXIST. WALLS AND PATCH FLOOR, WALL AND CEILINGS TO MATCH

UP

STUDY

DN

2'-0"

BEDROOM #1

CONSTRUCT NEW WALLS AND DOORS FOR CLOSETS

NEW SHOWER W/ NEW TILE AT FLOOR AND WALLS. PROVIDE GLASS SHOWER DOOR

ADD POCKET DOOR

DEMOLISH CHIMNEY, PATCH FINISHES, CONVERT TO CLOSET

DEMOLISH EXIST. CLOSET, ADD NEW FREE STANDING TUB, PATCH ALL FLOOR, WALL AND CEILING FINISHES TO MATCH

BEDROOM #2

ADD NEW DOOR OPENING

DEMOLISH EXIST. SHOWER STALL, CONSTRUCT WALL TO CREATE TOILET COMPARTMENT

PROVIDE NEW WALL AND FLOOR TILE AT TOILET ROOMS

AT EACH BATHROOM ON THIS FLOOR, PROVIDE NEW TOILET, LAVATORY, EXHAUST FAN, LIGHTING (2 SCONCES & ONE OVERHEAD LIGHT), ONE SWITCH, AND ONE GFI OUTLET.

## NEW SECOND FLOOR PLAN
SCALE: 1/4" = 1'-0"

EGYPT HOUSE
12 CONANT ROAD
MARBLEHEAD, MA
JULY 18, 2022



TRUE NORTH

PLAN NORTH

0    5    10    20



5' HEADROOM

5' HEADROOM

DN

5' HEADROOM

GROSS FLOOR AREA ? SF

## EXISTING THIRD FLOOR PLAN

SCALE: 1/4" = 1'-0"

HOUSE NEXT DOOR
12 CONANT ROAD
MARBLEHEAD, MA
JULY 13, 2022

TRUE NORTH

PLAN NORTH



0        5        10        20

SCOPE OF WORK AT 3RD FLOOR:

1. REFRAME MAIN ROOF AT EXIST. DORMERS TO GAIN HEADROOM WHERE DORMER FRAMES OVER ROOF
2. REMOVE EXISTING ROOF AT REAR HIP AND REPLACE WITH NEW GABLE ROOF AS PER FRAMING DRAWING, INCLUDING NEW GABLE ENDWALL WITH WINDOWS.
3. FULLY INSULATE EXISTING AND NEW WALL AND ROOF CAVITIES WITH CLOSED CELL SPRAY FOAM INSULATION (TO R-49 MAX AT CLG. & R-21 AT WALLS, IF SPACE ALLOWS)
4. INSTALL NEW GYPSUM WALLBOARD FINISH AT WALLS AND ROOFS.
5. PATCH / REPAIR EXISTING SUBFLOOR AS REQUIRED AND INSTALL NEW WHITE OAKFLOORING W/ POLY FINISH.
6. INSTALL NEW BATHROOM AS SHOWN.
7. INSTALL NEW STAIR RISERS, TREADS, HANDRAIL, AND GUARDRAIL AROUND OPENING.
8. INSTALL NEW ELECTRICAL ROUGH AND FINISH
9. INSTALL NEW HVAC SYSTEM.
10. PAINT ALL WALLS / CEILINGS
11. INTERIOR TRIM (DOOR & WINDOW CASINGS, BASEBOARDS) TO BE CUSTOM MATCH OF EXISTING AT LOWER FLOORS, PAINT GRADE MAPLE.
12. ALL WINDOWS AT THIS FLOOR TO BE NEW TRIPLE GLAZED ALUMINUM CASEMENT TILT TURN / (TILT ONLY AT BATHROOM) AS MANUFACTURED BY ALUMGLASS



## NEW THIRD FLOOR PLAN

SCALE: 1/4" = 1'-0"

EGYPT HOUSE
12 CONANT ROAD
MARBLEHEAD, MA

JULY 18, 2022

PLAN NORTH





EXIST. GABLE
DORMERS TO
REMAIN

DEMOLISH REAR HIP OF ROOF AND REPLACE WITH
GABLE AS SHOWN. ASSUME 2X12 RAFTERS AT 16" O/C.
& LVL RIDGE BEAM WITH POST IN ENDWALL.
CONSTRUCT NEW GABLE ENDWALL W/ 2X4 @ 16"
O/C. FINAL STRUCTURAL DESIGN TO BE PROVIDED BY
STRUCTURAL ENGINEER (INFORMATION PROVIDED
HERE IS FOR PRICING ONLY)

## SCHEMATIC ROOF FRAMING PLAN (NEW)

SCALE: 1/4" = 1'-0"

EGYPT HOUSE
12 CONANT ROAD
MARBLEHEAD, MA
JULY 18, 2022



PLAN NORTH

0    5    10    20

Exhibit 3



ST. NICHOLAS
THE WONDERWORKER,
BISHOP OF MYRRA,
BRINGER OF
EXPECTANT THINGS



A timeline of events from 2017 to 2021 regarding 120 Pleasant St.

**2017**

8.31.2017 — 124 Pleasant St. Purchased

Call MHD Building Commissioner Rich Baldacci ("BC")

12.6.2017 — BC issues Temporary Occupancy Certificate

9.2017 — Emails between BC, Town Planner & Town Counsel re: zoning

12.10.2017 — St. Nicholas provides load calculations to MMLD

12.18.2017 — C. Coleman emails BC about service, ceases communication after

12.12.2017 — C. Coleman states "we will be providing you a specific 277/480v transformer bank... just need to assign a crew... may be some work here and finagling... we will do our best to accommodate"

12.7.2017 — St. Nicholas applies for electrical service from MMLD

**2018**

5.9.2018 — Fire Dept. approves plans

4.11.2018 — Building Dept., including Wire & Health, approves building plan, Health Dept. requests dumpsters, Building requests ramp

9.6.2018 — BC issues letter allowing application for state plumbing variance

12.6.2018 — J. Harden AIA leaves SV

4.12.2018 — SV submits updated plans

2.15.2018 — Siemasko + Verbridge Architects ("SV") plans to BC

11.7.2018 — State Plumbing Variance issues

7.3.2018 — Building Permit ("BP") issued, but pre-construction plumbing variance required

12.13.2018 — MHD Board of Health suspends food service and pouring permit for 'table service establishment'.

**2019**

2.13.2019 — Requirement satisfied, Red Barn joins as new architect & general contractor

5.1.2019 — R. McShera building code review submitted

1.16.2019 — BC suspends BP pending new architect & general contractor

6.18.2019 — Goodwin sends demand letter

2.6.2019 — Sidley Austin letter to BC

6.11.2019 — BC sends letter refusing to reinstate building permit

4.15.2019 — Construction would have been completed but for BC refusal to reinstate building permit

7.9.2019 — St. Nicholas files complaint & BCAB appeal

9.24.2019 — BCAB reverses BC, building permit reinstated

12.27.2019 — BCAB Appeal #3

10.30.2019 — BC writes AAB alleging violations

W. Joyce writes BC correcting him

**2020**

3.11.2020 — BC sends letter asserting violations of fire rating, occupancy and AAB rules (despite being contrary to State guidance)

12.1.2020 — 124 Pleasant St. construction complete except for final electrical service wiring, contacts MMLD more intensively

5.4.2020 — E. Parkes rebuts 3.11 letter from BC comprehensively

11.30.2020 — St. Nicholas acquires 120 Pleasant St.

1.6.2020 — Rough electrical inspection passed by both R. Marks and assistant

3.15.2020 — COVID-19 National Disaster declared

12.11.2020 — MA Architectural Access Board issues "Findings of the Board" that BC is incorrect

**2021**

1.29.2021 — J. Kowalik emails MMLD "has agreed to evaluate the feasibility"

2.24.2021 — Updated load calculations and location discussed

6.11.2021 — 120 Pleasant St. BP issued

7.26.2021 — MHD Wire Inspector initials electrical service site diagram, equipment layout and one line diagram

9.4.2021 — TP 'doesn't remember' conversation with J. Kowalik

11.19.21 — BC refuses to meet with E. Parkes, T. Stockton, R. Johnson re: 120 Pleasant St. Plans left at door.

1.21.2021 — First Meeting with MMLD, Wire Inspector refuses to attend

2.10.2021 — MHD Wire Inspector requests load calculation & service location

5.11.2021 — Wire Inspector issues "violation" letter for design of electrical service

8.30.2021 — Waldron Engineering provides second letter confirming electrical load

9.24.2021 — First request for meeting with MMLD Commission & Selectmen

11.1.2021 — Appeal filed with MA Department of Public Utilities

1.25.2021 — Fr. Andrew emails to agree Pleasant St. transmission not possible

2.22.2021 — MBT issues updated load calculations

5.19.2021 — St. Nicholas appeals Wire Inspector to MA Board of Electricians Appeals

10.8.2021 — Third request to J. Silva requesting meeting with MMLD & Selectmen

11.16.2021 — J. Albright, new BC, issues "verbal" stop work order because St. Nicholas demolishes rotted exterior walls, refuses to meet with T. Stockton or Fr. Andrew

2.3.2021 — Email from Fr. Andrew to Kowalik & MMLD asking location for installation, states holding up construction

3.4.2021 — Second Meeting with MMLD, Wire Inspector attends, load calculations, service location and survey provided

7.7.2021 — MA State Plumbing Board issues variance for 120 Pleasant St.

9.21.2021 — St. Nicholas sends letter to TP, copying Planning Board, Select Board, MMLD, J. Silva & J. Kowalik

10.15.2021 — St. Nicholas leaves multiple messages for meeting with new BC. Messages ignored.

11.18.2021 — BC issues stop work order for 120 Pleasant St.

Property survey provided

8.8.2021 — BEA reverses Wire Inspector, approves service as designed

9.3.2021 — J. Kowalik declines to approve service installation citing Town Planner B. Curran Cutting ("TP") "parking concerns"

10.4.2021 — Second request for meeting with MMLD & Selectmen

"Multi-departmental meeting" held by J. Silva with members of Engineering, Highway, and MMLD

Email to J. Bell-Becker fourth request for meeting with MMLD & Selectmen

Email from J. Silva informing of meeting of week of 10.4 and no parking concerns

11.8.2021 — Fifth request for meeting with MMLD & Selectmen

**Legend:**

15 months waiting for building permit and pre-construction plumbing variance

Building Permit Suspension Delay

MMLD & Wire Inspector Refusal

Could build, but had to find new general contractor

Time Possible to Build

Exhibit 4



**DEPARTMENT OF CONSUMER & REGULATORY AFFAIRS**
## District of Columbia Government
Corporations Division

### Articles of Incorporation of Domestic Nonprofit Corporation

**One or more persons acting as the incorporator or incorporators under the provisions of the Title 29 of D.C. Code (Business Organizations Act) adopt the following Articles of Incorporation:**

**First:** Corporation Name:
Egypt House

**Second:** The corporation will have members: No

**Third:** Registered Agent's name and address in the District Columbia:
D.C. REGISTERED AGENT INC.
2300 N Street, NW
Suite 300-RLK
Washington, District of Columbia 20037

**Fourth: The corporation is incorporated as a nonprofit corporation under D.C. Code Title 29 Chapter 4.**

**Fifth:** Miscellaneous Provisions (may attach the statement):

See Statement, attached.

**Sixth:** Directors Name & Address:

No directors.

**Seventh:** Incorporators Name & Address:

| Name | Address |
|---|---|
| Tracey M.A. Stockton | 120 Pleasant Street, Marblehead, Massachusetts 01945 |

**Eighth:** Incorporators executing this form:

No information provided.

**If you sign this form you agree that anyone who makes a false statement can be punished by criminal penalties of a fine up to $1000, imprisonment up to 180 days, or both, under DCOC § 22-2405;**

**Amount Paid:** $80.00
**Date:** 6/15/2022 1:41 PM
**E-Signed**

**EGYPT HOUSE**
**Attachment to**
**Articles of Incorporation of Domestic Non-Profit Corporation**

5.    <u>Miscellaneous Provisions</u>.

(a)    The corporation is a Religious Corporation within the meaning of Section 29-401.02(32) of the Non-Profit Corporation Act of 2010.

(b)    Pursuant to Part C., Section 29-401.40 of the Non-Profit Corporation Act of 2010, where the religious doctrine or canon law governing the affairs of the corporation is inconsistent with the provisions of the Non-Profit Corporation Act of 2010 relative to a particular subject, the religious doctrine or canon law of Egypt House shall control to the extent required by the Constitution of the United States.

(c)    The corporation is one which does not contemplate pecuniary gain or profit, incidental or otherwise, and no part of the assets or income of the corporation shall be distributable to, or inure directly or indirectly to the benefit of, its members, trustees, officers or employees.

(d)    No substantial part of the corporation's activities shall be the carrying on of propaganda or otherwise attempting to influence legislation.  The corporation shall not participate in, or otherwise intervene in, whether by publication or distribution of statements or otherwise, any political campaign on behalf of (or in opposition to) any candidate for public office.

(e)    It is intended that the corporation shall have and continue to have the status of a corporation which is exempt from federal income taxation under Section 501(a) of the Internal Revenue Code of 1986, as amended, as an organization described in Section 50l(c)(3) thereof and which is other than a private foundation as defined in Section 509 of the Code.  These articles shall be construed accordingly and all powers and activities hereunder shall be limited accordingly.

(f)    The assets of the corporation are held and administered to by the Office of the Protos of St. Paul's Foundation or his delegate.  In keeping with the provisions of sub-Section (b) hereinabove, there are no board of directors or officers of the corporation, other than the Protos of St. Paul's Foundation or those upon whom such authority is bestowed in writing by the Protos of St. Paul's Foundation.

(g)    In the event of dissolution of the corporation, no member, trustee, officer or employee of the corporation shall receive or lawfully be entitled to receive any of the corporation's assets, but the Office of the Protos of St. Paul's Foundation or, in the absence of the Office of the Protos of St. Paul's Foundation, those persons so-authorized in writing by the Protos, shall, after paying or making provision for the payment of all the debts and liabilities of the corporation, distribute all of the remaining assets of the corporation exclusively to such organization or organizations, previously selected by the Office of the Protos of St. Paul's Foundation by sealed decree in writing or, in the absence of the Office of the Protos of St. Paul's Foundation, those persons so-authorized in writing by the Protos, which are organized and operated exclusively for religious and/or charitable purposes, subject to any such approval or direction as may then be required by law.  Should the Office of the Protos of St. Paul's Foundation or other persons so-authorized in writing by the Protos cease to exist because of some catastrophe, the assets of the corporation shall be distributed according to the direction of

the Ecumenical Patriarch, Archbishop of Constantinople-New Rome, Bartholomew I, or his successors.  Should, because of some catastrophe, the Ecumenical Patriarchate no longer exist, all assets shall be distributed according to the direction of the Protos of the Holy Community of Mount Athos in consultation with and by unanimous agreement of the representatives of the Holy Community.  Should, because of some catastrophe, the Holy Community of Mount Athos cease to exist, then all assets shall be distributed according to the direction of the Abbot of St. Catherine's Monastery and Archbishop of Sinai, Pharan and Raitho.  Should, because of some catastrophe, the Holy Community of St. Catherine's cease to exist, then all assets shall be distributed according to the direction of the next most senior patriarch, archbishop of metropolitan of the Orthodox Church in the order to precedence: Alexandria, Antioch, Jerusalem, Bulgaria, Georgia, Serbia, Russia, Romania, the Archbishop of the Church of Cyprus, the Archbishop of the Church of Greece and so forth.

Exhibit 5

**To:** Jennifer Smith[jennib9@comcast.net]
**From:** Kyle Wiley[wileyk@marblehead.org]
**Sent:** Wed 11/15/2017 4:25:36 PM (UTC-05:00)
**Subject:** RE: Feast of St. Nicholas and Sophia Smith

Good move in think.

Thanks but no thanks

---

**From:** Jennifer Smith [mailto:jennib9@comcast.net]
**Sent:** Wednesday, November 15, 2017 4:25 PM
**To:** Kyle Wiley
**Subject:** Re: Feast of St. Nicholas and Sophia Smith

Yah I said no anyway. Don't want anything from him

Jennifer
Sent from my iPhone
On Nov 15, 2017, at 4:14 PM, Kyle Wiley <wileyk@marblehead.org> wrote:

> Oh....we can talk tomorrow.

---

**From:** Jennifer Smith [mailto:jennib9@comcast.net]
**Sent:** Wednesday, November 15, 2017 3:37 PM
**To:** Kyle Wiley; Becky Curran
**Subject:** Fwd: Feast of St. Nicholas and Sophia Smith

OMG got this from my friend Jill holy crap and hell no

Jennifer
Sent from my iPhone
Begin forwarded message:

> **From:** Jill Donovan <jbl154@comcast.net>
> **Date:** November 15, 2017 at 3:13:37 PM EST
> **To:** jennib9@comcast.net
> **Subject: Fwd: Feast of St. Nicholas and Sophia Smith**
>
> Hi Jen, this is bobs friend who is opening a new brewery in Marblehead soon and would like to donate some of the profits on opening day to Sophia. Read this and bob will call you later and explain more!!
>
> Thanks, Jill
>
> Sent from my iPhone
> Begin forwarded message:
>
>> **From:** Bob Donovan <donovanconex@gmail.com>
>> **Date:** November 15, 2017 at 3:03:58 PM EST
>> **To:** Jill Donovan <jbl154@comcast.net>
>> **Subject: Fwd: Feast of St. Nicholas and Sophia Smith**
>>
>>
>> Sent from my iPhone
>> Begin forwarded message:
>>
>>> **From:** "Fr. Andrew Bushell" <ab@stpaulsfoundation.org>
>>> **Date:** November 9, 2017 at 8:57:03 AM EST
>>> **To:** Bob Donovan <donovanconex@gmail.com>
>>> **Subject: Feast of St. Nicholas and Sophia Smith**

Dear Bob,

December 6 is the Feast of St. Nicholas, patron saint of Marblehead's newest church, the Shrine of St. Nicholas the Wonderworker which we established in a humble way at 124 Pleasant Street. While we've dedicated the church to St. Nick as patron saint of sailors, brewers and repetant thieves so all know they're welcome, the saint is most famously known as the patron saint of children

And because St. Nick's is also the new home of the Marblehead Brewing Co. I had a thought to combine our celebration of the saint's feast with our new beer as a fundraiser for the work we do with children suffering from the war in Syria. And then you told me about your efforts to help Sophia Smith.

It is true that the vast majority of the profits of the Marblehead Brewing Co. go to support the charitable efforts of the most vulnerable, but if her family would like, we'd be very happy to set aside a dollar for every pint and two dollars for every growler fill (people buy the growlers and then pay for the fills) we sell on the Feast of St. Nicholas for her treatment expenses as a blessing from Father Christmas.

Once the website for St. Nicholas and the Marblehead Brewing Co. are set up in two weeks we can also advertise it there, print up posters and other things around Marblehead. We know that there are several reporters who have been asking about the Marblehead Brewing Co. and we've told them to keep quiet, but we can also speak with them about covering the event.

We understand there is a GoFundMe page. If you wish, I can ask our accountant and attorney about putting a button on St. Nick's website for restricted almsgiving so that people who donate can do so while receiving a tax deduction. However we can help — just let me know.

With great love in Christ,

Father Andrew
Guardian of the Shrine of St. Nicholas
Protos of St. Paul's Foundation
Masterbrewer, Marblehead Brewing Co.
--

_____
Fr. Andrew Bushell
Executive Chairman
St. Paul's Foundation
Post Office Box Two
Marblehead, MA 01945

EXHIBIT I

*See,* attached.

## COMMONWEALTH OF MASSACHUSETTS
## APPELLATE TAX BOARD

_____

|  |  |
|---|---|
| EGYPT HOUSE, | ) |
| | ) |
| Appellant | ) |
| | ) |
| v. | )    No. F-347637 |
| | ) |
| BOARD OF ASSESSORS OF | ) |
| TOWN OF MARBLEHEAD, | ) |
| | ) |
| Appellee | ) |

_____

Requesting Party:  Board of Assessors of Town of Marblehead
Responding Party:  Egypt House

### ANSWERS OF APPELLANT TO INTERROGATORIES OF APPELLEE

The Responding Party, by and through its attorneys, hereby answers the interrogatories submitted by the Requesting Party.  In providing such answers, the Responding Party hereby specifically objects to all questions that either directly or indirectly call for the disclosure or production of privileged material and material subject to work product protection.  None of the answers contained hereby or provided to the Requesting Party shall be deemed to be a waiver to such objection.

### ANSWERS TO INTERROGATORIES

1.      Identify the person authorized to answer these interrogatories on behalf of Egypt House, and their position, office, or role within Egypt House.

ANSWER:      Rev. Fr. Andrew Bushell, Superior

2.    Identify any individuals and/or documents consulted, referred to, or used in any way to answer these interrogatories.

ANSWER:    Articles of Incorporation of Egypt House

3.    Please identify and state the corporate or entity status of Egypt House, including the state or territory in which it is organized, its principal place of business, the locations at which it conducts any activities or business, and any officers, directors, or controllers of the entity.

ANSWER:    Egypt House is a District of Columbia religious nonprofit corporation. Egypt House is the fee simple owner of 12 Conant Road, Marblehead, Massachusetts 01945. Rev. Fr. Andrew Bushell is the Superior of Egypt House.

4.    State the circumstances, manner, and means of Egypt House's acquisition of the Locus.

ANSWER:    The discovery and disclosures sought by the Requesting Party under the subject interrogatory are totally irrelevant, designed to harass, will not lead to the discovery of any admissible evidence, were designed to harass and serve ulterior motives to obtain information that is completely unrelated to the material issues of this litigation, and such discovery and disclosure exceeds the obligations imposed under the Rules of Court.  The instant matter arises solely pursuant to the denial of municipal tax exemptions accorded religious organizations under Massachusetts General Laws at G. L. c. 59, § 5 (10) and (11) by the Requesting Party.  The analysis with respect to challenges arising under G.L. c. 59, § 5 (10) and (11) looks at *use* of the *property* subjected to such challenge.

5.    Describe in detail any and all activities conducted by Egypt House at the Locus at all times from Egypt House's acquisition of the Locus through the present.

ANSWER:         A chapel is located within Egypt House. Egypt House is a consecrated site used for Divine Liturgy, vespers, and administration of the sacraments. Egypt House serves as a guest house to pilgrims undergoing spiritual counselling, a reading room with books on Orthodox Spirituality, and a place for evangelical work. An iconographer engaged in the writing of the Holy Icons for the Shrine of St. Nicholas the Wonderworker performed his sacred work within Egypt House. Egypt House has benefitted from repairs, cleaning, and maintenance since acquisition.

6.      Identify any and all agents, servants, employees, officers, officials, directors, or personnel of any kind that conduct activities on behalf of Egypt House at the Locus, and which activities each individual conducts.

ANSWER:         The discovery and disclosures sought by the Requesting Party under the subject interrogatory are totally irrelevant, will not lead to the discovery of any admissible evidence, seek to obtain information that is completely unrelated to the material issues of this litigation and are designed to harass Responding Party. The discovery and disclosures sought by Requesting Party hereunder exceed the obligations imposed under the Rules of Court.

7.      Please state whether the Locus is covered by any insurance policy, and, if so, the issuer of that policy and its policy number.

ANSWER:         The discovery and disclosures sought by the Requesting Party are totally irrelevant, are not reasonably calculated to lead to the discovery of any admissible evidence, and such discovery and disclosure exceed the obligations imposed under the Rules of Court.

8.     Please state whether the Locus is encumbered by a mortgage, and if so, identify the mortgagee and/or any other parties holding an interest in the Locus.

ANSWER:     The discovery and disclosures sought by the Requesting Party are totally irrelevant and are not reasonably calculated to lead to the discovery of any admissible evidence, the requested documentation is just as easily obtainable by the Requesting Party, from third party sources, as they are from the Responding Party. The request constitutes an improper attempt by the Requesting Party to shift to the Responding Party the labor, cost, and responsibility for obtaining the requested documents. The instant matter arises solely pursuant to the denial of municipal tax exemptions accorded religious organizations under Massachusetts General Laws at G. L. c. 59, § 5 (10) and (11) by the Requesting Party. The analysis with respect to challenges arising under G.L. c. 59, § 5 (10) and (11) looks at *use* of the property subjected to such challenge.

9.     Please identify any and all individuals who have, since the time Egypt House acquired the Locus, resided at, lived at, or inhabited the Locus for more than one day.

ANSWER:     Dr. George Kordis and Rev. Fr. Andrew Bushell. The identities of the remaining individuals are subject to the Clergyman-Penitent Privilege. (G.L. c. 233, § 20A (LexisNexis, Lexis Advance through Chapter 25 of the 2023 Legislative Session of the 193rd General Court)).

10.     Please identify any and all individuals, entities, and persons who have leased, rented, or otherwise occupied space at the Locus.

ANSWER:     Aside from the individuals referred to at Interrogatory 9, Egypt House has not been leased, rented, nor otherwise occupied.

11.    For each individual, entity, or person identified in the Answer to Interrogatory No. 10, please state the terms of the lease, rental, or other agreement for use of the Locus. The Board will accept the production of a lease, rental, or other agreement in response to this Interrogatory.

ANSWER:    No lease, rental, or other agreement for the use of Egypt House has ever been effectuated. See attached relative to draft lease agreements, uneffectuated.

12.    Did Egypt House apply for any financing, loans, or external funding for the purpose of acquiring the Locus? If the answer to this Interrogatory is in the affirmative, please identify each application, request, or attempt to secure financing, loans, or external funding and to whom it was made.

ANSWER:    The discovery and disclosures sought by the Requesting Party under the subject interrogatory are totally irrelevant, will not lead to the discovery of any admissible evidence, and were designed as the result of ulterior motives to obtain information that is completely unrelated to the material issues of this litigation. The instant matter arises solely pursuant to the denial of municipal tax exemptions accorded religious organizations under Massachusetts General Laws at G. L. c. 59, § 5 (10) and (11) by the Requesting Party. The analysis with respect to challenges arising under G.L. c. 59, § 5 (10) and (11) looks at *use* of the *property* subjected to such challenge. Notwithstanding the foregoing, Responding Party did not apply for any financing, loans, or external funding for the purpose of acquiring the Locus.

13.    Does Egypt House possess, have custody of, or control any writings, plans, documents, communications, or writings of any kind that reference any intention, plan, or design for the use of the Locus?

ANSWER:    Yes.

14.     Identify any and all individuals who have acted on behalf of Egypt House in any way in using the Locus for any purpose.

ANSWER:     Rev. Fr. Andrew Bushell

Tracey M.A. Stockton


DATED:  August 22, 2023            EGYPT HOUSE, Appellant,
                                   by and through its attorney

                                   By:/s/_____
                                       Tracey M.A. Stockton

                                   124 Pleasant Street
                                   Marblehead, Massachusetts   01945
                                   617.800.3979
                                   ts@stpaulsfoundation.org
                                   BBO Number:  568495


**CERTIFICATE OF SERVICE**

I hereby certify a copy of the foregoing document was served upon counsel of record for the Appellee, Board of Assessors of Town of Marblehead, on the 22nd day of August, 2023.


                                   /s/_____
                                   Tracey M.A. Stockton

## COMMONWEALTH OF MASSACHUSETTS
## APPELLATE TAX BOARD

|  |  |  |
|---|---|---|
| EGYPT HOUSE, | ) | |
| | ) | |
| Appellant | ) | |
| | ) | |
| v. | ) | No. F-347637 |
| | ) | |
| BOARD OF ASSESSORS OF | ) | |
| TOWN OF MARBLEHEAD | ) | |
| | ) | |
| Appellee | ) | |

## APPELLEE BOARD OF ASSESSORS OF TOWN OF MARBLEHEAD'S MOTION TO COMPEL MORE RESPONSIVE ANSWERS TO INTERROGATORIES FROM APPELLANT EGYPT HOUSE

Now comes the Appellee, the Board of Assessors of the Town of Marblehead (the Board), and, pursuant to 831 CMR 1.25 and G.L. c. 231, § 64, moves for an order compelling more responsive answers to the interrogatories it propounded upon Appellant Egypt House. The Appellate Tax Board has the same power under 831 CMR 1.25 as courts of the Commonwealth do under G.L. c. 231, § 64, and "may make and enter such order, judgment or decree as justice requires" when a party fails to answer an interrogatory. The Board asks for a 7-day order, and seeks more responsive answers more specifically as follows:

## INTERROGATORY

3.    Please identify and state the corporate or entity status of Egypt House, including the state or territory in which it is organized, its principal place of business, the locations at which it conducts any activities or business, and any officers, directors, or controllers of the entity.

1

**ANSWER**

3.    Egypt House is a District of Columbia religious nonprofit corporation. Egypt House is the fee simple owner of 12 Conant Road, Marblehead, Massachusetts 01945. Rev. Fr. Andrew Bushell is the Superior of Egypt House.

**MOTION TO COMPEL**

3.    This answer is incomplete. The interrogatory seeks Egypt House's principal place of business, the locations it conducts activities and business, and the officers, directors, or controllers of the entity. The information is relevant and germane to the issues before this Board, and a further response should be compelled.

**INTERROGATORY**

4.    State the circumstances, manner, and means of Egypt House's acquisition of the Locus.

**ANSWER**

4.    The discovery and disclosures sought by the Requesting Party under the subject interrogatory are totally irrelevant, designed to harass, will not lead to the discovery of any admissible evidence, were designed to harass and serve ulterior motives to obtain information that is completely unrelated to the material issues of this litigation, and such discovery and disclosure exceeds the obligations imposed under the Rules of Court. The instant matter arises solely pursuant to the denial of municipal tax exemptions accorded religious organizations under Massachusetts General Laws at G. L. c. 59, § 5 (10) and (11) by the Requesting Party. The analysis with respect to challenges arising under G.L. c. 59, § 5 (10) and (11) looks at use of the property subjected to such challenge.

**MOTION TO COMPEL**

4.    This interrogatory seeks relevant and material information. The Appellant concedes that use of the property is at issue in this Appeal. The circumstances leading to acquisition of the

property provide relevant information about Egypt House's plans for the use of the property, a subject that is obviously relevant. There is no basis for the objection and refusal to answer, and a more responsive answer should be compelled.

## INTERROGATORY

5.     Describe in detail any and all activities conducted by Egypt House at the Locus at all times from Egypt House's acquisition of the Locus through the present.

## ANSWER

5.     A chapel is located within Egypt House. Egypt House is a consecrated site used for Divine Liturgy, vespers, and administration of the sacraments. Egypt House serves as a guest house to pilgrims undergoing spiritual counselling, a reading room with books on Orthodox Spirituality, and a place for evangelical work. An iconographer engaged in the writing of the Holy Icons for the Shrine of St. Nicholas the Wonderworker performed his sacred work within Egypt House. Egypt House has benefitted from repairs, cleaning, and maintenance since acquisition.

## MOTION TO COMPEL

5.     This answer is incomplete. The interrogatory seeks a description of any and all activities conducted by Egypt House at the property for which an exemption is claimed, a claim which in turn depends upon the actual use of the property by Egypt House. There is no information provided by the statement that a chapel is "located" within Egypt House—the Appellant must state under oath how often it is used, when, for what duration, etc. The same is true for all of the other activities referenced. The Appellant should be compelled to identify with specificity the activities that it conducts on the property.

## INTERROGATORY

6.     Identify any and all agents, servants, employees, officers, officials, directors, or personnel of any kind that conduct activities on behalf of Egypt House at the Locus, and which

activities each individual conducts.

**ANSWER**

6.      The discovery and disclosures sought by the Requesting Party under the subject interrogatory are totally irrelevant, will not lead to the discovery of any admissible evidence, seek to obtain information that is completely unrelated to the material issues of this litigation and are designed to harass Responding Party. The discovery and disclosures sought by Requesting Party hereunder exceed the obligations imposed under the Rules of Court.

**MOTION TO COMPEL**

6.      This information is plainly relevant and discoverable. As the Appellant concedes, an issue in this appeal is the use of the property by the Appellant, which includes the actions of its agents, servants, employees, and personnel. Determining who is present, and doing what, is a critical part of this appeal, in which the Appellant claims an exemption because it contends that the property is used for religious purposes. It cannot do so without identifying the individuals who do that activity, and describing what they do on site. The Board should compel a more responsive answer.

**INTERROGATORY**

7.      Please state whether the Locus is covered by any insurance policy, and, if so, the issuer of that policy and its policy number.

**ANSWER**

7.      The discovery and disclosures sought by the Requesting Party are totally irrelevant, are not reasonably calculated to lead to the discovery of any admissible evidence, and such discovery and disclosure exceed the obligations imposed under the Rules of Court.

**MOTION TO COMPEL**

7.      This interrogatory seeks relevant information. Insurance coverage is predicated upon use, and the information contained in an insurance policy is directly relevant to the issues in this appeal.

The Appellant has directly placed its own activity and conduct on the property at issue, and a responsive answer should be compelled.

**<u>INTERROGATORY</u>**

8.      Please state whether the Locus is encumbered by a mortgage, and if so, identify the mortgagee and/or any other parties holding an interest in the Locus.

**<u>ANSWER</u>**

8.      The discovery and disclosures sought by the Requesting Party are totally irrelevant and are not reasonably calculated to lead to the discovery of any admissible evidence, the requested documentation is just as easily obtainable by the Requesting Party, from third party sources, as they are from the Responding Party. The request constitutes an improper attempt by the Requesting Party to shift to the Responding Party the labor, cost, and responsibility for obtaining the requested documents. The instant matter arises solely pursuant to the denial of municipal tax exemptions accorded religious organizations under Massachusetts General Laws at G. L. c. 59, § 5 (10) and (11) by the Requesting Party. The analysis with respect to challenges arising under G.L. c. 59, § 5 (10) and (11) looks at use of the property subjected to such challenge.

**<u>MOTION TO COMPEL</u>**

8.      This interrogatory seeks relevant information. It is relevant if any other person or entity holds an interest in the property, which can take the form of a mortgage interest and/or restriction on the use of the property. Any restrictions are directly relevant to the activity that occurs thereon, the central issue in this appeal. The Appellant has directly placed its own activity and conduct on the property at issue, and a responsive answer should be compelled.

**INTERROGATORY**

9.    Please identify any and all individuals who have, since the time Egypt House acquired the Locus, resided at, lived at, or inhabited the Locus for more than one day.

**ANSWER**

9.    Dr. George Kordis and Rev. Fr. Andrew Bushell. The identities of the remaining individuals are subject to the Clergyman-Penitent Privilege. (G.L. c. 233, § 20A (LexisNexis, Lexis Advance through Chapter 25 of the 2023 Legislative Session of the 193rd General Court)).

**MOTION TO STRIKE AND COMPEL**

9.    The objection and claim of privilege should be struck and a more responsive answer compelled. Massachusetts' priest-penitent privilege is established in G.L. c. 233, § 20A, which provides that

> A priest, rabbi or ordained or licensed minister of any church or an accredited Christian Science practitioner shall not, without the consent of the person making the confession, be allowed to disclose a confession made to him in his professional character, in the course of discipline enjoined by the rules or practice of the religious body to which he belongs; nor shall a priest, rabbi or ordained or licensed minister of any church or an accredited Christian Science practitioner testify as to any communication made to him by any person in seeking religious or spiritual advice or comfort, or as to his advice given thereon in the course of his professional duties or in his professional character, without the consent of such person.

The priest-penitent privilege is "strictly construed and applies only to communications where a penitent seek[s] religious or spiritual advice or comfort." *Commonwealth v. Nutter*, 87 Mass. App. Ct. 260, 263 (quoting *Commonwealth v. Vital*, 83 Mass. App. Ct. 669, 672 (2013)). "Whether [a party's] communications are protected under the terms of the statute is a question of law." *Id.* (quoting *Commonwealth v. Kebreau*, 454 Mass. 287, 303 (2009)). By the terms of the statute, the privilege applies to communications, not to identities or the presence of individuals on a property. In fact, claiming the privilege "involves factual determinations concerning the defendant's intent." *Nutter*, 87 Mass. App. Ct. at 263 (citing *Kebreau*, 454 Mass. at 303). To claim the privilege, a person must identify themselves

as someone communicating with a priest, rabbi, or ordained or licensed minister of any church, and that they were making a confession or seeking religious or spiritual advice or comfort. The interrogatory seeks no information whatsoever about communications, and only the identities of individuals who have resided at the Locus in this matter. As the Appellant notes, this case involves a tax exemption claimed under G.L. c. 59, § 5, which requires the Appellant to prove that it has used the property for primarily religious purposes. The identities of individuals residing on the property is plainly relevant and not privileged. The assertion of privilege is ill founded and should be struck, and a responsive answer compelled.

**INTERROGATORY**

10.    Please identify any and all individuals, entities, and persons who have leased, rented, or otherwise occupied space at the Locus.

**ANSWER**

10.    Aside from the individuals referred to at Interrogatory 9, Egypt House has not been leased, rented, nor otherwise occupied.

**MOTION TO COMPEL**

10.    The Appellee moves for an order compelling a more responsive answer. The answer to Interrogatory 10 refers to the answer to Interrogatory 9, which, as set forth above, withholds the identities of an unknown number of individuals. Those individuals' identities are not privileged, are relevant, and a responsive answer so indicating should be compelled.

**INTERROGATORY**

11.    For each individual, entity, or person identified in the Answer to Interrogatory No. 10, please state the terms of the lease, rental, or other agreement for use of the Locus. The Board will accept the production of a lease, rental, or other agreement in response to this Interrogatory.

**ANSWER**

11.     No lease, rental, or other agreement for the use of Egypt House has ever been effectuated. See attached relative to draft lease agreements, uneffectuated.

**MOTION TO COMPEL**

11.     This interrogatory seeks relevant information related to use of the property. The Appellant's response states only that no written leases were executed. This does not preclude a lease, rental, or agreement for use, including a license by oral agreement. The Appellant must state in response whether any such agreements have ever existed, and what their terms are, separate from whether they were reduced to a writing. The Board stated that it would accept a written agreement *in lieu* of an answer; it did not limit the interrogatory to only written agreements.

<div style="margin-left: 40%;">

Appellee,
The Board of Assessors of the Town of Marblehead,
By its attorneys,


/s/ Matthew D. Provencher
Matthew D. Provencher (BBO#694114)
**Mead, Talerman & Costa, LLC**
227 Union Street, Suite 609
New Bedford, MA 02740
774-206-6857
matt@mtclawyers.com

</div>

Date: September 6, 2023

<div style="text-align: center;">

**CERTIFICATE OF SERVICE**

</div>

I hereby certify that a copy of the foregoing document was served upon counsel of record for the Appellant, Egypt House, on the 6th day of September, 2023.

<div style="margin-left: 40%;">

/s/ Matthew D. Provencher

</div>

**THE COMMONWEALTH OF MASSACHUSETTS**
**APPELLATE TAX BOARD**

| | | |
|---|---|---|
| EGYPT HOUSE, | ) | DOCKET NO.:  F-F347637 |
|     Appellant | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOARD OF ASSESSORS OF THE TOWN | ) | |
| OF MARBLEHEAD, | ) | |
|     Appellee | ) | |

## APPELLANT'S RESPONSE AND OPPOSITION TO APPELLEE'S MOTION TO COMPEL MORE RESPONSIVE ANSWERS TO INTERROGATORIES FROM APPELLANT

### Table of Authorities

**Cases**

*Assessors of Boston v. Garland Sch. of Home Making*, 296 Mass. 378 (1937).
*Assessors of Boston v. Old South Society in Boston, 314 Mass. 364, 366 (1943).*
*Boston Chamber of Commerce v. Assessors of Boston, 315 Mass. 712 (1944).*
*Mt. Auburn Hospital v. Assessors of Watertown*, 55 Mass. App. Ct. 611, 622, n. 11 (2002).
*New Eng. Forestry Found., Inc. v. Board of Assessors*, 468 Mass. 138 (2014).
*New England Hospital for Women and Children v. City of Boston*, 113 Mass. 518 (1873).
*Superior Realty Company, Inc. v. Assessors of Quincy*, Mass. ATB Findings of Fact and Reports
    2016-436, 446.47.
*Trimount Foundation, Inc. v. Board of Assessors of the City of Newton*, 2019 Mass. Tax LEXIS
    1.
*Trinity Church v. City of Boston*, 118 Mass. 164 (1875).
*Trustees of Boston College, Mass*. ATB Findings of Fact and Reports at 2010-96, 123.
*Walz v. Tax Comm. of N.Y.*, 397 U.S. 664 (1970).

**Constitutions**
ALM Constitution Pt. 1, Art. II.
USCS Const. Amend. I.

**Statutes**

ALM R. Civ. P. Rule 26.

ALM G. Evid. § 510.

G.L. c. 59, § 2 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative Session
of the 193rd General Court).

G.L. c. 59, § 5 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative Session
of the 193rd General Court)

G.L. c. 233, § 20 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative
Session of the 193rd General Court)

By and through its counsel, Appellant, Egypt House, respectfully submits this Response and Opposition to Appellee's Motion to Compel More Responsive Answers to Interrogatories from Appellant. For the reasons set forth herein, Appellant respectfully requests the Appellate Tax Board deny Appellee's Motion to Compel More Responsive Answers to Interrogatories from Appellant.

## I.    INTRODUCTION

Appellant is the fee simple owner of an approximately 1,900 square foot single-family residence situated on improved real property located at 12 Conant Road in the Town of Marblehead, Massachusetts (such property, "Egypt House"). Appellant is a District of Columbia religious non-profit corporation expressly because the laws of the District of Columbia allow for the consideration of canon law whereas the laws of the Commonwealth of Massachusetts do not. The premises owned by Appellant is contiguous to, and shares the same use with, a second single-family residence located at 22 Endicott Avenue of approximately 1,700 square feet, also used as a monastic house and incorporated in the District of Columbia for the same reasons, albeit incorporated separately for reasons of liability, as is normal practice. *See,* Exhibit 1, attached. Both houses, while separately titled and incorporated, together in harmony exist to serve the same religious purpose as one monastic complex which is a part of St. Paul's Foundation, an Orthodox Christian monastic institute, similar to how St. Joseph's Abbey, located in Spencer, Massachusetts, is comprised of several parcels forming St. Joseph's Abbey, a part of the Order of the Cistercians of the Strict Observance (the "Trappists"). There are three Massachusetts Department of Revenue exempt use codes for religious organizations, 960 for "Church, Mosque, Synagogue, Temple, etc.," 961 for "Rectory or Parsonage, etc.," and 962 for

"Other." There is also a non-exempt use code, 124, for rectories, convents and monasteries, although it is difficult to understand how it would be applied.

We looked to St. Joseph's Abbey in Spencer, Massachusetts as an example. The monks at St. Joseph's own 12 exempt properties: R48-10 listed as 962 although it is vacant land, R48-5 listed as 962 although it is vacant land, R49-1 listed as 962 although it is vacant land, R52-6 listed as 962, R53-2 listed as 962 although it is vacant land, R53-3 listed as 962 although it is a soccer field and vacant land, R53-5 listed as 962 although it is vacant land, R54-3 listed as 962 although it is a soccer field and vacant land, R54-4 listed as 962 although it is vacant land, R57-1 listed as 962 although it is vacant land, R59-1 listed as 960 described as antique residential clapboard, and R59-2 listed as 960 described as vacant land.

We recognize a tax exemption derives from "special grace and favor" and eligibility must be demonstrated by the applicant; in this case, Egypt House. We have demonstrated that Egypt House is contiguous to and shares the same use with Emmaus House. Prior to the purchase of Egypt House, Appellant met with an architect to develop plans to improve the property into a more suitable monastic property (with pricing plans therefor delivered on August 22, 2022), contacted two general contractors, scheduled meetings to renovate the property, and received one bid to renovate the property. In the meantime, while renovation work was being evaluated, designed, and workmen identified, the property was used for purposes exempted under Clause Eleventh, to wit:

(a)    as housing for Dr. George Kordis, a world-renowned iconographer (iconographers are a kind of cleric in the Orthodox Church specialized in writing the Holy Icons for churches, and receive special blessings from a bishop in order to write the Holy Icons with prayer and fasting);

(b)      a studio for the development of the Holy Icons for St. Nicholas the

Wonderworker, Egypt House, and Emmaus House – writing one of the Holy Icons is considered

analogous to a church service in the Orthodox Church;

(c)      celebration of religious liturgical services, including by clergy other than Fr.

Andrew, such as Bishop Theophan of Philomelion and Fr. Paul Zuniga;

(d)      housing for pilgrims seeking spiritual direction and confession of their sins; and

(e)      administrative work, such as reviewing construction documents and filing and

composing a seemingly endless stream of administrative appeals and legal defenses.

Appellant looked to other organizations whose exempted landholdings are comprised of

related parcels; organizations that acquired parcels, developed plans, and started construction

(*New England Hospital for Women and Children v. City of Boston*, 113 Mass. 518 (1873),

*Trinity Church v. City of Boston*, 118 Mass. 164 (1875), and *Mt. Auburn Hospital v. Assessors of

Watertown*, 55 Mass. App. Ct. 611, 622, n.11 (2002)); organizations that placed parcels under

temporary use in service to the organization while identifying the best and highest use for such

parcel within the subject organization (*Trustees of Boston College*, Mass. ATB Findings of Fact

and Reports at 2010-123); and organization owners that had not leased the property or derived

profit from it while identifying the best and highest use for such parcel within the subject

organization (*Mt. Auburn Hospital v. Assessors of Watertown*, 55 Mass. App. Ct. 611, 622, n.11

(2002)). We take each of these concepts and cases in turn.

In *New England Hospital for Women and Children v. City of Boston*, 113 Mass. 518

(1873), the Supreme Judicial Court found, "[w]ithin a period of about a month from its purchase

in April, 1871, the appellant had hired an architect, who had prepared plans and specifications

for the hospital, which the appellant approved, and by May 27, 1871, the architect had staked off

the property in preparation for digging the foundation. *Id*. The Supreme Judicial Court found that the appellant, as of the relevant determination date, was "diligently proceeding with the preliminary measures necessary to the erection" of the hospital and, accordingly, did "occupy" the property in accordance with the statute as of that time. *Id*. at 521. In *Trinity Church v. City of Boston*, 118 Mass. 164 (1875), "[i]t was then, and is now, the intention of the proprietors of the plaintiff corporation to use the lot on St. James Avenue for purposes of religious worship only; and they have caused the work of building the new church to be carried on with all reasonable diligence." *Mt. Auburn Hospital v. Assessors of Watertown*, citing *New England Hospital* as reflecting "a less rigid formulation [with respect to occupancy] focusing on the organization's intentions and diligence." *Mt. Auburn Hospital v. Assessors of Watertown*, 55 Mass. App. Ct. 611, 622, n.11 (2002): "although construction had not commenced yet, planning had been undertaken with due diligence and the hospital had not leased the premises or derived a profit therefrom; exemption allowed." In this instance, Egypt House purchased the subject property on June 30, 2022. Prior to June 30, 2022, it had already viewed the property with an architect and started developing the plans for the property. *See*, Exhibit 2, attached. In the interim, while bids for construction were being solicited and mortgages applied for, the subject property was being used for liturgical services, housing for retreatants for spiritual direction, and housing for the iconographer to beautify the chapel areas of St. Nicholas. Additionally, the garage building was used as storage for maintenance tools to maintain the property and the basement to store other items to extend the evangelical mission of the Orthodox Church such as fixtures and equipment to be installed at St. Nicholas. It is a common practice for parsonages and rectories to store various items to be used later at the actual houses of worship, particularly when there are renovations at the main house of worship.

The decision of the Board in *Trustees of Boston College*, Mass. ATB Findings of Fact and Reports at 2010-123, states:  "where the property at issue had only recently been acquired by the college, and its long-term use was still being studied," the Board found the property at issue was exempt, as the college occupied it with interim uses, such as passive recreation, overflow parking, and buffer space, and concluded, the "fact that these uses may have been temporary, or that Boston College's future plans for the subject property continued to evolve during the fiscal years at issue, did not warrant a finding to the contrary." Based upon the foregoing one is able to understand the situation of Egypt House is not unique and is the subject of well settled determinations by both this Board and the Supreme Judicial Court.

In *Trustees of Boston College v. Assessors of Boston*, Mass. ATB Findings of Fact and Reports 2010-96, and *Superior Realty Company, Inc. v. Assessors of Quincy*, Mass. ATB Findings of Fact and Reports 2016-436, 446-47, the Board treated contiguous parcels as one where the evidence showed they were used in the same manner and put to the same economic use. This is directly on point with the situation at Egypt House which is contiguous to Emmaus House.

A definition for the term "parsonage" is not contained in the statutes. In *Assessors of Boston* v. *Old South Society in Boston*, 314 Mass. 364, 366 (1943), the court stated in pertinent part:

> . . . the English word 'parsonage' as derived from American usage must be read, not in a technical or ecclesiastical sense, but in the broad meaning of a ministerial residence used in connection with any place of worship of any denomination. It is but a house owned by, or held in trust for, a religious organization for religious uses in which a minister serving

those uses lives. . . . The word 'parsonage' is commonly used to denote a residence

furnished by a church to a minister."

But surely, if a house of worship is under construction and diligently seeking to complete its

construction, using a parsonage as a temporary place of worship, retreat and necessary

administrative workspace such uses should not violate the exempt purpose of the religious

organization in question under Clause Eleventh, otherwise that would provide an impermissible

establishment of religious organizations that are older, wealthier, and better accepted by the

community.

　　　　Ownership of multiple contiguous properties serving the same religious purpose is a

concept that exists in Marblehead at other houses of worship, as documented in the Marblehead

Assessor's own records: Our Lady Star of the Sea, a Roman Catholic Parish, has five real

properties, three contiguous (church listed as 960, a parking lot listed as 962, the rectory has no

property card at all) and two on separate lots (an educational center and function hall across the

street from the church listed as 954 and a cemetery across town listed as 962); St. Michael's

Episcopal Church has five (5) contiguous real properties and at least one, an investment property,

called Davenport House, is incorporated separately in a trust and listed as a two family use 124,

but its real estate tax status is unclear; Old North Church has perhaps three separate real

properties including the church, and across the street a parking lot contiguous to a rectory.

Several, including St. Andrew's Episcopal and, St. Stephen's Methodist have parsonages. Of

these local religious organizations, Star of the Sea's rectory is most analogous to the facts at

issue here, use with clergy residences and offices on the upper floors and offices, meeting rooms

and kitchen space on the ground floor – except the single Catholic rectory has individual suites

on the upper floors for priests, is larger than both 12 Conant Road and 22 Endicott Avenue put

together, and only has one full-time priest. Unfortunately, there is no digital record of the rectory of Our Lady Star of the Sea in the public Town of Marblehead portal on the Patriot Property website. The renovation plans for Egypt House, responsive to Appellee's Second Request for Production of Documents (to be provided, response not yet due), will eventually allow for clerical suites so each cleric can have a bedroom with ensuite bathroom. There are many examples of such usage within the practices of Orthodox Catholic and Roman Catholic countries, such as the Convent of St. Elizabeth in Obitel-Minsk (https://obitel-minsk.org/history). Because a religious organization is nascent and all of its ministries are not finally settled does not make the religious organization less religious. For example, the time I am now spending writing this response could be better spent writing on the Feast of the Holy Cross, but my work at Egypt House sitting and writing as a lawyer defending the religious practice of the church does not make Egypt House less occupied for religious use, just as pilings installed at Holy Trinity Church in Boston, or architectural plans and permits for renovations of other properties, are indicative of occupancy.

Because the Board considers related parcels in analyses of this nature and because there is likely an additional matter that will appear before the Board shortly, it makes sense to lay out the entirety of St. Paul's Foundation's subordinate holdings in Marblehead. Emmaus House is listed as 960. The two contiguous St. Nicholas properties at 120 and 124 Pleasant Street also in Marblehead are listed as 960. Egypt House should either be listed as 960 because it has a chapel and is used for religious instruction as well as a residence for clergy, or 961 as a parsonage, or 962 as other. Whatever the case, Egypt House should be listed as the same use since the uses are the same. We note the Town of Marblehead recently revoked an exemption it had previously granted to St. Nicholas' property at 120 Pleasant Street which complements the ministry of 124

Pleasant Street without any explanation. At the Pleasant Street location, *The Archbishops Damaskinos and Iakovos Educational Center*, currently undergoing renovations, inclusive of the installation of an outdoor baptistry in a garden where outdoor worship services can be celebrated, administrative offices for church staff, multipurpose educational and conference rooms (including a place where a video screen can be lowered to show a movie explaining the devotions at St. Nicholas), it is contemplated our church will have a public-facing home for our ministries. In a recent filing in Superior Court, we note the Town, in a filing by counsel hereunder, denies the religious character of St. Nicholas' property at 120 Pleasant Street. Appellant is still puzzled over this turn of events, since the subject site is clearly a house of worship undergoing over $1,000,000.00 in fully-permitted renovations subjected to inspection by the Town of Marblehead. This site is contiguous to property in which the Orthodox Christian chapel, refectory, monastic workshop, and pilgrims' quarters are to be located. Constant delays to St. Nicholas' construction program required expansion at Emmaus House; hence Egypt House, literally named after the Holy Family's Flight to Egypt.

Each of Egypt House and Emmaus House have consecrated chapel areas for liturgical worship, rooms used as a residence for clergy and those otherwise consecrated to the mission of the Orthodox Church, guest quarters for pilgrims and lay cooperators, office space for the administrative and ever increasing amount of legal work required to, for example, file this brief, develop evangelical and mission related work, assist the local bishop in his work, review the construction work  at the Shrine of St. Nicholas or the various legal and/or administrative challenges to the establishment of St. Nicholas mounted by the Town of Marblehead, or any other of a hundred different tasks required by the planting of a church, which cannot be performed at either of the two buildings commonly known as 120 and 124 Pleasant Street

mentioned hereinabove due to the fact the buildings remain a construction site due to construction work being regularly halted as the result of a number of administrative and legal actions by Town of Marblehead officials (as partially laid out in the timeline attached hereto as Exhibit 3).

In view of the foregoing, Egypt House has the characteristics of both a house of worship and a parsonage; neither term quite fits a monastic usage, yet all monastic houses share the characteristics of both. It would be contrary to the current interpretation of the law, and indeed verge on establishment territory, to impose what is clearly a Protestant concept of church, *e.g.*, the word "parsonage" is never used among Orthodox Catholics or Roman Catholics, relative to a monastic institute. As noted hereinabove, the word "parsonage" is commonly used to denote a residence furnished by a church to a minister; however, even this definition does not conform to an Orthodox Catholic or Roman Catholic usage for what are termed "religious", *e.g.,* those men and women who live according to a stricter standard as monks, nuns, other kinds of consecration, or simply dedicated faithful such as the Numeraries of Opus Dei, *cf. Trimount Foundation*[1]. Importantly, the word "parsonage", or phrase "ministerial residence" could also mean two houses together used for the same purpose, especially when the aggregate square footage of the two properties combined is about 3,600 square feet and that space must provide for liturgical worship and uses, religious education classes and retreats, administrative offices, storage space for goods for religious purposes, and as well as residential uses.

Egypt House is neither a public nor private for-profit enterprise.  Egypt House is not a secular charitable organization. Egypt House is not a property held by a religious organization for charitable purposes. Egypt House does not employ persons to conduct business operations.

---

[1] Trimount Foundation, Inc. v. Board of Assessors of the City of Newton, 2019 Mass. Tax LEXIS 1.

Her function is to hold real property and provide usable space necessary for the religious use of a religious organization such as worship, mission, pilgrims housing, and that necessary administrative work to allow our ministry to survive while continuing with the construction of the Shrine of St. Nicholas the Wonderworker in downtown Marblehead. Where else would Appellee have Appellant house and provide for her clergy, religious workers, liturgical space, religious education, pilgrims, and administrative work whilst St. Nicholas is under construction, if not at two houses that share a common boundary? We direct the Board to our timeline which clearly illustrates a pattern on the part of the Appellee, to wit: despite the existence of fully-permitted building plans, the Town of Marblehead continually identifies new objections to work it had already permitted and, following the time consuming and costly exercises of filing and answering appeals, such objections were overturned at the State level. The process of researching, arguing, filing and applying for these appeals at the State level does more than give the residents of Emmaus House and Egypt House a backache, it actually constitutes occupancy under the decisions of this Board, even though it's not the occupancy Appellant would prefer; that is the celebration of more liturgical services, working on more evangelical materials, and confessing more sins to raise more souls to Heaven. The ability to acquire Egypt House to provide for space to pray, evangelize, minister, work, and live was a fortuitous event that solved an existential threat to our minority religious foundation.

Appellant does not possess a vast file of materials relative to a single-family dwelling acquired eighteen months ago in support of its mission. Appellee's counsel would love to mire and confuse the Appellate Tax Board in extraneous detail on the hunt for some salaciously underhanded scheme that simply does not exist. The facts and the law in this instance are not complex. Houses of worship and parsonages are allowed exemptions under Clause the Tenth and

Clause the Eleventh. While it's arguable as to whether a monastic property is more house of worship than parsonage or more parsonage than house of worship, it is not arguable that Egypt House has been used for one or the other uses, each of which are exempt under Clause Eleventh. While these properties might not be held by the same entities, they are all subordinate nonprofits under the IRS group ruling of St. Paul's Foundation, a Delaware religious non-stock non-profit, are under common control, and all together comprise the same fundamentally religious use as has been repeatedly demonstrated. How Churches choose to arrange, or not to arrange, since incorporation is not a necessary part of the statute.

**Legal Principles Underlying the Tax Exemptions Promulgated**
**At Massachusetts General Laws, Chapter 59, Section 5, Clauses 10th and 11th**

Separation of Church and State is a core tenet of the republic established by the Founding Fathers of the United States. Freedom of religion is enshrined in the First Amendment to the United States Constitution.[2] In similar fashion, the Constitution of the Commonwealth of Massachusetts protects its citizens from persecution resulting from the practice of religion.[3]

The Massachusetts Code provides: [a]ll property, real and personal, situated within the commonwealth, and all personal property of the inhabitants of the commonwealth wherever situated, unless expressly exempt, shall be subject to taxation; . . ." G.L. c. 59, § 2 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative Session of the 193rd General Court). The exemptions at issue here are the religious organization exemptions. The subject exemptions

---

[2]    Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. USCS Const. Amend. 1.

[3]    It is the right as well as the duty of all men in society, publicly, and at stated seasons to worship the SUPREME BEING, the great Creator and Preserver of the universe. And no subject shall be hurt, molested, or restrained, in his person, liberty, or estate for worshipping God in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession or sentiments; provided he doth not disturb the public peace, or obstruct others in their religious worship. ALM Constitution Pt. 1, Art. II.

are codified at G.L. c. 59, § 5 (LexisNexis, Lexis Advance through Chapter 27 of the 2023

Legislative Session of the 193rd General Court), to-wit:

      Tenth, Personal property owned by or held in trust within the commonwealth for

religious organizations, whether or not incorporated, if the principal or income is used or

appropriated for religious, benevolent or charitable purposes.

      Eleventh, Notwithstanding the provisions of any other general or special law to

the contrary, houses of religious worship owned by, or held in trust for the use of, any

religious organization, and the pews and furniture and each parsonage so owned, or held

in irrevocable trust, for the exclusive benefit of the religious organizations, and including

the official residences occupied by district superintendents of the United Methodist

Church and the Christian and Missionary Alliance and of the Church of the Nazarene,

and by district executives of the Southern New England District of the Assemblies of

God, Inc., Unitarian-Universalist Churches and the Baptist General Conference of New

England, and the official residence occupied by the president of the New England Synod

of the Lutheran Church in America, Inc., and the official residence occupied by a person

who has been designated by the congregation of a Hebrew Synagogue or Temple as the

rabbi thereof, but such exemption shall not, except as herein provided, extend to any

portion of any such house of religious worship appropriated for purposes other than

religious worship or instruction. The occasional or incidental use of such property by an

organization exempt from taxation under the provisions of 26 USC Sec. 501(c)(3) of the

Federal Internal Revenue Code shall not be deemed to be an appropriation for purposes

other than religious worship or instruction.

G.L. c. 59, § 5 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative Session

of the 193rd General Court). In *New England Forestry Foundation*,[4] the Court articulated the

burden placed upon an organization seeking an exemption from taxation within the

Commonwealth of Massachusetts:  "[e]xemption statutes are strictly construed, and the burden

lies with the party seeking an exemption to demonstrate that it qualifies according to the express

terms or the necessary implication of a statute providing the exemption." *Boston Chamber of*

*Commerce v. Assessors of Boston,* 315 Mass. 712 (1944), citing *Assessors of Boston v. Garland*

*Sch. of Home Making,* 296 Mass. 378 (1937). With respect to the matter before this Court,

Appellant has provided responsive information relative to the ownership and use of Egypt House

by Appellant. Egypt House was purchased approximately eighteen months ago; it is not unusual

that a wealth of documentation does not exist, given the short time frame since it was purchased.

Appellee now requests information relative to the terms of sale of Egypt House, inquiries as to

whether and how the property is insured, and the identities of persons worshipping at or

benefitting from the ministry(ies) performed at Egypt House. Appellant wonders why any of this

information is germane to *the use of Egypt House under ownership by Appellee*; indeed, why is

the name of any person who worships at Egypt House a topic for disclosure to the Town of

Marblehead? "*The Taxpayer's Guide to Property Tax Exemptions in Massachusetts - Religious*

*and Charitable Organizations*," published by the Taxpayer's Bureau, provides the following

guidance relative to analyzing exemption applications:

> The organization must provide whatever information is *reasonably required to establish*
>
> *eligibility*. This information may include, but is not limited to: Articles of incorporation,

---

[4]        *New Eng. Forestry Found., Inc. v. Board of Assessors*, 468 Mass. 138 (2014).

charter or declaration of trust, Organization by-laws, identification of officers, directors

or trustees, description of charitable activities, description of the use of the property,

including use by all lessees or other occupants. [Emphasis added.]

In construing the theory(ies) surrounding the use of tax exemptions for religious organizations, in

*Walz v. Tax Comm'n of City of New York*[5], the United States Supreme Court sums up the

attributes of the exemption treatment afforded religious organizations adopted by the legislatures

since the founding of our country:

> The legislative purpose of the property tax exemption is neither the advancement nor the
>
> inhibition of religion; it is neither sponsorship nor hostility. New York, in common with
>
> the other States, has determined that certain entities that exist in a harmonious
>
> relationship to the community at large, and that foster its 'moral or mental improvement,'
>
> should not be inhibited in their activities by property taxation or the hazard of loss of
>
> those properties for nonpayment of taxes. It has not singled out one particular church or
>
> religious group or even churches as such; rather, it has granted exemption to all houses of
>
> religious worship within a broad class of property owned by nonprofit, quasi-public
>
> corporations which include hospitals, libraries, playgrounds, scientific, professional,
>
> historical, and patriotic groups.

*Walz v. Tax Com. of N.Y.*, 397 U.S. 664 (1970). The actions of the Town of Marblehead in this

instance step very close to the entanglement boundary raised in *Walz*, "the exemptions for

religious organizations created only a minimal and remote involvement between church and

---

[5]     *Walz v. Tax Com. of N.Y.*, 397 U.S. 664 (1970).

state, and far less of an involvement than would be created by taxation of churches, and the effect of the exemptions was thus not an excessive government entanglement with religion." *Id*.

Egypt House is *not* a publicly- or privately- held *for-profit enterprise*. Egypt House does not employ persons to conduct its business operations, as its sole function is to support the work of St. Paul's in building the Orthodox Christian faith and providing a place of Christian sanctuary for the weary, the oppressed, the down-trodden, and those seeking to live their Christian values in our modern world:

> Let all guests who arrive be received like Christ, for He is going to say, 'I came as a guest, and you received Me' (Matt. 25:35). And to all let due honor be shown, especially to the domestics of the *faith* (Gal 6:10) and to pilgrims. . . . Let the Abbot give the guests water for their hands; and let both Abbot and community wash the feet of all guests. After the washing of the feet let them say this verse: '[w]e have received Your mercy, O God, in the midst of Your temple.' (Ps.47[48]:10) . . . . In the reception of the poor and of pilgrims the greatest care and solicitude should be shown, because it is especially in them that Christ is received . . . Let there be a separate kitchen for the Abbot and guests, that the brethren may not be disturbed when guests, who are never lacking in a monastery, arrive at irregular hours. [Emphasis added.]

*Rule of St. Benedict,* Chapter 53, On the Reception of Guests. To be clear, guest (pilgrim) lodging is provided at no charge.

## II.    MOTION TO COMPEL

Appellant states as follows relative to the assertions made by Appellee in the subject Motion to Compel:

Interrogatory 3

3.    Please identify and state the corporate or entity status of Egypt House, including the state or territory in which it is organized, its principal place of business, the locations at which it conducts any activities or business, and any officers, directors, or controllers of the entity.

ANSWER:    Egypt House is a District of Columbia religious nonprofit corporation. Egypt House is the fee simple owner of 12 Conant Road, Marblehead, Massachusetts 01945. Rev. Fr. Andrew Bushell is the Superior of Egypt House.

2ND ANSWER:    Appellant first provided its Articles of Organization to Appellee on July 5, 2022. Appellant has no further information relative to its corporate structure. The July 5, 2022 correspondence, inclusive of Appellant's Articles of Organization, are attached as Exhibit 4 hereto.

Interrogatory 4

4.    State the circumstances, manner, and means of Egypt House's acquisition of the Locus.

ANSWER:    The discovery and disclosures sought by the Requesting Party under the subject interrogatory are totally irrelevant, designed to harass, will not lead to the discovery of any admissible evidence, were designed to harass and serve ulterior motives to obtain information that is completely unrelated to the material issues of this litigation, and such discovery and disclosure exceeds the obligations imposed under the Rules of Court.  The instant matter arises solely pursuant to the denial

of municipal tax exemptions accorded religious organizations under

Massachusetts General Laws at G. L. c. 59, § 5 (10) and (11) by the Requesting

Party.  The analysis with respect to challenges arising under G.L. c. 59, § 5 (10)

and (11) looks at *use* of the *property* subjected to such challenge.

2ND ANSWER:    Appellant affirms the objection originally raised.

Interrogatory 5

5.      Describe in detail any and all activities conducted by Egypt House at the Locus at all

times from Egypt House's acquisition of the Locus through the present.

ANSWER:        A chapel is located within Egypt House. Egypt House is a consecrated site used

for Divine Liturgy, vespers, and administration of the sacraments. Egypt House

serves as a guest house to pilgrims undergoing spiritual counselling, a reading

room with books on Orthodox Spirituality, and a place for evangelical work. An

iconographer engaged in the writing of the Holy Icons for the Shrine of St.

Nicholas the Wonderworker performed his sacred work within Egypt House.

Egypt House has benefitted from repairs, cleaning, and maintenance since

acquisition.

2ND ANSWER:    There are no records in response to this Interrogatory. Appellant has responded

relative to the character and quality of the activities at Egypt House. No other

documentation exists. With due respect, it is difficult to understand the basis for

the conclusion of Appellee that Appellant's response is incomplete.

Interrogatory 6

6.      Identify any and all agents, servants, employees, officers, officials, directors, or personnel

of any kind that conduct activities on behalf of Egypt House at the Locus, and which activities each individual conducts.

ANSWER:    The discovery and disclosures sought by the Requesting Party under the subject interrogatory are totally irrelevant, will not lead to the discovery of any admissible evidence, seek to obtain information that is completely unrelated to the material issues of this litigation and are designed to harass Responding Party. The discovery and disclosures sought by Requesting Party hereunder exceed the obligations imposed under the Rules of Court.

2ND ANSWER:    Appellant has responded relative to the persons located within Egypt House from time to time. As stated hereinabove, Egypt House is not a public or private for-profit corporation. It is the owner of a single-family residence used to further the Orthodox Christian ministry of St. Paul's Foundation and its subordinates.

Interrogatory 7

7.    Please state whether the Locus is covered by any insurance policy, and, if so, the issuer of that policy and its policy number.

ANSWER:    The discovery and disclosures sought by the Requesting Party are totally irrelevant, are not reasonably calculated to lead to the discovery of any admissible evidence, and such discovery and disclosure exceed the obligations imposed under the Rules of Court.

2ND ANSWER:    The Massachusetts Rules of Civil Procedure provide as follows:

A party may obtain discovery of the existence and contents of any insurance agreement under which any person carrying on an insurance

business may be liable to satisfy part or all of a judgment which may be

entered in the action or to indemnify or reimburse for payments made to

satisfy the judgment.

ALM R. Civ. P. Rule 26. Under the subject circumstances, this request does not

fit within the parameters of the Rule.

<u>Interrogatory 8</u>

8.    Please state whether the Locus is encumbered by a mortgage, and if so, identify the

mortgagee and/or any other parties holding an interest in the Locus.

ANSWER:    The discovery and disclosures sought by the Requesting Party are totally

irrelevant and are not reasonably calculated to lead to the discovery of any

admissible evidence, the requested documentation is just as easily obtainable by

the Requesting Party, from third party sources, as they are from the Responding

Party. The request constitutes an improper attempt by the Requesting Party to

shift to the Responding Party the labor, cost, and responsibility for obtaining the

requested documents. The instant matter arises solely pursuant to the denial of

municipal tax exemptions accorded religious organizations under Massachusetts

General Laws at G. L. c. 59, § 5 (10) and (11) by the Requesting Party.  The

analysis with respect to challenges arising under G.L. c. 59, § 5 (10) and (11)

looks at *use* of the property subjected to such challenge.

2ND ANSWER:    The *use* of the property *under the ownership of the organization seeking*

*exemption* is germane to the subject analysis. Egypt House is not encumbered by a

mortgage. As stated in the original responses of Appellant, the requested

information is easily confirmed by Appellee.

Interrogatory 9

9.        Please identify any and all individuals who have, since the time Egypt House acquired

the Locus, resided at, lived at, or inhabited the Locus for more than one day.

ANSWER:        Dr. George Kordis and Rev. Fr. Andrew Bushell. The identities of the remaining

individuals are subject to the Clergyman-Penitent Privilege. (G.L. c. 233, § 20A

(LexisNexis, Lexis Advance through Chapter 25 of the 2023 Legislative Session

of the 193rd General Court)).

2ND ANSWER:        Appellant responded to this interrogatory in its initial responses. Neither the

identity of the persons seeking spiritual guidance, nor the nature of any

communications, are disclosable. The canons of the Orthodox faith strictly

prohibit such disclosures. St. Nikodemos wrote the manual for confessors that is

used in our faith today; wherein he writes:

> Nothing else remains after confession, Spiritual Father, except to keep the
>
> sins you hear a secret, and to never reveal them, either by word, or by
>
> letter, or by a bodily gesture, or by any other sign, even if you are in
>
> danger of death, for that which the wise Sirach says applies to you: '[h]ave
>
> you heard a word? Let it die with you.' (Sir. 19:8); meaning, if you heard a
>
> secret word, let the word also die along with you, and do not tell it to
>
> either a friend of yours or an enemy of yours, for as long as you live. And
>
> further still, that which the Prophet Micah says: '[t]rust not in friends . . .
>
> beware of thy wife, so as not to commit anything to her. (Mic. 7:5).

In addition to the foregoing, the qualifications to the clergyman-penitent privilege recognized in the Commonwealth of Massachusetts, provides as follows:

> A clergyman shall not disclose a confession made to him in his professional character *without the consent of the person making the confession*. Nor shall a clergyman testify as to any communication made to him by any person seeking religious or spiritual advice or comfort, or as to his advice given thereon in the course of his professional duties or in his professional character, *without the consent of such person.* ALM G. Evid. § 510.

Interrogatory 10

10.    Please identify any and all individuals, entities, and persons who have leased, rented, or otherwise occupied space at the Locus.

ANSWER:    Aside from the individuals referred to at Interrogatory 9, Egypt House has not been leased, rented, nor otherwise occupied.

2ND ANSWER:  The person(s) who were counterparty(ies) to the written leases provided are known to Appellant through the Orthodox Christian faith and the spiritual counsel provided to each of them. The rental opportunities reflected in the draft lease agreements disclosed arose in the context of evangelization and spiritual study, a portion of which is confession and related highly personal disclosures.

Interrogatory 11

11.    For each individual, entity, or person identified in the Answer to Interrogatory No. 10, please state the terms of the lease, rental, or other agreement for use of the Locus. The Board will

accept the production of a lease, rental, or other agreement in response to this Interrogatory.

ANSWER:    No lease, rental, or other agreement for the use of Egypt House has ever been

effectuated. See attached relative to draft lease agreements, uneffectuated.

2ND ANSWER:    No lease, occupancy agreement, or license has been effectuated at Egypt House.

There are no oral agreements or licenses related to the premises.

## II.    CONCLUSION

Appellant is a religious organization under Chapter 59, Section 5, Clauses 10 and

11, of the General Laws of The Commonwealth of Massachusetts. The forefathers of each of the

United States and The Commonwealth of Massachusetts upheld a firm belief in religious liberty.

Federal and state law protects the free exercise of religion. One of the methods often used by

municipalities to chill the practice of religion is to cause the religious organization to publicly

identify its congregants and to spend its resources on lengthy and costly maneuvers by such

municipality, including the imposition of illegal taxes, forcing the religious organization to

pursue the costly and protracted exercise to establish its legal authority to congregate and pursue

its religious devotion.

Appellant, Egypt House, by and through its Superior, hereby verifies the above

responses are true and accurate, to the best of its knowledge. Signed under the penalties of

perjury effective the 11th day of September, 2023.

EGYPT HOUSE

By:  /s/Rev. Fr. Andrew Bushell
        Rev. Fr. Andrew Bushell, Superior

As to objections:

/s/Tracey M.A. Stockton
Tracey M.A. Stockton
Legal Counsel to Appellant
124 Pleasant Street
Marblehead, Massachusetts   01945
617.800.3979
ts@stpaulsfoundation.org
BBO Number: 568495

## CERTIFICATE OF SERVICE

I certify a copy of the above Appellant's Response to Appellee's Motion to Compel More

Responsive Answers to Interrogatories from Appellant was mailed and delivered electronically

on September 11, 2023 to all counsel and self-represented parties of record.

Parties and/or attorneys served:

Karen D. Bertolino, M.A.A.
Marblehead Town Assessor

Adam J. Costa, Esq.
Mead, Talerman & Costa, LLC

Matthew D. Provencher, Esq.
Mead, Talerman & Costa, LLC

Brian Winner, Esq.
Mead, Talerman & Costa, LLC

/s/Tracey M.A. Stockton
Tracey M.A. Stockton

**COMMONWEALTH OF MASSACHUSETTS**
**APPELLATE TAX BOARD**

| | |
|---|---|
| EGYPT HOUSE, ) | |
| ) | |
| Appellant ) | |
| ) | |
| v. ) | No. F-347637 |
| ) | |
| BOARD OF ASSESSORS OF ) | |
| TOWN OF MARBLEHEAD, ) | |
| ) | |
| Appellee ) | |

## RESPONSE OF APPELLANT TO
## FIRST REQUEST FOR PRODUCTION OF DOCUMENTS OF APPELLEE

Requesting Party:  Board of Assessors of Town of Marblehead
Responding Party:  Egypt House

GENERAL OBJECTIONS

The Responding Party hereby asserts the following general objections ("General Objections") to each and every one of the Requesting Party's document requests contained in the First Request for Production of Documents of Appellee (the "Request") where applicable. The General Objections may or may not be reasserted after each specific document request. The assertion of the same, similar, or additional objections to each specific document request, or the failure to assert any additional objection to each specific document request, does not waive or alter the General Objections immediately set forth below:

1.      The Responding Party objects to each Request to the extent it seeks the production of documents and information protected from disclosure by the attorney-client privilege, the work product doctrine, and any other privilege, doctrine or immunity, including, without limitation, the

Clergyman-Penitent Privilege. G.L. c. 233, § 20A (LexisNexis, Lexis Advance through Chapter 25 of the 2023 Legislative Session of the 193rd General Court).

2.      The Responding Party objects to each Request to the extent it is vague and ambiguous.

3.      The Responding Party objects to each Request to the extent it is overly broad and unduly burdensome.

4.      The Responding Party objects to each Request to the extent it prematurely seeks documents and information.

5.      The Responding Party objects to each Request to the extent it seeks documents and information already within the Requesting Party's possession, custody, or control and/or not in the Requesting Party's possession, custody or control.

6.      The Responding Party objects to each Request to the extent the burden of deriving or ascertaining the answer is substantially the same for the propounding party as for the party served.

7.      The Responding Party objects to each Request to the extent it seeks documents and information that are publicly available.

8.      The Responding Party objects to each Request to the extent it seeks documents and information that are neither relevant to any of the claims or defenses in this action nor are reasonably calculated to lead to the discovery of admissible or relevant evidence.

9.      The Responding Party objects to each Request to the extent it assumes facts not in evidence.

10.      The Responding Party objects to each Request to the extent it does not contain a reasonable time restriction for the document search responses.

11.    The Responding Party objects to each Request to the extent specific requests are duplicative of each other.

12.    The Responding Party objects to each Request to the extent it purports to impose obligations on the Responding Party beyond those set forth in the Rules of Court.

REQUESTS FOR PRODUCTION OF DOCUMENTS

Subject to and without waiver of the foregoing General Objections, Responding Party responds as follows:

Request 1:    Any and all documents read, reviewed, consulted, examined, used, or relied upon in preparing your responses hereto or in connection with the Board's Interrogatories to you.

RESPONSE:    Request 1 is objectionable because the requested documentation is subject to the attorney-client privilege and the work product doctrine. Notwithstanding the foregoing, the requested material has already been obtained by the Requesting Party and such request is, therefore, duplicative. The requested documentation is just as easily obtainable by the Requesting Party, from third party sources, as it is for the Responding Party. The request constitutes an improper attempt by the Requesting Party to shift to the Responding Party the labor, cost, and responsibility for obtaining the requested documents.

Request 2:    Any and all documents relative to the relationship between each and every agent, servant, employee, or individual empowered by Egypt House to carry on any activities, business, religious, or otherwise at 12 Conant Road, including but not limited to the status of any such individuals as an officer, employee, director, lay worker, clergy, or other relationship and the usual and customary activities performed by such individuals on behalf of or as a representative or employee of Egypt House.

RESPONSE:    Request 2 is objectionable because the request is vague, overbroad, oppressive, and unduly burdensome. The request fails to describe with reasonable particularity any objective and it imposes obligations on the Responding Party beyond those set forth in the Rules of Court.

Request 3:    Any and all documents containing information about the facts, allegations, and conclusions introduced or made by you in your Petition.

RESPONSE:    Request 3 is objectionable because it is irrelevant and requires the production of documents already obtained by the Requesting Party.  Request 3 is, therefore, duplicative.

Request 4:    Insofar as they may have relevance to the valuation of the Locus or the methodology of calculating the same, any and all:

(a)    photograph(s) of the Locus;

(b)    lease(s) of all or any portion of the Locus;

(c)    income and revenue calculations;

(d)    expense calculations;

(e)    record(s) of maintenance costs and expenditures;

(f)    documentation of capital improvements;

(g)    opinion(s) of value; and

(h)    appraisal(s);

from June 25, 2022 to the present.

RESPONSE:    Request 4 is objectionable because it is irrelevant and requires the production of documents that have no relation to the litigation, nor are they reasonably calculated to lead to the discovery of admissible evidence. The request imposes obligations on

the Responding Party beyond those set forth in the Rules of Court. Valuation is not in dispute.

Request 5:    Any and all records of income or revenue generating activities conducted on the Locus.

RESPONSE:    The request is objectionable because it imposes obligations on the Responding Party beyond those set forth in the Rules of Court. Notwithstanding the foregoing, no such records exist. No income or revenue generating activities have been conducted at Egypt House.

Request 6:    Any and all records of non -income or -revenue generating activity conducted on the Locus.

RESPONSE:    The request is objectionable because it imposes obligations on the Responding Party in excess of those promulgated under the Rules of Court. No such records exist. Notwithstanding the foregoing, attached is documentation evidencing the non-income generating activities conducted at Egypt House.

Request 7:    Any and all documents which you intend to use as evidence at the hearing on your appeal.

RESPONSE:    Request 7 is objectionable because it requests documentation that is subject to the work product doctrine and prematurely seeks documents and information.

Request 8:    The curricula vitae of any and all witnesses to be tendered as experts at the hearing on your appeal, if any.

RESPONSE:    Request 8 is objectionable because it prematurely seeks documents and information.

Request 9:    Any and all documents referenced, consulted, relied upon, or which may be utilized by any expert witness you intend to call to testify at the hearing on your appeal.

RESPONSE:    Request 9 is objectionable because it prematurely seeks documents and information.

Request 10:    Any and all documents prepared by any expert witness you intend to call to testify at the hearing on your appeal, including but not limited to opinion(s) of value, appraisal(s), notes, reports, memoranda, letters, correspondence, e-mails, and other documents.

RESPONSE:    Request 10 is objectionable because it prematurely seeks documents and information.

Request 11:    Any and all mortgage, financing, lending, or funding applications made with respect to Egypt House's acquisition and ownership of the Locus.

RESPONSE:    Request 11 is objectionable because (a) it is irrelevant and requires the production of documents that have no relation to the litigation, nor is it reasonably calculated to lead to the discovery of admissible evidence, and (b) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court. Notwithstanding the foregoing, if Requesting Party will stipulate to a protective order ensuring such documentation be ensealed and delivered to the Court for further handling by the Court, Responding Party will produce such documentation into the registry of the Court. If Requesting Party is amenable to the proposed handling of the requested documentation, Responding Party will prepare a Motion and Order in keeping with the criteria so stated.

Request 12:    Any and all liability, property, or other type of insurance policies applicable to the Locus.

RESPONSE:    Request 12 is objectionable because (a) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court, and (b) it is irrelevant and requires the production of documents that have no relation to the litigation, nor are they reasonably calculated to lead to the discovery of admissible evidence.

Request 13:    Any and all insurance applications made regarding the Locus.

RESPONSE:    Request 13 is objectionable because it is irrelevant and requires the production of documents that have no relation to the litigation, nor are they reasonably calculated to lead to the discovery of admissible evidence.

Request 14:    Any and all policies, procedures, protocols, or similar documents that relate to the use and management of the Locus by Egypt House.

RESPONSE:    Request 14 is objectionable because (a) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court, and (b) it is irrelevant and requires the production of documents that have no relation to the litigation, nor are they reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing, the texts most frequently used at Egypt House may be found at goarch.org/chapel/texts.

Request 15:    Any and all documents, writings, communications, or agreements relating to any lease, tenancy, letting, subletting, or exchange of any interest whatsoever in the Locus.

RESPONSE:    Egypt House has not been a party to any effectuated lease, tenancy, letting, subletting, or exchange of any interest whatsoever. Notwithstanding the foregoing, attached is documentation of the nature requested, though such documentation was never effectuated.

Request 16:    Any and all documents, writings, or unwritten materials of any kind that relate to, list, show, or evidence in any fashion any tenants, renters, or occupants of the Locus.

RESPONSE:    There has been no tenancy at Egypt House. Request 16 is objectionable because (a) the identity of any occupant of Egypt House is subject to the Clergyman-Penitent Privilege (G.L. c. 233, § 20A (LexisNexis, Lexis Advance through Chapter 25 of the 2023 Legislative Session of the 193rd General Court)), (b) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court, and (c) it is irrelevant and requires the production of documents that have no relation to the litigation, nor is it reasonably calculated to lead to the discovery of admissible evidence.

Request 17:    Any and all documents, writings, communications, or materials of any kind relating to the listing of the Locus for sale or rent from your acquisition of the Locus through the present time.

RESPONSE:    Egypt House was listed in February and March of 2023 on Zillow. The listing was allowed to lapse with no transaction resulting therefrom.

DATED:  August 22, 2023                    EGYPT HOUSE, Appellant,
                                           by and through its attorney

                                           By:/s/_____
                                               Tracey M.A. Stockton

                                           124 Pleasant Street
                                           Marblehead, Massachusetts   01945
                                           617.800.3979
                                           ts@stpaulsfoundation.org
                                           BBO Number:  568495

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing document was served upon counsel of record for the Appellee, Board of Assessors of Town of Marblehead, on the 22nd day of August, 2023.

/s/_____
Tracey M.A. Stockton

<u>Responses to First Request for Production of Documents of Appellee</u>

*See,* attached.



ALBANIAN ORTHODOX DIOCESE OF AMERICA

HOLY TRINITY ALBANIAN ORTHODOX CHURCH
245 D STREET, P.O. BOX 224 / SOUTH BOSTON, MASSACHUSETTS 02127
TELEPHONE 617-268-7808

25 March 2023

This is to certify that the monk, Father Andrew (né Brian Andrew Bushell), formerly of the Holy and Great Monastery of Vatopedi, Mount Athos, Greece, and currently of Marblehead, Massachusetts, USA:

- Is in the order of monastics of the Orthodox Church. This means he is a monk, styled "Father Andrew" and addressed as such.
- Sacramentally, he is a regular communicant in good standing of our patriarchal church.

Our patriarchal church, Holy Trinity Albanian Orthodox Church, a legal corporation in the Commonwealth of Massachusetts since 1930, was established in South Boston in 1921. Our patriarchal church is a parish of the Albanian Orthodox Diocese of America-Ecumenical Patriarchate, a canonical institution of the Ecumenical Throne of Constantinople (https://ec-patr.org/) As such, our patriarchal church is distinct from and independent of the Greek Orthodox Metropolis of Boston.

REVEREND PRESBYTER PAUL ZUNIGA
PRIEST-IN-CHARGE



ALBANIAN ORTHODOX DIOCESE OF AMERICA

## HOLY TRINITY ALBANIAN ORTHODOX CHURCH

245 D STREET, P.O. BOX 224 / SOUTH BOSTON, MASSACHUSETTS 02127

TELEPHONE 617-268-7808

10 May 2023

This is to certify that on the 7th day of January, 2023, I was hosted in the monastic enclosure, styled "Egypt House" and located at 12 Conant Road, Marblehead, Massachusetts, USA 01945, for the purpose of officiating the sacraments of the Eastern Orthodox Church, indicated below:

- The Divine Liturgy of St John Chrysostom in Egypt House.
- The Blessing of Waters, as stipulated by church canons, throughout the grounds of the monastic enclosure, including Egypt House.

I conduct myself as Priest of Holy Trinity Albanian Orthodox Church, a legal corporation in the Commonwealth of Massachusetts since 1930, operating in South Boston since 1921.  Our patriarchal church is a parish of the Albanian Orthodox Diocese of America-Ecumenical Patriarchate, a canonical institution of the Ecumenical Throne of Constantinople (https://ec-patr.org/)  As such, our patriarchal church is distinct from and independent of the Greek Orthodox Metropolis of Boston.

REVEREND PRESBYTER PAUL ZUNIGA

PRIEST-IN-CHARGE









© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.







© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts



© David









© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.



© David Watts, Jr.





© David Watts, Jr.

© David Watts, Jr.

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") is made as and entered into as of this 5 day of October, 2022. Subject to the provisions of this Lease, this is a demise of a single-family dwelling, currently commonly known as Egypt House, 12 Conant Road, Marblehead, Massachusetts, (the "Premises"). The Premises is comprised of a two (2) story residence, comprised of three (3) bedrooms, two and one-half baths, a living room, dining room, kitchen, and sunroom. The Premises is demised to Tenants on a fully furnished basis, as more particularly described in an Addendum to this Lease.

The **LANDLORD** is **EGYPT HOUSE**, a District of Columbia religious corporation ("Landlord"), with offices located at 120 Pleasant Street, Marblehead, Massachusetts. The telephone number for Landlord is c/o Tracey M.A. Stockton, 617.800.3979. Landlord is the owner in fee simple of the Premises. The party responsible for the care, maintenance, and repair of the Premises on behalf of the Landlord (to the extent of Landlord's responsibility pursuant to this Lease or applicable statute) is: Tracey M.A. Stockton. Ms. Stockton may be reached at 617.800.3979 or ts@stpaulsfoundation.org. The following persons are authorized to receive notice of violations of law, or to accept service of process on behalf of the Landlord: Tracey M.A. Stockton, 120 Pleasant Street, Marblehead, Massachusetts 01945, 617.800.3979. In case of emergency, the Tenant shall utilize the following procedure to contact the Landlord: Call Tracey M.A Stockton and send an email to Ms. Stockton at ts@stpaulsfoundation.org.

The TENANT                      an individual (whether one or more, "Tenant").

The Term of this Lease is one year, commencing on November 15, 2022, and continuing through and including November 30, 2023 (the "Term"), although it is possible the Term may end sooner as explained later in the Lease. If Tenant takes possession and uses the Premises at any time before the Term commences, this Lease will begin on the date possession begins and will terminate on the termination date specified above. Tenant must pay Rent to the Landlord for any period of early occupancy at the monthly rate prorated daily for any such period of occupancy.

*Landlord hereby leases and demises the Premises to the Tenants under the following terms, conditions, and covenants:*

     **1.**    **Rent and Security Deposit.** Tenant shall pay rent over the Term of this Lease in the amount of Seventy-eight Thousand and No/100 Dollars ($78,000.00) per annum (the "Rent"). Rent shall be payable by Tenant in equal monthly installments of Six Thousand and No/100 Dollars ($6,500.00). All amounts in this Lease are payable in United States dollars. Each installment of Rent shall be due and payable on the 1st day of every month in advance. Rent will be paid to Landlord, as follows:

       Egypt House
       120 Pleasant Street
       Marblehead, Massachusetts  01945

Rent shall be paid by bank check drawn upon a United States financial institution or, preferably, electronic funds transfer. In the event Tenant presents a payment for Rent which is dishonored or which payment is otherwise refused, the Landlord may require in writing that the Tenant pay Rent in cash for three (3) months, and that all future Rent payments shall be remitted by Tenant to Landlord by money order or cashier's check.

1

Rent will be considered by both the Landlord and the Tenant as having been paid on the date on which it is *received* by the Landlord. *Rent received by the Landlord after the due date is late, placing Tenant in default and entitling Landlord to terminate this Lease for nonpayment of Rent. There* is *no grace period* under this Lease that entitles the Tenant to pay the Rent after the due date. Any waiver by the Landlord of any late payment of Rent shall not be deemed a waiver of any prior or subsequent late payment of Rent by the Tenant.

   **(a)    Chronic Late Payment.** Chronic late payment of Rent shall constitute a separate cause for termination of this Lease by the Landlord. If Rent is received from the Tenant after the due date more than *two (2) times* in any twelve (12) month period or Tenant has received a fourteen (14) day notice to quit more than twice within any twelve (12) month period, then it is agreed by all parties to this Lease that Tenant shall be considered by any court or administrative agency to have been chronically late in the payment of the Rent.

   **(b)    Interest and Other Charges for Late Payment of Rent.** If Tenant fails to pay Rent in full when due, Tenant shall pay to Landlord interest on the amount unpaid, calculated on a per diem basis, at the rate of eighteen (18%) percent per annum; however, in accordance with Massachusetts General Laws, chapter 186, § 15B(c). In addition to interest that may accrue, if any payment of Rent due under this Lease remains unpaid, in whole or in part, for a period of more than ten (10) days after its due date, Tenant shall pay to Landlord a late charge equal to the greater of 3% of the monthly rent, or $135.00.

   **(c)    Bad Check Charges.** Tenant shall pay Landlord the aggregate of $50.00, plus the amount of bank fees payable with respect to each such insufficient payment for each check given to Landlord for the payment of Rent that is returned to Landlord unpaid by the bank on which it is drawn.

   **(d)    Security Deposit.** Landlord hereby acknowledges receipt and sufficiency of the sum of Six Thousand and No/100 Dollars ($6,500.00) as and for a security deposit for the initial Term (the "Security Deposit"). The Security Deposit shall be held as set forth in Rider 1. Rider 1 shall be deemed incorporated into this Lease as if fully set forth herein.

   **(e)    Last Month's Rent.** [Intentionally Omitted.]

**2.    Heat, Hot Water, and Other Utilities.**

   **(a)    Responsibility for Payment.** Upon commencement of this Lease, for any utility not provided by Landlord, Tenant shall notify each such respective utility provider to bill such utility to Tenant. Throughout the Term and any period of occupancy by Tenant thereafter, Tenant shall *promptly* pay, as they become due, all bills for utilities, electricity, gas, fuel, heat, heating oil, and hot water, each of which are monitored separately or exclusively service the Premises whether they are used for furnishing heat or for other purposes. Tenant shall make payments for these utilities directly to the utility companies. All such bills and charges shall be paid directly to the provider of such utility as set forth in their respective policy indicating terms of service. Upon request, Tenant shall provide copies of utility bills to Landlord. In addition, Tenant shall be responsible for all turn on and / or shut off fees imposed by the utility for any utility service paid directly to the utility company. Where Tenant is responsible for heating the Premises and the Premises is heated by oil, Tenant agrees to maintain an adequate level of fuel in the tank at all times; where the Premises is heated by gas or electricity, Tenant shall maintain continuous gas or electric service at all times. Should Tenant fail to do so, placing the heating system and pipes in risk of damage or breakage, Landlord may, but without any obligation to do so, supply fuel or

2

pay for gas or electric to protect the heating and piping system at Tenant's expense, and Tenant shall reimburse Landlord the amount paid therefor upon demand.

        (b)    **Responsibility for Maintenance.**

        (i)    Landlord shall maintain in good working order the facilities and equipment necessary to provide heat, hot water, and other utilities to the Premises.

        (ii)    Tenant shall repair any facilities or equipment damaged or not properly functioning due to negligence or misconduct of the Tenants or its visitors or guests.

        (iii)    Landlord shall maintain in good working order the common areas and passageways. Tenant shall maintain in good working order the Premises, except to the extent Landlord is obligated to maintain same in a safe and habitable condition. Tenant's obligation hereunder shall include: stairs, stairways, and landings leading to or adjacent to the Premises. Tenant shall be obligated to remove snow or ice from any egress solely utilized for access to the Premises.

        (iv)    Tenant may not install or permit to be installed any doorbell camera or other video recording device upon the Premises.

    3.    **Permissible Occupants, Roommates, Visitors and Guests.** OTHER PERMISSIBLE OCCUPANTS — The following persons may occupy the Premises in addition to the previously named Tenants as licensees of the Tenant: ▊▊▊▊▊ At no time shall occupancy exceed local restrictions. It is agreed that the above-named occupants, or any subsequent or other occupants, *shall not* be or become a tenant of Landlord without the written assent of all parties to this Lease, and the right of any occupant, roommate, visitor, or guest to remain on the Premises is strictly dependent on *first*, Tenant's continued right to possession, and *second*, the permission of Tenant. In the event that Tenant vacates the Premises, but any occupants, roommates, visitors, or guests do not, then Tenant shall reimburse Landlord for any losses, costs, and expenses, including, but not limited to, reasonable attorney's fees, incurred or resulting from said continued occupancy or presence. *Occupancy under this Lease is strictly limited to those persons named herein as the Tenant and those persons named in this Section 3. Landlord may terminate this Lease if any other or additional person shares, occupies, or resides in the Premises with Tenant or inhabits the Premises on a regular basis. In such event, and notwithstanding Landlord's right to terminate this Lease, Tenant shall owe Landlord the further amount of $1500.00 per month for each such additional person so occupying, using, or frequenting the Premises, except as prohibited by local rent control laws.*

        (a)    **Payment of Rent by A Co-occupant or Visitor Does Not Make That Person A Tenant.** It is expressly understood and agreed by Tenant that the payment of Rent to Landlord by anyone who is not a Tenant named herein *shall not, in any respect,* constitute either an acknowledgment or acceptance of that person as a Tenant under this Lease, a modification to this Lease, or the establishment of a new tenancy related to the Premises. Tenant hereby affirmatively states any money so-tendered is tendered solely on behalf of Tenant for the *Tenant's benefit.*

        (b)    **Tenant's Responsibility for Conduct of any Occupant of the Premises or any Visitor to the Premises.** *Tenant shall not allow any person to engage in any act or omission prohibited by this Lease in regard to Tenant.* Further, Tenant accepts full and complete responsibility for the conduct of any Premises occupant, visitor, or guest to the same extent as if Tenant committed the offending or wrongful act. Tenant will indemnify Landlord against any resulting loss or damage suffered and

3

immediately reimburse Landlord for any time and / or expenses incurred in fixing or correcting any damage to the Premises, building, or land that was done thereby.

      (c)    **Sublet or Assignment and Other Occupants Prohibited.** Tenant shall not assign nor sublet any part of the Premises, nor permit the Premises to be occupied for a period longer than a brief, temporary, visit by anyone, except the individuals specifically named herein and Tenant's minor children.. Notwithstanding the foregoing, if Landlord consents to an occupancy by an additional person, such consent shall only be effective if it is in writing and, further, shall be given strictly for that instance and shall not be deemed by the Tenant as a general permission to allow others to occupy the Premises in the future without Landlord's written permission, nor shall such consent be deemed a waiver of any prior unpermitted occupancy.

      (d)    **Guest Provisions.** Except as authorized by Landlord in advance, Tenant may permit a guest to stay for no more than ten (10) days in any one month, nor may any guest stay cumulatively in excess of twenty (20) days in any one year.

    **4.**    **Care and Use of The Premises.** *Tenant shall solely use the Premises for residential occupancy purposes and in a reasonable and tenantlike manner and under the following restrictions and terms. Landlord shall have the right to promulgate, implement, and amend rules from time to time.*

      (a)    **Business Use Prohibited.** Except for telecommuting for work-related purposes, Tenant shall not operate a business in or from the Premises.  To the extent any work-related in-person meetings are performed from the Premises, Tenant shall provide a certificate of insurance evidencing commercial general liability and covered vehicle coverage maintained by such person's employer to include Landlord as an additional insured, as its interest may appear.

      (b)    **Cleanliness.** Rent includes monthly cleaning of the Premises by a third-party. Notwithstanding such monthly cleaning, Tenant shall at all times maintain the Premises in a clean condition and shall not sweep, throw, or dispose of, nor suffer or permit, any dirt, waste, rubbish, or other substance or article to be swept, shaken, thrown, or disposed of, from any doors, windows, balconies, porches, or other parts of the building, and shall place all such rubbish, garbage, dirt, and debris in proper receptacles and in accordance with rules of the Landlord. Tenant shall maintain the Premises in a manner which is not conducive to mold or mildew, including the inhibition of moisture accumulation. Tenant shall maintain the Premises free of mold and mildew, including dirt, debris, and moisture. Tenant shall clean surfaces with mold or mildew appropriate cleaners, if mold or mildew appears. Tenant shall clean and dry all wet surfaces or visible moisture as soon as Tenant becomes aware or should become aware of same. Tenant shall have a duty of reasonable care to ensure that no moisture is entering the Premises from any window or exterior door. Tenant shall notify Landlord of any leak, drips, sweating pipe, overflow of any toilet, sink, shower or tub, or other water intrusion as soon as Tenant shall become aware of any of same. Landlord shall not be liable for any damage to Tenant because of Tenant's failure to comply with this provision regarding mold and/or mildew.

      (c)    **Common Areas.** Tenant shall not place any garbage, vehicles, receptacles, baby carriages, bicycles, or other articles or obstructions in the hallways, passageways, or other common areas. Tenant may only use the basement as permitted by the Landlord. The basement is not a part of the Premises and Landlord may at any time establish rules concerning Tenant's right to use the basement and revoke or place restrictions on such usage.

4

(d)     **Day Care Use Prohibited.** Tenant shall not operate a day care facility on, in, or from the Premises nor use the Premises to provide day care on a fee or gratuitous basis to anyone.

(e)     **Decoration.** Except for pre-approved holiday decorations, timely removed, Tenant shall not paint or wallpaper, nor strip or remove paint or wallpaper, or make any similar type of change to the Premises without the prior written consent of Landlord. Tenant shall not place holes in the walls or ceilings or hang pictures or other items by the use of nails or screws.

(f)     **Disturbance or Illegal Use.** Neither Tenant, nor any person permitted on the Premises, within the building, or upon the grounds by Tenant or any co-occupant shall make or suffer any unlawful, noisy, or otherwise offensive use of the Premises, nor commit or permit any nuisance to exist thereon, nor cause damage to the Premises, nor interfere with the rights, comfort, safety of enjoyment of Landlord or other occupants of same.

(g)     **Fuel —Loss or Damage.** Tenant agrees to indemnify and save Landlord harmless from and against all liability, loss, or damage arising from any nuisance made of suffered on the Premises, in the building, or on the grounds by Tenant, its family, friends, relatives, invitees, visitors, agents, or servants or from any carelessness, neglect, or improper conduct of any of such persons.

(h)     **Moving.** Tenant shall be responsible for all damage to the hallways, doors, and common areas caused while or by moving furniture, possessions, or other items into or from the Premises, building, and grounds. Tenant shall only use the front and rear entrance ways, and shall not move anything in, off, or through the windows or porches and shall move at such time of the day and in such manner as not to disturb the persons living near the Premises.

(i)     **Parking.** Parking on the Premises is permitted in the driveway. Driveway parking is limited to two (2) passenger vehicles.

(j)     **Pets.** No dogs, cats, or other pets shall be kept in or upon the Premises or building without the Landlord's written consent; and any consent so given may be revoked at any time.

(k)     **Plumbing.** Water closets, disposals, and waste pipes *shall not* be used for any purposes other than those for which they were reasonably and properly intended. Tenant shall be liable for any plumbing expenses and damages incurred by Landlord in connection with any improper or unreasonable use, including repairs due to the presence of, without limitation: bobby pins, rings, earrings, silverware, plastic, toothpaste caps, contact lenses, dog hair, grease, newspaper, bones, food (unless there is a disposal), diapers, sanitary napkins, or tampon products.

(l)     **Porches.** *Storage of any kind is strictly prohibited on any porch.* A single barbecue and related equipment are permitted on the rear patio, provided the area is maintained in a clean and sanitary manner and all related equipment is stored in covered weatherproof containers.

(m)     **Waste.** Tenant shall not make or suffer any waste, nor suffer or allow the heat or water to be wasted.

(n)     **Washing Machines and Dryers.** Tenant shall not use or install any washing machine, space heater, clothes dryer, cable television or aerials, or other like equipment without the prior written consent of Landlord. *No waterbeds shall be* permitted in the Premises at any time absent Landlord's prior written consent. Such consent may be contingent upon Tenant's compliance with

5

additional rules and regulations. Tenant further agrees to assume full responsibility for any damage caused by, connected with, or resulting from the use of the aforesaid items, whether or not said express consent has been obtained.

(o) **No Smoking.** The Premises, the building, and the grounds, including the common areas are smoke-free. No smoking shall be permitted within one hundred (100) feet of any common area. No Tenant shall smoke or permit their invitee, guest, occupant of the Premises, agent, contract, or household worker in the Premises or on the common areas to smoke or to allow smoke (including, but not limited to, tobacco smoke or second-hand smoke) or any other noxious fumes/odors to infiltrate, intrude, permeate, or otherwise seep or be transmitted from the Premises.

(i) Smoking is defined as including without limitation carrying, holding, burning, inhaling, exhaling, or otherwise handling or controlling any: lighted, heated, electric, or smoldering product containing tobacco, plant product, or other substance, or item which can be smoked (including without limitation cigarettes, cigars, or pipes); or any other type of smoking apparatus, heated tobacco or plant product intended for inhalation (including without limitation a hookah); or the use of any electronic smoking device creating an aerosol or vapor in any manner or form (including without limitation an electronic cigarette, vape pen, juul, or similar device).

(A) An electronic smoking device shall mean any device containing, delivering, or intending to contain or deliver nicotine or other substance used by a person in any manner to inhale vapor or aerosol from the device to simulate smoking. An inhaler or nebulizer of the type commonly used to treat asthma or other breathing disorders, or diseases is specifically excluded from the definition of electronic smoking device to the extent such device is used for its commonly intended purpose. An electronic smoking device shall include without limitation those devices manufactured, distributed, marketed, sold, or commonly known as an e-cigarette, e-cigar, e-pipe, e-hookah, juul or vape pen, or other similar product or device.

(B) A hookah means a glass or metal waterpipe shaped similarly to a bottle, generally with long, flexible hoses with tips that people put into their mouths to inhale tobacco smoke.

(ii) Tenant is responsible for compliance with this provision by Tenant and all invitees, guests, tenants, occupants of the Premises, agents of Tenant, and any contract or household worker in the Premises, the building, upon the grounds, or on the common areas.

5. **Keys, Locks and Access.** Landlord and his/her/its designees may enter upon the Premises, with reasonable notice, to make repairs or improvements (which shall include without limitation, for purposes of this Lease, preparation of the Premises for impending or anticipated inclement weather or natural disaster), to inspect the Premises, or to show the Premises to prospective tenants, purchasers, or lenders. A determination of whether inclement weather or a natural disaster is impending or anticipated shall be in the Landlord's sole discretion and such decision shall be determinative. Such weather need not yet be a named storm to entitle Landlord to make such determination. Landlord may also enter upon the Premises if it appears to have been abandoned or as otherwise permitted by law. No locks shall be changed, altered, added, or replaced by Tenant without the prior written permission of the Landlord, except as otherwise permitted by applicable law. Any locks so-permitted to be installed shall become the property of Landlord and shall not be removed by Tenant. Tenant shall promptly give Landlord, without the necessity of a request, a duplicate key to any new locks or cylinders. If Tenant changes the locks without Landlord's prior consent, then Landlord shall have the right to remove such

6

locks at Tenant's expense and replace them. Landlord shall *at all times* have the right to a key to the Premises.

6.    **Expiration and Renewal of Lease.** Unless the parties enter into a new Lease or unless otherwise prohibited by local rent control or other laws, *Tenant shall be required to* vacate the Premises at the expiration of this Lease. Tenant hereby promises and warrants, at the expiration of the Term, it shall fully vacate the Premises, removing all persons, personal property, and effects, and all rubbish and debris from the Premises, the building and grounds, and shall leave the Premises in broom clean condition, and shall further leave all stoves, refrigerators, and appliances in a clean condition and good working order. *Tenant shall deliver all personal property belonging to Landlord in good clean and tenantable order and condition, reasonable wear and tear excepted.* If Tenant moves from the Premises but leaves behind personal property belonging to Tenant or other persons, Tenant hereby authorizes Landlord to place those items in storage or place them in the basement for Tenant's benefit. If such items remain in the Premises, storage, or the basement more than fourteen (14) days after Tenant has moved, Tenant hereby declares those items may be considered as abandoned and thrown away or otherwise disposed of in any permanent manner Landlord sees fit. Landlord shall not be liable to Tenant for any such disposal, nor for the cost to replace any such disposed of items. If, despite the expiration of this Lease, Landlord continues to accept Rent so as to establish as a matter of law a tenancy-at-will relationship, the forms of this Lease shall constitute the terms of such tenancy-at-will with the exception of the term or duration of such tenancy. In no event will the acceptance of Rent after the expiration date of this Lease constitute a renewal of this Lease for another term.

7.    **Default-Termination of This Lease.**

(a)    **Lease Provision Materiality.** Each of the provisions of this Lease is considered by the undersigned parties to be essential and material provisions. The violation of any provision of this Lease by Tenant or by any occupant, visitor, guest, or any person for whose conduct Tenant is responsible shall be a breach of this Lease and shall constitute and place Tenant in default. Such default shall entitle Landlord, in its sole discretion, to any and all Lease remedies. In addition, and not in limitation thereof, the following acts shall constitute a default under this Lease: (1) failure to pay the Rent when due, or pay interest, late charges, or bad check charges upon demand; (2) failure to promptly pay when due all utilities, electricity, gas, fuel, heat, heating oil and hot water; (3) where Tenant is responsible for heat, the failure to maintain an adequate level of fuel or uninterrupted gas or electric service so as to place the heating system and pipes in risk of damage or breakage, or to reimburse Landlord upon demand for any sums expended on Tenant's behalf for the same in order to protect the systems of the building from the possibility of damage; (4) assignment or sublet to, or occupancy of the Premises by, a person who is neither a named written tenant nor a named permitted occupant, in each case, without Landlord's prior express written permission; (5) failure to pay the additional amount indicated for the additional occupancy of a person who is neither a named written tenant nor a permitted occupancy; (6) failure to properly care for or use the Premises, or obey the rules and regulations as specified herein; (7) failure to act in a reasonable or tenantlike manner; (8) failure to fully vacate the Premises at the expiration of the Term of this Lease, removing all persons, personal property and effects, and all rubbish and debris from the Premises and the surrounding building and grounds, leaving the Premises in broom clean condition and all stoves, refrigerators and appliances in a clean condition and good working order, and returning the personal property of Landlord in good clean and tenantable order and condition reasonable wear and tear excepted; (9) failure to permit Landlord access to the Premises, upon reasonable notice, or to provide Landlord, upon demand, with keys to all locks affecting the Premises, or the alteration or replacement of any locks without Landlord's prior consent, except as otherwise described in this Lease; (10) failure to comply with any form, provision, or covenant of this Lease or of any rider attached to this Lease; (11)

7

failure of any representation made by the Tenant in order to induce the Landlord to rent or re-rent the Premises to Tenant; or (12) failure to pay the amount of any required tax, water and sewer, insurance, rent increase, or other adjustment.

(b)     **Default Notice.** Upon a default by Tenant, Landlord shall be entitled to terminate this Lease by a fourteen (14) days' written notice given for nonpayment of Rent, or by a seven (7) days' written notice given for any other default of the provisions in this Lease, to Tenant.

(c)     **General Laws, Chapter 132, § 19.** Notwithstanding any other provision in this Lease, Landlord may immediately terminate this Lease for any act or conduct of Tenant, any co-occupant, visitor, or guest which thereby entitles Landlord to evict, enjoin, or eject Tenant under General Laws, chapter 139, § 19.

(d)     **Lease Notice.** Any notice required to be given to Tenant to terminate this tenancy shall be considered by the parties as given, delivered, and received if and when actually received or otherwise delivered to another person at the Premises. Similarly, any notice required to be given to Landlord to terminate this tenancy shall be considered by the parties as given, delivered, and received if and when actually received or otherwise delivered at the location where the Rent is payable.

(e)     **Waiver.** The acceptance of Rent by Landlord despite knowledge of Tenant default under this Lease shall not act as a waiver of the default, but rather, shall be considered by the parties as an opportunity given to Tenant to cure any such default. The failure of Landlord to act or otherwise assert its rights shall not preclude it from doing so in the future or otherwise be considered a waiver of its rights or of the provisions of this Lease (including without limitation any prior or subsequent waiver of any Lease provision). Should Landlord be deemed to have waived a breach of this Lease by Tenant, such waiver shall not relinquish the right of Landlord to later insist that said term, condition, or provision of this Lease be complied with in the future and be reinstated.

(f)     **Tenant's Continuing Liability.** If the Lease is terminated by a notice to quit for nonpayment of Rent or for any cause or fault attributable to Tenant or any occupant, visitor, or guest, or the Premises is wrongfully abandoned by Tenant, then, at the election of Landlord and subject to any right of reinstatement accorded Tenant by law, the balance of Rent due for the remainder of the Term of this Lease shall be immediately due and payable. If Landlord re-rents the Premises after termination or abandonment, the responsibility of Tenant for the continued payment of Rent shall cease upon the occupancy of the new tenants, except if such re-rental is at a lower monthly rent than paid by Tenant herein, in which event Tenant herein shall remain liable for any deficiency. However, any such efforts by Landlord to re-rent the Premises shall be for the benefit of Tenant and no act by Landlord in the advertising, showing, accessing, repairing, or preparing the Premises for rental shall constitute surrender or a termination of the rental obligation of Tenant named herein. Each person who is a Tenant under this Lease shall be jointly and severally responsible for and obligated to pay the entirety of the Rent due for the remainder of the term of this Lease, as well as any judgment rendered against any one of the tenants or occupants named in this Lease. The compromise of any claim with, or the release of, any one (1) person comprising Tenant shall not constitute a compromise with, or a release of, any other person comprising Tenant.

(g)     **Hold-Over.** If, at the expiration of this Lease, Tenant or any co-occupant or guest continues to occupy or use the Premises, Tenant shall be responsible to Landlord or any successor or assign for payment on a per diem basis for such use and occupancy, and such payment shall be based upon the then fair rental value of the Premises during the period of such continued use and occupancy. It

8

is expressly understood, acknowledged, and agreed that acceptance by Landlord of any payment during such period shall not be deemed a waiver of Landlord's right to possession of the Premises. In the event Landlord brings a lawsuit brought in relation to Lease termination, recovery of possession, eviction, secure damages for nonpayment of rent, breach of this Lease, damage to the Premises, or an action in equity and, as a result of such lawsuit, Landlord receives a judgment in its favor on any or all counts or otherwise substantially prevails on any or all counts, then Tenant shall be liable to and owe Landlord for such legal fees and expenses incurred by Landlord in bringing or prosecuting such suit to judgment and / or in any appeal, and in satisfying or otherwise collecting on any judgment rendered in Landlord's favor.

## 8.   Other Provisions.

   **(a)**   **Rules and Regulations.** Landlord may from time to time establish reasonable rules and regulations for the use or nonuse of the building, grounds, or Premises by Tenant and / or other occupants and guests and impose such rules and regulations by written notice given to Tenant.

   **(b)**   **Payments in Advance of Occupancy.** Landlord may, at Landlord's election, declare (1) Tenant in default or (2) this Lease null and void from its inception and, in such event, no tenancy, demise, or right to possession shall be deemed by any party or court to have been created, if any checks given by Tenant, in advance of or near the time of occupancy, for any first month's rent, last month's rent, security deposit, or key and lock deposit are not paid by the bank on which they are drawn.

   **(c)**   **Indemnification.** Tenant agrees to indemnify and save Landlord harmless from and against all liability, loss, or damage arising from any nuisance made or suffered on the Premises or the building by Tenant, its family, friends, relatives, invitees, visitors, agents, or servants or from any carelessness, neglect, or improper conduct of any of such persons.

   **(d)**   **Landlord's Liability.** In the event Landlord is a limited partnership, corporation, trust, or trustee, neither any such limited partner, corporate officer, trustee, or any beneficiary or any shareholder of such trust or corporation shall be personally liable to anyone under any term, condition, covenant, obligation, or agreement expressed or implied hereunder for any loss, damage, or cause at law or in equity arising out of the occupancy of the Premises, except *to the extent required by state law and where such liability may not be contractually waived.*

   **(e)**   **Definitions.** As used in this Lease, the word "Tenant" shall refer to each and all individual(s) who sign(s) this agreement and is named in the first page as a Tenant. Although used in the singular tense, the word Tenant shall be given its plural meaning where there is more than one person signing this Lease as a tenant. Where more than one person is named as a Tenant, each such individual shall be jointly and severally liable for the acts, obligation, and responsibilities of each other named tenant, including, but not limited to, the liability for the full amount of any Rent or other amount due Landlord.

   **(f)**   **Insurance.** Any insurance on the Premises is obtained and maintained to protect Landlord's rights in the property and does not (i) cover the costs to repair or replace any of Tenant's stolen or damaged personal property, (ii) mitigate Tenant's liability for injuries sustained in the Premises or portions of the property under Tenant's exclusive control, or (iii) cover the costs of any damage to Landlord's property caused by Tenant's negligence. **IT IS RECOMMENDED, BUT NOT MANDATORY, THAT TENANT OBTAIN INSURANCE WHICH COVERS THE PROPERTY OF TENANT LOCATED IN, ON, OR ABOUT THE PREMISES AND TENANT'S LIABILITY FOR INJURIES AND DAMAGES.**

      **(g)**    **Governance.** This Lease shall be governed, construed, and interpreted by, through, and under the Laws of the Commonwealth of Massachusetts.

      **(h)**    **Invalidity of Lease Provisions.** If any provision of this Lease or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Lease nor the application of the provision to other persons, entities, or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

      **(i)**    **Binding Nature of Lease.** The covenants, obligations, and conditions herein contained shall be binding on and inure to the benefit of the heirs, legal representatives, and assigns of the parties hereto.

      **(j)**    **Headings.** The descriptive headings used herein are for convenience of reference only and they are not intended to have any effect whatsoever in determining the rights or obligations of Landlord or Tenant.

      **(k)**    **Gender and Use of Singular.** The pronouns used herein shall include, where appropriate, any applicable gender, all or none, and any singular pronoun shall include the plural, and vice versa. The use of the masculine gender shall be deemed to refer to the feminine, neuter, other gender or non-gender with which the party identifies, and the use of the singular shall be deemed to refer to the plural and vice versa, whenever the context so requires (including without limitation, the use of the plural to refer to a singular individual, where that is the respective parties' preferred indicator). Any use of a pronoun shall be deemed to refer to the preferred pronoun with which the respective party identifies.

      **(l)**    **Entire Agreement.** The parties hereby agree that this document contains the entire agreement between the parties and this Lease shall not be modified, changed, altered, or amended in any way except through a written amendment signed by all parties hereto.

## RIDERS

    The following attached riders are incorporated within this Lease as additional terms, conditions, and provisions to the same as if originally stated herein:

Rider 1: Rent And Deposits Paid In Advance Of Occupancy
Rider 2: Statement Of The Condition Of The Premises At Occupancy
Rider 3: Rental Application — Representations — Verifications

    By signing this Lease, each of the undersigned agrees and accepts the provisions and terms herein and assumes joint and several personal liability, for the entirety of any unpaid Rent, or other loss or damage of any kind or nature for *which any* signor is or would otherwise be responsible.

[The remainder of this page intentionally left blank.]

<u>Signature Page to Lease Agreement</u>

IN WITNESS WHEREOF, the undersigned, *after having read this Lease* and the accompanying riders,

EGYPT HOUSE

By:_____
Name:_____
Title:_____

Landlord

**Initial each page.**

11

## Rider 1. Rent and Deposits Paid in Advance of Occupancy

The undersigned hereby acknowledges having received the above amounts on the dates indicated on behalf of the Landlord, for the Premises specified above. (If none, enter none or zero):

|  |  | **Date Received** |
|---|---|---|
| **First Month's Rent:** | $0.00 | |
| **Last Month's Rent:** | $0.00 | |
| **Security Deposit:** | $6,500.00 | |
| **Key & Lock Deposit:** | $0.00 | |

_Signature of rental agent or landlord_

## Notice to Tenants Paying Security Deposits

If you have paid a security deposit, Landlord must hold the security deposit in a separate interest bearing account and give you a receipt and notice of the bank and account number in which the security is held; pay you interest at a rate the lower of which is: five (5%) percent or such lesser amount as has been received by the bank where such funds are being held, per annum, such interest which will be payable at the end of each year of the tenancy if the security is held for one year or longer; submit to you a separate written statement of the present condition of the Premises and, if you disagree with such statement, you must attach a separate list of the damages in the Premises and return it to Landlord as directed by that notice of condition; return your security deposit within thirty (30) days after the end of your tenancy with interest owed, but if Landlord deducts for any damage, Landlord must submit to you an itemized list of damages and evidence of the cost to repair such damage, except no deduction may be made for any damage listed in the statement of the apartment's condition previously given or returned to Landlord; and if Landlord or owner transfers your unit or the building containing your apartment, your security deposit will be transferred to any successor or buyer.

## Notice to Tenants Paying Last Month's Rent

If you have paid a last month's rent, you are entitled to receive interest on that amount calculated at the rate of five (5%) percent per annum, or such lesser amount as has been received by the bank where such funds are being held, such interest shall be payable at the end of each year of the tenancy, if the security is held for one year or longer. If Landlord or owner transfers the Premises or the building containing the Premises, your last month's Rent will be transferred to any successor or buyer.

***FORWARDING ADDRESS:*** Tenant hereby authorizes Landlord to send any letters, notices, or pay any monies owed to Tenant by mailing the same to the following address at such time as the tenant moves from the above apartment:

I/We acknowledge having received this rider and receipt.

Signature of Applicant

Dated:

13

**Rider 2. Statement of the Condition of the Premises at Occupancy**

Re: Egypt House, 12 Conant Road, Marblehead, Massachusetts

This is a statement of the condition of the Premises you have leased or rented. You should read it carefully in order to see if it is correct. If it is correct you must sign it. As of the commencement of the Term of the Lease, Landlord will provide a schedule of furniture and furnishings included in the Premises at the time of Lease commencement. Your signature on the list of furniture and furnishings will evidence your agreement that the list is correct and complete. If it is not correct, you must attach a separate signed list of any damages to the Premises or furnishings and furniture that are not included within the Premises upon delivery to Tenant. This statement must be returned to the Landlord or his agent within fifteen (15) days after you receive this list or within fifteen (15) days after you move in, whichever is later. If you do not return this list, within the specified time period, a court may later view your failure to return the list as your agreement that the list is complete and correct in any suit which you may bring to recover the security deposit.

**Statement**

The Premises rented is presently fully *habitable, in good condition and repair*, and without defect or problem, and all appliances provided are properly functioning.

I/We, the undersigned, hereby acknowledge we have inspected the Premises and, having occupied the premises for fifteen (15) days, find the above statement to be true and accurate, except as noted in the lines below.

Furthermore, I/we promise to notify the Landlord immediately of any problems and conditions needing repair that affect the Premises' livability or use and to allow the Landlord access as needed to make any repair and inspections of the Premises.

_____        _____
                                                                                Tenant

I/We acknowledge having received this Rider upon signing this Lease and promise to return it to the Landlord within fifteen (15) days of our occupancy.

_____        _____
Tenant                                                                        Tenant

Dated: _____

**Rider 3. Rental Application — Representations — Verifications**
Re: Egypt House, 12 Conant Road, Marblehead, Massachusetts
*Representations*
The undersigned hereby acknowledges the attached rental application(s) is submitted to Landlord in order
to induce Landlord to enter into a Lease.  In making any decision to rent the Premised to the undersigned
applicant(s), it is understood Landlord will rely upon the accuracy, completeness, honesty, and full
disclosure of the information so-requested.

The undersigned hereby represent (1) the information and statements contained in the attached rental
application(s) are true, accurate, and complete; (2) the undersigned have not been named or subject to any
eviction proceeding in the last three (3) years; and (3) the undersigned did not vacate any premises in the
last three (3) years owing any landlord rent.

If any information contained in any rental application or any representation made within this Rider is not
wholly true and accurate, or made in good faith, Landlord may, at Landlord's sole election, declare (1)
Tenants in default of this Lease, or (2) this Lease null and void from its inception and, in such latter event,
no tenancy, demise or right to possession shall be deemed by any party or court to have been created.
Should either such event occur, then Tenant (if more than one person) shall be jointly and severally liable
to Landlord for any losses, damages, and expenses incurred in connection with such default, recovery of
possession of the premises, appeals, and the collection of any sums due the Landlord.

*Credit and Employment Authorization*
In connection with an application submitted to rent the Premises above-described, the undersigned hereby
authorize Landlord to inquire, and any person receiving such request to verify or provide such
information requested, (1) in order to (a) evaluate (i) the credit worthiness and/or employment of the
undersigned; (ii) the accuracy of any representation made; or (iii) the undersigned's continuing ability to
pay the rent; or (b) locate the undersigned or satisfy any judgment; or (2) for any other purpose not in
violation of law.

*Acknowledgment*
The undersigned hereby acknowledges the information provided the undersigned by the rental agent with
respect to the condition of the Premises, the Rent that may be legally charged, and the work or items that
will be furnished by Landlord, was provided by Landlord to the rental agent. The undersigned hereby
agrees to hold the rental agent harmless and release said agent from any liability if such information,
representations, or promises made on Landlord's behalf are not true, accurate, or performed as promised.
It is the obligation of the undersigned to verify the accuracy of any information provided.



*Controlled Substances*
The undersigned states, under the penalties of perjury, that he or she does not presently use, possess, or
store any drugs or substances in violation of state or federal law, and shall not during the course of any
future tenancy or occupancy of the Premises, use, possess, or store such substances within the Premises or



## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") is made as and entered into as of this 5 day of October, 2022. Subject to the provisions of this Lease, this is a demise of a single-family dwelling, currently commonly known as Egypt House, 12 Conant Road, Marblehead, Massachusetts, (the "Premises"). The Premises is comprised of a two (2) story residence, comprised of three (3) bedrooms, two and one-half baths, a living room, dining room, kitchen, and sunroom. The Premises is demised to Tenants on a fully furnished basis, as more particularly described in an Addendum to this Lease.

The **LANDLORD** is **EGYPT HOUSE**, a District of Columbia religious corporation ("Landlord"), with offices located at 120 Pleasant Street, Marblehead, Massachusetts. The telephone number for Landlord is c/o Tracey M.A. Stockton, 617.800.3979. Landlord is the owner in fee simple of the Premises. The party responsible for the care, maintenance, and repair of the Premises on behalf of the Landlord (to the extent of Landlord's responsibility pursuant to this Lease or applicable statute) is: Tracey M.A. Stockton. Ms. Stockton may be reached at 617.800.3979 or ts@stpaulsfoundation.org. The following persons are authorized to receive notice of violations of law, or to accept service of process on behalf of the Landlord: Tracey M.A. Stockton, 120 Pleasant Street, Marblehead, Massachusetts 01945, 617.800.3979. In case of emergency, the Tenant shall utilize the following procedure to contact the Landlord: Call Tracey M.A Stockton and send an email to Ms. Stockton at ts@stpaulsfoundation.org.

The TENANT an individual (whether one or more, "Tenant").

The Term of this Lease is one year, commencing on November 15, 2022, and continuing through and including November 30, 2023 (the "Term"), although it is possible the Term may end sooner as explained later in the Lease. If Tenant takes possession and uses the Premises at any time before the Term commences, this Lease will begin on the date possession begins and will terminate on the termination date specified above. Tenant must pay Rent to the Landlord for any period of early occupancy at the monthly rate prorated daily for any such period of occupancy.

*Landlord hereby leases and demises the Premises to the Tenants under the following terms, conditions, and covenants:*

1.    **Rent and Security Deposit.** Tenant shall pay rent over the Term of this Lease in the amount of Seventy-eight Thousand and No/100 Dollars ($78,000.00) per annum (the "Rent"). Rent shall be payable by Tenant in equal monthly installments of Six Thousand and No/100 Dollars ($6,500.00). All amounts in this Lease are payable in United States dollars. Each installment of Rent shall be due and payable on the 1st day of every month in advance. Rent will be paid to Landlord, as follows:

Egypt House
120 Pleasant Street
Marblehead, Massachusetts  01945

Rent shall be paid by bank check drawn upon a United States financial institution or, preferably, electronic funds transfer. In the event Tenant presents a payment for Rent which is dishonored or which payment is otherwise refused, the Landlord may require in writing that the Tenant pay Rent in cash for three (3) months, and that all future Rent payments shall be remitted by Tenant to Landlord by money order or cashier's check.

1

Rent will be considered by both the Landlord and the Tenant as having been paid on the date on which it is *received* by the Landlord. *Rent received by the Landlord after the due date is late, placing Tenant in default and entitling Landlord to terminate this Lease for nonpayment of Rent. There is no grace period* under this Lease that entitles the Tenant to pay the Rent after the due date. Any waiver by the Landlord of any late payment of Rent shall not be deemed a waiver of any prior or subsequent late payment of Rent by the Tenant.

      **(a)**    **Chronic Late Payment.** Chronic late payment of Rent shall constitute a separate cause for termination of this Lease by the Landlord. If Rent is received from the Tenant after the due date more than *two (2) times* in any twelve (12) month period or Tenant has received a fourteen (14) day notice to quit more than twice within any twelve (12) month period, then it is agreed by all parties to this Lease that Tenant shall be considered by any court or administrative agency to have been chronically late in the payment of the Rent.

      **(b)**    **Interest and Other Charges for Late Payment of Rent.** If Tenant fails to pay Rent in full when due, Tenant shall pay to Landlord interest on the amount unpaid, calculated on a per diem basis, at the rate of eighteen (18%) percent per annum; however, in accordance with Massachusetts General Laws, chapter 186, § 15B(c). In addition to interest that may accrue, if any payment of Rent due under this Lease remains unpaid, in whole or in part, for a period of more than ten (10) days after its due date, Tenant shall pay to Landlord a late charge equal to the greater of 3% of the monthly rent, or $135.00.

      **(c)**    **Bad Check Charges.** Tenant shall pay Landlord the aggregate of $50.00, plus the amount of bank fees payable with respect to each such insufficient payment for each check given to Landlord for the payment of Rent that is returned to Landlord unpaid by the bank on which it is drawn.

      **(d)**    **Security Deposit.** Landlord hereby acknowledges receipt and sufficiency of the sum of Six Thousand and No/100 Dollars ($6,500.00) as and for a security deposit for the initial Term (the "Security Deposit"). The Security Deposit shall be held as set forth in Rider 1. Rider 1 shall be deemed incorporated into this Lease as if fully set forth herein.

      **(e)**    **Last Month's Rent.** [Intentionally Omitted.]

**2.**    **Heat, Hot Water, and Other Utilities.**

      **(a)**    **Responsibility for Payment.** Upon commencement of this Lease, for any utility not provided by Landlord, Tenant shall notify each such respective utility provider to bill such utility to Tenant. Throughout the Term and any period of occupancy by Tenant thereafter, Tenant shall *promptly* pay, as they become due, all bills for utilities, electricity, gas, fuel, heat, heating oil, and hot water, each of which are monitored separately or exclusively service the Premises whether they are used for furnishing heat or for other purposes. Tenant shall make payments for these utilities directly to the utility companies. All such bills and charges shall be paid directly to the provider of such utility as set forth in their respective policy indicating terms of service. Upon request, Tenant shall provide copies of utility bills to Landlord. In addition, Tenant shall be responsible for all turn on and / or shut off fees imposed by the utility for any utility service paid directly to the utility company. Where Tenant is responsible for heating the Premises and the Premises is heated by oil, Tenant agrees to maintain an adequate level of fuel in the tank at all times; where the Premises is heated by gas or electricity, Tenant shall maintain continuous gas or electric service at all times. Should Tenant fail to do so, placing the heating system and pipes in risk of damage or breakage, Landlord may, but without any obligation to do so, supply fuel or

2

pay for gas or electric to protect the heating and piping system at Tenant's expense, and Tenant shall reimburse Landlord the amount paid therefor upon demand.

      **(b)**    **Responsibility for Maintenance.**

      (i)    Landlord shall maintain in good working order the facilities and equipment necessary to provide heat, hot water, and other utilities to the Premises.

      (ii)    Tenant shall repair any facilities or equipment damaged or not properly functioning due to negligence or misconduct of the Tenants or its visitors or guests.

      (iii)    Landlord shall maintain in good working order the common areas and passageways. Tenant shall maintain in good working order the Premises, except to the extent Landlord is obligated to maintain same in a safe and habitable condition. Tenant's obligation hereunder shall include: stairs, stairways, and landings leading to or adjacent to the Premises. Tenant shall be obligated to remove snow or ice from any egress solely utilized for access to the Premises.

      (iv)    Tenant may not install or permit to be installed any doorbell camera or other video recording device upon the Premises.

    **3.**    **Permissible Occupants, Roommates, Visitors and Guests.** OTHER PERMISSIBLE OCCUPANTS — The following persons may occupy the Premises in addition to the previously named Tenants as licensees of the Tenant: ███████ At no time shall occupancy exceed local restrictions. It is agreed that the above-named occupants, or any subsequent or other occupants, *shall not* be or become a tenant of Landlord without the written assent of all parties to this Lease, and the right of any occupant, roommate, visitor, or guest to remain on the Premises is strictly dependent on *first*, Tenant's continued right to possession, and *second*, the permission of Tenant. In the event that Tenant vacates the Premises, but any occupants, roommates, visitors, or guests do not, then Tenant shall reimburse Landlord for any losses, costs, and expenses, including, but not limited to, reasonable attorney's fees, incurred or resulting from said continued occupancy or presence. *Occupancy under this Lease is strictly limited to those persons named herein as the Tenant and those persons named in this Section 3. Landlord may terminate this Lease if any other or additional person shares, occupies, or resides in the Premises with Tenant or inhabits the Premises on a regular basis. In such event, and notwithstanding Landlord's right to terminate this Lease, Tenant shall owe Landlord the further amount of $1500.00 per month for each such additional person so occupying, using, or frequenting the Premises, except as prohibited by local rent control laws.*

      **(a)**    **Payment of Rent by A Co-occupant or Visitor Does Not Make That Person A Tenant.** It is expressly understood and agreed by Tenant that the payment of Rent to Landlord by anyone who is not a Tenant named herein *shall not, in any respect,* constitute either an acknowledgment or acceptance of that person as a Tenant under this Lease, a modification to this Lease, or the establishment of a new tenancy related to the Premises. Tenant hereby affirmatively states any money so-tendered is tendered solely on behalf of Tenant for the *Tenant's benefit.*

      **(b)**    **Tenant's Responsibility for Conduct of any Occupant of the Premises or any Visitor to the Premises.** *Tenant shall not allow any person to engage in any act or omission prohibited by this Lease in regard to Tenant.* Further, Tenant accepts full and complete responsibility for the conduct of any Premises occupant, visitor, or guest to the same extent as if Tenant committed the offending or wrongful act. Tenant will indemnify Landlord against any resulting loss or damage suffered and

3

immediately reimburse Landlord for any time and / or expenses incurred in fixing or correcting any damage to the Premises, building, or land that was done thereby.

(c)   **Sublet or Assignment and Other Occupants Prohibited.** Tenant shall not assign nor sublet any part of the Premises, nor permit the Premises to be occupied for a period longer than a brief, temporary, visit by anyone, except the individuals specifically named herein and Tenant's minor children.. Notwithstanding the foregoing, if Landlord consents to an occupancy by an additional person, such consent shall only be effective if it is in writing and, further, shall be given strictly for that instance and shall not be deemed by the Tenant as a general permission to allow others to occupy the Premises in the future without Landlord's written permission, nor shall such consent be deemed a waiver of any prior unpermitted occupancy.

(d)   **Guest Provisions.** Except as authorized by Landlord in advance, Tenant may permit a guest to stay for no more than ten (10) days in any one month, nor may any guest stay cumulatively in excess of twenty (20) days in any one year.

4.   **Care and Use of The Premises.** *Tenant shall solely use the Premises for residential occupancy purposes and in a reasonable and tenantlike manner and under the following restrictions and terms. Landlord shall have the right to promulgate, implement, and amend rules from time to time.*

(a)   **Business Use Prohibited.** Except for telecommuting for work-related purposes, Tenant shall not operate a business in or from the Premises. To the extent any work-related in-person meetings are performed from the Premises, Tenant shall provide a certificate of insurance evidencing commercial general liability and covered vehicle coverage maintained by such person's employer to include Landlord as an additional insured, as its interest may appear.

(b)   **Cleanliness.** Rent includes monthly cleaning of the Premises by a third-party. Notwithstanding such monthly cleaning, Tenant shall at all times maintain the Premises in a clean condition and shall not sweep, throw, or dispose of, nor suffer or permit, any dirt, waste, rubbish, or other substance or article to be swept, shaken, thrown, or disposed of, from any doors, windows, balconies, porches, or other parts of the building, and shall place all such rubbish, garbage, dirt, and debris in proper receptacles and in accordance with rules of the Landlord. Tenant shall maintain the Premises in a manner which is not conducive to mold or mildew, including the inhibition of moisture accumulation. Tenant shall maintain the Premises free of mold and mildew, including dirt, debris, and moisture. Tenant shall clean surfaces with mold or mildew appropriate cleaners, if mold or mildew appears. Tenant shall clean and dry all wet surfaces or visible moisture as soon as Tenant becomes aware or should become aware of same. Tenant shall have a duty of reasonable care to ensure that no moisture is entering the Premises from any window or exterior door. Tenant shall notify Landlord of any leak, drips, sweating pipe, overflow of any toilet, sink, shower or tub, or other water intrusion as soon as Tenant shall become aware of any of same. Landlord shall not be liable for any damage to Tenant because of Tenant's failure to comply with this provision regarding mold and/or mildew.

(c)   **Common Areas.** Tenant shall not place any garbage, vehicles, receptacles, baby carriages, bicycles, or other articles or obstructions in the hallways, passageways, or other common areas. Tenant may only use the basement as permitted by the Landlord. The basement is not a part of the Premises and Landlord may at any time establish rules concerning Tenant's right to use the basement and revoke or place restrictions on such usage.

4

(d)     **Day Care Use Prohibited.** Tenant shall not operate a day care facility on, in, or from the Premises nor use the Premises to provide day care on a fee or gratuitous basis to anyone.

(e)     **Decoration.** Except for pre-approved holiday decorations, timely removed, Tenant shall not paint or wallpaper, nor strip or remove paint or wallpaper, or make any similar type of change to the Premises without the prior written consent of Landlord. Tenant shall not place holes in the walls or ceilings or hang pictures or other items by the use of nails or screws.

(f)     **Disturbance or Illegal Use.** Neither Tenant, nor any person permitted on the Premises, within the building, or upon the grounds by Tenant or any co-occupant shall make or suffer any unlawful, noisy, or otherwise offensive use of the Premises, nor commit or permit any nuisance to exist thereon, nor cause damage to the Premises, nor interfere with the rights, comfort, safety of enjoyment of Landlord or other occupants of same.

(g)     **Fuel —Loss or Damage.** Tenant agrees to indemnify and save Landlord harmless from and against all liability, loss, or damage arising from any nuisance made of suffered on the Premises, in the building, or on the grounds by Tenant, its family, friends, relatives, invitees, visitors, agents, or servants or from any carelessness, neglect, or improper conduct of any of such persons.

(h)     **Moving.** Tenant shall be responsible for all damage to the hallways, doors, and common areas caused while or by moving furniture, possessions, or other items into or from the Premises, building, and grounds. Tenant shall only use the front and rear entrance ways, and shall not move anything in, off, or through the windows or porches and shall move at such time of the day and in such manner as not to disturb the persons living near the Premises.

(i)     **Parking.** Parking on the Premises is permitted in the driveway. Driveway parking is limited to two (2) passenger vehicles.

(j)     **Pets.** No dogs, cats, or other pets shall be kept in or upon the Premises or building without the Landlord's written consent; and any consent so given may be revoked at any time.

(k)     **Plumbing.** Water closets, disposals, and waste pipes *shall not* be used for any purposes other than those for which they were reasonably and properly intended. Tenant shall be liable for any plumbing expenses and damages incurred by Landlord in connection with any improper or unreasonable use, including repairs due to the presence of, without limitation: bobby pins, rings, earrings, silverware, plastic, toothpaste caps, contact lenses, dog hair, grease, newspaper, bones, food (unless there is a disposal), diapers, sanitary napkins, or tampon products.

(l)     **Porches.** *Storage of any kind is strictly prohibited on any porch.* A single barbecue and related equipment are permitted on the rear patio, provided the area is maintained in a clean and sanitary manner and all related equipment is stored in covered weatherproof containers.

(m)     **Waste.** Tenant shall not make or suffer any waste, nor suffer or allow the heat or water to be wasted.

(n)     **Washing Machines and Dryers.** Tenant shall not use or install any washing machine, space heater, clothes dryer, cable television or aerials, or other like equipment without the prior written consent of Landlord. *No waterbeds shall be* permitted in the Premises at any time absent Landlord's prior written consent. Such consent may be contingent upon Tenant's compliance with

5

additional rules and regulations. Tenant further agrees to assume full responsibility for any damage caused by, connected with, or resulting from the use of the aforesaid items, whether or not said express consent has been obtained.

(o)   **No Smoking.** The Premises, the building, and the grounds, including the common areas are smoke-free. No smoking shall be permitted within one hundred (100) feet of any common area. No Tenant shall smoke or permit their invitee, guest, occupant of the Premises, agent, contract, or household worker in the Premises or on the common areas to smoke or to allow smoke (including, but not limited to, tobacco smoke or second-hand smoke) or any other noxious fumes/odors to infiltrate, intrude, permeate, or otherwise seep or be transmitted from the Premises.

(i)   Smoking is defined as including without limitation carrying, holding, burning, inhaling, exhaling, or otherwise handling or controlling any: lighted, heated, electric, or smoldering product containing tobacco, plant product, or other substance, or item which can be smoked (including without limitation cigarettes, cigars, or pipes); or any other type of smoking apparatus, heated tobacco or plant product intended for inhalation (including without limitation a hookah); or the use of any electronic smoking device creating an aerosol or vapor in any manner or form (including without limitation an electronic cigarette, vape pen, juul, or similar device).

(A)   An electronic smoking device shall mean any device containing, delivering, or intending to contain or deliver nicotine or other substance used by a person in any manner to inhale vapor or aerosol from the device to simulate smoking. An inhaler or nebulizer of the type commonly used to treat asthma or other breathing disorders, or diseases is specifically excluded from the definition of electronic smoking device to the extent such device is used for its commonly intended purpose. An electronic smoking device shall include without limitation those devices manufactured, distributed, marketed, sold, or commonly known as an e-cigarette, e-cigar, e-pipe, e-hookah, juul or vape pen, or other similar product or device.

(B)   A hookah means a glass or metal waterpipe shaped similarly to a bottle, generally with long, flexible hoses with tips that people put into their mouths to inhale tobacco smoke.

(ii)   Tenant is responsible for compliance with this provision by Tenant and all invitees, guests, tenants, occupants of the Premises, agents of Tenant, and any contract or household worker in the Premises, the building, upon the grounds, or on the common areas.

5.   **Keys, Locks and Access.** Landlord and his/her/its designees may enter upon the Premises, with reasonable notice, to make repairs or improvements (which shall include without limitation, for purposes of this Lease, preparation of the Premises for impending or anticipated inclement weather or natural disaster), to inspect the Premises, or to show the Premises to prospective tenants, purchasers, or lenders. A determination of whether inclement weather or a natural disaster is impending or anticipated shall be in the Landlord's sole discretion and such decision shall be determinative. Such weather need not yet be a named storm to entitle Landlord to make such determination. Landlord may also enter upon the Premises if it appears to have been abandoned or as otherwise permitted by law. No locks shall be changed, altered, added, or replaced by Tenant without the prior written permission of the Landlord, except as otherwise permitted by applicable law. Any locks so-permitted to be installed shall become the property of Landlord and shall not be removed by Tenant. Tenant shall promptly give Landlord, without the necessity of a request, a duplicate key to any new locks or cylinders. If Tenant changes the locks without Landlord's prior consent, then Landlord shall have the right to remove such

6

locks at Tenant's expense and replace them. Landlord shall *at all times* have the right to a key to the Premises.

   6.    **Expiration and Renewal of Lease.** Unless the parties enter into a new Lease or unless otherwise prohibited by local rent control or other laws, *Tenant shall be required to* vacate the Premises at the expiration of this Lease. Tenant hereby promises and warrants, at the expiration of the Term, it shall fully vacate the Premises, removing all persons, personal property, and effects, and all rubbish and debris from the Premises, the building and grounds, and shall leave the Premises in broom clean condition, and shall further leave all stoves, refrigerators, and appliances in a clean condition and good working order. *Tenant shall deliver all personal property belonging to Landlord in good clean and tenantable order and condition, reasonable wear and tear excepted.* If Tenant moves from the Premises but leaves behind personal property belonging to Tenant or other persons, Tenant hereby authorizes Landlord to place those items in storage or place them in the basement for Tenant's benefit. If such items remain in the Premises, storage, or the basement more than fourteen (14) days after Tenant has moved, Tenant hereby declares those items may be considered as abandoned and thrown away or otherwise disposed of in any permanent manner Landlord sees fit. Landlord shall not be liable to Tenant for any such disposal, nor for the cost to replace any such disposed of items. If, despite the expiration of this Lease, Landlord continues to accept Rent so as to establish as a matter of law a tenancy-at-will relationship, the forms of this Lease shall constitute the terms of such tenancy-at-will with the exception of the term or duration of such tenancy. In no event will the acceptance of Rent after the expiration date of this Lease constitute a renewal of this Lease for another term.

   7.    **Default-Termination of This Lease.**

       **(a)    Lease Provision Materiality.** Each of the provisions of this Lease is considered by the undersigned parties to be essential and material provisions. The violation of any provision of this Lease by Tenant or by any occupant, visitor, guest, or any person for whose conduct Tenant is responsible shall be a breach of this Lease and shall constitute and place Tenant in default. Such default shall entitle Landlord, in its sole discretion, to any and all Lease remedies. In addition, and not in limitation thereof, the following acts shall constitute a default under this Lease: (1) failure to pay the Rent when due, or pay interest, late charges, or bad check charges upon demand; (2) failure to promptly pay when due all utilities, electricity, gas, fuel, heat, heating oil and hot water; (3) where Tenant is responsible for heat, the failure to maintain an adequate level of fuel or uninterrupted gas or electric service so as to place the heating system and pipes in risk of damage or breakage, or to reimburse Landlord upon demand for any sums expended on Tenant's behalf for the same in order to protect the systems of the building from the possibility of damage; (4) assignment or sublet to, or occupancy of the Premises by, a person who is neither a named written tenant nor a named permitted occupant, in each case, without Landlord's prior express written permission; (5) failure to pay the additional amount indicated for the additional occupancy of a person who is neither a named written tenant nor a permitted occupancy; (6) failure to properly care for or use the Premises, or obey the rules and regulations as specified herein; (7) failure to act in a reasonable or tenantlike manner; (8) failure to fully vacate the Premises at the expiration of the Term of this Lease, removing all persons, personal property and effects, and all rubbish and debris from the Premises and the surrounding building and grounds, leaving the Premises in broom clean condition and all stoves, refrigerators and appliances in a clean condition and good working order, and returning the personal property of Landlord in good clean and tenantable order and condition reasonable wear and tear excepted; (9) failure to permit Landlord access to the Premises, upon reasonable notice, or to provide Landlord, upon demand, with keys to all locks affecting the Premises, or the alteration or replacement of any locks without Landlord's prior consent, except as otherwise described in this Lease; (10) failure to comply with any form, provision, or covenant of this Lease or of any rider attached to this Lease; (11)

failure of any representation made by the Tenant in order to induce the Landlord to rent or re-rent the Premises to Tenant; or (12) failure to pay the amount of any required tax, water and sewer, insurance, rent increase, or other adjustment.

(b)　**Default Notice.** Upon a default by Tenant, Landlord shall be entitled to terminate this Lease by a fourteen (14) days' written notice given for nonpayment of Rent, or by a seven (7) days' written notice given for any other default of the provisions in this Lease, to Tenant.

(c)　**General Laws, Chapter 132, § 19.** Notwithstanding any other provision in this Lease, Landlord may immediately terminate this Lease for any act or conduct of Tenant, any co-occupant, visitor, or guest which thereby entitles Landlord to evict, enjoin, or eject Tenant under General Laws, chapter 139, § 19.

(d)　**Lease Notice.** Any notice required to be given to Tenant to terminate this tenancy shall be considered by the parties as given, delivered, and received if and when actually received or otherwise delivered to another person at the Premises. Similarly, any notice required to be given to Landlord to terminate this tenancy shall be considered by the parties as given, delivered, and received if and when actually received or otherwise delivered at the location where the Rent is payable.

(e)　**Waiver.** The acceptance of Rent by Landlord despite knowledge of Tenant default under this Lease shall not act as a waiver of the default, but rather, shall be considered by the parties as an opportunity given to Tenant to cure any such default. The failure of Landlord to act or otherwise assert its rights shall not preclude it from doing so in the future or otherwise be considered a waiver of its rights or of the provisions of this Lease (including without limitation any prior or subsequent waiver of any Lease provision). Should Landlord be deemed to have waived a breach of this Lease by Tenant, such waiver shall not relinquish the right of Landlord to later insist that said term, condition, or provision of this Lease be complied with in the future and be reinstated.

(f)　**Tenant's Continuing Liability.** If the Lease is terminated by a notice to quit for nonpayment of Rent or for any cause or fault attributable to Tenant or any occupant, visitor, or guest, or the Premises is wrongfully abandoned by Tenant, then, at the election of Landlord and subject to any right of reinstatement accorded Tenant by law, the balance of Rent due for the remainder of the Term of this Lease shall be immediately due and payable. If Landlord re-rents the Premises after termination or abandonment, the responsibility of Tenant for the continued payment of Rent shall cease upon the occupancy of the new tenants, except if such re-rental is at a lower monthly rent than paid by Tenant herein, in which event Tenant herein shall remain liable for any deficiency. However, any such efforts by Landlord to re-rent the Premises shall be for the benefit of Tenant and no act by Landlord in the advertising, showing, accessing, repairing, or preparing the Premises for rental shall constitute surrender or a termination of the rental obligation of Tenant named herein. Each person who is a Tenant under this Lease shall be jointly and severally responsible for and obligated to pay the entirety of the Rent due for the remainder of the term of this Lease, as well as any judgment rendered against any one of the tenants or occupants named in this Lease. The compromise of any claim with, or the release of, any one (1) person comprising Tenant shall not constitute a compromise with, or a release of, any other person comprising Tenant.

(g)　**Hold-Over.** If, at the expiration of this Lease, Tenant or any co-occupant or guest continues to occupy or use the Premises, Tenant shall be responsible to Landlord or any successor or assign for payment on a per diem basis for such use and occupancy, and such payment shall be based upon the then fair rental value of the Premises during the period of such continued use and occupancy. It

is expressly understood, acknowledged, and agreed that acceptance by Landlord of any payment during such period shall not be deemed a waiver of Landlord's right to possession of the Premises. In the event Landlord brings a lawsuit brought in relation to Lease termination, recovery of possession, eviction, secure damages for nonpayment of rent, breach of this Lease, damage to the Premises, or an action in equity and, as a result of such lawsuit, Landlord receives a judgment in its favor on any or all counts or otherwise substantially prevails on any or all counts, then Tenant shall be liable to and owe Landlord for such legal fees and expenses incurred by Landlord in bringing or prosecuting such suit to judgment and / or in any appeal, and in satisfying or otherwise collecting on any judgment rendered in Landlord's favor.

## 8.　Other Provisions.

**(a)　Rules and Regulations.** Landlord may from time to time establish reasonable rules and regulations for the use or nonuse of the building, grounds, or Premises by Tenant and / or other occupants and guests and impose such rules and regulations by written notice given to Tenant.

**(b)　Payments in Advance of Occupancy.** Landlord may, at Landlord's election, declare (1) Tenant in default or (2) this Lease null and void from its inception and, in such event, no tenancy, demise, or right to possession shall be deemed by any party or court to have been created, if any checks given by Tenant, in advance of or near the time of occupancy, for any first month's rent, last month's rent, security deposit, or key and lock deposit are not paid by the bank on which they are drawn.

**(c)　Indemnification.** Tenant agrees to indemnify and save Landlord harmless from and against all liability, loss, or damage arising from any nuisance made or suffered on the Premises or the building by Tenant, its family, friends, relatives, invitees, visitors, agents, or servants or from any carelessness, neglect, or improper conduct of any of such persons.

**(d)　Landlord's Liability.** In the event Landlord is a limited partnership, corporation, trust, or trustee, neither any such limited partner, corporate officer, trustee, or any beneficiary or any shareholder of such trust or corporation shall be personally liable to anyone under any term, condition, covenant, obligation, or agreement expressed or implied hereunder for any loss, damage, or cause at law or in equity arising out of the occupancy of the Premises, except *to the extent required by state law and where such liability may not be contractually waived.*

**(e)　Definitions.** As used in this Lease, the word "Tenant" shall refer to each and all individual(s) who sign(s) this agreement and is named in the first page as a Tenant. Although used in the singular tense, the word Tenant shall be given its plural meaning where there is more than one person signing this Lease as a tenant. Where more than one person is named as a Tenant, each such individual shall be jointly and severally liable for the acts, obligation, and responsibilities of each other named tenant, including, but not limited to, the liability for the full amount of any Rent or other amount due Landlord.

**(f)　Insurance.** Any insurance on the Premises is obtained and maintained to protect Landlord's rights in the property and does not (i) cover the costs to repair or replace any of Tenant's stolen or damaged personal property, (ii) mitigate Tenant's liability for injuries sustained in the Premises or portions of the property under Tenant's exclusive control, or (iii) cover the costs of any damage to Landlord's property caused by Tenant's negligence. **IT IS RECOMMENDED, BUT NOT MANDATORY, THAT TENANT OBTAIN INSURANCE WHICH COVERS THE PROPERTY OF TENANT LOCATED IN, ON, OR ABOUT THE PREMISES AND TENANT'S LIABILITY FOR INJURIES AND DAMAGES.**

9

     **(g)**    **Governance.** This Lease shall be governed, construed, and interpreted by, through, and under the Laws of the Commonwealth of Massachusetts.

     **(h)**    **Invalidity of Lease Provisions.** If any provision of this Lease or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Lease nor the application of the provision to other persons, entities, or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

     **(i)**    **Binding Nature of Lease.** The covenants, obligations, and conditions herein contained shall be binding on and inure to the benefit of the heirs, legal representatives, and assigns of the parties hereto.

     **(j)**    **Headings.** The descriptive headings used herein are for convenience of reference only and they are not intended to have any effect whatsoever in determining the rights or obligations of Landlord or Tenant.

     **(k)**    **Gender and Use of Singular.** The pronouns used herein shall include, where appropriate, any applicable gender, all or none, and any singular pronoun shall include the plural, and vice versa. The use of the masculine gender shall be deemed to refer to the feminine, neuter, other gender or non-gender with which the party identifies, and the use of the singular shall be deemed to refer to the plural and vice versa, whenever the context so requires (including without limitation, the use of the plural to refer to a singular individual, where that is the respective parties' preferred indicator). Any use of a pronoun shall be deemed to refer to the preferred pronoun with which the respective party identifies.

     **(l)**    **Entire Agreement.** The parties hereby agree that this document contains the entire agreement between the parties and this Lease shall not be modified, changed, altered, or amended in any way except through a written amendment signed by all parties hereto.

## RIDERS

The following attached riders are incorporated within this Lease as additional terms, conditions, and provisions to the same as if originally stated herein:

Rider 1: Rent And Deposits Paid In Advance Of Occupancy
Rider 2: Statement Of The Condition Of The Premises At Occupancy
Rider 3: Rental Application — Representations — Verifications

By signing this Lease, each of the undersigned agrees and accepts the provisions and terms herein and assumes joint and several personal liability, for the entirety of any unpaid Rent, or other loss or damage of any kind or nature for *which any* signor is or would otherwise be responsible.

[The remainder of this page intentionally left blank.]

10

Signature Page to Lease Agreement

IN WITNESS WHEREOF, the undersigned, *after having read this Lease* and the accompanying riders,

EGYPT HOUSE

By:_____
Name:_____
Title:_____

Landlord

**Initial each page.**

11

## Rider 1. Rent and Deposits Paid in Advance of Occupancy

The undersigned hereby acknowledges having received the above amounts on the dates indicated on behalf of the Landlord, for the Premises specified above. (If none, enter none or zero):

|  |  | **Date Received** |
|---|---|---|
| **First Month's Rent:** | $0.00 | |
| **Last Month's Rent:** | $0.00 | |
| **Security Deposit:** | $6,500.00 | |
| **Key & Lock Deposit:** | $0.00 | |

_____

*Signature of rental agent or landlord*

## Notice to Tenants Paying Security Deposits

If you have paid a security deposit, Landlord must hold the security deposit in a separate interest bearing account and give you a receipt and notice of the bank and account number in which the security is held; pay you interest at a rate the lower of which is: five (5%) percent or such lesser amount as has been received by the bank where such funds are being held, per annum, such interest which will be payable at the end of each year of the tenancy if the security is held for one year or longer; submit to you a separate written statement of the present condition of the Premises and, if you disagree with such statement, you must attach a separate list of the damages in the Premises and return it to Landlord as directed by that notice of condition; return your security deposit within thirty (30) days after the end of your tenancy with interest owed, but if Landlord deducts for any damage, Landlord must submit to you an itemized list of damages and evidence of the cost to repair such damage, except no deduction may be made for any damage listed in the statement of the apartment's condition previously given or returned to Landlord; and if Landlord or owner transfers your unit or the building containing your apartment, your security deposit will be transferred to any successor or buyer.

## Notice to Tenants Paying Last Month's Rent

If you have paid a last month's rent, you are entitled to receive interest on that amount calculated at the rate of five (5%) percent per annum, or such lesser amount as has been received by the bank where such funds are being held, such interest shall be payable at the end of each year of the tenancy, if the security is held for one year or longer. If Landlord or owner transfers the Premises or the building containing the Premises, your last month's Rent will be transferred to any successor or buyer.

*FORWARDING ADDRESS:* Tenant hereby authorizes Landlord to send any letters, notices, or pay any monies owed to Tenant by mailing the same to the following address at such time as the tenant moves from the above apartment:

I/We acknowledge having received this rider and receipt.

Signature of Applicant

Dated:

13

**Rider 2. Statement of the Condition of the Premises at Occupancy**

Re: Egypt House, 12 Conant Road, Marblehead, Massachusetts

This is a statement of the condition of the Premises you have leased or rented. You should read it carefully in order to see if it is correct. If it is correct you must sign it. As of the commencement of the Term of the Lease, Landlord will provide a schedule of furniture and furnishings included in the Premises at the time of Lease commencement. Your signature on the list of furniture and furnishings will evidence your agreement that the list is correct and complete. If it is not correct, you must attach a separate signed list of any damages to the Premises or furnishings and furniture that are not included within the Premises upon delivery to Tenant. This statement must be returned to the Landlord or his agent within fifteen (15) days after you receive this list or within fifteen (15) days after you move in, whichever is later. If you do not return this list, within the specified time period, a court may later view your failure to return the list as your agreement that the list is complete and correct in any suit which you may bring to recover the security deposit.

**Statement**

The Premises rented is presently fully *habitable, in good condition and repair*, and without defect or problem, and all appliances provided are properly functioning.

I/We, the undersigned, hereby acknowledge we have inspected the Premises and, having occupied the premises for fifteen (15) days, find the above statement to be true and accurate, except as noted in the lines below.

Furthermore, I/we promise to notify the Landlord immediately of any problems and conditions needing repair that affect the Premises' livability or use and to allow the Landlord access as needed to make any repair and inspections of the Premises.

_____        _____
                                         Tenant

I/We acknowledge having received this Rider upon signing this Lease and promise to return it to the Landlord within fifteen (15) days of our occupancy.

_____        _____
Tenant                                   Tenant

Dated: _____

**Rider 3. Rental Application — Representations — Verifications**
Re: Egypt House, 12 Conant Road, Marblehead, Massachusetts
*Representations*

The undersigned hereby acknowledges the attached rental application(s) is submitted to Landlord in order to induce Landlord to enter into a Lease. In making any decision to rent the Premised to the undersigned applicant(s), it is understood Landlord will rely upon the accuracy, completeness, honesty, and full disclosure of the information so-requested.

The undersigned hereby represent (1) the information and statements contained in the attached rental application(s) are true, accurate, and complete; (2) the undersigned have not been named or subject to any eviction proceeding in the last three (3) years; and (3) the undersigned did not vacate any premises in the last three (3) years owing any landlord rent.

If any information contained in any rental application or any representation made within this Rider is not wholly true and accurate, or made in good faith, Landlord may, at Landlord's sole election, declare (1) Tenants in default of this Lease, or (2) this Lease null and void from its inception and, in such latter event, no tenancy, demise or right to possession shall be deemed by any party or court to have been created. Should either such event occur, then Tenant (if more than one person) shall be jointly and severally liable to Landlord for any losses, damages, and expenses incurred in connection with such default, recovery of possession of the premises, appeals, and the collection of any sums due the Landlord.

*Credit and Employment Authorization*

In connection with an application submitted to rent the Premises above-described, the undersigned hereby authorize Landlord to inquire, and any person receiving such request to verify or provide such information requested, (1) in order to (a) evaluate (i) the credit worthiness and/or employment of the undersigned, (ii) the accuracy of any representation made, or (iii) the undersigned's continuing ability to pay the rent; or (b) locate the undersigned or satisfy any judgment; or (2) for any other purpose not in violation of law.

*Acknowledgment*

The undersigned hereby acknowledges the information provided the undersigned by the rental agent with respect to the condition of the Premises, the Rent that may be legally charged, and the work or items that will be furnished by Landlord, was provided by Landlord to the rental agent. The undersigned hereby agrees to hold the rental agent harmless and release said agent from any liability if such information, representations, or promises made on Landlord's behalf are not true, accurate, or performed as promised. It is the obligation of the undersigned to verify the accuracy of any information provided.



*Controlled Substances*

The undersigned states, under the penalties of perjury, that he or she does not presently use, possess, or store any drugs or substances in violation of state or federal law, and shall not during the course of any future tenancy or occupancy of the Premises, use, possess, or store such substances within the Premises or



COMMONWEALTH OF MASSACHUSETTS
APPELLATE TAX BOARD

| | |
|---|---|
| EGYPT HOUSE,<br><br>        Appellant<br><br>v.<br><br>BOARD OF ASSESSORS OF<br>TOWN OF MARBLEHEAD<br><br>        Appellee | )<br>)<br>)<br>)<br>)<br>)    No. F-347637<br>)<br>)<br>)<br>)<br>)<br>) |

### APPELLEE BOARD OF ASSESSORS OF TOWN OF MARBLEHEAD'S MOTION TO COMPEL FURTHER RESPONSES TO FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO APPELLANT EGYPT HOUSE

Now comes the Appellee, the Board of Assessors of the Town of Marblehead (the Board), and, pursuant to 831 CMR 1.25 and G.L. c. 231, § 64, moves for an order compelling further responses to document requests it propounded upon Appellant Egypt House. The Appellate Tax Board has the same power under 831 CMR 1.25 as courts of the Commonwealth do under G.L. c. 231, § 64, and "may make and enter such order, judgment or decree as justice requires" when a party fails to answer an interrogatory. The Board asks for a 7-day order, and seeks more further responses more specifically as follows:

**REQUEST**

1.      Any and all documents read, reviewed, consulted, examined, used or relied upon in preparing your responses hereto or in connection with the Board's Interrogatories to you.

**RESPONSE**

1.      Request 1 is objectionable because the requested documentation is subject to the attorney-client privilege and the work product doctrine. Notwithstanding the foregoing,

the requested material has already been obtained by the Requesting Party and such request is, therefore, duplicative. The requested documentation is just as easily obtainable by the Requesting Party, from third party sources, as it is for the Responding Party. The request constitutes an improper attempt by the Requesting Party to shift to the Responding Party the labor, cost, and responsibility for obtaining the requested documents.

## MOTION TO COMPEL

1.     The Board moves for an order compelling a further response. The Appellant has not identified what documents it is refusing to produce, nor why any such production would be duplicative. The Request seeks documents in the possession and control of the Appellant. Documents utilized to answer relevant interrogatories are themselves plainly relevant. A further response should be compelled.

## REQUEST

2.     Any and all documents relative to the relationship between each and every agent, servant, employee, or individual empowered by Egypt House to carry on any activities, business, religious, or otherwise at 12 Conant Road, including but not limited to the status of any such individuals as an officer, employee, director, lay worker, clergy, or other relationship and the usual and customary activities performed by such individuals on behalf of or as a representative or employee of Egypt House.

## RESPONSE

2.     Request 2 is objectionable because the request is vague, overbroad, oppressive, and unduly burdensome. The request fails to describe with reasonable particularity any objective and it imposes obligations on the Responding Party beyond those set forth in the Rules of Court.

**MOTION TO COMPEL**

2.    The Board moves to compel a further response to this request. The subject of this appeal is an exemption claimed under Clause Eleventh of G.L. c. 59, § 5. That exemption turns upon the uses that the Appellant conducts on the property in question. The documents sought are plainly relevant to Egypt House's activities on the site, and their production should be compelled.

**REQUEST**

3.    Any and all documents containing information about the facts, allegations and conclusions introduced or made by you in your Petition.

**RESPONSE**

3.    Request 3 is objectionable because it is irrelevant and requires the production of documents already obtained by the Requesting Party. Request 3 is, therefore, duplicative.

**MOTION TO COMPEL**

3.    This response is ambiguous and a further response should be compelled. This request seeks documents that directly contain information about the central allegations made by the Appellant. It is not clear what the response means by stating that documents have already been obtained. The Appellant should be compelled to respond to the request and produce those documents in their possession.

**REQUEST**

6.    Any and all records of non-income or -revenue generating activity conducted on the Locus.

**RESPONSE**

6.    The request is objectionable because it imposes obligations on the Responding Party in excess of those promulgated under the Rules of Court. No such records

exist. Notwithstanding the foregoing, attached is documentation evidencing the non-income generating activities conducted at Egypt House.

**MOTION TO COMPEL**

6.     The Board moves to compel a further response to this request. The response is plainly ambiguous: the Appellant simultaneously states that no responsive records exist, and also produces what it contends are responsive records. The Appellant should be compelled to produce all responsive records in its possession and make it clear that nothing is being withheld or denied.

**REQUEST**

7.     Any and all documents which you intend to use as evidence at the hearing on your appeal.

**RESPONSE**

7.     Request 7 is objectionable because it requests documentation that is subject to the work product doctrine and prematurely seeks documents and information.

**MOTION TO COMPEL**

7.     The Board moves to compel a response to this request. The hearing is upcoming and adequate time has passed to identify all material to be used. The Appellant bears the burden at this hearing, and full and frank disclosure serves the interests of all parties and the Appellate Tax Board. A further response should be compelled.

**REQUEST**

11.     Any and all mortgage, financing, lending, or funding applications made with respect to Egypt House's acquisition and ownership of the Locus.

**RESPONSE**

11.     Request 11 is objectionable because (a) it is irrelevant and requires the

production of documents that have no relation to the litigation, nor is it reasonably calculated to lead to the discovery of admissible evidence, and (b) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court. Notwithstanding the foregoing, if Requesting Party will stipulate to a protective order ensuring such documentation be ensealed and delivered to the Court for further handling by the Court, Responding Party will produce such documentation into the registry of the Court. If Requesting Party is amenable to the proposed handling of the requested documentation, Responding Party will prepare a Motion and Order in keeping with the criteria so stated.

## MOTION TO COMPEL

11.    The Board moves to compel a further response to this request. Financing, lending, or funding applications are reasonably likely to contain information relating to the Appellant's proposed uses of the property at issue here. Furthermore, the Appellant's objections are ill-founded; this is not a Court, there is no registry, and even presuming that there was, the Board is entitled to review a responsive document, not have it filed with the Appellate Tax Board under seal. It is the Appellant who has placed its conduct on the property at issue by taking this appeal, and it is its burden to prove the applicability of the claimed religious use exemption. A further response to this request should be compelled.

## REQUEST

12.    Any and all liability, property, or other type of insurance policies applicable to the Locus.

## RESPONSE

12.    Request 12 is objectionable because (a) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court, and (b) it is irrelevant and requires the production of documents that have no relation to the litigation, nor are they

reasonably calculated to lead to the discovery of admissible evidence.

**MOTION TO COMPEL**

12.    The Board moves to compel a further response. Insurance coverage is predicated upon use, and the information contained in an insurance policy is directly relevant to the issues in this appeal. The Appellant has directly placed its own activity and conduct on the property at issue, and a further response with all applicable insurance policies should be produced.

**REQUEST**

13.    Any and all insurance applications made regarding the Locus.

**RESPONSE**

13.    Request 13 is objectionable because it is irrelevant and requires the production of documents that have no relation to the litigation, nor are they reasonably calculated to lead to the discovery of admissible evidence.

**MOTION TO COMPEL**

13.    The Board moves to compel a further response. Insurance coverage is predicated upon use, and the information contained in an insurance policy is directly relevant to the issues in this appeal. The Appellant has directly placed its own activity and conduct on the property at issue, and a further response with all applicable insurance policies should be produced.

**REQUEST**

14.    Any and all policies, procedures, protocols, or similar documents that relate to the use and management of the Locus by Egypt House.

**RESPONSE**

14.    Request 14 is objectionable because (a) it imposes obligations on the

Responding Party beyond those set forth in the Rules of Court, and (b) it is irrelevant and requires the production of documents that have no relation to the litigation, nor are they reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing, the texts most frequently used at Egypt House may be found at goarch.org/chapel/texts.

**MOTION TO COMPEL**

14.    The Board moves to compel a further response. The use and management of the property at issue here is central to this appeal, in which Egypt House contends that it uses the property for religious purposes, thereby rendering the property exempt from taxation. Egypt House's own policies and procedures on the use of the property directly bear on the activities it conducts thereon. The response given is inadequate and a further response should be compelled.

**REQUEST**

16.    Any and all documents, writings, or unwritten materials of any kind that relate to, list, show, or evidence in any fashion any tenants, renters, or occupants of the Locus.

**RESPONSE**

16.    There has been no tenancy at Egypt House. Request 16 is objectionable because (a) the identity of any occupant of Egypt House is subject to the Clergyman-Penitent Privilege (G.L. c. 233, § 20A (LexisNexis, Lexis Advance through Chapter 25 of the 2023 Legislative Session of the 193rd General Court)), (b) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court, and (c) it is irrelevant and requires the production of documents that have no relation to the litigation, nor is it reasonably calculated to lead to the discovery of admissible evidence.

## MOTION TO STRIKE AND COMPEL

16. The objection and claim of privilege should be struck and a further response compelled. Massachusetts' priest-penitent privilege is established in G.L. c. 233, § 20A, which provides that

> A priest, rabbi or ordained or licensed minister of any church or an accredited Christian Science practitioner shall not, without the consent of the person making the confession, be allowed to disclose a confession made to him in his professional character, in the course of discipline enjoined by the rules or practice of the religious body to which he belongs; nor shall a priest, rabbi or ordained or licensed minister of any church or an accredited Christian Science practitioner testify as to any communication made to him by any person in seeking religious or spiritual advice or comfort, or as to his advice given thereon in the course of his professional duties or in his professional character, without the consent of such person.

The priest-penitent privilege is "strictly construed and applies only to communications where a penitent seek[s] religious or spiritual advice or comfort." *Commonwealth v. Nutter*, 87 Mass. App. Ct. 260, 263 (quoting *Commonwealth v. Vital*, 83 Mass. App. Ct. 669, 672 (2013)). "Whether [a party's] communications are protected under the terms of the statute is a question of law." *Id.* (quoting *Commonwealth v. Kebreau*, 454 Mass. 287, 303 (2009)). By the terms of the statute, the privilege applies to communications, not to identities or the presence of individuals on a property. In fact, claiming the privilege "involves factual determinations concerning the defendant's intent." *Nutter*, 87 Mass. App. Ct. at 263 (citing *Kebreau*, 454 Mass. at 303). To claim the privilege, a person must identify themselves as someone communicating with a priest, rabbi, or ordained or licensed minister of any church, and that they were making a confession or seeking religious or spiritual advice or comfort. The interrogatory seeks no information whatsoever about communications, and only the identities of individuals who have resided at the Locus in this matter. As the Appellant notes, this case involves a tax exemption claimed under G.L. c. 59, § 5, which requires the Appellant to prove that it has used the property for primarily religious purposes. The

identities of individuals residing on the property is plainly relevant and not privileged. The assertion of privilege is ill founded and should be struck, and a further response compelled.

## REQUEST

17.     Any and all documents, writings, communications, or materials of any kind relating to the listing of the Locus for sale or rent from your acquisition of the Locus through the present time.

## RESPONSE

17.     Egypt House was listed in February and March of 2023 on Zillow. The listing was allowed to lapse with no transaction resulting therefrom.

## MOTION TO COMPEL

17.     The Board moves to compel a further response. The response indicates that the Appellant made efforts to list the property, but does not provide any documents. The production of any documents, writings, communications, or materials related to the admitted listings should be compelled.

Appellee,
The Board of Assessors of the Town of Marblehead,
By its attorney,


/s/ Matthew D. Provencher
Matthew D. Provencher (BBO#694114)
**Mead, Talerman & Costa, LLC**
227 Union Street, Suite 609
New Bedford, MA 02740
774-206-6857
matt@mtclawyers.com

Date: September 6, 2023

9

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record for the Appellant, Egypt House, on the 6th day of September, 2023.

/s/ Matthew D. Provencher

THE COMMONWEALTH OF MASSACHUSETTS
APPELLATE TAX BOARD

| | | |
|---|---|---|
| EGYPT HOUSE, | ) | DOCKET NO.:  F-347637 |
| Appellant | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOARD OF ASSESSORS OF THE TOWN | ) | |
| OF MARBLEHEAD, | ) | |
| Appellee | ) | |

## APPELLANT'S RESPONSE AND OPPOSITION TO APPELLEE'S MOTION TO COMPEL
## FURTHER RESPONSES TO FIRST REQUEST
## FOR PRODUCTION OF DOCUMENTS TO APPELLANT

### Table of Authorities

**Cases**

*Assessors of Boston v. Garland Sch. of Home Making*, 296 Mass. 378 (1937).
*Assessors of Boston v. Old South Society in Boston, 314 Mass. 364, 366 (1943).*
*Boston Chamber of Commerce v. Assessors of Boston, 315 Mass. 712 (1944).*
*Mt. Auburn Hospital v. Assessors of Watertown*, 55 Mass. App. Ct. 611, 622, n. 11 (2002).
*New Eng. Forestry Found., Inc. v. Board of Assessors*, 468 Mass. 138 (2014).
*New England Hospital for Women and Children v. City of Boston*, 113 Mass. 518 (1873).
*Superior Realty Company, Inc. v. Assessors of Quincy*, Mass. ATB Findings of Fact and Reports
    2016-436, 446.47.
*Trimount Foundation, Inc. v. Board of Assessors of the City of Newton*, 2019 Mass. Tax LEXIS
    1.
*Trinity Church v. City of Boston*, 118 Mass. 164 (1875).
*Trustees of Boston College, Mass*. ATB Findings of Fact and Reports at 2010-96, 123.
*Walz v. Tax Comm. of N.Y.*, 397 U.S. 664 (1970).

**Constitutions**
ALM Constitution Pt. 1, Art. II.
USCS Const. Amend. I.

**Statutes**

ALM R. Civ. P. Rule 26.

ALM G. Evid. § 510.

G.L. c. 59, § 2 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative Session
of the 193rd General Court).

G.L. c. 59, § 5 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative Session
of the 193rd General Court)

G.L. c. 233, § 20 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative
Session of the 193rd General Court)

By and through its counsel, Appellant, Egypt House, respectfully submits this Response and Opposition to Appellee's Motion to Compel More Responsive Answers to Interrogatories from Appellant. For the reasons set forth herein, Appellant respectfully requests the Appellate Tax Board deny Appellee's Motion to Compel More Responsive Answers to Interrogatories from Appellant.

## I.    INTRODUCTION

Appellant is the fee simple owner of an approximately 1,900 square foot single-family residence situated on improved real property located at 12 Conant Road in the Town of Marblehead, Massachusetts (such property, "Egypt House"). Appellant is a District of Columbia religious non-profit corporation expressly because the laws of the District of Columbia allow for the consideration of canon law whereas the laws of the Commonwealth of Massachusetts do not. The premises owned by Appellant is contiguous to, and shares the same use with, a second single-family residence located at 22 Endicott Avenue of approximately 1,700 square feet, also used as a monastic house and incorporated in the District of Columbia for the same reasons, albeit incorporated separately for reasons of liability, as is normal practice. *See,* Exhibit 1, attached. Both houses, while separately titled and incorporated, together in harmony exist to serve the same religious purpose as one monastic complex which is a part of St. Paul's Foundation, an Orthodox Christian monastic institute, similar to how St. Joseph's Abbey, located in Spencer, Massachusetts, is comprised of several parcels forming St. Joseph's Abbey, a part of the Order of the Cistercians of the Strict Observance (the "Trappists"). There are three Massachusetts Department of Revenue exempt use codes for religious organizations, 960 for "Church, Mosque, Synagogue, Temple, etc.," 961 for "Rectory or Parsonage, etc.," and 962 for

"Other." There is also a non-exempt use code, 124, for rectories, convents and monasteries, although it is difficult to understand how it would be applied.

We looked to St. Joseph's Abbey in Spencer, Massachusetts as an example. The monks at St. Joseph's own 12 exempt properties: R48-10 listed as 962 although it is vacant land, R48-5 listed as 962 although it is vacant land, R49-1 listed as 962 although it is vacant land, R52-6 listed as 962, R53-2 listed as 962 although it is vacant land, R53-3 listed as 962 although it is a soccer field and vacant land, R53-5 listed as 962 although it is vacant land, R54-3 listed as 962 although it is a soccer field and vacant land, R54-4 listed as 962 although it is vacant land, R57-1 listed as 962 although it is vacant land, R59-1 listed as 960 described as antique residential clapboard, and R59-2 listed as 960 described as vacant land.

We recognize a tax exemption derives from "special grace and favor" and eligibility must be demonstrated by the applicant; in this case, Egypt House. We have demonstrated that Egypt House is contiguous to and shares the same use with Emmaus House. Prior to the purchase of Egypt House, Appellant met with an architect to develop plans to improve the property into a more suitable monastic property (with pricing plans therefor delivered on August 22, 2022), contacted two general contractors, scheduled meetings to renovate the property, and received one bid to renovate the property. In the meantime, while renovation work was being evaluated, designed, and workmen identified, the property was used for purposes exempted under Clause Eleventh, to wit:

(a)    as housing for Dr. George Kordis, a world-renowned iconographer (iconographers are a kind of cleric in the Orthodox Church specialized in writing the Holy Icons for churches, and receive special blessings from a bishop in order to write the Holy Icons with prayer and fasting);

(b)      a studio for the development of the Holy Icons for St. Nicholas the

Wonderworker, Egypt House, and Emmaus House – writing one of the Holy Icons is considered

analogous to a church service in the Orthodox Church;

(c)      celebration of religious liturgical services, including by clergy other than Fr.

Andrew, such as Bishop Theophan of Philomelion and Fr. Paul Zuniga;

(d)      housing for pilgrims seeking spiritual direction and confession of their sins; and

(e)      administrative work, such as reviewing construction documents and filing and

composing a seemingly endless stream of administrative appeals and legal defenses.

Appellant looked to other organizations whose exempted landholdings are comprised of

related parcels; organizations that acquired parcels, developed plans, and started construction

(*New England Hospital for Women and Children v. City of Boston*, 113 Mass. 518 (1873),

*Trinity Church v. City of Boston*, 118 Mass. 164 (1875), and *Mt. Auburn Hospital v. Assessors of

Watertown*, 55 Mass. App. Ct. 611, 622, n.11 (2002)); organizations that placed parcels under

temporary use in service to the organization while identifying the best and highest use for such

parcel within the subject organization (*Trustees of Boston College*, Mass. ATB Findings of Fact

and Reports at 2010-123); and organization owners that had not leased the property or derived

profit from it while identifying the best and highest use for such parcel within the subject

organization (*Mt. Auburn Hospital v. Assessors of Watertown*, 55 Mass. App. Ct. 611, 622, n.11

(2002)). We take each of these concepts and cases in turn.

In *New England Hospital for Women and Children v. City of Boston*, 113 Mass. 518

(1873), the Supreme Judicial Court found, "[w]ithin a period of about a month from its purchase

in April, 1871, the appellant had hired an architect, who had prepared plans and specifications

for the hospital, which the appellant approved, and by May 27, 1871, the architect had staked off

the property in preparation for digging the foundation. *Id*. The Supreme Judicial Court found that the appellant, as of the relevant determination date, was "diligently proceeding with the preliminary measures necessary to the erection" of the hospital and, accordingly, did "occupy" the property in accordance with the statute as of that time. *Id*. at 521. In *Trinity Church v. City of Boston*, 118 Mass. 164 (1875), "[i]t was then, and is now, the intention of the proprietors of the plaintiff corporation to use the lot on St. James Avenue for purposes of religious worship only; and they have caused the work of building the new church to be carried on with all reasonable diligence." *Mt. Auburn Hospital v. Assessors of Watertown*, citing *New England Hospital* as reflecting "a less rigid formulation [with respect to occupancy] focusing on the organization's intentions and diligence." *Mt. Auburn Hospital v. Assessors of Watertown*, 55 Mass. App. Ct. 611, 622, n.11 (2002): "although construction had not commenced yet, planning had been undertaken with due diligence and the hospital had not leased the premises or derived a profit therefrom; exemption allowed." In this instance, Egypt House purchased the subject property on June 30, 2022. Prior to June 30, 2022, it had already viewed the property with an architect and started developing the plans for the property. *See*, Exhibit 2, attached. In the interim, while bids for construction were being solicited and mortgages applied for, the subject property was being used for liturgical services, housing for retreatants for spiritual direction, and housing for the iconographer to beautify the chapel areas of St. Nicholas. Additionally, the garage building was used as storage for maintenance tools to maintain the property and the basement to store other items to extend the evangelical mission of the Orthodox Church such as fixtures and equipment to be installed at St. Nicholas. It is a common practice for parsonages and rectories to store various items to be used later at the actual houses of worship, particularly when there are renovations at the main house of worship.

The decision of the Board in *Trustees of Boston College*, Mass. ATB Findings of Fact and Reports at 2010-123, states: "where the property at issue had only recently been acquired by the college, and its long-term use was still being studied," the Board found the property at issue was exempt, as the college occupied it with interim uses, such as passive recreation, overflow parking, and buffer space, and concluded, the "fact that these uses may have been temporary, or that Boston College's future plans for the subject property continued to evolve during the fiscal years at issue, did not warrant a finding to the contrary." Based upon the foregoing one is able to understand the situation of Egypt House is not unique and is the subject of well settled determinations by both this Board and the Supreme Judicial Court.

In *Trustees of Boston College v. Assessors of Boston*, Mass. ATB Findings of Fact and Reports 2010-96, and *Superior Realty Company, Inc. v. Assessors of Quincy*, Mass. ATB Findings of Fact and Reports 2016-436, 446-47, the Board treated contiguous parcels as one where the evidence showed they were used in the same manner and put to the same economic use. This is directly on point with the situation at Egypt House which is contiguous to Emmaus House.

A definition for the term "parsonage" is not contained in the statutes. In *Assessors of Boston* v. *Old South Society in Boston*, 314 Mass. 364, 366 (1943), the court stated in pertinent part:

> . . . the English word 'parsonage' as derived from American usage must be read, not in a technical or ecclesiastical sense, but in the broad meaning of a ministerial residence used in connection with any place of worship of any denomination. It is but a house owned by, or held in trust for, a religious organization for religious uses in which a minister serving

those uses lives. . . . The word 'parsonage' is commonly used to denote a residence

furnished by a church to a minister."

But surely, if a house of worship is under construction and diligently seeking to complete its

construction, using a parsonage as a temporary place of worship, retreat and necessary

administrative workspace such uses should not violate the exempt purpose of the religious

organization in question under Clause Eleventh, otherwise that would provide an impermissible

establishment of religious organizations that are older, wealthier, and better accepted by the

community.

Ownership of multiple contiguous properties serving the same religious purpose is a

concept that exists in Marblehead at other houses of worship, as documented in the Marblehead

Assessor's own records: Our Lady Star of the Sea, a Roman Catholic Parish, has five real

properties, three contiguous (church listed as 960, a parking lot listed as 962, the rectory has no

property card at all) and two on separate lots (an educational center and function hall across the

street from the church listed as 954 and a cemetery across town listed as 962); St. Michael's

Episcopal Church has five (5) contiguous real properties and at least one, an investment property,

called Davenport House, is incorporated separately in a trust and listed as a two family use 124,

but its real estate tax status is unclear; Old North Church has perhaps three separate real

properties including the church, and across the street a parking lot contiguous to a rectory.

Several, including St. Andrew's Episcopal and, St. Stephen's Methodist have parsonages. Of

these local religious organizations, Star of the Sea's rectory is most analogous to the facts at

issue here, use with clergy residences and offices on the upper floors and offices, meeting rooms

and kitchen space on the ground floor – except the single Catholic rectory has individual suites

on the upper floors for priests, is larger than both 12 Conant Road and 22 Endicott Avenue put

together, and only has one full-time priest. Unfortunately, there is no digital record of the rectory of Our Lady Star of the Sea in the public Town of Marblehead portal on the Patriot Property website. The renovation plans for Egypt House, responsive to Appellee's Second Request for Production of Documents (to be provided, response not yet due), will eventually allow for clerical suites so each cleric can have a bedroom with ensuite bathroom. There are many examples of such usage within the practices of Orthodox Catholic and Roman Catholic countries, such as the Convent of St. Elizabeth in Obitel-Minsk (https://obitel-minsk.org/history). Because a religious organization is nascent and all of its ministries are not finally settled does not make the religious organization less religious. For example, the time I am now spending writing this response could be better spent writing on the Feast of the Holy Cross, but my work at Egypt House sitting and writing as a lawyer defending the religious practice of the church does not make Egypt House less occupied for religious use, just as pilings installed at Holy Trinity Church in Boston, or architectural plans and permits for renovations of other properties, are indicative of occupancy.

Because the Board considers related parcels in analyses of this nature and because there is likely an additional matter that will appear before the Board shortly, it makes sense to lay out the entirety of St. Paul's Foundation's subordinate holdings in Marblehead. Emmaus House is listed as 960. The two contiguous St. Nicholas properties at 120 and 124 Pleasant Street also in Marblehead are listed as 960. Egypt House should either be listed as 960 because it has a chapel and is used for religious instruction as well as a residence for clergy, or 961 as a parsonage, or 962 as other. Whatever the case, Egypt House should be listed as the same use since the uses are the same. We note the Town of Marblehead recently revoked an exemption it had previously granted to St. Nicholas' property at 120 Pleasant Street which complements the ministry of 124

Pleasant Street without any explanation. At the Pleasant Street location, *The Archbishops Damaskinos and Iakovos Educational Center*, currently undergoing renovations, inclusive of the installation of an outdoor baptistry in a garden where outdoor worship services can be celebrated, administrative offices for church staff, multipurpose educational and conference rooms (including a place where a video screen can be lowered to show a movie explaining the devotions at St. Nicholas), it is contemplated our church will have a public-facing home for our ministries. In a recent filing in Superior Court, we note the Town, in a filing by counsel hereunder, denies the religious character of St. Nicholas' property at 120 Pleasant Street. Appellant is still puzzled over this turn of events, since the subject site is clearly a house of worship undergoing over $1,000,000.00 in fully-permitted renovations subjected to inspection by the Town of Marblehead. This site is contiguous to property in which the Orthodox Christian chapel, refectory, monastic workshop, and pilgrims' quarters are to be located. Constant delays to St. Nicholas' construction program required expansion at Emmaus House; hence Egypt House, literally named after the Holy Family's Flight to Egypt.

Each of Egypt House and Emmaus House have consecrated chapel areas for liturgical worship, rooms used as a residence for clergy and those otherwise consecrated to the mission of the Orthodox Church, guest quarters for pilgrims and lay cooperators, office space for the administrative and ever increasing amount of legal work required to, for example, file this brief, develop evangelical and mission related work, assist the local bishop in his work, review the construction work at the Shrine of St. Nicholas or the various legal and/or administrative challenges to the establishment of St. Nicholas mounted by the Town of Marblehead, or any other of a hundred different tasks required by the planting of a church, which cannot be performed at either of the two buildings commonly known as 120 and 124 Pleasant Street

mentioned hereinabove due to the fact the buildings remain a construction site due to construction work being regularly halted as the result of a number of administrative and legal actions by Town of Marblehead officials (as partially laid out in the timeline attached hereto as Exhibit 3).

In view of the foregoing, Egypt House has the characteristics of both a house of worship and a parsonage; neither term quite fits a monastic usage, yet all monastic houses share the characteristics of both. It would be contrary to the current interpretation of the law, and indeed verge on establishment territory, to impose what is clearly a Protestant concept of church, *e.g.*, the word "parsonage" is never used among Orthodox Catholics or Roman Catholics, relative to a monastic institute. As noted hereinabove, the word "parsonage" is commonly used to denote a residence furnished by a church to a minister; however, even this definition does not conform to an Orthodox Catholic or Roman Catholic usage for what are termed "religious", *e.g.,* those men and women who live according to a stricter standard as monks, nuns, other kinds of consecration, or simply dedicated faithful such as the Numeraries of Opus Dei, *cf. Trimount Foundation*[1]. Importantly, the word "parsonage", or phrase "ministerial residence" could also mean two houses together used for the same purpose, especially when the aggregate square footage of the two properties combined is about 3,600 square feet and that space must provide for liturgical worship and uses, religious education classes and retreats, administrative offices, storage space for goods for religious purposes, and as well as residential uses.

Egypt House is neither a public nor private for-profit enterprise.  Egypt House is not a secular charitable organization. Egypt House is not a property held by a religious organization for charitable purposes. Egypt House does not employ persons to conduct business operations.

---

[1]    Trimount Foundation, Inc. v. Board of Assessors of the City of Newton, 2019 Mass. Tax LEXIS 1.

Her function is to hold real property and provide usable space necessary for the religious use of a religious organization such as worship, mission, pilgrims housing, and that necessary administrative work to allow our ministry to survive while continuing with the construction of the Shrine of St. Nicholas the Wonderworker in downtown Marblehead. Where else would Appellee have Appellant house and provide for her clergy, religious workers, liturgical space, religious education, pilgrims, and administrative work whilst St. Nicholas is under construction, if not at two houses that share a common boundary? We direct the Board to our timeline which clearly illustrates a pattern on the part of the Appellee, to wit: despite the existence of fully-permitted building plans, the Town of Marblehead continually identifies new objections to work it had already permitted and, following the time consuming and costly exercises of filing and answering appeals, such objections were overturned at the State level. The process of researching, arguing, filing and applying for these appeals at the State level does more than give the residents of Emmaus House and Egypt House a backache, it actually constitutes occupancy under the decisions of this Board, even though it's not the occupancy Appellant would prefer; that is the celebration of more liturgical services, working on more evangelical materials, and confessing more sins to raise more souls to Heaven. The ability to acquire Egypt House to provide for space to pray, evangelize, minister, work, and live was a fortuitous event that solved an existential threat to our minority religious foundation.

Appellant does not possess a vast file of materials relative to a single-family dwelling acquired eighteen months ago in support of its mission. Appellee's counsel would love to mire and confuse the Appellate Tax Board in extraneous detail on the hunt for some salaciously underhanded scheme that simply does not exist. The facts and the law in this instance are not complex. Houses of worship and parsonages are allowed exemptions under Clause the Tenth and

Clause the Eleventh. While it's arguable as to whether a monastic property is more house of worship than parsonage or more parsonage than house of worship, it is not arguable that Egypt House has been used for one or the other uses, each of which are exempt under Clause Eleventh. While these properties might not be held by the same entities, they are all subordinate nonprofits under the IRS group ruling of St. Paul's Foundation, a Delaware religious non-stock non-profit, are under common control, and all together comprise the same fundamentally religious use as has been repeatedly demonstrated. How Churches choose to arrange, or not to arrange, since incorporation is not a necessary part of the statute.

### Legal Principles Underlying the Tax Exemptions Promulgated
### At Massachusetts General Laws, Chapter 59, Section 5, Clauses 10ᵗʰ and 11ᵗʰ

Separation of Church and State is a core tenet of the republic established by the Founding Fathers of the United States. Freedom of religion is enshrined in the First Amendment to the United States Constitution.[2] In similar fashion, the Constitution of the Commonwealth of Massachusetts protects its citizens from persecution resulting from the practice of religion.[3]

The Massachusetts Code provides: [a]ll property, real and personal, situated within the commonwealth, and all personal property of the inhabitants of the commonwealth wherever situated, unless expressly exempt, shall be subject to taxation; . . ." G.L. c. 59, § 2 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative Session of the 193rd General Court). The exemptions at issue here are the religious organization exemptions. The subject exemptions

---

[2]     Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. USCS Const. Amend. 1.

[3]     It is the right as well as the duty of all men in society, publicly, and at stated seasons to worship the SUPREME BEING, the great Creator and Preserver of the universe. And no subject shall be hurt, molested, or restrained, in his person, liberty, or estate for worshipping God in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession or sentiments; provided he doth not disturb the public peace, or obstruct others in their religious worship. ALM Constitution Pt. 1, Art. II.

are codified at G.L. c. 59, § 5 (LexisNexis, Lexis Advance through Chapter 27 of the 2023

Legislative Session of the 193rd General Court), to-wit:

Tenth, Personal property owned by or held in trust within the commonwealth for

religious organizations, whether or not incorporated, if the principal or income is used or

appropriated for religious, benevolent or charitable purposes.

Eleventh, Notwithstanding the provisions of any other general or special law to

the contrary, houses of religious worship owned by, or held in trust for the use of, any

religious organization, and the pews and furniture and each parsonage so owned, or held

in irrevocable trust, for the exclusive benefit of the religious organizations, and including

the official residences occupied by district superintendents of the United Methodist

Church and the Christian and Missionary Alliance and of the Church of the Nazarene,

and by district executives of the Southern New England District of the Assemblies of

God, Inc., Unitarian-Universalist Churches and the Baptist General Conference of New

England, and the official residence occupied by the president of the New England Synod

of the Lutheran Church in America, Inc., and the official residence occupied by a person

who has been designated by the congregation of a Hebrew Synagogue or Temple as the

rabbi thereof, but such exemption shall not, except as herein provided, extend to any

portion of any such house of religious worship appropriated for purposes other than

religious worship or instruction. The occasional or incidental use of such property by an

organization exempt from taxation under the provisions of 26 USC Sec. 501(c)(3) of the

Federal Internal Revenue Code shall not be deemed to be an appropriation for purposes

other than religious worship or instruction.

G.L. c. 59, § 5 (LexisNexis, Lexis Advance through Chapter 27 of the 2023 Legislative Session of the 193rd General Court). In *New England Forestry Foundation*,[4] the Court articulated the burden placed upon an organization seeking an exemption from taxation within the Commonwealth of Massachusetts: "[e]xemption statutes are strictly construed, and the burden lies with the party seeking an exemption to demonstrate that it qualifies according to the express terms or the necessary implication of a statute providing the exemption." *Boston Chamber of Commerce v. Assessors of Boston,* 315 Mass. 712 (1944), citing *Assessors of Boston v. Garland Sch. of Home Making,* 296 Mass. 378 (1937). With respect to the matter before this Court, Appellant has provided responsive information relative to the ownership and use of Egypt House by Appellant. Egypt House was purchased approximately eighteen months ago; it is not unusual that a wealth of documentation does not exist, given the short time frame since it was purchased. Appellee now requests information relative to the terms of sale of Egypt House, inquiries as to whether and how the property is insured, and the identities of persons worshipping at or benefitting from the ministry(ies) performed at Egypt House. Appellant wonders why any of this information is germane to *the use of Egypt House under ownership by Appellee*; indeed, why is the name of any person who worships at Egypt House a topic for disclosure to the Town of Marblehead? "*The Taxpayer's Guide to Property Tax Exemptions in Massachusetts - Religious and Charitable Organizations*," published by the Taxpayer's Bureau, provides the following guidance relative to analyzing exemption applications:

The organization must provide whatever information is *reasonably required to establish eligibility*. This information may include, but is not limited to: Articles of incorporation,

---

[4]    *New Eng. Forestry Found., Inc. v. Board of Assessors*, 468 Mass. 138 (2014).

charter or declaration of trust, Organization by-laws, identification of officers, directors

or trustees, description of charitable activities, description of the use of the property,

including use by all lessees or other occupants. [Emphasis added.]

In construing the theory(ies) surrounding the use of tax exemptions for religious organizations, in

*Walz v. Tax Comm'n of City of New York*[5], the United States Supreme Court sums up the

attributes of the exemption treatment afforded religious organizations adopted by the legislatures

since the founding of our country:

> The legislative purpose of the property tax exemption is neither the advancement nor the
>
> inhibition of religion; it is neither sponsorship nor hostility. New York, in common with
>
> the other States, has determined that certain entities that exist in a harmonious
>
> relationship to the community at large, and that foster its 'moral or mental improvement,'
>
> should not be inhibited in their activities by property taxation or the hazard of loss of
>
> those properties for nonpayment of taxes. It has not singled out one particular church or
>
> religious group or even churches as such; rather, it has granted exemption to all houses of
>
> religious worship within a broad class of property owned by nonprofit, quasi-public
>
> corporations which include hospitals, libraries, playgrounds, scientific, professional,
>
> historical, and patriotic groups.

*Walz v. Tax Com. of N.Y.*, 397 U.S. 664 (1970). The actions of the Town of Marblehead in this

instance step very close to the entanglement boundary raised in *Walz*, "the exemptions for

religious organizations created only a minimal and remote involvement between church and

---

[5]     *Walz v. Tax Com. of N.Y.*, 397 U.S. 664 (1970).

state, and far less of an involvement than would be created by taxation of churches, and the effect of the exemptions was thus not an excessive government entanglement with religion." *Id.*

Egypt House is *not* a publicly- or privately- held *for-profit enterprise*. Egypt House does not employ persons to conduct its business operations, as its sole function is to support the work of St. Paul's in building the Orthodox Christian faith and providing a place of Christian sanctuary for the weary, the oppressed, the down-trodden, and those seeking to live their Christian values in our modern world:

> Let all guests who arrive be received like Christ, for He is going to say, 'I came as a guest, and you received Me' (Matt. 25:35). And to all let due honor be shown, especially to the domestics of the *faith* (Gal 6:10) and to pilgrims. . . . Let the Abbot give the guests water for their hands; and let both Abbot and community wash the feet of all guests. After the washing of the feet let them say this verse: '[w]e have received Your mercy, O God, in the midst of Your temple.' (Ps.47[48]:10) . . . . In the reception of the poor and of pilgrims the greatest care and solicitude should be shown, because it is especially in them that Christ is received . . . Let there be a separate kitchen for the Abbot and guests, that the brethren may not be disturbed when guests, who are never lacking in a monastery, arrive at irregular hours. [Emphasis added.]

*Rule of St. Benedict,* Chapter 53, On the Reception of Guests. To be clear, guest (pilgrim) lodging is provided at no charge.

## II.    MOTION TO COMPEL

Appellant states as follows relative to the assertions made by Appellee in the subject Motion to Compel:

<u>Request 1</u>    Any and all documents read, reviewed, consulted, examined, used, or relied upon in preparing your responses hereto or in connection with the Board's Interrogatories to you.

RESPONSE:    Request 1 is objectionable because the requested documentation is subject to the attorney-client privilege and the work product doctrine. Notwithstanding the foregoing, the requested material has already been obtained by the Requesting Party and such request is, therefore, duplicative. The requested documentation is just as easily obtainable by the Requesting Party, from third party sources, as it is for the Responding Party. The request constitutes an improper attempt by the Requesting Party to shift to the Responding Party the labor, cost, and responsibility for obtaining the requested documents.

2ND RESPONSE: The Appellant reviewed the Articles of Organization of Appellant. The Articles of Organization are attached hereto as <u>Exhibit 4</u>.

<u>Request 2</u>    Any and all documents relative to the relationship between each and every agent, servant, employee, or individual empowered by Egypt House to carry on any activities, business, religious, or otherwise at 12 Conant Road, including but not limited to the status of any such individuals as an officer, employee, director, lay worker, clergy, or other relationship and the usual and customary activities performed by such individuals on behalf of or as a representative or employee of Egypt House.

Appellant's Response and Opposition to Appellee's Motion to Compel Further Responses to First Request for Production of Documents to Appellant - Page 18 of 28

RESPONSE:    Request 2 is objectionable because the request is vague, overbroad, oppressive, and unduly burdensome. The request fails to describe with reasonable particularity any objective and it imposes obligations on the Responding Party beyond those set forth in the Rules of Court.

2ND RESPONSE: Fr. Andrew Bushell is the Superior of Egypt House. Pursuant to the Articles of Organization of Appellant, he is empowered to act with respect to Appellant.

Request 3    Any and all documents containing information about the facts, allegations, and conclusions introduced or made by you in your Petition.

RESPONSE:    Request 3 is objectionable because it is irrelevant and requires the production of documents already obtained by the Requesting Party.  Request 3 is, therefore, duplicative.

2ND RESPONSE: Each of Appellant's initial application for exemption, documentation provided in response to the queries of the Town of Marblehead Assessor with respect thereto, and documentation filed in connection with these proceedings are the sole documents responsive to this request. Egypt House is a single-family dwelling. It was purchased approximately eighteen months ago; it is not unusual that a wealth of documentation does not exist, given the short time frame since it was purchased.

Request 6    Any and all records of non -income or -revenue generating activity conducted on the Locus.

RESPONSE:    The request is objectionable because it imposes obligations on the Responding Party in excess of those promulgated under the Rules of Court. No such records

exist. Notwithstanding the foregoing, attached is documentation evidencing the non-income generating activities conducted at Egypt House.

2ND RESPONSE:  No records regarding income or non-revenue generating activities at Egypt House exist. Aside from images of the Liturgy, provided, no records exist. Appellant is a religious nonprofit corporation with no business activities. Appellant is a house of worship, place of evangelization and clergy and pilgrim lodging.

Request 7      Any and all documents which you intend to use as evidence at the hearing on your appeal.

RESPONSE:      Request 7 is objectionable because it requests documentation that is subject to the work product doctrine and prematurely seeks documents and information.

2ND RESPONSE:  We respectfully disagree with counsel for Appellee. As we have communicated, relevant documentation has already been provided. As previously stated, hearing preparation is not near final.

Request 11     Any and all mortgage, financing, lending, or funding applications made with respect to Egypt House's acquisition and ownership of the Locus.

RESPONSE:      Request 11 is objectionable because (a) it is irrelevant and requires the production of documents that have no relation to the litigation, nor is it reasonably calculated to lead to the discovery of admissible evidence, and (b) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court. Notwithstanding the foregoing, if Requesting Party will stipulate to a protective order ensuring such documentation be ensealed and delivered to the Court for further handling by the

Court, Responding Party will produce such documentation into the registry of the Court. If Requesting Party is amenable to the proposed handling of the requested documentation, Responding Party will prepare a Motion and Order in keeping with the criteria so stated.

2ND RESPONSE:    Appellant replied in the affirmative to the request. To the extent it exists, subject to the issuance of a protective order that provides that such disclosures will be under the care and custody of the Court, Appellant will disclose the requested materials. Appellant and its affiliates, Fr. Andrew Bushell, and Tracey M.A. Stockton, have been subjected to highly publicized media disclosures which have led to threats to safety and subjected to public indecency by citizens of the Town of Marblehead.[6] The slanders circulated by the employees of the Town of Marblehead are not without notice and it is well-documented that communications within the Town of Marblehead government are not secure, with deletions and self-serving modifications made to communications by Town board members, agents, and employees[7]. *Also, see*, <u>Exhibit 5</u>. In view of the fact many of the subject requests are not germane to the analysis at issue, "how is the subject property used by the party claiming the subject exemption," yet Appellant is willing to accommodate such requests, we respectfully request the Board enable such disclosures to proceed under cover of a protective order. In view of the fact Appellee was studiously incurious about the use of the property by the current

---

[6]    https://www.bostonglobe.com/2022/10/13/metro/purported-christian-orthodox-monk-lawyer-arrested-federal-charges-35-million-covid-19-relief-scam/
      https://www.marbleheadbeacon.com/search/node?keys=Andrew+Bushell
[7]    https://marbleheadcurrent.org/2023/09/01/deleted-school-committee-texts-leave-gap-in-trove-of-communications-about-former-superintendent/

owner prior to its denial and deemed denial of the two applications for exemption presented to Appellee upon acquisition of the subject property, with all due respect, it is now before the Board to review the materials submitted and opine as to whether the Appellant is a religious organization entitled to the requested exemption(s).

Request 12    Any and all liability, property, or other type of insurance policies applicable to the Locus.

RESPONSE:    Request 12 is objectionable because (a) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court, and (b) it is irrelevant and requires the production of documents that have no relation to the litigation, nor are they reasonably calculated to lead to the discovery of admissible evidence.

2ND RESPONSE: The Massachusetts Rules of Civil Procedure provide as follows:

> A party may obtain discovery of the existence and contents of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

ALM R. Civ. P. Rule 26. Under the subject circumstances, this request does not fit within the parameters of the Rule.

Request 13    Any and all insurance applications made regarding the Locus.

RESPONSE:    Request 13 is objectionable because it is irrelevant and requires the production of documents that have no relation to the litigation, nor are they reasonably calculated

to lead to the discovery of admissible evidence.

2ND RESPONSE: Request 13 is objectionable because (a) it is irrelevant and requires the production of documents that have no relation to the litigation, nor is it reasonably calculated to lead to the discovery of admissible evidence, and (b) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court. Notwithstanding the foregoing, if Requesting Party will stipulate to a protective order ensuring such documentation be ensealed and delivered to the Court for further handling by the Court, Responding Party will produce such documentation into the registry of the Court. If Requesting Party is amenable to the proposed handling of the requested documentation, Responding Party will prepare a Motion and Order in keeping with the criteria so stated.

Request 14    Any and all policies, procedures, protocols, or similar documents that relate to the use and management of the Locus by Egypt House.

RESPONSE:    Request 14 is objectionable because (a) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court, and (b) it is irrelevant and requires the production of documents that have no relation to the litigation, nor are they reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing, the texts most frequently used at Egypt House may be found at goarch.org/chapel/texts.

2ND RESPONSE: Appellant is a religious nonprofit corporation with no business activities. Appellant is a house of worship, place of evangelization and clergy and pilgrim

lodging. Aside from the responses produced, there are no such responsive materials.

Request 16    Any and all documents, writings, or unwritten materials of any kind that relate to, list, show, or evidence in any fashion any tenants, renters, or occupants of the Locus.

RESPONSE:    There has been no tenancy at Egypt House. Request 16 is objectionable because (a) the identity of any occupant of Egypt House is subject to the Clergyman-Penitent Privilege (G.L. c. 233, § 20A (LexisNexis, Lexis Advance through Chapter 25 of the 2023 Legislative Session of the 193rd General Court)), (b) it imposes obligations on the Responding Party beyond those set forth in the Rules of Court, and (c) it is irrelevant and requires the production of documents that have no relation to the litigation, nor is it reasonably calculated to lead to the discovery of admissible evidence.

2ND RESPONSE:    Appellant responded to this request in its initial responses. Neither the identity of the persons seeking spiritual guidance, nor the nature of any communications, are disclosable. The canons of the Orthodox faith strictly prohibit such disclosures. St. Nikodemos of Mount Athos, the same place where Fr. Andrew became a monk, wrote the manual for confessors that is used by Father Andrew and the Ecumenical Patriarchate today; wherein he writes:

> Nothing else remains after confession, Spiritual Father, except to keep the sins you hear a secret, and to never reveal them, either by word, or by letter, or by a bodily gesture, or by any other sign, even if you are in danger of death, for that which the wise Sirach says applies to you: '[h]ave

you heard a word? Let it die with you.' (Sir. 19:8); meaning, if you heard a

secret word, let the word also die along with you, and do not tell it to

either a friend of yours or an enemy of yours, for as long as you live. And

further still, that which the Prophet Micah says: '[t]rust not in friends . . .

beware of thy wife, so as not to commit anything to her. (Mic. 7:5).

In addition to the foregoing, the qualifications to the clergyman-penitent privilege recognized in the Commonwealth of Massachusetts, provides as follows:

A clergyman shall not disclose a confession made to him in his

professional character *without the consent of the person making the*

*confession*. Nor shall a clergyman testify as to any communication made

to him by any person seeking religious or spiritual advice or comfort, or as

to his advice given thereon in the course of his professional duties or in his

professional character, *without the consent of such person.* ALM G. Evid.

§ 510.

Where "professional character" refers to the course of discipline prescribed by the rules or practice of the religious body to which the clergy member belongs[8].Aside from the responses produced, there are no such responsive materials.

<u>Request 17</u>    Any and all documents, writings, communications, or materials of any kind relating to the listing of the Locus for sale or rent from your acquisition of the Locus through the present time.

RESPONSE:    Egypt House was listed in February and March of 2023 on Zillow. The listing was

---

[8]    ALM G. Evid. § 510.

allowed to lapse with no transaction resulting therefrom.

2ND RESPONSE: Aside from the responses produced, there are no such responsive materials.

Zillow is a digital portal. There are no records for the listing, except the lapsed

listing on Zillow, previously disclosed.

## II.    CONCLUSION

Appellant is a religious organization under Chapter 59, Section 5, Clauses 10 and

11, of the General Laws of The Commonwealth of Massachusetts. The forefathers of each of the

United States and The Commonwealth of Massachusetts upheld a firm belief in religious liberty.

Federal and state law protects the free exercise of religion. One of the methods often used by

municipalities to chill the practice of religion is to cause the religious organization to publicly

identify its congregants and to spend its resources on lengthy and costly maneuvers by such

municipality, including the imposition of illegal taxes, forcing the religious organization to

pursue the costly and protracted exercise to establish its legal authority to congregate and pursue

its religious devotion.

Appellant, Egypt House, by and through its Superior, hereby verifies the above answers are true and accurate, to the best of its knowledge. Signed under the penalties of perjury effective this 11th day of September, 2023.

EGYPT HOUSE

By: /s/ Rev. Fr. Andrew Bushell
      Rev. Fr. Andrew Bushell, Superior

As to objections:

/s/ Tracey M.A. Stockton
Tracey M.A. Stockton
Legal Counsel to Appellant
124 Pleasant Street
Marblehead, Massachusetts   01945
617.800.3979
ts@stpaulsfoundation.org
BBO Number:  568495

## CERTIFICATE OF SERVICE

I certify a copy of the above Appellant's Response to Appellee's Motion to Compel Further Responses to First Request for Production of Documents to Appellant was mailed and delivered electronically on September 11, 2023 to all counsel and self-represented parties of record.

Parties and/or attorneys served:

Karen D. Bertolino, M.A.A.
Marblehead Town Assessor

Adam J. Costa, Esq.
Mead, Talerman & Costa, LLC

Matthew D. Provencher, Esq.
Mead, Talerman & Costa, LLC

Brian Winner, Esq.
Mead, Talerman & Costa, LLC

_____
Tracey M. Stockton

EXHIBIT J

*See,* attached.

Father Andrew:

In response to your request for records of conversation with Paul Jalbert regarding 124 Pleasant Street. The email of August 28, 2017 10:22 is the only correspondence I had with Mr. Jalbert, regarding 124 Pleasant Street.

Jason R. Gilliland.

**Jason R. Gilliland**

| | |
|---|---|
| **From:** | Jason R. Gilliland |
| **Sent:** | Monday, August 28, 2017 10:22 AM |
| **To:** | Paul Jalbert |
| **Subject:** | RE: 124 Pleasant St? |

Hi Paul:

Yes it is Father Andrew who is buying the property.

**From:** Paul Jalbert
**Sent:** Monday, August 28, 2017 10:15 AM
**To:** Jason R. Gilliland
**Subject:** 124 Pleasant St?

Good Morning Jason,

I just spoke at length with Petrisse Briel, the owner of 124 Pleasant Street. Apparently, she will be transferring ownership to the Saint Paul's Foundation (named after me, of course) tomorrow but had not scheduled the required inspection with water and sewer. She said that she has been working with you concerning the fire department inspections.

She seemed to be quite upset at the whole process and said that the buyers were shady. Is there anything that we should be aware of with this organization. Could this be the same organization behind the Father "Salt" episode?

(I wonder if they are buying property and going to claim religious exemption to take them off the tax rolls?)

Thanks Jason.

Paul

Paul E. Jalbert
Office Manager
Marblehead Water and Sewer Commission
P.O. Box 1108
Marblehead, MA 01945
Phone: 781 631-0102      FAX: 781 631-2670

1

Jason Silva
978-810-1479

**Thanks, Chief!**

There is a man and his young son in 124 Pleasant, the man is having a glass of beer. I did get pictures.

— Jason Gilliland
781-983-3580

**Thanks, chief!**

Jason Silva —
978-810-1479

Welcome

— Jason Gilliland
781-983-3580

Sat, Dec 1, 3:41 PM

Another report of people sitting at tables. No need for special trip but if you're in the area. Thx.

Jason Silva —
978-810-1479

Ok, I will take a look

— Jason Gilliland
781-983-3580

Jason Silva —
978-810-1479

**Thank you.**



Jason

Wed, Aug 15, 8:49 PM



— Jason Gilliland
781-983-3580

Not a real big crowd tonight

— Jason Gilliland 781-983-3580

Jason silva
978-810-1479

You're kidding me!

I went down around 6:30 and there were only 3 or 4 people there.

— Jason Gilliland
781-983-3580

Jason Silva
978-810-1479

Sat, Nov 24, 7:22 PM

I just received a message that 124 Pleasant is serving. Don't make a special trip but if you're out and drive by take a look.

Hope you had a great thanksgiving!

I will go down now and take a look. Thanksgiving was good, I hope you and your family had an enjoyable Thanksgiving as well

Jason Gilliland
978-983-3580

Ok. Thanks for the update. Hopefully he understands we need to enforce the code consistently.

Jason Silva
978-810-1479

Sat, Dec 8, 5:31 PM



← Jason Gilliland
981-983-3580

Not a real big crowd tonight

—Jason Gilliland
781-983-3580

Jason Silva
978-810-1479

You're kidding me!

I went down around 6:30 and there were only 3 or 4 people there.

—Jason Gilliland
781-983-3580

I figured there'd be more than that. Well, I'm glad it went off without any issues.

Jason Silva
978-810-1479

That was a good call to let him proceed, he has no one to blame for low turn out.

Have a good night

—Jason Gilliland
781-983-3580

Agreed. You too. Have a great night.

Jason Silva
978-810-1479

Sat, Dec 8, 2:50 PM

Captain Rice called Father Andrew and told him he would have to remove the tree, Tom also cited the code for why he could not have it. As expected, he went on the defense and stated to Tom that it was suspect that he was being told to remove the tree based on what was going on. Tom told him he had no idea what he was referring and told him that he would provide copies of the code on Monday. Father Andrew told him that he would need them for his lawyer.

— Jason Gilliland
781-983-3580

Ok. Thanks for the update. Hopefully he understands we need to enforce the code consistently.

Jason Silva
978-810-1479

# iMessage
## Yesterday 6:45 PM

To: **Chief Gilliland**

Wed, Dec 12, 8:34 AM

**Was hawkes street battery** — Tom Rice
978-239-4914

Yes — Jason Gilliland — 781-983-3580

Thu, Dec 13, 2:21 PM

I am dragging and need to put my foot up. I have my responsibilities done for the day. Ok if I bug out and make up some hours later? I did come in on Saturday to deal with father Andrew as well. Let me know — Tom Rice 978-239-4914

No worries, go home and rest — Jason Gilliland - 781-983-3580

Thu, Dec 20, 8:02 AM

Officer Morris just witnessed and videotaped Father Andrew serving.

— Jason Gilliland
781-983-3580

My understanding is that because the Building Commissioner and you are responsible for enforcing the codes that his establishment is violating, it must be either of you that witness the violation in order to take action.

Jason Silva —
978-810-1479

Ok, I guess I will take a trip to Pleasant Street

— Jason Gilliland
781-983-3580

Sorry, Chief. That's how it was explained to me by town counsel.

Jason Silva —
978-810-1479

No worries, I understand

— Jason Gilliland
781-983-3580

Mon, Aug 13, 1:14 PM

Rich Baldacci
781-584-5205

We are on for the conference call at 130. Check your email

Fri, Jan 18, 12:29 PM

Rich Baldacci
781-584-5206

Sorry, I can't talk right now.

Rich Baldacci
781-584-5206

Can you text me. I'm in a meeting

Not important    - Jason Gillilead  781-983-3580

Rich Baldacci
781-584-5206

I'll call you in ten or fifteen mins

Delivered

Ok    - Jason Gillilead
781-983-3580

We have to meet with Father Andrew tomorrow at some point to figure final numbers for outdoor seating

— Jason Gilliland
781-983-3580

Thu, Jul 19, 6:42 AM

Do you have time to meet with Father Andrew and I in your office at 9:00 this morning

— Jason Gilliland
781-983-3580

Rich Baldacci
781-584-5206 —

No. I have a 900 and a 1000. Can we meet between 800 and 830? Or between 1230 and 100?

I will check with him

— Jason Gilliland
781-983-3580

Today 6:52 AM

Father, I spoke to Rich this morning, he is asking if we could meet at 8:15 or 12:30, he has an appointment at 9:00

Jason Grihlow
781-983-3580

Today 8:02 AM

has an appoint-
ment at 9:00

Today 8:02 AM

815 works for me.
I have a noon
meeting. See you
in a bit.

Jason Gilliland
781-983-3580

Thank you!!






**Today** 6:42 AM

Do you have time to meet with Father Andrew and I in your office at 9:00 this morning

*Jason Gilliland*
*781-983-3580*

No. I have a 900 and a 1000. Can we meet between

*Rich Baldacci*
*781-584-8206*

In your office at 9:00 this morning

Jason
Gillilard
781-983-3580

No. I have a 900 and a 1000. Can we meet between 800 and 830? Or between 1230 and 100?

Rich Baldacci
781-584-5205

I will check with him, stand by

Jason
Gillilacd
781-983-3580

## iMessage

**Yesterday** 8:33 PM

We have to meet with Father Andrew tomorrow at some point to figure final numbers for outdoor seating

Jason
Gilliland
781-983-3580

**Today** 6:42 AM

No. I have a 900 and a 1000. Can we meet between 800 and 830? Or between 1230 and 100?

Rich
Baldacci
781-584-5205

I will check with him, stand by

Jason Gillilané
781-983-3580

Delivered

**To:** Rich Baldacci[baldaccir@marblehead.org]
**From:** Becky Curran[rebeccac@marblehead.org]
**Sent:** Wed 9/27/2017 5:19:13 PM (UTC-04:00)
**Subject:** RE: pleasant st

That is the question  that lisa is looking at – in this instance it may be

---

**From:** Rich Baldacci
**Sent:** Wednesday, September 27, 2017 4:42 PM
**To:** Becky Curran
**Subject:** RE: pleasant st

Is a beer brewery a religion?

Richard Baldacci, CBO
Building Commissioner
Town of Marblehead
7 Widger Road
Marblehead, MA  01945
781-631-2220

*The MA State Secretary has determined that e-mails to and from public computers are subject to public record requests unless exempted by law.*

---

**From:** Becky Curran
**Sent:** Wednesday, September 27, 2017 4:26 PM
**To:** Rich Baldacci
**Subject:** pleasant st

Religious uses and special permit. I spoke with Lisa yesterday and  she says we cannot subject a protected use under 40a sec 3  to a discretionary special permit process. Lisa said you have would  not apply that since the imposition of statutory special permit uses on religious and nonprofit educational uses  are afforded protection from any discretionary process

Rebecca Curran Cutting
Town of Marblehead
Town Planner
rebeccac@marblehead.org

Not a real big crowd tonight

—Jason Gilliland
781-983-3580

Jason Silva
978-810-1479

You're kidding me!

I went down around 6:30 and there were only 3 or 4 people there.

—Jason Gilliland
781-983-3580

I figured there'd be more than that. Well, I'm glad it went off without any issues.

Jason Silva
978-810-1479

That was a good call to let him proceed, he has no one to blame for low turn out.

Have a good night

—Jason Gilliland
781-983-3580

Agreed. You too. Have a great night.

Jason Silva
978-810-1479

**To:** Jason Silva[silvaj@marblehead.org]
**From:** Kyle Wiley[wileyk@marblehead.org]
**Sent:** Wed 10/23/2019 10:15:14 AM (UTC-04:00)
**Subject:** Licsence renewal - Marblehead Brewing

Case 1:25-cv-10537    Document 1    Filed 03/12/25    Page 333 of 425

Jason
I just want to confirm that I will not send out a "renewal package" to Marblehead Brewing this year.

Background:
November 2018 - Marblehead Brewing did submit their renewal package during the month of November (November 30th specifically)  and paid the $400 renewal fee.

The License was voted on at BOS meeting in December "subject to" meeting all the requirements of the Town.  They never met the requirements during 2019 and have never been issued their License.

When I submit all the renewals this year I will have to make note to ABCC that the Town did not issue their license in 2019 due to failure to meet requirements.

Does this sound right?  I don't' want to do anything that makes this more complicated.
I am not sending letters out until Monday so we can talk.

Thanks

*Kyle A. Wiley*
*Administrative Aide*
*Town of Marblehead*
*Abbot Hall*
*188 Washington Street*
*Marblehead, MA  01945*

*781-631-0000*
*(f) 781-631-8571*

| | |
|---|---|
| **From :** | Leandro Difilippo <DifilippoL@marblehead.org> |
| **To :** | Karen Bertolino <bertolinok@marblehead.org> |
| **Subject :** | links |
| **Received On :** | 9/14/2023 10:01 AM |

https://www.ft.com/content/15a9f79f-76d9-4990-92c2-a5836ad15e61

https://www.salemnews.com/news/local_news/marian-court-may-become-home-for-monks-beer-and-cider/article_3abdce5f-8d0a-5829-ac98-f6f68470fbe8.html

https://www.nbcboston.com/news/local/monks-battle-swampscott-mass-over-beer/58009/

https://www.wickedlocal.com/story/swampscott-reporter/2016/12/09/residents-largely-embrace-monastary-eyed/64688810007/

https://patch.com/massachusetts/swampscott/swampscott-estate-could-become-monastic-community

https://www.salemnews.com/news/florida-woman-sues-over-investment-in-brewery-owned-by-monk/article_c3805636-d30d-11ed-aa53-a7b1f66633cb.html

https://www.wickedlocal.com/story/marblehead-reporter/2014/06/05/salt-earth-marblehead-man-funds/35208549007/

United States v. Bushell, 1:22-mj-04506 – CourtListener.com

EMMAUS HOUSE SUFFIX in Washington, DC | Company Info & Reviews (bizapedia.com)

EGYPT HOUSE SUFFIX in Washington, DC | Company Info & Reviews (bizapedia.com)

https://interiordesignsociety.org/blog/id/29

https://slate.com/author/andrew-bushell

**Anti-Christian bigotry in Massachusetts**

by Jeff Jacoby

IF YOU WERE looking for someone to successfully manage a promising company, it would be hard to find a candidate with a better array of credentials and know-how than Andrew Bushell.

He's a natural-born entrepreneur, with wide and varied experience both in and out of the business world. He founded and successfully managed a $2.5 billion investment firm. He worked as a management consultant for McKinsey & Co. After 9/11, he took a hiatus from the high-pressure world of finance and venture capital, immersing himself instead in the high-pressure world of war-zone journalism to cover Afghanistan and Pakistan for The Economist. And when, after years abroad, he returned to his New England hometown, he came up with an idea for a unique local business: making and selling gourmet salt from Atlantic seawater. Like Bushell's other endeavors, the Marblehead Salt Company flourished, with annual sales growing at a 25 percent clip and the salt winning raves from foodies.

So when Bushell approached the Massachusetts Development Finance Agency last year with an application for loans to grow yet another Marblehead business venture — a craft brewery and taproom — officials might

have been expected to welcome him with open arms. According to MassDevelopment's website, after all, the agency was created to "help foster real estate and business projects that generate economic benefits for local communities and the state." Given Bushell's stellar track record, financing for Marblehead Brewing Co. should have been a no-brainer.

It wasn't.

The brewery applied for two loans. It intended to use the funds from one to improve its property in downtown Marblehead, and the other to purchase additional brewing equipment, in order to increase production from 700 barrels of beer in 2018 to 2,500 barrels by 2023. MassDevelopment said no. It demanded that the brewery enlist private backers who would personally guarantee the repayment of any loans. Bushell and Marblehead Brewing did so, providing the state with guarantees equal to three times the value of the loans applied for. The state demanded that the company's brewing equipment, worth $1.6 million, be put up as collateral. Bushell agreed to that too.

And still the agency says no.

Why? Because Bushell — more accurately, Father Andrew Bushell — is an Orthodox Christian monk. And the Commonwealth of Massachusetts is flummoxed by a loan applicant whose business chops are everything a state development agency dreams of, but whose mission and appearance are not at all what it's used to.

Marblehead Brewing is a for-profit corporation. Like any other commercial brewery, it pays taxes and must keep its federal, state, and municipal licenses current. It won't survive if it can't turn a profit. But turning a profit isn't its highest purpose. Supporting the work of the church is.

Bushell is the 192nd chairman of the St. Paul's Foundation, a monastic Christian charity more than 1,000 years old. Under Bushell, it has focused in recent years on easing the misery of Syrian refugees, providing food for 2 million displaced people, and supplying hundreds of thousands of tents and blankets for the homeless. The foundation also supports the Guitars Project, a charitable endeavor that provides guitars and musical instruction to hundreds of mostly Muslim children in the Middle East who have been displaced by violence. (Profits from Marblehead Salt have been donated to local causes as well, including the Marblehead Festival of the Arts and the anti-addiction work of the Marblehead Health Department.)

Marblehead Brewing is located at the Shrine of St. Nicholas, the first Orthodox Christian church in Marblehead. The church and the brewpub share the same building — the drinking establishment with its tables and tap is in the front room; the church, complete with altar and icon, is in a more private interior space — but they are separate entities, with different tax ID numbers, bank accounts, and legal profiles. The brewery is a secular, for-profit business. The church and the foundation are nonprofit religious entities that are among Marblehead Brewing's shareholders. In launching a commercial brewery to sustain the work of his church, Bushell is following the classic example of Trappist and Benedictine monks who for centuries have supported themselves through brewing and winemaking.

MassDevelopment has no problem with beer companies. It has provided financing for quite a few of them, including Notch Brewing in Salem, Tree House Brewing in Charlton, and Night Shift Brewing in Everett. But a brewing company run by an Orthodox monk who wears a black cassock, lives under a vow of poverty, and has devoted his life — and exceptional business talents — to God appears to give state officials the heebie-jeebies. According to Bushell, agency officials have told him his loan will not be approved "because you're a church" and the state doesn't want to be in the position of suing a church if a loan weren't repaid. Through a spokeswoman, MassDevelopment declined to comment for this column.

Rejecting Bushell's application because of his religious vocation may well be illegal under the First Amendment. It is unquestionably short-sighted.

"Entrepreneurs come in many shapes and sizes, and not all fit the typical business model," says Glenn Hutchins, a tech investment superstar who is a director of the New York Fed and sits on the executive committee of the Boston Celtics. In a phone conversation the other day, Hutchins sang the praises of Bushell's beer, Marblehead Ale No. 2. He was even more enthusiastic about the monk's ability to "take a blank sheet and turn it into something impressive."

To a talented financier like Hutchins, hardheaded business acumen isn't to be discounted because it serves a larger, spiritual devotion. He knows better than to judge an entrepreneur by his cassock. If only Massachusetts bureaucrats were as clear-sighted.

SOURCE

*Lee DiFilippo*
Administrative Assessor
Town of Marblehead
Mary Alley Municipal Building
7 Widger Road, Marblehead, MA 01945
Email: difilippol@marblehead.org
P: 781.631.0236 | F: 781.631.2617
https://www.marblehead.org/assessors-office

 **Johnny Ray** is 🛍️ eating **lunch** at **Three Cod Tavern**.

January 17, 2021 · Marblehead, MA · 👥

Sunday Confession with Friar Tumma **Tumulty** Sundays 11AM-3PM By appointment only



Lesli Mead
Diane DeBettencourt Vigneron
Ralph Khouri
Haley Paster Scimone
Frank Simard
Mike Dowling
Mary Grant Boucher
T Michael Rockett
Brad Levin
Molly Booth Waniak
Darlene Ligor
JoAnne Buswell
Richard A Genest II
Jim Hazell
John Foster
Tom Regis
Michael Kirby
Michael Butler
Dawne Troupe
and 29 more...

 **Lesli Mead and 47 others**                    18 comments

 **Like**          Depicted individual is Defendant Michael Tumulty.          💬 **Comment**



**Johnny's Post**  ✕

**Johnny Ray**
October 13, 2022 · 👥

Michael Tumulty was right all along about the fake Monk!

👍😂❤️ Michael Tumulty, Lisa Stetler Hull and 24 others    16 comments

👍 Like          ○ Comment

Most relevant ▾

**Richard A Genest II**
Knock knock
1y   Like   Reply   😄

**Richard A Genest II**   •••

1y   Like   Reply   2 👍❤️

**Richard A Genest II**

Write a comment...

**Marblehead Beacon's Post**                                              ✕



**Anything Marblehead 01945**                                    •••
**Marblehead Beacon** · November 4, 2022 · 🌐

Are Marblehead's most famous monk and his co-defendant lawyer friend working on plea deals?



MARBLEHEADBEACON.COM
**Defendants in Massive Fraud Scam Appear Via Zoom in Federal Court**
At today's preliminary hearing in federal court, defendants Brian Bushell and Tracy Stockton–...

👍😆😮 Michael Tumulty and 3 others              13 comments



👍 Like          💬 Comment          ➤ Send

Top comments ▾



**Michael Tumulty**
No deals until he repays the taxpayers for all the taxes he was exempted from. It's
bullsht.. clearly his crimes would disqualify him as a legitimate clergyman      •••

1y   Like   Reply                                              3 👍

**Ronny Knight**



Write an answer...

😊 😃 📷 GIF 🏷                                              👍 3
                                                        Ronny Knight
                                                        Kristin Mavragis Percy
                                                        Chicki Curtis

**Marblehead Beacon's Post**



MARBLEHEADBEACON.COM

**Defendants in Massive Fraud Scam Appear Via Zoom in Federal Court**

At today's preliminary hearing in federal court, defendants Brian Bushell and Tracy Stockton–...

Michael Tumulty and 3 others                                    13 comments

👍 Like              💬 Comment              ▷ Send

**Top comments** ▾

**Michael Tumulty**
No deals until he repays the taxpayers for all the taxes he was exempted from. It's bullsht.. clearly his crimes would disqualify him as a legitimate clergyman

1y   Like   Reply                                                    3 👍

**Ronny Knight**
Over under on when the buildings catch fire??????

1y   Like   Reply                                    👍

**Michael Tumulty**
**Ronny Knight** sooner than later. Depends on which one sells out the other in the plea deal

1y   Like   Reply                                                    👍

**Sue Hogan**
**Ronny Knight**🤣🤣

1y   Like   Reply

👍 1
Matthew Martin

Reply to Michael Tumulty...                      😎 ☺ 📷 GIF 🎁

**Chicki Curtis**
Sell off all the "supplies" he had,saw them carry out 4 huge TVs still in boxes and that was just while I was stopped at light

1y   Like   Reply

Write an answer...

😎 ☺ 📷 GIF 🎁                                                    ➤

## Pam's Post 

19w    **Like    Reply**

 **Paul Broderick**
First of all I have to confess I love their 14 different beers. Second, because the FBI raids your house or establishment doesn't make it fact. (Richard Jewel ATL bombing). When the FBI comes in with the clowns and elephants and makes a big splash that should make you ask, why. They "The Monk" was charged with 100+ counts and the disgraced prosecutor was let go and the new prosecutor dismissed all counts. Because Monks are strange because they spend their days praying for US and making great brandy, beer and salt doesn't make them bad people. Just odd. Why wouldn't we question their intentions when they're not interested in sex , drugs and rockin roll. I have bought my beer from him and I have never had conversations about the Russians, Chinese, or reverting money. They say always follow the money, but monks swear a vow to poverty???

19w    Like    Reply                                                    3 

 **Tom McMahon**
**Paul Broderick** so what were all the big screen TVs for? Monk stuff?

19w    Like    Reply                                                    3 

 **Michael Tumulty**
**Tom McMahon** and they were poverty Rolexes

19w    Like    Reply                                    

 **Paul Broderick**
**Tom McMahon** Im truly impressed with your hard work and dedication to the town. And I appreciate your progressive thinking but big screen TVs for a library and media center at 120 Pleasant St should not be suspicious. As you know Facebook makes it to easy to bash someone with progressive thinking and unique solutions, stay on the high road

19w    Like    Reply

 **Tom McMahon**
**Paul Broderick** appreciate you following what I've been doing. There is significant history on this situation for people to weigh in. And not just history in Marblehead.

19w    Like    Reply

 **Cheryl Razin**
**Tom McMahon** And all those covid payments

## Marblehead Beacon's Post 

 **Chicki Curtis**
Sell off all the "supplies" he had, saw them carry out 4 huge TVs still in boxes and that was just while I was stopped at light

1y   Like   Reply

 **James Arthur Full**
GUILTY on all charges......GUILTY.

1y   Like   Reply

 **Matthew Martin**


1y   Like   Reply   

 **Ronny Knight**
Buttercup😎

1y   Like   Reply

 **Michael Tumulty**
POS

1y   Like   Reply   

 **Ronny Knight**
**Michael Tumulty** "Ten Pounds of S&@T in a five pound bag "

1y   Like   Reply   

 **Ronny Knight**
**Michael Tumulty** still waiting for the buildings to mysteriously catch fire 🎯🤔😉😎‼️

1y   Like   Reply   

 **Michael Tumulty**
**Ronny Knight** 😊. I think the Monkey is waiting to see how the plea deal goes. I'm guessing he'll have to get a real job now. Like collecting rocks from Goldthwait to make door stops.

1y   Like   Reply   •••

 Reply to Michael Tumulty...     

 Write an answer...



 **Michael Tumulty**

October 19, 2022 · 👥

So I'm thinking the Fake Monk defrauded the Massachusetts Secretary of State to recieve an illegal exemption for his properties.  He was granted exemption for his 3 properties and multiple cars.  He paid no real estate taxes or excise taxes. I think the taxpayers of Marblehead are entitled to the tens of thousands in real taxes and excise taxes. Just saying. Mr Francis Galvin you have some splainin to do.

 15

4 comments

👍 Like        💬 Comment

 **Anything Marblehead 01945**

Marblehead Beacon · October 13, 2022 · 😊    •••

Read our latest story on the FBI's raids this morning on a purported monk's (and that of his organizations' attorney) dwellings/businesses.

Also follow our Facebook page for video capturing part of the raid.



MARBLEHEADBEACON.COM
**Multi-Million $ Wire Fraud Conspiracy Scheme Alleged by Feds Against Purported Orthodox Monk and His Organizations' Attorney**

👍😮 11                                                    8 comments

○ Comment          ▽ Send

Jayne Madigan Patten
Tara McDonald Segee
Katherine Keyes Millett
Cheryl Razin
Arthur McGeown
Roger Fallon
JD Lausier
Mir Valkenburg
Sharman Pollender
Heather Tobin
Irina Litvak

**Jimmy Ray** is 🍴 eating **lunch** at **Three Cod Tavern**.    •••
January 17, 2021 · Marblehead, MA · 👥

Su____ _____tion with Friar Tumma Tumulty Sundays 11AM-3PM By appointment only





**Marblehead Beacon's Post**

1y    Like    Reply

**Chicki Curtis**    Town of Marblehead Harbors & Water Board Member, Alternate.
Sell off all the "supplies" he had,saw them carry out 4 huge TVs still in boxes and that was just while I was stopped at light

1y    Like    Reply

**James Arthur Full**
GUILTY on all charges......GUILTY.

1y    Like    Reply

**Matthew Martin**
💩💩💩

1y    Like    Reply

**Ronny Knight**
Buttercup😎

1y    Like    Reply

**Michael Tumulty**
POS

1y    Like    Reply

**Ronny Knight**
**Michael Tumulty** "Ten Pounds of S&&T in a five pound bag "

1y    Like    Reply

**Ronny Knight**
**Michael Tumulty** still waiting for the buildings to mysteriously catch fire 🎯🤔😉😎‼️

1y    Like    Reply

**Michael Tumulty**
**Ronny Knight** 😂. I think the Monkey is waiting to see how the plea deal I'm guessing he'll have to get a real job now. Like collecting rocks from Goldthwait to make door stops.

1y    Like    Reply

Write an answer...

**Michael Tumulty**
October 14, 2022 · 

Words the funky Monk lives by 😂



theseinfeldfeeds
· Reels · Oct 9 · 

if you believe it.

@THESEINFELDFEEDS

6x16

Costanza words of wisdom!!
Follow @theseinfeldfeeds ... **See more**

Original audio    these

😄 2                                    2 comments

👍 Like              💬 Comment              ↪ Share



**Michael Tumulty**
October 14, 2022 · 👥

· · ·

https://interiordesignsociety.org/blog/id/29



INTERIORDESIGNSOCIETY.ORG

**Member Spotlight: Father Andrew Bushell**

When church meets interior design, that's where Father Andrew comes in. Read more belo...

😂👍😮 Michael Tumulty and 13 others                    30 comments

 Like         Comment         Share

## Michael's Post



INTERIORDESIGNSOCIETY.ORG
**Member Spotlight: Father Andrew Bushell**
When church meets interior design, that's where Father Andrew comes in. Read more below ...

😆👍😮 Michael Tumulty and 13 others                30 comments

👍 Like          💬 Comment          ↪ Share

Most relevant ▾

**Michael Tumulty**
He will have the nicest cell on the block 😆
1y    Like    Reply                          4 👍😆

**Michael Tumulty**
You can't make this shit up.
1y    Like    Reply                          👍

**Michael Tumulty**
I heard his most recent design was a mattress with a hidden pouch to stash cash
1y    Like    Reply                          2 👍

INTERIORDESIGNSOCIETY.ORG

## Member Spotlight: Father Andrew Bushell

When church meets interior design, that's where Father Andrew comes in. Read more below ...

Michael Tumulty and 13 others                                    30 comments

👍 Like          💬 Comment          ➤ Share

**Most relevant** ▾

**Michael Tumulty**
He will have the nicest cell on the block 😆
1y    Like    Reply                    4 👍😄

**Michael Tumulty**
You can't make this shit up.
1y    Like    Reply                    👍

**Michael Tumulty**
I heard his most recent design was a mattress with a hidden pouch to stash cash
1y    Like    Reply                    2 👍

**JoAnne Buswell**
**Michael Tumulty**    •••

you
know
it!

1y    Like    Reply

**Michael Tumulty**



**Johnny Ray**
Just the kind of baffling bullshit sheep love to consume and believe. It's hilarious.

1y  Like  Reply    2 

**Anne Rodgers**
What is Frankincense

1y  Like  Reply

**Cheryl Razin**
From reading the guy's websites, he was a total snake oil salesman. Too slick. I can't believe he sold salt. And people bought not only the salt, but the idea salt could be somehow special. Hysterical! Glad he got too greedy.

1y  Like  Reply    3


Michael Tumulty
👍 1
❤️ 1

**Maureen Sheehan**
He will have time to pound salt now. **#themarbleheadsaltcom** 

1y  Like  Reply  Edited    2 

 JoAnne Buswell replied · 4 Replies

**Marblehead Beacon's Post**



MARBLEHEADBEACON.COM

**Defendants in Massive Fraud Scam Appear Via Zoom in Federal Court**

At today's preliminary hearing in federal court, defendants Brian Bushell and Tracy Stockton–…

Michael Tumulty and 3 others                                    13 comments

👍 Like          💬 Comment          ➤ Send

Top comments ▾

**Michael Tumulty**
No deals until he repays the taxpayers for all the taxes he was exempted from. It's bullsht.. clearly his crimes would disqualify him as a legitimate clergyman

1y    Like    Reply                                              3 👍

**Ronny Knight**
Over under on when the buildings catch fire??????

1y    Like    Reply                                              👍

**Michael Tumulty**
**Ronny Knight** sooner than later. Depends on which one sells out the other in the plea deal

1y    Like    Reply                                              👍

**Sue Hogan**
**Ronny Knight** 🤣🤣

1y    Like    Reply

Write an answer...

**Marblehead Beacon's Post**

**Ronny Knight**🤣🤣

1y   Like   Reply

**Chicki Curtis**
Sell off all the "supplies" he had,saw them carry out 4 huge TVs still in boxes and that was just while I was stopped at light

1y   Like   Reply

**James Arthur Full**
GUILTY on all charges......GUILTY.

1y   Like   Reply

**Matthew Martin**
💩 💩 💩

1y   Like   Reply

**Ronny Knight**
Buttercup😎

1y   Like   Reply        👍 1
                          Chicki Curtis

**Michael Tumulty**
POS

1y   Like   Reply   👍

**Ronny Knight**
**Michael Tumulty** "Ten Pounds of S&@T in a five pound bag "

1y   Like   Reply                               👍

**Ronny Knight**
**Michael Tumulty** still waiting for the buildings to mysteriously catch fire 🎯🥺😉😎‼️

1y   Like   Reply                               😃

**Michael Tumulty**
**Ronny Knight** 😋. I think the Monkey is waiting to see how the plea deal goes. I'm guessing he'll have to get a real job now. Like collecting rocks from Goldthwait to make door stops.

1y   Like   Reply

Write an answer...

**Johnny Ray**
October 13, 2022 · 👥

# Michael Tumulty was right all along about the fake Monk!

👍😆❤️ Michael Tumulty, Lisa Stetler Hull and 24 others          16 comments

👍 Like                                    💬 Comment

Michael Tumulty
Lisa Stetler Hull
Marc Liebman
Hope Carpenter
Yunita Pittard Farrar
Tum Mike
Cheryl Razin
Adam Silver
Kris W Enscoe
Jamie Hare
Vin Conte
Enid Cherry Laganas
Amy Renee Hallman
Caitlyn Buswell
Bonnie Buckley
Anne Rodgers
Tess Jam
Amy Bucher
Sam Easthope
and 7 more...

**Anything Marblehead 01945**
Marblehead Beacon · October 13, 2022 · 😩

FBI raids and arrest early this morning in Marblehead.



INTERIORDESIGNSOCIETY.ORG

**Member Spotlight: Father Andrew Bushell**

When church meets interior design, that's where Father Andrew comes in. Read more below ...

😂👍😮 Michael Tumulty and 13 others                    30 comments

👍 Like          💬 Comment          ↗ Share

**Most relevant** ▾

**Michael Tumulty**
He will have the nicest cell on the block 😆

1y   Like   Reply                    4 👍😆

**Michael Tumulty**
You can't make this shit up.

1y   Like   Reply          👍

**Michael Tumulty**
I heard his most recent design was a mattress with a hidden pouch to stash cash

1y   Like   Reply          2 👍

**JoAnne Buswell**
**Michael Tumulty**   •••

*you know it!*

1y   Like   Reply

## Michael's Post

**Michael Tumulty**
October 19, 2022 · 👥

So I'm thinking the Fake Monk defrauded the Massachusetts Secretary of State to recieve an illegal exemption for his properties. He was granted exemption for his 3 properties and multiple cars. He paid no real estate taxes or excise taxes. I think the taxpayers of Marblehead are entitled to the tens of thousands in real taxes and excise taxes. Just saying. Mr Francis Galvin you have some splainin to do.

👍❤️😆 15                                              4 comments

👍 Like                          💬 Comment

**Mike Ruotolo**
BOYCOTT THE BITCH
1y   Like   Reply   👍

**Ronny Knight**
As stated earlier with NO cash flow of Government COVID Funding for the "FM" aka "POS", and his side kick code name "Matilda". What is the date on the "careless use of smoking material of all properties owed? ⏰🤯
1y   Like   Reply                                      😄

**David Donahue**
Town officials bent over backwards for father fraud
1y   Like   Reply                                      3 👍

**Anne Rodgers**
It really wasn't on the news much - I figure the FBI has more raids lined up and they don't want people fleeing before they can be brought in ...??? This father fraud money man could have taken the money and pulled a Whitey Bulger 🤥😅
1y   Like   Reply                                      👍

Write a comment...

 **Michael Tumulty**





1y    **Like**    **Reply**

**Johnny Ray**
Just the kind of baffling bullshit sheep love to consume and believe. It's hilarious.

1y    **Like**    **Reply**    2 


👍 1
❤️ 1
Michael Tumulty

 **Anne Rodgers**
What is Frankincense 😄

1y    **Like**    **Reply**    

 **Cheryl Razin**
From reading the guy's websites, he was a total snake oil salesman. Too slick. I can't believe he sold salt. And people bought not only the salt, but the idea salt could be somehow special. Hysterical! Glad he got too greedy.

1y    **Like**    **Reply**    3 

 **Maureen Sheehan**
He will have time to pound salt now. **#themarbleheadsaltcom** [OBJ]

1y    **Like**    **Reply**    Edited    2 

 **JoAnne Buswell** replied · 4 Replies

**Michael's Post**

Wonderworker

**Patron of Sailors, Brewers & Repentant Thieves**

**124 Pleasant Street**

**Marblehead, MA 01945**

E-Mail:    theo@marbleheadsalt.com

1y    Like    Reply    

 **Maureen Sheehan**



As St. Nicholas is currently undergoing renovations we are completely web-based until they are complete. We'll announce opening for salt sales in the Shrine's hall soon!

Annual closures (orders placed during this period will be filled when we return):

**Closed for Christmas Feasts** December 24 through January 7 every year.

**Closed for the Annunciation** March 25

**Closed for Orthodox Holy Week, Easter and Easter Monday** every year.

2019 - Closed April 20 - 29

2020 - Closed April 11th - 20th

2021 - Closed April 24th - May 3rd

2022 - Closed April 16- 25th

**Closed for the Transfiguration** August 6

1y    Like    Reply    

 **Michael Tumulty**
I'm giddy

1y    Like    Reply    

**JoAnne Buswell**
**Maureen Sheehan**       

  



1y    Like    Reply    2 

 Write a reply...       GIF 

 **Richard A Genest II**

Write a comment...

  GIF

EXHIBIT K

*[To be provided under separate cover.]*

EXHIBIT L

*See,* attached.

## Re: Inspection Date at St Nicholas Shrine

From   Fr. Andrew Bushell (St. Paul's) <ab@stpaulsfoundation.org>

To   Richard Scanlon<ptr701@comcast.net>, Tracey Stockton<ts@stpaulsfoundation.org>

Date   Monday, September 30th, 2024 at 10:33 AM

Good afternoon Rich,

Thank you for this.  I'm adding Attorney Tracey Stockton so she's part of the conversation since we are currently suing the Town for revoking our exemption for St. Nicholas's building at 120 Pleasant Street and arbitrarily listing it as a "professional association".

To be clear, we are discussing two different properties owned by two separate organizations.

First, Egypt House at 12 Conan Rd.  Please note that one year is currently under appeal at the ATB for 2023-2024. The 2022-2023 year was not eligible for appeal at the ATB because a portion of the tax was paid late, but before that was discovered the facts were already well developed. If the Assessors do not issue an abatement for that year I understand we would be required to appeal to Superior Court.  During that litigation we provided architect's plans, photos of the chapel, and objected to Town Counsel's motion to compel me to reveal names of those who came to me for confession and spiritual direction, plus a letter from a bishop of the Ecumenical Patriarchate. So all you have to do to understand the exempt status of Egypt House is read the filings.  If you don't have them I will provide them to you.  We will file the abatement request for 2024-2025 today under Clauses 3, 10, and 11.  If we receive a tax bill on October 1, we will, as is our right under Clause 3, take that as the Assessor's declining to recognize those exemptions afforded to us under the plain language of the law and immediately appeal to the ATB under Clause 3. As you know, that does not prevent the Assessor from simply issuing the abatement which can occur at any time. Assessors can always correct an error and refund the church's money with interest. It's my understanding that Mr. Kelly might not understand that.

Second, St. Nicholas' religious educational center, clerical residence, and outdoor worship area at 120 Pleasant Street has had building plans filed with the Building Department since 2021.  We received a tax bill for her in July 2022 without explanation.

I don't really see what Mr. Kelly has to do with it.  He might be elected. He might have discretion relative to valuation questions of first instance. But in this area he, like you, merely possesses ministerial authority. If a property is completely used for religious purposes then it is exempt under clauses 10th and 11th. Additionally, if a property is used for religious purposes then by a transitive legal property it is also a charitable entity exempt under clause 3rd which is the more generous exemption. The plans for the renovations of 120 Pleasant Street are on file with the Building Department. There is a wealth of case law to support our positions.

I will include the relevant cases from both the ATB and SJC in my filings with your office later today. I will also scan and send to you the stamped received copy because I know you said you only come in once a week.

You're welcome to tour both of the buildings, but given that you already have photos and other documents perhaps it's not necessary.

Thank you very much.

With great love in Christ,

Father Andrew


On Fri, Sep 27, 2024 at 1:22 PM, Richard Scanlon < ptr701@comcast.net> wrote:

> Good afternoon Fr. Andrew,
>
> I'm following up with you regarding our discussion during our meeting earlier this week about setting up an inspection date at the St Nicholas Shrine properties.  Thank you for offering to tour me around the properties.
>
> Unfortunately, I have been unable to get a hold of John Kelley, as I wanted his input on these appeals prior to the inspection.  Apparently, he is on vacation in the Bahamas.  Where I work for him as Chair of the Board of Assessors and as I've got input from all other relevant parties, I am hesitant to set up an inspection date until I speak to him.   I will let you know when that occurs.
>
> Furthermore, it is my understanding that the Town is on the verge of hiring a full time Asst Assessor.  The job has been offered, and he has apparently accepted it pending salary and benefit negotiations.  It is anticipated that he will start in mid to late October.  Since that is only a few weeks away, I thought it may be more productive to have both of us attend when you tour us around the St Nicholas properties. I'm glad to offer my input, but I think it would be the best course of action to wait and have the new Assessor attend. He will be the one working with you on these appeals into the future as my time as a Consultant for Marblehead will eventually finish.  Again, I would contact you to arrange for a date once he has started.
>
> I look forward to touring the St Nicholas Shrine properties sometime in the near future.
>
> Thank you,  Rich
>
> Richard J Scanlon
> Asst. Assessor Consultant
> Town of Marblehead

978-821-7038 (cell)
ptr701@comcast.net (email)

## Inspection Date at St Nicholas Shrine

From   Richard Scanlon <ptr701@comcast.net>

To   Fr. Andrew Bushell (St. Paul's)<ab@stpaulsfoundation.org>

Date   Friday, September 27th, 2024 at 2:22 PM

Good afternoon Fr. Andrew,

I'm following up with you regarding our discussion during our meeting earlier this week about setting up an inspection date at the St Nicholas Shrine properties.  Thank you for offering to tour me around the properties.

Unfortunately, I have been unable to get a hold of John Kelley, as I wanted his input on these appeals prior to the inspection.  Apparently, he is on vacation in the Bahamas.  Where I work for him as Chair of the Board of Assessors and as I've got input from all other relevant parties, I am hesitant to set up an inspection date until I speak to him.   I will let you know when that occurs.

Furthermore, it is my understanding that the Town is on the verge of hiring a full time Asst Assessor.  The job has been offered, and he has apparently accepted it pending salary and benefit negotiations.  It is anticipated that he will start in mid to late October.  Since that is only a few weeks away, I thought it may be more productive to have both of us attend when you tour us around the St Nicholas properties. I'm glad to offer my input, but I think it would be the best course of action to wait and have the new Assessor attend. He will be the one working with you on these appeals into the future as my time as a Consultant for Marblehead will eventually finish.  Again, I would contact you to arrange for a date once he has started.

I look forward to touring the St Nicholas Shrine properties sometime in the near future.

Thank you,  Rich

Richard J Scanlon
Asst. Assessor Consultant
Town of Marblehead
978-821-7038 (cell)
ptr701@comcast.net (email)

## Re: Inspection Date at St Nicholas Shrine

From   Fr. Andrew Bushell (St. Paul's) <ab@stpaulsfoundation.org>

To   Richard Scanlon<ptr701@comcast.net>, Leandro Difilippo<DifilippoL@marblehead.org>,
Thatcher Kezer<KezerT@marblehead.org>

Date   Monday, September 30th, 2024 at 6:03 PM

Rich,

I am copying Leandro Difilippo and Thatcher Kezer on this message so everyone is on the chain.

Attached please find the 1B3 Forms for an abatement application under Clause 3, the nonprofit clause, which
were filed today for both Egypt House at 12 Conant Road and St. Nicholas at 120 Pleasant Street. We have also
received certification from the tax collector that the taxes have been paid with no interest or penalties through
February 1, 2025.

We included by reference the 285 page Exhibit List comprehensively establishing the right to a real property tax
exemption for Egypt House. Some of these documents, such as our IRS Determination letter for St. Paul's and
our Group Ruling, also apply to St. Nicholas. You can download that PDF document here:

https://drive.proton.me/urls/GQ17CNY2V8#dvPqbgFvEMLg

Please note that the link will expire on Thursday.

It is my understanding that John Kelly has now returned from his Bahamanian vacation, so I think you can ask him
for permission before taking a look at St. Nicholas and Egypt House. It is troubling; however, that Mr. Kelly does
not allow staff members to exercise professional judgment which in your case includes being president of the
Middlesex County Assessors Association, Associate Assessor for both Beverly and Somerville, twenty-eight years
as Chief Assessor of Billerica and another three years as the Associate Assessor -- not to mention Interim Chief
Assessor of Concord and Leominster. I would have hoped Mr. Kelly would credit your experience more.

Given the extensive documentation on both properties, I do not see a reason why you would need to make a site
visit. But if you are a Catholic in good standing you are welcome to come and pray. Keep in mind that good
standing means that you have recently gone to confession, received a blessing from a priest to receive Holy
Communion, and have not otherwise violated the canons of the Church. Just let me know when you'd like to
come.

In the meantime please educate Mr. Provencher and Mr. Kelly on the caselaw surrounding the exemptions for
Clauses Third, Tenth and Eleventh so we can all put this chapter behind us. I've attached the relevant case
citations for your review in each of the addenda. It's just very clear.

Finally, please note that now that we have applied using form 1B3, and tomorrow is October 1, you have the
opportunity to abate the Church's remittances with interest as is required by law. In the alternative, if you decide
not to do that, then I will instruct counsel to go ahead and file additional actions as appropriate to enforce the law.

Just let us know what you would like to do

With great love in Christ,

Father Andrew

_____

Father Andrew Bushell
Protos (Executive Chairman)
St. Paul's Foundation
Shrine of St. Nicholas
120-124 Pleasant Street
Marblehead, MA 01945
(Please Note: St. Nicholas is still under construction.  Services are being held in the chapel at Egypt House, after the Holy Family's Flight to Egypt, at 12 Conant Rd. in the meanwhile)

On Friday, September 27th, 2024 at 2:22 PM, Richard Scanlon <ptr701@comcast.net> wrote:

Good afternoon Fr. Andrew,

I'm following up with you regarding our discussion during our meeting earlier this week about setting up an inspection date at the St Nicholas Shrine properties.  Thank you for offering to tour me around the properties.

Unfortunately, I have been unable to get a hold of John Kelley, as I wanted his input on these appeals prior to the inspection.  Apparently, he is on vacation in the Bahamas.  Where I work for him as Chair of the Board of Assessors and as I've got input from all other relevant parties, I am hesitant to set up an inspection date until I speak to him.   I will let you know when that occurs.

Furthermore, it is my understanding that the Town is on the verge of hiring a full time Asst Assessor.  The job has been offered, and he has apparently accepted it pending salary and benefit negotiations.  It is anticipated that he will start in mid to late October.  Since that is only a few weeks away, I thought it may be more productive to have both of us attend when you tour us around the St Nicholas properties. I'm glad to offer my input, but I think it would be the best course of action to wait and have the new Assessor attend. He will be the one working with you on these appeals into the future as my time as a Consultant for Marblehead will eventually finish.  Again, I would contact you to arrange for a date once he has started.

I look forward to touring the St Nicholas Shrine properties sometime in the near future.

Thank you,  Rich

Richard J Scanlon
Asst. Assessor Consultant
Town of Marblehead
978-821-7038 (cell)
ptr701@comcast.net (email)

---

**10.27 MB**   1 file attached

2024.09.30 Filemarked 1B3 Application.pdf  10.27 MB

## RE: ATB Nos. F-351238 and F-351239, Egypt House and Shrine of St. Nicholas v. Bd. of Assessors of Marblehead

| | |
|---|---|
| From | Tracey Stockton <ts@stpaulsfoundation.org> |
| To | Matt Provencher<matt@mtclawyers.com>, Adam J. Costa<adam@mtclawyers.com> |
| Date | Thursday, October 24th, 2024 at 1:57 PM |

Dear Matt:

Your email is troubling for the reasons I discuss hereinbelow. References to Rules in the first paragraph refer to the Massachusetts Rules of Professional Conduct.

As you can see from the attached correspondence between Richard Scanlon and Father Andrew*, you are making assertions that are not true. Perhaps you were mislead by your client, but Rule 4.1, "Truthfulness in Statements to Others," is intended to prohibit attorneys from making false statements; Rule 3.1 provides "[a]" lawyer shall not bring, continue, or defend a proceeding or assert or controvert any issue therein unless there is a basis in law and fact for doing so that is not frivolous;" and Rule 3.4, "Fairness to Opposing Party and Counsel," states "[a] lawyer shall not: . . . unlawfully obstruct another party's access to evidence or unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value." Cherry-picking one phrase out of context and concealing the entirety of the document — which disproves your construction (not to mention the additional email that evidences your interpretation to be false; *see, specifically,* Mr. Scanlon's appreciation of *Father Andrew's offer* to allow him to inspect the property). Your statements evidence your proclivity for misstating the facts. Not only did Fr. Andrew *not* deny a request for inspection; Father Andrew is the person *who offered* for Mr. Scanlon to perform an inspection in the first place — an offer he repeated multiple times; to which Mr. Scanlon hesitated, stating he needed to confer with his superior, Mr. Kelley. At that point, Father Andrew provided alternatives for Mr. Scanlon to enable a site visit at the property(ies).

Here are some relevant quotes from the correspondence:

     A. Email of September 27, 2024, 2:22 P.M.: Email from Richard Scanlon to Fr. Andrew, "Thank you for offering to tour me around the properties."

     B. Email of September 30, 2024, 10:33 A.M.: Email from Father Andrew to Richard Scanlon, "You're welcome to tour both of the buildings, but given that you already have photos and other documents perhaps it is not necessary."

     C. Email September 30, 2024, 6:03 P.M.: Email from Father Andrew to Richard Scanlon, "[i]t is my understanding that John Kelly[sic] has now returned from his Bahamanian vacation, so I think you can ask him for permission before taking a look at St. Nicholas and Egypt House. . .. Given the extensive documentation on both properties, I do not see a reason why you would need to make a site visit. But

if you are a Catholic in good standing you are welcome to come and pray."

As you are now able to see, there is no truth to your assertion: "Fr. Bushell wrote to Mr. Scanlon on September 30, denying a request for an inspection." Moreover, you flip causality. It was Fr. Andrew who offered, not Mr. Scanlon who made a request. The plain language of the correspondence provides Fr. Andrew offered the opportunity to inspect; then, when Mr. Scanlon expressed hesitation because of concerns about Mr. Kelley, Father Andrew pointed to other options: the wealth of photos and discovery already provided — important context, in view of the fact Mr. Scanlon is a retiree and only serving in Marblehead one day per week — Wednesdays. Father Andrew also followed up his email correspondence with phone calls to Mr. Scanlon on each of September 30, 2024, at 10:23 A.M.; October 10, 2024, at 1:03 P.M., and October 17, 2024, at 3:38 P.M. In sum, nothing you write about the interaction between the two (2) persons on this matter is accurate.

You additionally assert Fr. Andrew cites his own opinion of what it means to be a Catholic in good standing. The actual text to which you refer states, "[k]eep in mind that good standing means that you have recently gone to confession, received a blessing from a priest to receive Holy Communion, and have not otherwise violated the cannons of the Church." The foregoing is *not* Fr. Andrew's opinion. The quoted text is literally the definition of what it means to be in good standing in either the Orthodox Catholic or Roman Catholic communions as defined by canon law. You may not be aware, but it is a condition precedent among some monastics for participation in Orthodox church services. Fr. Andrew studied canon law at the Pontifical Gregorian University at the Vatican. You were either attempting to cast aspersions on the religious beliefs and practices of the Roman Catholic and Orthodox Catholic churches or you were expressing your opinion about its practices, either of which is wrong.

Relative to your statement, "[a]s you know, the Town has a right to conduct inspections on the properties at issue in your 2 ATB appeals . . .." I actually do not know that. It is my understanding this is a matter before the ATB *de novo;* the ATB is the trier of fact — as Commissioner DeFrancisco stated during our last hearing. Just to confirm I am not mistaken in this understanding, I reread the Rules of the ATB at 831 CMR 1.00, *et. seq.,* and no where in the section on discovery, nor anywhere else, does it state a counterparty possesses the right to inspect based on an ATB appeal, despite the fact the rules of discovery are laid out very specifically within the published Rules.

Based on our exchange of this morning, I am going to reconsider Father Andrew's offer to Mr. Scanlon, made in kindness. What is again made abundantly clear to me is you and/or your client are making untrue statements about Father Andrew, St. Nicholas, Egypt House, me, and the law. These behaviors must stop.

With sincerity,
Tracey M.A. Stockton

- Father Andrew is a monastic; therefore, his correct address is Father Andrew. It is not Father Bushell, Mr. Bushell, or Andrew.

---

Tracey M.A. Stockton

General Counsel

St. Paul's Foundation

124 Pleasant Street

Marblehead, Massachusetts   01945

617.800.3979


On Thursday, October 24th, 2024 at 10:54 AM, Matt Provencher <matt@mtclawyers.com> wrote:

Tracey,


With respect to an inspection, Fr. Bushell wrote to Mr. Scanlon on September 30, denying a request for an inspection, stating that it was unnecessary due to other documentation and indicating that Mr. Scanlon could come to the property and pray provided that he was a Catholic in good standing in Fr. Bushell's opinion. As you know, the Town has a right to conduct inspections on the properties at issue in your two ATB appeals, 12 Conant Road and 120 Pleasant Street irrespective of Fr. Bushell's position on these stated issues.


As you are willing to permit an inspection, please let me know what dates would work for you and your client as requested. If you are objecting to the presence of any specific personnel, please advise me of who your objection is to, and the basis for that objection.


Thanks,


Matt Provencher




Matthew D. Provencher

Mead, Talerman & Costa, LLC

227 Union Street, Suite 610 · New Bedford, Massachusetts · 02740

Phone (774) 206-6857

matt@mtclawyers.com · www.mtclawyers.com

**PLEASE NOTE: IF YOU RECEIVE AN EMAIL OR ANY OTHER COMMUNICATION THAT APPEARS TO BE GENERATED FROM OUR OFFICE, CONTAINING NEW, REVISED, OR ALTERED BANK WIRE INSTRUCTIONS, CONSIDER IT SUSPECT, AND CALL OUR OFFICE AT A NUMBER YOU TRUST. OUR BANK WIRE INSTRUCTIONS <u>VERY</u> SELDOM CHANGE.**

The information contained herein is confidential and may be protected by the attorney-client and/or other applicable privilege(s). It is intended only for the named recipient(s). If you are neither an intended recipient nor a person responsible for delivery to a recipient, you are hereby notified that any unauthorized use, dissemination, distribution or reproduction of the contents hereof is strictly prohibited and may be unlawful.

If you have received the above transmittal in error, please delete the message and any attachment(s) hereto from your e-mail system and notify us immediately.

 Think before you print.

*Please consider the environment before printing this email.* 

---

**From:** Tracey M.A. Stockton <ts@stpaulsfoundation.org>
**Sent:** Thursday, October 24, 2024 10:48 AM
**To:** Matt Provencher <matt@mtclawyers.com>
**Cc:** Adam J. Costa <adam@mtclawyers.com>
**Subject:** Re: ATB Nos. F-351238 and F-351239, Egypt House and Shrine of St. Nicholas v. Bd. of Assessors of Marblehead

Hello,

I confirm receipt of discovery requests relative to these matters.

With respect to inspections, Mr. Scanlon wrote to Father Andrew some weeks ago. Father has not heard back. Mr. Scanlon is free to contact Father Andrew directly. I understand Todd Laramie may be the Assistant Assessor. In this event, Mr. Laramie is welcome to join Mr. Scanlon and Father. Father has not heard from Mr. Scanlon since his last email to him on September 30. Provided the assessing personnel performing the site visits are licensed and certificated, as provided at law, Mr. Scanlon is welcome to view the properties with Father.

Thank you.

Sincerely,

Tracey M.A. Stockton

_____

Tracey M.A. Stockton

General Counsel

St. Paul's Foundation

124 Pleasant Street

Marblehead, Massachusetts   01945

617.800.3979

On Monday, October 21st, 2024 at 5:00 PM, Matt Provencher <matt@mtclawyers.com> wrote:

> Tracey,
>
> Please find attached discovery requests in the two above-referenced ATB matters, propounded to your clients Egypt House and the Shrine of St. Nicholas. I have attached these documents in both Word and PDF format.
>
> I would also like to coordinate inspections of the two properties. Please let me know of available dates for inspections of both properties, and I will confer with my client to select a mutually agreeable date.
>
> If you would like to discuss please feel free to call me.
>
> Thanks,
>
> Matt Provencher
>
> Matthew D. Provencher



Mead, Talerman & Costa, LLC

227 Union Street, Suite 610 · New Bedford, Massachusetts · 02740

Phone (774) 206-6857

matt@mtclawyers.com · www.mtclawyers.com

**PLEASE NOTE: IF YOU RECEIVE AN EMAIL OR ANY OTHER COMMUNICATION THAT APPEARS TO BE GENERATED FROM OUR OFFICE, CONTAINING NEW, REVISED, OR ALTERED BANK WIRE INSTRUCTIONS, CONSIDER IT SUSPECT, AND CALL OUR OFFICE AT A NUMBER YOU TRUST. OUR BANK WIRE INSTRUCTIONS <u>VERY</u> SELDOM CHANGE.**

The information contained herein is confidential and may be protected by the attorney-client and/or other applicable privilege(s). It is intended only for the named recipient(s). If you are neither an intended recipient nor a person responsible for delivery to a recipient, you are hereby notified that any unauthorized use, dissemination, distribution or reproduction of the contents hereof is strictly prohibited and may be unlawful.

If you have received the above transmittal in error, please delete the message and any attachment(s) hereto from your e-mail system and notify us immediately.

🌳 Think before you print.

*Please consider the environment before printing this email.* 

---

**1.82 MB**   1 file attached   4 embedded images

| image006.png 5.22 KB | image010.jpg 2.17 KB | image011.png 6.39 KB | image012.jpg 2.16 KB |

10.24.24 Attachments .pdf 1.80 MB

## RE: ATB Nos. F-351238 and F-351239, Egypt House and Shrine of St. Nicholas v. Bd. of Assessors of Marblehead

| | |
|---|---|
| From | Matt Provencher <matt@mtclawyers.com> |
| To | Tracey Stockton<ts@stpaulsfoundation.org> |
| CC | Adam J. Costa<adam@mtclawyers.com> |
| Date | Thursday, October 24th, 2024 at 10:54 AM |

Tracey,

With respect to an inspection, Fr. Bushell wrote to Mr. Scanlon on September 30, denying a request for an inspection, stating that it was unnecessary due to other documentation and indicating that Mr. Scanlon could come to the property and pray provided that he was a Catholic in good standing in Fr. Bushell's opinion. As you know, the Town has a right to conduct inspections on the properties at issue in your two ATB appeals, 12 Conant Road and 120 Pleasant Street irrespective of Fr. Bushell's position on these stated issues.

As you are willing to permit an inspection, please let me know what dates would work for you and your client as requested. If you are objecting to the presence of any specific personnel, please advise me of who your objection is to, and the basis for that objection.

Thanks,

Matt Provencher

 Matthew D. Provencher

Mead, Talerman & Costa, LLC

227 Union Street, Suite 610 · New Bedford, Massachusetts · 02740

Phone (774) 206-6857

matt@mtclawyers.com · www.mtclawyers.com

**PLEASE NOTE: IF YOU RECEIVE AN EMAIL OR ANY OTHER COMMUNICATION THAT APPEARS TO BE GENERATED FROM OUR OFFICE, CONTAINING NEW, REVISED, OR ALTERED BANK WIRE INSTRUCTIONS, CONSIDER IT SUSPECT, AND CALL OUR OFFICE AT A NUMBER YOU TRUST. OUR BANK WIRE INSTRUCTIONS <u>VERY</u> SELDOM CHANGE.**

The information contained herein is confidential and may be protected by the attorney-client and/or other applicable privilege(s). It is intended only for the named recipient(s). If you are neither an intended recipient nor a person responsible for delivery to a recipient, you are hereby notified that any unauthorized use, dissemination, distribution or reproduction of the contents hereof is strictly prohibited and may be unlawful.

If you have received the above transmittal in error, please delete the message and any attachment(s) hereto from your e-mail system and notify us immediately.

 Think before you print.

*Please consider the environment before printing this email.* 

---

**From:** Tracey M.A. Stockton <ts@stpaulsfoundation.org>
**Sent:** Thursday, October 24, 2024 10:48 AM
**To:** Matt Provencher <matt@mtclawyers.com>
**Cc:** Adam J. Costa <adam@mtclawyers.com>
**Subject:** Re: ATB Nos. F-351238 and F-351239, Egypt House and Shrine of St. Nicholas v. Bd. of Assessors of Marblehead

Hello,

I confirm receipt of discovery requests relative to these matters.

With respect to inspections, Mr. Scanlon wrote to Father Andrew some weeks ago. Father has not heard back. Mr. Scanlon is free to contact Father Andrew directly. I understand Todd Laramie may be the Assistant Assessor. In this event, Mr. Laramie is welcome to join Mr. Scanlon and Father. Father has not heard from Mr. Scanlon since his last email to him on September 30. Provided the assessing personnel performing the site visits are licensed and certificated, as provided at law, Mr. Scanlon is welcome to view the properties with Father.

Thank you.

Sincerely,

Tracey M.A. Stockton

_____

Tracey M.A. Stockton

General Counsel

St. Paul's Foundation

124 Pleasant Street

Marblehead, Massachusetts   01945

617.800.3979


On Monday, October 21st, 2024 at 5:00 PM, Matt Provencher <matt@mtclawyers.com> wrote:

> Tracey,
>
> Please find attached discovery requests in the two above-referenced ATB matters, propounded to your clients Egypt House and the Shrine of St. Nicholas. I have attached these documents in both Word and PDF format.
>
> I would also like to coordinate inspections of the two properties. Please let me know of available dates for inspections of both properties, and I will confer with my client to select a mutually agreeable date.
>
> If you would like to discuss please feel free to call me.
>
> Thanks,
>
> Matt Provencher
>
>  Matthew D. Provencher
>
> Mead, Talerman & Costa, LLC

 227 Union Street, Suite 610 · New Bedford, Massachusetts · 02740

Phone (774) 206-6857

matt@mtclawyers.com · www.mtclawyers.com

**PLEASE NOTE:  IF YOU RECEIVE AN EMAIL OR ANY OTHER COMMUNICATION THAT APPEARS TO BE GENERATED FROM OUR OFFICE, CONTAINING NEW, REVISED, OR ALTERED BANK WIRE INSTRUCTIONS, CONSIDER IT SUSPECT, AND CALL OUR OFFICE AT A NUMBER YOU TRUST.  OUR BANK WIRE INSTRUCTIONS <u>VERY</u> SELDOM CHANGE.**

The information contained herein is confidential and may be protected by the attorney-client and/or other applicable privilege(s).  It is intended only for the named recipient(s).  If you are neither an intended recipient nor a person responsible for delivery to a recipient, you are hereby notified that any unauthorized use, dissemination, distribution or reproduction of the contents hereof is strictly prohibited and may be unlawful.

If you have received the above transmittal in error, please delete the message and any attachment(s) hereto from your e-mail system and notify us immediately.

🌳 Think before you print.        *Please consider the environment before printing this email.* 

---

**36.50 KB**   4 files attached   4 embedded images

| image001.png 5.60 KB | image003.jpg 7.57 KB | image005.png 5.22 KB | image008.jpg 2.17 KB |

| image006.png 5.22 KB | image010.jpg 2.17 KB | image011.png 6.39 KB | image012.jpg 2.16 KB |

EXHIBIT M

*See,* attached.

THE COMMONWEALTH OF MASSACHUSETTS
APPELLATE TAX BOARD

| | | |
|---|---|---|
| SHRINE OF ST. NICHOLAS, | ) | DOCKET NO.:  F-351239 |
| Appellant | ) | |
| | ) | |
| EGYPT HOUSE, | ) | DOCKET NO.:  F-351238 |
| Appellant | ) | |
| v. | ) | |
| | ) | |
| BOARD OF ASSESSORS OF THE TOWN | ) | |
| OF MARBLEHEAD, | | |
| Appellee | | |

## <u>AFFIDAVIT OF CHIEF JASON R. GILLILAND</u>

I, Jason R. Gilliland, being duly sworn, on oath depose and state as follows:

1.      I am the Fire Chief in and for the Town of Marblehead.

2.      I am also a member of the parish council of Our Lady Star of the Sea, the Roman Catholic parish in Marblehead and a Roman Catholic in good standing.

3.      I make this affidavit of my personal knowledge, except those statements made upon information and belief.  Those statements are made on information of which I am aware and which I believe to be true.

4.      On December 13, 2023, at 11:00 a.m., in my capacity as Fire Chief for the Town of Marblehead, I accompanied Thatcher Kezer III, the Town Administrator, to a meeting at Egypt House, located at 12 Conant Road, Marblehead, Massachusetts.

5.      During the December 13, 2023 visit, I noted Egypt House was a modest residence to be similar to that of a rectory.

6.      The first floor of Egypt House includes a chapel which contains altars and a lectern. The chapel area was similar to what one would see in a Catholic church's residence for a religious community.

7.      Egypt House' chapel also contains many holy icons throughout the first floor.

8.      Egypt House' chapel also contains a number of reliquaries that Father Andrew displayed to me carved of Mammoth tusks and set with gold and gemstones.

9.      The dining area contains a large conference-style table, suited to meetings.

10.      On numerous occasions over the entire seven (7) year period the Shrine of St. Nicholas has been under construction, I have been the Fire Chief and I have personally paid site visits to St. Nicholas' properties located at 120 and 124 Pleasant Street including based on complaints when he was roasting lamb for the Feast of the Assumption of the Blessed Virgin Mary.

11.      Based on my review of actual architect stamped building plans also approved by the Marblehead Building Commissioner and personal observations I know St. Nicholas' building at 124 Pleasant Street contains or will contain a chapel, refectory, workshop and pilgrims' guesthouses.

12.      Based on my review of actual architect stamped building plans also approved by the Marblehead Building Commissioner and personal observations, I know 120 Pleasant Street contains or will contain rooms for religious education, administrative offices, clergy housing, an outdoor immersion baptistry and a transformer and remote metering system for electrical service for 124 Pleasant Street.

13.      Based on my review of actual architect stamped building plans also approved by the Marblehead Building Commissioner, personal observations, and meetings with Town of

Marblehead building officials and Father Andrew and his architect I know both 124 and 120 Pleasant Street operate together as one property. They share and use the outdoor garden and the occupancy for the outdoor garden is based on the toilet fixture count for both of the buildings.

14.     Based on my review of actual architect stamped building plans also approved by the Marblehead Building Commissioner and personal observations, I know both 120 and 124 Pleasant Street share the same outdoor garden area dedicated to the Virgin Mary where outdoor services are to be held and the occupancy of the garden for services was discussed with the Fire Department and approved by the Fire Department for the Town of Marblehead. This would also be consistent with Father Andrew's past outdoor religious celebrations which I was required to observe by former Town Administrator Jason Silva.

15.     There is a pad mounted transformer and remote meter wall at 120 Pleasant Street and underground electrical conduits which service the electrical needs for 124 Pleasant Street.

16.     I have reviewed plans and specifications for fire and safety relative to the construction on-going at the site. The Fire Department reviews all building plans in the Town of Marblehead.

17.     I have participated in meetings with various Building Commissioner(s) possessing responsibility for construction within the Town of Marblehead and relative to St. Nicholas. I have also participated in at least one hearing of the Building Code Appeals Board relative to St. Nicholas.

18.     I sent my Fire Inspection officer, Captain Gregg McLaughlin, to a meeting with the Marblehead Chief of Police, Building Commissioner, and St. Nicholas' architect Eric Parkes relative to the occupancy of St. Nicholas' buildings at 120 and 124 Pleasant Street where all agreed the use and occupancy was intended to be religious and has been under construction or

going through permitting litigation for that religious purpose since 2018 for 124 Pleasant Street or 2021 for 120 Pleasant Street when the building permits were first issued.

19.     On August 28, 2024, I was at a meeting of the Select Board of Marblehead where the Board voted an occupancy of both of St. Nicholas' properties which is dependent on an A-3 use and occupancy designation which means they are classified as religious properties.

20.     At the August 28, 2024 meeting, Dan Fox, one member of the Select Board asked about parking and Father Andrew responded that the parking requirements were similar to the other houses of worship in Marblehead, which was that parking was not required for houses of worship in Marblehead, and Mr. Fox agreed and said he was simply asking if Father Andrew had thought about it.

21.     Meetings of the Select Board of Marblehead are videotaped and available for viewing by the public.

22.     It has been my understanding from these meetings that the use for both properties is religious, that they related to each other, that they are mutually supportive of the same, single, religious mission, and that they are in the process of being developed according to their plans.

     **Signed under the pains and penalties of perjury this ___ day of October, 2024.**


_____
            Jason R. Gilliland

## THE COMMONWEALTH OF MASSACHUSETTS
## APPELLATE TAX BOARD

| | | |
|---|---|---|
| SHRINE OF ST. NICHOLAS, | ) | DOCKET NO.: F-351239 |
| Appellant | ) | |
| | ) | |
| EGYPT HOUSE, | ) | DOCKET NO.: F-351238 |
| Appellant | ) | |
| v. | ) | |
| | ) | |
| BOARD OF ASSESSORS OF THE TOWN | ) | |
| OF MARBLEHEAD, | | |
|     Appellee | | |

### <u>AFFIDAVIT OF BUILDING COMMISSIONER STEPHEN CUMMINGS</u>

I, Stephen Cummings, being duly sworn, on oath depose and state as follows:

1.      I make this affidavit of my personal knowledge, except those statements made upon information and belief.  Those statements are made on information of which I am aware and which I believe to be true.

2.      I am the Building Commissioner for the Town of Marblehead.  I am also the Building Commissioner for the Town of Swampscott.

3.      I have over 25 years of experience in the construction industry.

4.      I succeeded Robert Ives in November 2023, Mr. Ives briefly served as interim Building Commissioner after John Albright was forced to resign as Building Commissioner for Marblehead in July 2023.

5.      I have reviewed the construction plans for the buildings owned by the Shrine of St. Nicholas ("St. Nicholas") at 120 and 124 Pleasant Street on more than one occasion.

6.      I have spoken with Eric Parkes, the registered architect for St. Nicholas on more than one occasion.

7.      Based on my review of actual architect stamped building plans also approved by the previous Marblehead Building Commissioner and personal observations I know St. Nicholas' building at 124 Pleasant Street contains or will contain a chapel, refectory, workshop and pilgrims' guesthouses.

8.      Based on my review of actual architect stamped building plans also approved by the previous Marblehead Building Commissioner and personal observations, I know 120 Pleasant Street contains or will contain rooms for religious education, administrative offices, clergy housing, an outdoor immersion baptistry and a transformer and remote metering system for electrical service for 124 Pleasant Street provided by conduits across the rear of the garden of the property of 120 Pleasant Street.

9.      Based on my review of actual architect stamped building plans also approved by the previous Marblehead Building Commissioner, personal observations, and meetings with Town of Marblehead building officials and Father Andrew and his architect I know both 124 and 120 Pleasant Street operate together as one property.  They share and use the outdoor garden and the occupancy for the outdoor garden is based on the toilet fixture count for both buildings.

10.     Based on my review of actual architect stamped building plans also approved by the Marblehead Building Commissioner, I have determined the use of both 120 Pleasant Street and 124 Pleasant Street is that of a house of worship under the Building Code, which is A-3 in the International Building Code as amended and A-4 in the Plumbing Code as amended.

11.     Based on my review of actual architect stamped building plans also approved by the Marblehead Building Commissioner and personal observations, I know both 120 and 124 Pleasant Street share the same outdoor garden area dedicated to the Virgin Mary where outdoor services are to be held and the occupancy of the garden for services was discussed at a meeting

with me, the Fire Department Fire Inspector, the Police Chief, St. Nicholas' architect and Father Andrew.

12.    There is a pad mounted transformer and remote meter wall at 120 Pleasant Street and underground electrical conduits which service the electrical needs for 124 Pleasant Street.

13.    I have participated in meetings with various officials within the Town of Marblehead and relative to St. Nicholas.

14.    I know from my work as a Building Commissioner that during the last four years since COVID-19 there have been supply chain problems sourcing construction materials such as transformers, electrical meter panels, and delays in scheduling installation of geothermal heat pump systems.  All of these delays have delayed progress at St. Nicholas.

15.    St. Nicholas has completely rewired both buildings and brought in new electrical transmission from a different part of the property (the other side), the new electrical system includes brand new transmission from brand new transformers including a pad mounted transformer which was paid for in January 2022, but not installed by MMLD until July 2024.  I know this was a source of frustration for Father Andrew.

16.    It is also true that Father Andrew had ordered triple glazed windows for St. Nicholas from a factory in Ukraine and Poland whose shipment was delayed, further delaying construction.

17.    In November 2023 I received affidavits from St. Nicholas' architect Eric Parkes and general contractor MCR Construction stating that construction at St. Nicholas' buildings had not lapsed.  I found these affidavits credible. I reversed a determination made by local building Inspector Roger Ennis, reissued the building permits, and waived the fees.  As a result, St. Nicholas moved to dismiss an appeal of this determination by Roger Ennis that was approved by

Robert Ives before the Building Code Appeals Board after I assured them that dismissing their appeal would have no negative impact on their rights.

18.     On August 28, 2024, the Select Board of Marblehead voted an occupancy of both of St. Nicholas' properties which is dependent on an A-3 use and occupancy designation which means they are classified as religious properties and they did so based on my analysis of the use of the properties.

19.     Meetings of the Select Board of Marblehead are videotaped and available for viewing by the public.

20.     It has been my understanding from these meetings that the use for both properties is religious, that they related to each other, that they are mutually supportive of the same, single, religious mission, and that they are in the process of being developed according to their plans.

**Signed under the pains and penalties of perjury this ___ day of October, 2024.**

_____
Stephen Cummings

## THE COMMONWEALTH OF MASSACHUSETTS
## APPELLATE TAX BOARD

SHRINE OF ST. NICHOLAS,      )     DOCKET NO.:  F-351239
Appellant                  )
                          )
EGYPT HOUSE,           )     DOCKET NO.:  F-351238
Appellant                  )
v.                     )
                          )
BOARD OF ASSESSORS OF THE TOWN  )
OF MARBLEHEAD,
      Appellee

### <u>AFFIDAVIT OF TOWN ADMINISTRATOR THATCHER KEZER III</u>

I, Thatcher Kezer III, being duly sworn, on oath depose and state as follows:

1.      I am the Town Administrator for the Town of Marblehead.

2.      I was raised Roman Catholic and my wife is Orthodox Catholic (colloquially "Greek Orthodox").

3.      I make this affidavit of my personal knowledge, except those statements made upon information and belief.  Those statements are made on information of which I am aware and which I believe to be true.

4.      On December 13, 2023, at 11:00 a.m., in my capacity as Town Administrator, I came to a meeting at Egypt House, located at 12 Conant Road, Marblehead, Massachusetts, Jason R. Gilliland, Fire Chief for the Town of Marblehead, accompanied me.

5.      During the December 13, 2023 visit, I noted Egypt House was a modest residence to be similar to that of a rectory.

6.    The first floor of Egypt House includes a chapel which contains altars and a lectern. The chapel area was similar to what one would see in a Catholic church's residence for a religious community.

7.    Egypt House' chapel also contains many holy icons throughout the first floor similar to what I have seen in Orthodox Catholic (colloquially "Greek Orthodox") churches.

8.    Egypt House' chapel also contains a number of reliquaries that Father Andrew displayed to me carved of Mammoth tusks and set with gold and gemstones.

9.    The dining area contains a large conference-style table, suited to meetings.

10.    On at least two occasions over the approximately (2) year period I have been Town Administrator, I have personally paid site visits to St. Nicholas' properties located at 120 and 124 Pleasant Street. The first time also included Rabbi David Meyer from Temple Emanu-el and Monsignor Timothy Moran from Our Lady Star of the Sea.  Rabbi Meyer was the convenor for the local Marblehead Ministerial Association.

11.    I am aware that Father Andrew had to hire a building code consulting firm to explain to former Town of Marblehead Building Commissioner John Albright that a sprinkler system was not required.

12.    Former Town of Marblehead Building Commissioner John Albright was forced to resign because he never took the licensure examinations required for the office of Building Commissioner.

13.    I have had conversations with Father Andrew and Amy McHugh, the director of the Highway Department and the Water and Sewer Commission regarding removal of concrete that the Town of Marblehead's contactors poured across the front of both St. Nicholas properties and the installation of an accessible ramp for 120 Pleasant Street.  The Town of Marblehead has

not yet removed the concrete for the ramp installation or reinstalled the surveyor's magnetic pins which were removed marking the border between Town land and St. Nicholas' land.

14.     I have had several conversations with Father Andrew about his frustration regarding the time it took to receive the pad mounted transformer for both properties from the Marblehead Municipal Light Department.

15.     I have also reviewed the property line between St. Nicholas' property at 120 Pleasant Street and the Town's municipal parking lot.  Father Andrew has been renovating the border between the two properties which includes a large pad mounted transformer and a remote metering system including conduits to serve the electrical needs of St. Nicholas' building at 124 Pleasant Street.

16.     On August 28, 2024, I was at a meeting of the Select Board of Marblehead where the Board voted an occupancy of both of St. Nicholas' properties which is dependent on an A-3 use and occupancy designation which means they are classified as religious properties.

17.     Prior to the August 28, 2024 meeting of the Select Board I spoke with the Town Building Commissioner Stephen Cummings about St. Nicholas' properties and the status of the construction.

18.     At the August 28, 2024 meeting, Dan Fox, one member of the Select Board asked about parking and Father Andrew responded that the parking requirements were similar to the other houses of worship in Marblehead, which was that parking was not required for houses of worship in Marblehead, and Mr. Fox agreed and said he was simply asking if Father Andrew had thought about it.

19.     Meetings of the Select Board of Marblehead are videotaped and available for viewing by the public.

20.     It has been my understanding from these meetings that the use for both properties

is religious, that they related to each other, that they are mutually supportive of the same, single,

religious mission, and that they are in the process of being developed according to their plans.

**Signed under the pains and penalties of perjury this ___ day of October, 2024.**


_____
                        Thatcher Kezer III

EXHIBIT N

*See,* attached.



# THE COMMONWEALTH OF MASSACHUSETTS
## *Appellate Tax Board*
*100 Cambridge Street, Suite 200*
*Boston, Massachusetts 02114*

**Docket No. F351238**

**EGYPT HOUSE**

**Appellant.**

**v.**

**BOARD OF ASSESSORS OF THE TOWN OF MARBLEHEAD,**

**Appellee.**

## ORDER

After review of the appellant's Motion for Summary Judgement ("Motion") and accompanying memorandum, the Motion is denied. The Motion and memorandum make clear that there are genuine issues of material fact that can only be determined after an evidentiary hearing. The hearing remains scheduled for February 4, 2025.

**ORDERED ACCORDINGLY**

**APPELLATE TAX BOARD**

**By:** /s/ *Mark J. DeFrancisco*

**Mark J. DeFrancisco, Chairman**

**Attest:** /s/ *William J. Doherty*

**Clerk of the Board**

**Date: October 31, 2024**

EXHIBIT O

*See,* attached.



# THE COMMONWEALTH OF MASSACHUSETTS
## *Appellate Tax Board*
*100 Cambridge Street, Suite 200*
*Boston, Massachusetts 02114*

**Docket No. F351238**

**EGYPT HOUSE,**
**Appellant.**

**v.**

**BOARD OF ASSESSORS OF THE TOWN OF MARBLEHEAD,**
**Appellee.**

## ORDER

After consideration of the appellee's Motion to Compel Inspection ("Motion"), the appellant's opposition to the Motion, and the arguments advanced at the December 12, 2024, hearing of the Motion, the Board rules as follows:

- The Motion is allowed;

- In accordance with G.L. c. 58A, § 8A, the assessors and any attorneys, experts, or other agents may participate in the inspection of the subject properties, including the interiors of the subject properties;

- The assessors shall provide the appellants with a list of those who will be participating in the inspection on behalf of the assessors no later than two days prior to the inspection;

- On the Board's own motion, the Chairman will conduct a view of the subject properties in conjunction with the inspection;

- The assessors are permitted to photograph the interiors of the subject properties without limitation. To the extent that any disagreement should arise concerning photographs during the inspection, the Chairman will resolve the dispute;

- The assessors shall contact the appellants to agree on two dates and times for the inspection and provide the Board with those dates. The Board will then confirm the date of the inspection and view.

**ORDERED ACCORDINGLY**

**APPELLATE TAX BOARD**

**By:** /s/ *Mark J. DeFrancisco*
                **Mark J. DeFrancisco, Chairman**

**Attest:** /s/ *William J. Doherty*
                **Clerk of the Board**

**Date: January 7, 2025**

EXHIBIT P

*See,* attached.



### THE COMMONWEALTH OF MASSACHUSETTS
### Appellate Tax Board
*100 Cambridge Street*
*Suite 200*
*Boston, Massachusetts 02114*

**Docket Nos. F351238, F351239**

**EGYPT HOUSE**
**&**
**SHRINE OF ST. NICHOLAS THE WONDERWORKER ET AL,**
**Appellants.**

**v.**

**BOARD OF ASSESSORS OF THE TOWN OF MARBLEHEAD,**
**Appellee.**

### ORDER

After consideration of the appellant's Motion for Leave to Depose ("Motion"), the appellee's Opposition to the Motion, and the arguments advanced at the January 16, 2025 hearing of the Motion, the Board rules that the Motion is denied.

After consideration of the appellant's Motion For Reconsideration ("Reconsideration Motion"), the assessors' Motion to Compel Inspection or Dismiss ("Compel Motion"), and the appellant's opposition to the Compel Motion, the Board orders the following:

- The Reconsideration Motion is denied without a hearing;

- The Compel Motion is allowed without a hearing. In the event that the Board is not provided with dates for the inspection as set forth in the Board's January 7, 2025 Order on or before January 23, 2025, a hearing will be held on Monday January 27, 2025, at 10:30 a.m. via Zoom, on the issue of whether the appeal should be dismissed for failure of the appellant to comply with the Board's January 7, 2025 Order.

**ORDERED ACCORDINGLY**

**APPELLATE TAX BOARD**

By: */s/ Mark J. DeFrancisco*
**Mark J. DeFrancisco, Chairman**

Attest: */s/ William J. Doherty*
**Clerk of the Board**

**Date: January 21, 2025**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPREME JUDICIAL COURT
                                      FOR SUFFOLK COUNTY
                                      SJ-2025-0035

                                      Appellate Tax Board
                                      No. F-351238


**EGYPT HOUSE**

**v.**

**BOARD OF ASSESSORS OF THE TOWN OF MARBLEHEAD**


**<u>JUDGMENT</u>**

Before the court is an "Emergency Motion for Preliminary Injunction" filed by Egypt House, styled as "appellant."  The filing, on which Egypt House was represented by counsel and which is not accompanied by a complaint stating a claim for relief, relates to a matter currently pending before the Appellate Tax Board (ATB) between Egypt House and the Board of Assessors of the Town of Marblehead (Marblehead) concerning the denial of request for an abatement of local property taxes.  Egypt House seeks an injunction from this court restraining the ATB from allowing an inspection of Egypt House's property pursuant to G. L. c. 58A, § 8A.  Among other materials appended to the request is a January 7, 2025 order of the ATB granting Marblehead's motion to compel inspection of the premises, subject to various conditions ordered by the ATB.

The motion seeks to invoke Supreme Judicial Court Rule 2:20, which provides that "[i]nterlocutory matters arising in appeals from the decisions of the Appellate Tax Board and questions of final disposition thereof when further proceedings appear unnecessary may be presented to a single justice, who may after notice hear and determine the same both as to questions of law and of fact or reserve and report the case."  This rule is not applicable in the circumstances presented, because there has been no purported "appeal[] from" a final decision of the ATB.  Moreover, Egypt House has not identified any authority establishing a right of appeal from an interlocutory order of the ATB.[1]

Upon consideration of the motion filed by Egypt House and materials appended thereto, the opposition, and Egypt House's reply, the motion is **DENIED**.

By the Court, (Dewar, J.)

Allison S. Cartwright, Clerk

Dated: February 20, 2025

---

[1] Nor is relief available to appellant under G. L. c. 211, § 3, because the ATB is not a "court[] of inferior jurisdiction" but instead an agency of the executive branch.

**THE COMMONWEALTH OF MASSACHUSETTS**
**APPELLATE TAX BOARD**

|  |  |  |
|---|---|---|
| EGYPT HOUSE, | ) | DOCKET NO.: F-351238 |
|     Appellant, | ) | DOCKET NO.: F-351239 |
| SHRIINE OF ST. NICHOLAS, | ) | |
|     Appellant, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | |
| BOARD OF ASSESSORS OF THE TOWN | ) | |
| OF MARBLEHEAD, | ) | |
|     Appellee. | ) | |

**APPELLANTS' MOTION TO SEVER**

This is Motion to Sever of Appellants Egypt House ("Egypt House") and Shrine of St.

Nicholas the Wonderworker ("St. Nicholas") (this "Motion"). In support hereof, Appellants

submit as follows:

1.     St. Nicholas is greatly prejudiced by the Order of the Appellate Tax Board (the

"ATB") dated February 20, 2025.

2.     Evaluation of the multifarious claims at issue in the Joined Dockets penalizes St.

Nicholas gratuitously.

3.     Docket No. F-351238 can be inspected and the hearing on the matter concluded

imminently. There is no reason for further delay.

4.     Appellants did not move the ATB to join the matters currently pending before the

ATB under Docket Nos.: F-351238 and F-351239 (collectively, the "Joined Dockets").

5.     ALM R. Civ. P. Rule 18, at sub-section (a), provides as follows:

Joinder of Claims. A party asserting a claim to relief as an original claim,
counterclaim, cross-claim, or third party claim, may join, either as independent or

as alternate claims, as many claims, legal or equitable, or both, as he has against
an opposing party. ALM R. Civ. P. Rule 18.

According to the foregoing Rule, it appears to be within the domain of the plaintiff, or appellant

in this instance, to make such request.

6.      ALM R. Civ. P. Rule 21 provides as follows:

Misjoinder of parties is not ground for dismissal of an action. Parties may be
dropped or added by order of the court on motion of any party or of its own
initiative, after hearing, at any stage of the action and *on such terms as are just*.
Any claim against a party may be severed and proceeded with separately.
[Emphasis added.] ALM R. Civ. P. Rule 21.

Joinder of the Joined Dockets is *not just*, as it unduly prejudices St. Nicholas.

7.      Upon filing each separate matter comprising the Joined Dockets, Appellants

moved the ATB to grant a speedy hearing in each matter. Neither motion was granted.

8.      The ATB ordered the joinder of the Joined Dockets under the theory of "judicial

economy." Judicial economy is not advanced by the subject joinder, as the facts giving rise to

Docket No.: F-351238 and Docket No.: F-351239 will require separate treatment and analysis.

9.      The Appellants in each of the Joined Dockets are distinct and separate legal

entities. The facts giving rise to each of the Joined Dockets are distinct and separate and bear no

relationship to one another.

10.      Joining the Joined Dockets is prejudicial to St. Nicholas, as the joinder needlessly

delays a final hearing on Docket No.: F-351239, while the dispute between the ATB, Appellee,

and Egypt House is resolved.

11.      Various Courts within The Commonwealth have opined on the use of joinder and

severance in numerous contexts, to-wit:

(a)    In *Commonwealth v. Tradition (North Am.) Inc.,* 91 Mass. App. Ct. 63

(2017), "[m]isjoinder of parties is not ground for dismissal of an action. … Any claim against a

party may be severed and proceeded with separately."

(b)    In *Roddy & McNulty Ins. Agency, Inc. v. A.A. Proctor & Co.,* 16 Mass.

App. Ct. 525 (1983):

> The precise basis for the judge's order separating the claims is not clear. While
> labelling his order an order of severance, the judge may have been acting pursuant
> to Mass.R.Civ.P. 42(b), which permits the separate trial of any claim "in
> furtherance of convenience or to avoid prejudice, or when separate trials will be
> conducive to expedition and economy," rather than the last sentence of
> Mass.R.Civ.P. 21, which permits "[a]ny claim against a party [to be] severed and
> proceeded with separately." Although the two rules appear to confer similar
> authority, the language of rule 21 dealing  with severance was inserted by the
> drafters of the civil rules in the context of provisions addressing misjoinder of
> parties. This suggests that severance under rule 21 may be principally directed to
> the separation of claims within multiclaim litigation because *of the peculiar
> relationship or status of parties with respect to particular claims.* [Emphasis
> added.] *See generally*, Smith & Zobel, *Rules Practice* § 21.2 (1975); 3A *Moore's
> Federal Practice* par. 21.05[2], at 21-41 to 21-44 (2d ed. 1982). Some examples
> of the use of the severance power in rule 21 in precisely this manner can be seen
> in *Sporia v. Pennsylvania Greyhound Lines, Inc.,* 143 F.2d 105, 107 (3d Cir.
> 1944) (severance ordered where defendant sought to implead one of two plaintiffs
> who had joined to assert individual tort claims); *Jennings v. Beach,* 1 F.R.D. 442,
> 443 (D. Mass. 1940) (severance ordered to cure misjoinder); and *Thee v. Marvin
> Glass & Associates,* 412 F. Supp. 1116, 1117, 1121 (E.D.N.Y. 1976) (severance
> ordered where venue not proper as to all defendants).
>
> Rule 42(b), on the other hand, appears to be devoted to the convenience of
> adjudication, *the avoidance of prejudice and the interests of expedition and
> economy as dictated by the characteristics and elements of proof of the claims
> themselves. See* Smith & Zobel, *Rules Practice* § 42.4 (1977). The following
> sampling shows the utilization of rule 42(b) to further these purposes:  *Western
> Geophysical Co. of America, Inc. v. Bolt Associates,* 50 F.R.D. 193, 194 (D.
> Conn. 1970) (separate trial ordered for counterclaim for patent infringement
> brought in breach of contract action); *Cohen v. District of Columbia Natl. Bank,*
> 59 F.R.D. 84, 88 (D.D.C. 1972) (separate trials ordered as to each of the several
> defendant banks in usury case because of the potential for prejudice inherent in
> keeping track of the banks' differing practices and policies with respect to the
> subject loans); *Washington Whey Co. v. Fairmont Foods Co.,* 72 F.R.D. 180, 182
> (D. Neb. 1976) (separate trial ordered for counterclaims alleging antitrust

violations and unfair competition brought in contract action). Although both rules have different objectives and ordinarily should not overlap,  they share a common bond by conferring discretion upon trial judges to deal with the exigencies of litigation by separating parties, claims, and issues in order "to secure the just, speedy and inexpensive determination of every action." [Emphasis added.] Mass.R.Civ.P. 1, as appearing in 385 Mass. 1214 (1982).

The facts at issue under the Joined Dockets are not similar and do not arise out of the same matter. Egypt House and St. Nicholas respectfully request the Appellate Tax Board enter an Order in the proposed form attached hereto, granting severance.

Respectfully submitted,


/s/Tracey M.A. Stockton
Tracey M.A. Stockton
Counsel for Egypt House
Counsel for St. Nicholas
Massachusetts Bar No.:  568495
Date:  February 23, 2025

## CERTIFICATE OF SERVICE

I certify a copy of the above Appellants' Motion to Sever was delivered electronically on February 24, 2025, to the following parties:

Rebecca Sullivan
Assistant Clerk
The Commonwealth of Massachusetts
Appellate Tax Board

Adam J. Costa, Esq.
Mead, Talerman & Costa, LLC

Matthew D. Provencher, Esq.
Mead, Talerman & Costa, LLC


/s/Tracey M.A. Stockton
Tracey M.A. Stockton

**THE COMMONWEALTH OF MASSACHUSETTS**
**APPELLATE TAX BOARD**

EGYPT HOUSE,                              )        DOCKET NO.:  F-351238
    Appellant,                        )        DOCKET NO.:  F-351239
SHRINE OF ST. NICHOLAS,                   )
    Appellant,                        )
                                          )
v.                                        )
                                          )
BOARD OF ASSESSORS OF THE TOWN            )
OF MARBLEHEAD,                            )
    Appellee.                         )

**SEVERANCE ORDER**

    This matter having come before the Board on Motion to Sever of Appellant Egypt House

and Appellant Shrine of St. Nicholas the Wonderworker, Patron of Sailors, Brewers & Repentant

Thieves, it is hereby **ORDERED** that the cases evidenced by Docket No.: F-351238 and Docket

No.: F-351239 are hereby severed.

               APPELLATE TAX BOARD:


               _____


               Dated: _____, 2025

Order - Page Solo

## THE COMMONWEALTH OF MASSACHUSETTS
## APPELLATE TAX BOARD

| | | |
|---|---|---|
| EGYPT HOUSE, | ) | DOCKET NO.: F-351238 |
|     Appellant, | ) | DOCKET NO.: F-351239 |
| SHRIINE OF ST. NICHOLAS, | ) | |
|     Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOARD OF ASSESSORS OF THE TOWN | ) | |
| OF MARBLEHEAD, | | |
|     Appellee. | | |

## NOTICE OF HEARING

**PLEASE TAKE NOTICE,** a hearing on Appellant's Motion to Sever will take place on

March 6, 2025 via Zoom, at such time and pursuant to such dial-in information as is confirmed

by the Clerk of the Board prior to the hearing date.

Dated: February 23, 2025.

EGYPT HOUSE


By: /s/Tracey M.A. Stockton
    Tracey M.A. Stockton

SHRINE OF ST. NICHOLAS THE
WONDERWORKER


By: /s/Tracey M.A. Stockton
    Tracey M.A. Stockton

    124 Pleasant Street
    Marblehead, Massachusetts   01945
    617.800.3979
    ts@stpaulsfoundation.org
    BBO Number: 568495
    Attorney to Each of Them

## CERTIFICATE OF SERVICE

I certify a copy of the above Appellees' Notice of Hearing was delivered electronically on February 24, 2025, as follows:

Rebecca Sullivan
Assistant Clerk
The Commonwealth of Massachusetts
Appellate Tax Board

Adam J. Costa, Esq.
Mead, Talerman & Costa, LLC

Matthew D. Provencher, Esq.
Mead, Talerman & Costa, LLC

/s/Tracey M.A. Stockton
Tracey M.A. Stockton



# THE COMMONWEALTH OF MASSACHUSETTS
## *Appellate Tax Board*
*100 Cambridge Street, Suite 200*
*Boston, Massachusetts 02114*

**Docket Nos. F351238, F351239**

**EGYPT HOUSE
&
SHRINE OF ST. NICHOLAS THE WONDERWORKER ET AL,**
**Appellants.**

**v.**

**BOARD OF ASSESSORS OF THE TOWN OF MARBLEHEAD,**
**Appellee.**

## ORDER

After consideration of the appellant's Motion Requesting Stay ("Motion"), the arguments advanced at the February 13, 2025 hearing of the Motion, and with the assent of the assessors, the Board rules that the Motion is allowed as follows:

- All proceedings in Egypt House (F351238) and Shrine of St. Nicholas the Wonderworker et al (F351239) are stayed pending notification of the Supreme Judicial Court's action on the appellant's Emergency Motion for Preliminary Injunction.

- To the extent not already covered by the Board's January 22, 2025 Order, Docket Nos. F351238 and F351239 are consolidated for all proceedings and hearing.

- The appellant's Motion to Compel is denied without prejudice. The appellant may refile the Motion to Compel after the Stay is lifted.

- The inspection and view scheduled for Monday February 17, 2025 is continued pending further Order of the Board.

**ORDERED ACCORDINGLY**

**APPELLATE TAX BOARD**

**By:** /s/ *Mark J. DeFrancisco*

**Mark J. DeFrancisco, Chairman**

**Attest:** /s/ *William J. Doherty*

**Clerk of the Board**

**Date: February 13, 2025**



**THE COMMONWEALTH OF MASSACHUSETTS**
*Appellate Tax Board*
*100 Cambridge Street, Suite 200*
*Boston, Massachusetts 02114*

**Docket Nos. F351238, F351239**

**EGYPT HOUSE
&
SHRINE OF ST. NICHOLAS THE WONDERWORKER ET AL,
Appellants.**

**v.**

**BOARD OF ASSESSORS OF THE TOWN OF MARBLEHEAD,
Appellee.**

**ORDER**

In light of the February 20, 2025 Judgement of the Supreme Judicial Court denying the appellant Egypt House's Emergency Motion for Preliminary Injunction, the Board orders the following:

- The stay of these appeals issued on February 13, 2025 is lifted;

- The parties shall, within seven (7) days of this Order, provide to the Board alternative dates on which the parties are available to view the subject properties in accordance with the Board's January 7, 2025 Order.

**ORDERED ACCORDINGLY**

**APPELLATE TAX BOARD**

By: */s/ Mark J. DeFrancisco*
**Mark J. DeFrancisco, Chairman**

Attest: */s/ William J. Doherty*
**Clerk of the Board**

**Date: February 20, 2025**



# THE COMMONWEALTH OF MASSACHUSETTS
## *Appellate Tax Board*
*100 Cambridge Street, Suite 200*
*Boston, Massachusetts 02114*

**Docket Nos. F351238, F351239**

**EGYPT HOUSE**
**&**
**SHRINE OF ST. NICHOLAS THE WONDERWORKER ET AL,**
**Appellants.**

**v.**

**BOARD OF ASSESSORS OF THE TOWN OF MARBLEHEAD,**
**Appellee.**

## ORDER

After consideration of appellant Egypt House's February 23, 2025 Motion Requesting Stay ("Stay Motion"), which is based on the false statement that "[c]ontemporaneous" with the filing of the Stay Motion appellant "filed" an emergency motion for preliminary injunction with the Supreme Judicial Court, as well as the February 25, 2025 email from appellant's counsel to the Board indicating that: (1) "obviously" no such motion for preliminary injunction was filed; and (2) no such motion for preliminary injunction would be filed until no later than February 27, 2025, because counsel was "heavily committed," the Board orders the following:

- The Stay Motion is denied;
- The Board's February 20, 2025 Order, which requires the parties to "provide alternative dates on which the parties are available to view the **subject properties**" within seven (7) days of the February 20, 2025 Order, remains in full force and effect. (emphasis added).

After consideration of the appellants' February 23, 2025 Motion to Sever and in light of G.L. c. 58A, § 8, which authorizes the Chairman to "direct that two or more petitions for abatement of the taxes assessed upon real estate situated in the same general locality of the same town be heard together, irrespective of the identity of the appellants," the Board further orders that the Motion to Sever is denied.

**ORDERED ACCORDINGLY**

**APPELLATE TAX BOARD**

**By:** */s/ Mark J. DeFrancisco*
**Mark J. DeFrancisco, Chairman**

**Attest:** */s/ William J. Doherty*
**Clerk of the Board**

**Date: February 26, 2025**



# THE COMMONWEALTH OF MASSACHUSETTS
## *Appellate Tax Board*
*100 Cambridge Street, Suite 200*
*Boston, Massachusetts 02114*

**Docket Nos. F351238, F351239**

**EGYPT HOUSE**
**&**
**SHRINE OF ST. NICHOLAS THE WONDERWORKER ET AL,**
**Appellants.**

**v.**

**BOARD OF ASSESSORS OF THE TOWN OF MARBLEHEAD,**
**Appellee.**

**ORDER**

By agreement of the parties, an inspection and view of both properties at issue in the above appeals will be held on Tuesday, April 1, 2025 at 10 a.m. in accordance with the Board's January 7, 2025 Order.

**ORDERED ACCORDINGLY**

**APPELLATE TAX BOARD**

By: */s/ Mark J. DeFrancisco*

**Mark J. DeFrancisco, Chairman**

Attest: */s/ William J. Doherty*

**Clerk of the Board**

**Date: March 5, 2025**

EXHIBIT Q

*See,* attached.



ALBANIAN ORTHODOX DIOCESE OF AMERICA

## HOLY TRINITY ALBANIAN ORTHODOX CHURCH

245 D STREET, P.O. BOX 224 / SOUTH BOSTON, MASSACHUSETTS 02127

TELEPHONE 617-268-7808

10 May 2023

This is to certify that on the 7th day of January, 2023, I was hosted in the monastic enclosure, styled "Egypt House" and located at 12 Conant Road, Marblehead, Massachusetts, USA 01945, for the purpose of officiating the sacraments of the Eastern Orthodox Church, indicated below:

- The Divine Liturgy of St John Chrysostom in Egypt House.
- The Blessing of Waters, as stipulated by church canons, throughout the grounds of the monastic enclosure, including Egypt House.

I conduct myself as Priest of Holy Trinity Albanian Orthodox Church, a legal corporation in the Commonwealth of Massachusetts since 1930, operating in South Boston since 1921. Our patriarchal church is a parish of the Albanian Orthodox Diocese of America-Ecumenical Patriarchate, a canonical institution of the Ecumenical Throne of Constantinople (https://ec-patr.org/) As such, our patriarchal church is distinct from and independent of the Greek Orthodox Metropolis of Boston.

REVEREND PRESBYTER PAUL ZUNIGA

PRIEST-IN-CHARGE



September 12, 2023

Mark J. DeFrancisco, Chairman
Appellate Tax Board
100 Cambridge Street, Suite 200
Boston, MA 02114

In Re: Egypt House v. Board of Assessors of the Town of Marblehead, Docket No. F-347636

To Chairman DeFrancisco and the Appellate Tax Board:

We write regarding the real estate tax matter at Egypt House, a monastic house of St. Paul's Foundation, as a bishop of the Ecumenical Throne.  Reverend Father Andrew (Bushell), our co-struggler in monastic life, is Protos of St. Paul's Foundation, Father Guardian of the Shrine of St. Nicholas, and Superior of Emmaus House and Egypt House, which serve as houses of worship and related structures for the monastic community he suffers to build in Marblehead.

The subject of this appeal is Egypt House, located at 12 Conant Rd. in Marblehead.  It shares a 100 foot plus contiguous border with Emmaus House, located at 22 Endicott Avenue.  While incorporated separately, together they comprise a single monastic complex.  Egypt House's necessity resulted from the series of delays over the last six years relative to construction of the monastic Shrine of St. Nicholas the Wonderworker, which is located at the two contiguous properties of 120 and 124 Pleasant Street, also in Marblehead.  Unfortunately, the near constant objections of various Town of Marblehead officials to the completion of the work at St. Nicholas, have harmed the ministry by increasing time to completion, increasing costs, and destroying the ability for the community to have a place to worship and for Father Andrew to provide spiritual direction.

Purchase of Egypt House provided air to a ministry which is being slowly and continuously strangled by actions of officials of the Town of Marblehead, hence why we named it after the Holy Family's Flight to Egypt.  Both houses, Egypt House and Emmaus House, in the tradition of monastic houses, are houses of worship where the Divine Services (Vespers, Compline, Matins, the minor hours, and the Divine Liturgy) are celebrated and religious programming exists on the first floors and housing of clergy and lay cooperators dedicated to the mission of the Orthodox Church, as well as pilgrims seeking retreat and spiritual direction are on the upper floors with that necessary administrative space to run the organization.  Clergy under our omophorion, have celebrated services and distributed Holy Communion to the faithful at Egypt House.

Finally, we understand that there has been a request for the names of pilgrims and penitents who have come to Egypt House seeking spiritual direction and enlightenment.  Let there be no confusion.  Betraying the confidentiality of a penitent is a crime that screams to Heaven.  St. Nikodemos, who like Father Andrew was a monk of Mount Athos, wrote the manual for confessors which we use today, wherein he writes:

> Nothing else remains after confession, Spiritual Father, except to keep the sins you hear a secret, and to never reveal them, either by word, or by letter, or by a bodily gesture, or by any other sign, even if you are in danger of death, for that which the wise Sirach says applies to you: "Have you heard a word? Let it die with you" (Sir. 19:8); meaning, if you heard a secret word, let the word also die along with you, and do not tell it to either a friend of yours or an enemy of yours, for as long as you live. And further still, that which the Prophet Micah says: "Trust not in friends... beware of thy wife, so as not to commit anything to her" (Mic. 7:5)."

Counsel for the Town of Marblehead, in furtherance of this abuse writes, but we only ask for names of the people.  Why would the names be required?  Only to contact the penitents.  And then the Faithful would be questioned and scandalized and their souls wounded, and they would no longer seek the healing grace of holy confession.  The Holy Canons of the Orthodox Church do not permit such a thing.  Those who come seeking forgiveness and spiritual direction expect and deserve absolute confidentiality.  It is not the practice of the Orthodox Church to reveal the names of those either seeking spiritual direction, to confess their sins.  Such things were demanded of us in Communist countries, such as in my own native Albania where only seven priests were left in the entire country after dictator Enver Hoxha was finished with his executions.  This also happened in Russia, Ukraine, Serbia, Romania and elsewhere. The East is littered with graves of monks who died to keep the Faith.  It is unacceptable and offensive according to Holy Mother Church.  Many monks died protecting this information so that sinners may have confidence confess, repent, and reach eternal life.  Father Andrew will honor his monastic forbears according to the Holy Canons.

With our Archpastoral blessing and great love in Christ,

THEOPHAN
Bishop of Philomelion
Albanian Orthodox Diocese of the Americas
Ecumenical Patriarchate

Tuesday before the Exaltation of the Holy Cross

Wednesday, January 8, 2025

Mark J. DeFrancisco, Chairman
Appellate Tax Board
100 Cambridge Street, Suite 200
Boston, MA 02114

In Re:  Egypt House v. Board of Assessors of the Town of Marblehead, Docket No. F-351238
        St. Nicholas v. Board of Assessors of the Town of Marblehead, Docket No. F-351239

To: Chairman DeFrancisco and the Appellate Tax Board

From: Very Reverend Nectarios Eben Trevino, opriest@gmail.com, ROC The Holy Innocents & St.
Nina, Equal-to-the-Apostles

I am an Orthodox Christian archpriest in the Eastern American Diocese of the Russian Orthodox
Church Outside of Russia. I am the only Orthodox exorcist in the United States who has been trained
in Rome by Reverend Father Gabriel Amorth, the former Chief Exorcist of the Diocese of Rome. I
have been a priest for over 22 years, an exorcist for 16 years. I am also a retired U.S. Air Force
lieutenant colonel having served our nation in peacetime and combat. I graduated from the
Georgetown University Law Center in 1983.

I personally celebrated Divine Liturgy at Egypt House on December 6, 2024. Present were multiple
Orthodox Christians and a group of 6 pilgrims. I and two of my parishioners from Virginia and stayed
in the Egypt House guestrooms. I stayed in Father Andrew's room, and he stayed at Emmaus House to
accommodate our group.

I want to thank Chairman DeFrancisco in advance for being willing to come to visit St. Nicholas and
Egypt House which he did, I believe, in response to an appeal from Father Andrew that there be an
"honest broker" involved in this process.

After reading your Order dated January 7, 2025, as well as the relevant transcripts, I am required by
the Holy Canons, to write and express my deep concern, and horror, as a priest, an exorcist, and
myself, a student of the law, relative to what will amount to a desecration of a part of a monastic
complex that serves as an Orthodox chapel and retreat house. Sacred grounds in the Holy Orthodox
Church are promote the "spiritual perfection" of church members. Any violation or deliberate
interference of the preceding will necessitate spiritual and, if deemed necessary, secular recourse.

Please note that the day your order was issued, January 7, is celebrated as Christmas Day according to
the Julian Calendar, that calendar followed by the majority of Orthodox Christians as well as the
Russian Orthodox Church Outside of Russia, which accounts for the delay in this letter.  We only
received the actual transcript of the hearing in question this past Saturday, January 11, from Court
Reporter Denise Rizzari at 5:28 AM.  Therefore, this is why it has taken so long for me to pen this
memorandum for the record.

Based on my experience, if carried out, this Order will result in the desecration of Holy Ground which will cause irreparable harm to the Holy Places established in Marblehead. I also do not understand, given the fact that Father Andrew has offered so many alternatives, why it is that the Board cannot accommodate a *de minimis* request when the desecration of holy objects, and indeed an entire working chapel, is at stake. He has only objected to:

1.) the presence of two people, Matthew Provencher and John Kelley, both of whom, based on independently verifiable statements and actions that they made or undertook, have actively participated in the harm and destruction of the Orthodox mission in Marblehead; and

2.) that inspectors not touch or photograph the Holy Objects in the chapel at Egypt House.

Even Assistant Assessor Todd Laramie of the Marblehead Assessors Office has said to Father Andrew that he does not have to open reliquaries, but perhaps on advice of Mr. Provencher, he has refused to put this in writing that they will refrain from touching the Sacred Objects. Additionally, while it is arguable that there is a right for Assessors to bring anyone they want, there is no such right in the related law that allows the Assessors to photograph anything. And even if they wanted to do so, what would be the point? This is an exemption case, not a valuation case.

Further, if the Chair is present and issues a ruling on the spot, and that ruling is objected to, then how does the appeal work? How would Father Andrew prevent the desecration of the Holy Objects? The desecration will have already occurred. Indeed, any desecration will resonate across this nation in every Orthodox Christian parish across America – and every Christian denomination and their parishes.

Please note that Father Andrew is insisting on videotaping the Assessors to record their behavior, not Egypt House. This is, I believe, Father Andrew's right. Moreover, it is his right because Town of Marblehead officials in the past, including the last two Assistant Assessors of the Town of Marblehead, have behaved badly. Father has no desire to videotape the Holy Objects. These are not similar positions. Objective third party evidence, including Facebook posts proving Assistant Assessors have made false and defamatory statements about Father Andrew have been provided to the Board were provided in the Appendix to the Motion for Summary Judgment, yet the Board refused to consider the Motion. It is hard to believe that the Board read through the hundreds of pages of third-party documentation of this behavior of the Assessors of the Town of Marblehead.

Further, regarding the presence of unclean people. While people allowed into a holy place do not need to be free of sin, they must not be hostile to or harbor evil intent in their hearts against the Church. Specifically, as Father Andrew has explained to the Board, both Matthew Provencher and John Kelley, in addition to Karen Bertolino and Michael Tumulty, are in this category. There are other members of the Marblehead Board of Assessors, Mr. Laramie the Assistant Assessor, and Leandro DiFillipo, who have been invited to come.

It is clear from the transcripts that the behavior of Matthew Provencher falls short of the mark when he misled the Chair during the 24 August 2024 hearing; perhaps successfully deceiving the Chair. I reference page 14, lines 12-24, and page 15, 1-24, and page 16, 1-9 where he states:

The difficultly the town has had and the Board of Assessors has had, is both the Shrine and Egypt House are very reluctant to provide any information concerning what activities actually take place at the property. We were here on motion in a previous matter in which the Shrine –

Egypt House, excuse me, reserved the right to withhold the identity under a claim of privilege of any of the individuals who actually resided at the property. Whether they were renters, whether they were leasing. So, frankly, from my perspective, this is a case in which the Board of Assessors has been trying to do its due diligence. It is seeking information on what the actual use of the properties are. And my sister, Ms. Stockton, has taken the position that she is essentially entitled to claim the exemption, assert that it is a religious organization, and that's the end of the matter. There can be no further investigations to what actually takes place on the property. So that's why I think discovery is necessary, because even in the previous case, we weren't given a clear idea as to what actually transpires on the property. Whether services are held. How often they are held. If there's any attendance. I think that's a matter for another day, but that's why we need to do discovery in this case.

And then you respond, Mr. Chairman:

Well, it certainly seems to be relevant. Whether or not individuals have to identified is another question. But certainly I would think any leases that are in place giving people a right to live in the property, even if you redacted their names, that's certainly relevant information.

It is my understanding that the preceding is false. Neither Ms. Bertolino or the Board asked if there was a lease when the initial applications for the exemption were filed, albeit they did ask questions. That question only occurred on appeal, and when Mr. Provencher asked the question, it was answered. There are no leases. How could there be when we visited and were accommodated. More importantly, it is against canon law for a sacred space to be leased. The only people who stayed in the property were Father Andrew, the iconographer Dr. George Kordis, and pilgrims coming to visit in the tradition of monastic hospitality. Even St. Benedict of Nursia says that a monastery must have guests. So, this issue is without merit.

The question of an oral lease is incomprehensible, if not astonishing, how could it be enforced? Additionally, wanting the names of people who came to visit for marriage counseling, spiritual direction, or any spiritual nature is incomprehensible. It was then that Father declined to violate the Holy Canons and provided this Board a letter from a bishop of the Ecumenical Patriarchate, Bishop Theophan.

Moreover, in the past a list of names of people who have attended services has been provided and the names have been redacted as the Chairman has suggested. It is my opinion that Father Andrew did not need to do the preceding. Would the same be asked of a synagogue, mosque, or another Christian faith? Fr. Andrew has explained "what exactly transpires on the property": religious services, spiritual counseling, and housing for clergy and pilgrims. Further, in the case of St. Nicholas' property, it is my understanding that Mr. Provencher knows exactly what has been going on because St. Nicholas has been under construction and his own law firm has represented the Town on no less than seven actions where the State has overturned it as they have attempted to prevent St. Nicholas' construction – and he prevented the Building Commissioner from testifying to that fact. In fact, the Select Board of the Town voted to recognize the occupancy as a religious exemption.

It is my understanding that the reason why St. Nicholas and Egypt House went through the trouble and expense to have a Court Reporter at these hearings is because Attorney Provencher has a habit of

misleading the tribunal and such actions need to be recorded and displayed for everyone, if necessary, for the entire nation, to read.

Here are three examples:

First, contrary to Mr. Provencher's "free speech" the Board of Assessors did not attempt any due diligence prior to denying the tax exemption application for Egypt House. There is an email from Karen Bertolino, the Marblehead Assistant Assessor, to John Kelley, the Chair of the Board of Assessors, that states in pertinent part, "I will be surprised if they try for an exemption to the [12 Conant Road property]." This email was provided to you during our motion for summary judgment which was ignored.

Second, as has been exhaustively documented, Father Andrew invited the consulting assessor Richard Scanlon, for a tour of both properties and even invited Mr. Scanlon to a prayer service if Mr. Scanlon was in good standing. It is my understanding that Mr. Provencher then twisted Father Andrew's words saying that Father Andrew stated that Mr. Scanlon could only go if he was a Catholic in good standing.

Third, you have repeatedly requested an agreed statement of facts; however, Mr. Provencher prevented the Building Commissioner, the Fire Chief, the General Manager of the Municipal Light Department, and the Town Administrator from providing affidavits attesting to their personal knowledge that the properties were used for religious use.

Finally, what is the actual point of an inspection? One would think an inspection would be related to valuation. But valuation is not what is being considered here, only ownership and use. It doesn't require an expert. It doesn't require biased individuals, Matthew Provencher or John Kelley. Anyone with eyes can see the actual use. There is no need to violate the religious sensibilities of the most traditional group of Christians in the United States. Yet, that is exactly what is being undertaken.

Accordingly, I urge the Chairman to modify the Order, which constitutes a government action, to accommodate the Orthodox Faith which has existed for 2,000 years without alteration or change, in the following ways.

First, the Order states that:

> in accordance with GL c. 58A, § 8A, the assessors and any attorneys, experts, or other agents may participate in the inspection of the subject properties, including the interiors of the subject properties

It has been the religious tradition of the Orthodox Church for over 2,000 years that the angel of light who became a demon after his fall from Heaven, is the Prince of Lies, also known as Satan. Anyone who seeks to deceive participates in the works of Satan. This was explained to the Chair at the last hearing by Father Andrew. You disagreed with Father Andrew. You are welcome to disagree with us; however, even the Chair of the Appellate Tax Board cannot determine Orthodox Christian doctrine which is sincerely held religious belief which is protected by the First Amendment. Father Andrew has previously stated that he is happy to have anyone come to inspect who has not lied about us in a court setting or actively worked to harm the church. Forcing the presence of those demonstrably

hostile to the Orthodox Faith into a house of worship is a desecration. You cannot disadvantage a religious group for declining to have their chapel desecrated – it would be like forcing us to allow someone with a defect into the altar area or sanctuary of an Orthodox Church, allowing an assistant assessor into a Chabad Synagogue who insisted on eating a pork sandwich inside the Synagogue, or a man who had given his child to Molech, or a sodomite, as Leviticus says in chapter 20, verses 22 to 26:

> You shall therefore keep all my statutes and all my ordinances and do them; that the land where I am bringing you to dwell may not vomit you out. And you shall not walk in the customs of the nation which I am casting out before you; for they did all these things, and therefore I abhorred them. But I have said to you, 'You shall inherit their land, and I will give it to you to possess, a land flowing with milk and honey.' I am the LORD your God, who have separated you from the peoples. You shall therefore make a distinction between the clean beast and the unclean, and between the unclean bird and the clean; you shall not make yourselves abominable by beast or by bird or by anything with which the ground teems, which I have set apart for you to hold unclean. You shall be holy to me; for I the LORD am holy, and have separated you from the peoples, that you should be mine.

And further, Leviticus chapter 21, verses 16 to 24:

> And the LORD said to Moses, "Say to Aaron, None of your descendants throughout their generations who has a blemish may approach to offer the bread of his God. For no one who has a blemish shall draw near, a man blind or lame, or one who has a mutilated face or a limb too long, or a man who has an injured foot or an injured hand, or a hunchback, or a dwarf, or a man with a defect in his sight or an itching disease or scabs or crushed testicles; no man of the descendants of Aaron the priest who has a blemish shall come near to offer the LORD's offerings by fire; since he has a blemish, he shall not come near to offer the bread of his God. He may eat the bread of his God, both of the most holy and of the holy things, but he shall not come near the veil or approach the altar, because he has a blemish, that he may not profane my sanctuaries; for I am the LORD who sanctify them." So Moses spoke to Aaron and to his sons and to all the people of Israel.

Mr. Provencher and Mr. Kelley have both violated the Ninth Commandment, "Thou shalt no bear false witness against they neighbor." Please note that the Orthodox Catholic Church follows the Septuagint numbering, which is also used by the Talmud and Masoretic text, whereas the Roman Catholic Church and Lutherans follow St. Augustine' numbering so for them it is number 8. Is Mr. Provencher attempting to deceive the tribunal and Mr. Kelley by conspiring with Ms. Bertolino to revoke a valid and subsisting exemption to one of St. Nicholas' properties which is clearly part of a complex with the other, refusing any real dialogue with respect to Egypt House's applications, and encouraging his staff to lie about the status of St. Nicholas' building at 120 Pleasant Street by calling a "professional association" a category held by exactly no organization in Marblehead. Those who behave honestly would be welcome. Those who have behaved dishonestly are engaging is a sacrilege not only to Orthodox Christians, but every religion, including in their professional capacities. The presence of either of them would be a desecration.

We believe that the current Order violates both the Establishment Clause and the Free Exercise Clause because it is neither narrowly tailored nor does it avoid irreparable harm, nor would it survive strict scrutiny. It can and should be modified. It would be the right and honest thing to do.

As Chairman DeFrancisco has previously stated, cf. page 6 and line 8 – 14, and page 12 lines 21 -24, and page 13 lines 3 to 8, in hearing transcript 1 August 2024 attached, the only things which matter in this case are that the properties are owned by the religious organizations, and they are used for religious purposes. We note that Attorney Stockton filed a motion for Summary Judgment with hundreds of pages of third-party verifiable documents which conclusively proves that both properties meet this double test. Did Chairman DeFrancisco and the Board decline to read the Motion, asserting there was a question of fact because the Marblehead Assessors said so?

In 2022, the Supreme Court overturned the Lemon test and said cases should be decided through interpreting the Establishment Clause "by reference to historical practices and understandings." In our instance, laws relative to collecting real property taxes clearly have a neutral secular purpose; however, misapplication of these laws inhibits religion by siphoning resources away from religious groups, forcing entanglement by the Marblehead Board of Assessors where none would naturally exist as in this instance, in order to harass and oppress, as when Mr. Provencher, in the previous appeal relative to Egypt House, filed a motion to compel Father Andrew to reveal the names of those people who came for spiritual direction, confession, and marriage counseling. Has Mr. Provencher has since doubled down on this false narrative to force greater entanglement?

In evaluating whether a particular law or government action violates the "Free Exercise" Clause, the Supreme Court has formulated the following two rules: first, government may never interfere with an individual's right to believe whatever he or she wants; second, in Free Exercise cases, the courts must consider (i) whether the activity was motivated by and rooted in legitimate and sincerely held religious belief, (ii) whether the activity was unduly and substantially burdened by the government's action, and (iii) whether the government has a compelling interest in limiting the religious activity that cannot be accomplished by less restrictive means.

Second, the Order states that they:

> are permitted to photograph the interiors of the subject properties without limitation.

This could be construed to mean that the Assessors could handle and open reliquaries, photograph Holy Objects, and otherwise behave in any manner they see fit. This also would be an impermissible desecration.
We respectfully request the Chair ask the Marblehead Assessors to refrain from touching or photographing the Sacred Objects in the chapel at Egypt House.

Thank you.

<div style="text-align:center">

With great love in Christ,

V. Rev. Nectarios Treuw

Very Reverend Nectarios Eben Trevino
Archpriest/Exorcist, Eastern Diocese of the Russian Orthodox Church Outside of Russia
Rector, ROC The Holy Innocents and St. Nina, Equal-to-the-Apostles
Mailing Address: 8665 Sudley Rd, #231, Manassas, VA 20110

</div>

EXHIBIT R

*See,* attached.

Federal Register

Vol. 90, No. 28

Wednesday, February 12, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14202 of February 6, 2025

## Eradicating Anti-Christian Bias

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. *Purpose and Policy*. It is the policy of the United States, and the purpose of this order, to protect the religious freedoms of Americans and end the anti-Christian weaponization of government. The Founders established a Nation in which people were free to practice their faith without fear of discrimination or retaliation by their government.

For that reason, the United States Constitution enshrines the fundamental right to religious liberty in the First Amendment. Federal laws like the Religious Freedom Restoration Act of 1993, as amended (42 U.S.C. 2000bb *et seq.*), further prohibit government interference with Americans' rights to exercise their religion. Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. 2000e *et seq.*), prohibits religious discrimination in employment while Federal hate-crime laws prohibit offenses committed due to religious animus.

Yet the previous Administration engaged in an egregious pattern of targeting peaceful Christians, while ignoring violent, anti-Christian offenses. The Biden Department of Justice sought to squelch faith in the public square by bringing Federal criminal charges and obtaining in numerous cases multi-year prison sentences against nearly two dozen peaceful pro-life Christians for praying and demonstrating outside abortion facilities. Those convicted included a Catholic priest and 75-year-old grandmother, as well as an 87-year-old woman and a father of 11 children who were arrested 18 months after praying and singing hymns outside an abortion facility in Tennessee as a part of a politically motivated prosecution campaign by the Biden Administration. I rectified this injustice on January 23, 2025, by issuing pardons in these cases.

At the same time, Catholic churches, charities, and pro-life centers sought justice for violence, theft, and arson perpetrated against them, which the Biden Department of Justice largely ignored. After more than 100 attacks, the U.S. House of Representatives passed a resolution condemning this violence and calling on the Biden Administration to enforce the law.

Then, in 2023, a Federal Bureau of Investigation (FBI) memorandum asserted that ''radical-traditionalist'' Catholics were domestic-terrorism threats and suggested infiltrating Catholic churches as ''threat mitigation.'' This later-retracted FBI memorandum cited as support evidence propaganda from highly partisan sources.

The Biden Department of Education sought to repeal religious-liberty protections for faith-based organizations on college campuses. The Biden Equal Employment Opportunity Commission sought to force Christians to affirm radical transgender ideology against their faith. And the Biden Department of Health and Human Services sought to drive Christians who do not conform to certain beliefs on sexual orientation and gender identity out of the foster-care system. The Biden Administration declared March 31, 2024—Easter Sunday—as ''Transgender Day of Visibility.''

In this atmosphere of anti-Christian government, hostility and vandalism against Christian churches and places of worship surged, with the number of such identified acts in 2023 exceeding by more than eight times the

number from 2018. Catholic churches and institutions have been aggressively targeted with hundreds of acts of hostility, violence, and vandalism.

My Administration will not tolerate anti-Christian weaponization of government or unlawful conduct targeting Christians. The law protects the freedom of Americans and groups of Americans to practice their faith in peace, and my Administration will enforce the law and protect these freedoms. My Administration will ensure that any unlawful and improper conduct, policies, or practices that target Christians are identified, terminated, and rectified.

**Sec. 2**. *Establishing a Task Force to Eradicate Anti-Christian Bias*. (a) There is hereby established within the Department of Justice the Task Force to Eradicate Anti-Christian Bias (Task Force).

(b) The Attorney General shall serve as Chair of the Task Force.

(c) In addition to the Chair, the Task Force shall consist of the following other members:

(i) the Secretary of State;

(ii) the Secretary of the Treasury;

(iii) the Secretary of Defense;

(iv) the Secretary of Labor;

(v) the Secretary of Health and Human Services;

(vi) the Secretary of Housing and Urban Development;

(vii) the Secretary of Education;

(viii) the Secretary of Veterans Affairs;

(ix) the Secretary of Homeland Security;

(x) the Director of the Office of Management and Budget;

(xi) Representative of the United States of America to the United Nations;

(xii) the Administrator of the Small Business Administration;

(xiii) the Director of the Federal Bureau of Investigation;

(xiv) the Assistant to the President for Domestic Policy;

(xv) the Administrator of the Federal Emergency Management Agency;

(xvi) the Chair of the Equal Employment Opportunity Commission; and

(xvii) the heads of such other executive departments, agencies, and offices that the Chair may, from time to time, invite to participate.

**Sec. 3**. *Task Force Functions*. (a) The Task Force shall meet as required by the Chair and shall take appropriate action to:

(i) review the activities of all executive departments and agencies (agencies), including the Department of State, the Department of Justice, including the Federal Bureau of Investigation, the Department of Labor, the Department of Health and Human Services, the Department of Education, the Department of Homeland Security, and the Equal Employment Opportunity Commission, over the previous Administration and identify any unlawful anti-Christian policies, practices, or conduct by an agency contrary to the purpose and policy of this order;

(ii) recommend to the head of the relevant agency steps to revoke or terminate any violative policies, practices, or conduct identified under subsection (3)(a)(i) of this section and remedial actions to fulfill the purpose and policy of this order;

(iii) share information and develop strategies to protect the religious liberties of Americans and advance the purpose and policy of this order;

(iv) solicit information and ideas from a broad range of individuals and groups, including Americans affected by anti-Christian conduct, faith-based organizations, and State, local, and Tribal governments, in order to ensure that its work is informed by a broad spectrum of ideas and experiences;

(v) identify deficiencies in existing laws and enforcement and regulatory practices that have contributed to unlawful anti-Christian governmental or private conduct and recommend to the relevant agency head, or recommend to the President, through the Deputy Chief of Staff for Policy and the Assistant to the President for Domestic Policy, as applicable, appropriate actions that agencies may take to remedy failures to fully enforce the law against acts of anti-Christian hostility, vandalism, and violence; and

(vi) recommend to the President, through the Deputy Chief of Staff for Policy and the Assistant to the President for Domestic Policy, any additional Presidential or legislative action necessary to rectify past improper anti-Christian conduct, protect religious liberty, or otherwise fulfill the purpose and policy of this order.

(b) In order to advise the President regarding its work and assist the President in formulating future policy, the Task Force shall submit to the President, through the Deputy Chief of Staff for Policy and the Assistant to the President for Domestic Policy:

(i) a report within 120 days from the date of this order regarding the Task Force's initial work;

(ii) a report within 1 year from the date of this order that summarizes the Task Force's work; and

(iii) a final report upon the dissolution of the Task Force.

**Sec. 4**. *Administration*. (a) The heads of agencies shall, to the extent permitted by law, upon the request of the Chair, provide the Task Force with any information required by the Task Force for the purpose of carrying out its functions.

(b) The Department of Justice shall provide such funding and administrative and technical support as the Task Force may require, to the extent permitted by law and as authorized by existing appropriations.

**Sec. 5**. *Termination*. The Task Force shall terminate 2 years from the date of this order unless extended by the President.

**Sec. 6**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 6, 2025.*

[FR Doc. 2025–02611
Filed 2–11–25; 8:45 am]
Billing code 3395–F4–P