# EXHIBIT 5

**THE COMMONWEALTH OF MASSACHUSETTS**
**APPELLATE TAX BOARD**

| | | |
|---|---|---|
| EGYPT HOUSE, | ) | DOCKET NO.: F-351238 |
|     Appellant, | ) | |
| | ) | Oral Argument Requested |
| v. | ) | |
| | ) | |
| BOARD OF ASSESSORS OF THE TOWN | ) | |
| OF MARBLEHEAD, | ) | |
|     Appellee. | ) | |

**APPELLANT'S MOTION FOR RECONSIDERATION**

This is Motion for Reconsideration of Appellant Egypt House ("Egypt House") (this "Motion"). Egypt House respectfully requests the reconsideration of that certain Order issued by the Appellate Tax Board (the "Board") on January 7, 2025, which Order specifically provides:

      1.     The Motion to Compel [Inspection] of Appellee heard on December 12, 2025, is allowed;

      2.     In accordance with G.L. c. 58A, § 8A, the assessors and any attorneys, experts, or other agents may participate in the inspection of the subject properties, including the interiors of the subject properties;

      3.     The assessors shall provide the appellants with a list of those who will be participating in the inspection on behalf of the assessors no later than two days prior to the inspection;

      4.     On the Board's own motion, the Chairman will conduct a view of the subject properties in conjunction with the inspection;

      5.     The assessors are permitted to photograph the interiors of the subject properties without limitation; [and]

      6.     To the extent that any disagreement should arise concerning photographs during the inspection, the Chairman will resolve the dispute.

      7.     The assessors shall contact the appellants to agree on two dates and times for the inspection and provide the Board with those dates.

8.    The Board will then confirm the date of the inspection and view.

Egypt House acknowledges the accommodations granted in the Order; however, we hereby request the Board reconsider the elements of the Order specified at Item Nos.: 2 and 5 therein. Such elements evidence demonstrable error with respect to the actions so-Ordered.

## STATUTORY RIGHT TO INSPECT NOT ABSOLUTE

At subsection (b), ALM R. Civ. P. Rule 26 states: "[u]nless otherwise limited by order of the court . . .;" thereby highlighting the interplay between the statutory requirements of G.L. c. 58A, § 8A and the discretion of the Court to condition such requirements "within the sound discretion of the motion or trial judge" (*Hanover Ins. Co. v. Sutton,* 46 Mass. App. Ct. 153, 159, 705 N.E.2d 279 (1999)). The Court in *Stanley Realty Holdings v. Watertown Zoning Bd. of Appeals*, 18 Mass. L. Rep. 468 (Mass. Super. Ct. 2004) further elucidates the premise: "[w]here good cause is shown, the Court 'may make any order justice requires to protect a party . . . from undue burden or expense.'" In *Trustees, Woodburyville Heights Condominium Trust,* the Court stated:  "the court . . . may make any order which justice requires to protect a party from *annoyance, embarrassment, oppression,* or undue burden or expense, including on or more of the following (1) *that the discovery not be had;* (2) that the discovery may be had only on *specified terms and conditions,* . . . [emphasis added]." Relative to the issue of good cause shown, the *Woodburyville* Court stated: "[f]or good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted."[1] The *Woodburyville* Court goes on to state:  "in some instances, if a court were to find that a particularized harm would result from disclosure of information to the public, then it balances

---

[1]    *Trustees, Woodburyville Heights Condominium Trust v. Magill,* 20 Mass. L. Rep. 721 (2006).

the public and private interests to decide whether a protective order is necessary." In this instance, Egypt House has objectively demonstrated a history of particularized harm resulting from disclosure of certain information to the public relative to the matters at-issue. The Orthodox Catholic faith practiced by Fr. Andrew at Egypt House has been the subject of newspaper articles, magazine articles, hateful blog posts, and considerable defamatory Facebook® postings relative to its ministry, the publication of which has been disseminated across the North Shore of Massachusetts, including the greater Boston Massachusetts area. Indeed, the very individuals serving in the role of Chairman of the Board of Assessors and Assistant Assessor for the Town of Marblehead, respectively, engaged in slanderous and libelous behavior regarding Egypt House. Fr. Andrew, the Superior of Egypt House, has been physically and psychologically assaulted as a result of the efforts of the Town of Marblehead to discredit, disparage, and defame the Orthodox Catholic faith community in the Town of Marblehead. It is difficult to contemplate a more widespread campaign of hate speech *perpetrated by a municipality* as evidence of "good cause to exist," pursuant to which "the party seeking protection" has amply fulfilled "the burden of showing specific prejudice or harm will result if no protective order is granted."[2]

**REGULATION OF FIRST AMENDMENT RIGHTS MUST BE NARROWLY TAILORED**

To distinguish the subject inspection from other inspections to be performed under G.L. c. 58A, § 8A, Egypt House is a Church. There are two (2) aspects that come into play when courts construe the Constitutional contours of the practice of religion in a representational democracy such as the United States: the effects of the Establishment Clause and the Free

---

[2]        *Woodburyville, supra.*

Exercise Clause[3]. It is a well-established principle that actions by the state that affect First Amendment rights must be narrowly tailored. As the Court stated in *Fed. Election Com. v. Mass. Citizens for Life, Inc.,* 479 U.S. 238, 107 S. Ct. 616, 93 L. Ed. 2d 539 (1986), "[w]hen statutory provision burdens First Amendment rights, it must be justified by compelling state interest." In the relatively recent holding of the Massachusetts Supreme Judicial Court in *Massachusetts Commission for the Homeless v. Fall River, citing, Sable Communications of Cal., Inc. v. Federal Communications Comm'n,* 492 U.S. 115, 126, 109 S. Ct. 2829, 106 L. Ed. 2d 93 (1989): "[i]n the context of strict scrutiny, a regulation is not narrowly tailored unless 'it chooses the least restrictive means to further the articulated interest.'" Another important concept given deference in this area is a finding of unnecessary entanglement. As the Supreme Court stated in *Lemon v. Kurtzman,* 403 U.S. 602 (1971), "political division along religious lines was one of the principal evils against which the First Amendment was intended to protect." In the matter at issue, the Town of Marblehead is unnecessarily entangled in Orthodox Catholic religious practices. As the Supreme Court stated in *Town of Greece,*[4] the Establishment Clause must be interpreted by "reference to historical practices and understandings." In respect of secular notions of fairness, the Order sets out a brokered accommodation. In this instance; however, the religious beliefs of the religious organization must be recognized. Allowing persons who have defamed and discredited the faith to enter into Egypt House is, in and of itself, a desecration. It damages the religious practice gratuitously, as the parties have all recognized that there are a host of other

---

[3]    Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. USCS Const. Amend. 1

[4]

individuals who can perform the Egypt House inspection — there is no practical basis for *not* prohibiting Chairman Kelly and Attorney Provencher from performing the inspection.

The actions of the Town of Marblehead are not narrowly tailored by the Order. The articulated interest to be served in this instance is the ability of the township to confirm the ownership and use of the subject property is by and for a religious organization. The duty to inspect arises as a matter of law pursuant to an appeal under consideration by the Board.[5] Specifically, the Town of Marblehead seeks to perform the inspection that arises as a matter of law; however, in view of the fact the property to be inspected is owned and used by a religious organization, the First Amendment limitations that arise when the subject property is owned and used by a religious organization provide that the Board is legally required to narrowly tailor the inspection procedure, enabling inspection of the site to confirm use, thereby accomplishing the objective of the physical inspection (*i.e.,* visual confirmation of property use).

Egypt House acknowledges the jurisdiction of the Board in this instance is limited to the *ownership by and use of*, the subject property by a religious organization. The Board may believe discernment of whether or not Egypt House is a religious organization exceeds the limitations of its jurisdiction; however, the exercise of the Board here does not require this analysis, as this burden has been met by others, as evidenced by the organic documentation evidencing the formation of Egypt House, the exemption conferred upon Egypt House under Section 501(c)(3) of the Internal Revenue Code, as amended,[6] and correspondence submitted by members of the Orthodox Catholic church hierarchy. With respect to use of the subject property, the observations obtained during the inspection appear to be dispositive of property use at law. In view of the

---

[5]        G.L. c. 58A, § 8A.
[6]        26 U.S.C.S. § 501.

treatment of the Town of Marblehead vis-à-vis this appellant, Egypt House requested certain individuals be barred from performing the subject site inspection. Contrary to Attorney Provencher's statement given at the hearing on this matter on December 12, 2024, we do believe there is a good basis to restrict access by certain individuals,[7] namely, John P. Kelly, Chairman of the Board of Assessors, and Matthew D. Provencher of Mead Talerman & Costa LLP, counsel to the Town of Marblehead in this action. Egypt House has articulated the reasons for these limitations at length in the various briefings and motions filed with respect to the instant matter, and, verbally, during the hearing before the Board on this issue conducted on December 12, 2024.[8] It seems contrary to the good faith efforts of Egypt House for the Board to order a sensitive inspection to go forward in the face of such objective, demonstrated, misguided actions of the Town of Marblehead over the years relative to the subject appellant, without placing prohibitions on two (2) persons out of a universe of acceptable persons for the purpose of performing the inspection, when the parties have already agreed there are others who can perform this task without objection by Egypt House to perform the inspection.[9]

As a corollary to the arguments raised above related to limitations upon persons authorized to perform the subject inspection, Egypt House requested a prohibition on any type of recording (whether video or photographic) of icons, holy relics, and holy vessels located at Egypt House. Egypt House articulated the ecclesiastical reasons for requiring such prohibitions, most recently at Lines 20 through 24, Page 24; Lines 1 through 24, Page 25; and Lines 1 through 5,

---

[7]        December 12, 2024 Hearing Transcript, at 10:24:35 through 10:25:01, *Egypt House v. Town of Marblehead,* F-351238 (2024).
[8]        December 12, 2024 Hearing Transcript, in its entirety; however, *see specifically,* 10:26:55 through 10:29:53, 10:30:19 through 10:35:13, *Egypt House v. Town of Marblehead,* F-351238 (2024).
[9]        December 12, 2024 Hearing Transcript, at 10:32:26 through 10:34:01, *Egypt House v. Town of Marblehead,* F-351238 (2024).

Page 26 of December 12, 2024 Hearing Transcript, *Egypt House v. Town of Marblehead,* F-351238 (2024). A failure by the Board to prohibit recordation of any of the foregoing enumerated items does not advance the compelling state interest of the Town of Marblehead — confirmation of the use of Egypt House as a religious organization. It is the visual observation accomplished by the inspection that satisfies the second element of the analysis (*i.e.,* discernment of ownership and use of property seeking recognition of exemptions under G.L. c. 59, § 5, Clauses 10 and 11). As the *Fed. Election Com.* Court,[10] opined: "[w]hen statutory provision burdens First Amendment rights, it must be justified by compelling state interest." The compelling state interest in this instance is the confirmation by visual inspection of the use of the subject property, an act that can be efficiently and effectively performed by individuals who are not Mr. Kelly or Attorney Provencher. In a similar vein, the parties have already discussed a need for respect and sensitivity to any type of handling of the holy objects and making any kind of recorded or photographic images of the objects.

**CONCLUSION**

The Town of Marblehead has never articulated a reason for the years of refusal to recognize exemptions arising as a matter of law in The Commonwealth of Massachusetts, causing the Town of Marblehead and Egypt House to waste valuable resources in the process. Indeed, no Town of Marblehead assessor has ever responded to the repeated offers to enter into a dialogue about the matter — Egypt House *has no idea why* the ownership and use of Egypt House is *not* religious. The recitation of facts relative to every decision rendered by the Board in connection with claims arising as a result of a claim for religious exemption have included a discussion about the facts in contention giving rise to the subject denial. The Town of

---

[10]     *Fed. Election Com. v. Mass. Citizens for Life, Inc.,* 479 U.S. 238, 107 S. Ct. 616, 93 L. Ed. 2d 539 (1986).

Marblehead arrives at exemption decisions based upon bias and negative innuendo about the citizenry of the township, causing untold damage to the victims of such abuse and persecution. It is our belief allowing those who have defamed Egypt House, its ministry, or its principals to enter into the property is in itself a desecration, a further attack upon the good and holy work performed and to be performed therein. In support of our positions, attached hereto as <u>Exhibit A</u> is correspondence of Very Reverend Archpriest Nectarios Trevino of even date herewith. Harassment of Appellant by the Town of Marblehead must cease. When the dictates of G.L. c. 58A, § 8A speak solely to the right to inspect, how can the Board embrace objectionable parties and objectionable inspection practices when the United States Constitution mandates that the practices be narrowly tailored to serve the state interest? Egypt House respectfully requests the Board limit the inspections upon Egypt House in the manner specifically requested hereinabove.

Respectfully submitted,


/s/<u>Tracey M.A. Stockton</u>
Tracey M.A. Stockton
Counsel for Egypt House

Massachusetts Bar No.:  568495
Date:  January 15, 2025

## CERTIFICATE OF SERVICE

I certify a copy of the above Appellant's Motion for Reconsideration was delivered electronically on January 15, 2025, to the following parties:

Rebecca Sullivan
Assistant Clerk
The Commonwealth of Massachusetts
Appellate Tax Board

Adam J. Costa, Esq.
Mead, Talerman & Costa, LLC

Matthew D. Provencher, Esq.
Mead, Talerman & Costa, LLC


/s/Tracey M.A. Stockton
Tracey M.A. Stockton

Exhibit A

*See,* attached.

Wednesday, January 8, 2025

Mark J. DeFrancisco, Chairman
Appellate Tax Board
100 Cambridge Street, Suite 200
Boston, MA 02114

In Re:  Egypt House v. Board of Assessors of the Town of Marblehead, Docket No. F-351238
        St. Nicholas v. Board of Assessors of the Town of Marblehead, Docket No. F-351239

To: Chairman DeFrancisco and the Appellate Tax Board

From: Very Reverend Nectarios Eben Trevino, opriest@gmail.com, ROC The Holy Innocents & St. Nina, Equal-to-the-Apostles

I am an Orthodox Christian archpriest in the Eastern American Diocese of the Russian Orthodox Church Outside of Russia. I am the only Orthodox exorcist in the United States who has been trained in Rome by Reverend Father Gabriel Amorth, the former Chief Exorcist of the Diocese of Rome. I have been a priest for over 22 years, an exorcist for 16 years. I am also a retired U.S. Air Force lieutenant colonel having served our nation in peacetime and combat. I graduated from the Georgetown University Law Center in 1983.

I personally celebrated Divine Liturgy at Egypt House on December 6, 2024. Present were multiple Orthodox Christians and a group of 6 pilgrims. I and two of my parishioners from Virginia and stayed in the Egypt House guestrooms. I stayed in Father Andrew's room, and he stayed at Emmaus House to accommodate our group.

I want to thank Chairman DeFrancisco in advance for being willing to come to visit St. Nicholas and Egypt House which he did, I believe, in response to an appeal from Father Andrew that there be an "honest broker" involved in this process.

After reading your Order dated January 7, 2025, as well as the relevant transcripts, I am required by the Holy Canons, to write and express my deep concern, and horror, as a priest, an exorcist, and myself, a student of the law, relative to what will amount to a desecration of a part of a monastic complex that serves as an Orthodox chapel and retreat house. Sacred grounds in the Holy Orthodox Church are promote the "spiritual perfection" of church members. Any violation or deliberate interference of the preceding will necessitate spiritual and, if deemed necessary, secular recourse.

Please note that the day your order was issued, January 7, is celebrated as Christmas Day according to the Julian Calendar, that calendar followed by the majority of Orthodox Christians as well as the Russian Orthodox Church Outside of Russia, which accounts for the delay in this letter.  We only received the actual transcript of the hearing in question this past Saturday, January 11, from Court Reporter Denise Rizzari at 5:28 AM.  Therefore, this is why it has taken so long for me to pen this memorandum for the record.

Based on my experience, if carried out, this Order will result in the desecration of Holy Ground which will cause irreparable harm to the Holy Places established in Marblehead. I also do not understand, given the fact that Father Andrew has offered so many alternatives, why it is that the Board cannot accommodate a *de minimis* request when the desecration of holy objects, and indeed an entire working chapel, is at stake. He has only objected to:

1.) the presence of two people, Matthew Provencher and John Kelley, both of whom, based on independently verifiable statements and actions that they made or undertook, have actively participated in the harm and destruction of the Orthodox mission in Marblehead; and

2.) that inspectors not touch or photograph the Holy Objects in the chapel at Egypt House.

Even Assistant Assessor Todd Laramie of the Marblehead Assessors Office has said to Father Andrew that he does not have to open reliquaries, but perhaps on advice of Mr. Provencher, he has refused to put this in writing that they will refrain from touching the Sacred Objects. Additionally, while it is arguable that there is a right for Assessors to bring anyone they want, there is no such right in the related law that allows the Assessors to photograph anything. And even if they wanted to do so, what would be the point? This is an exemption case, not a valuation case.

Further, if the Chair is present and issues a ruling on the spot, and that ruling is objected to, then how does the appeal work? How would Father Andrew prevent the desecration of the Holy Objects? The desecration will have already occurred. Indeed, any desecration will resonate across this nation in every Orthodox Christian parish across America – and every Christian denomination and their parishes.

Please note that Father Andrew is insisting on videotaping the Assessors to record their behavior, not Egypt House. This is, I believe, Father Andrew's right. Moreover, it is his right because Town of Marblehead officials in the past, including the last two Assistant Assessors of the Town of Marblehead, have behaved badly. Father has no desire to videotape the Holy Objects. These are not similar positions. Objective third party evidence, including Facebook posts proving Assistant Assessors have made false and defamatory statements about Father Andrew have been provided to the Board were provided in the Appendix to the Motion for Summary Judgment, yet the Board refused to consider the Motion. It is hard to believe that the Board read through the hundreds of pages of third-party documentation of this behavior of the Assessors of the Town of Marblehead.

Further, regarding the presence of unclean people. While people allowed into a holy place do not need to be free of sin, they must not be hostile to or harbor evil intent in their hearts against the Church. Specifically, as Father Andrew has explained to the Board, both Matthew Provencher and John Kelley, in addition to Karen Bertolino and Michael Tumulty, are in this category. There are other members of the Marblehead Board of Assessors, Mr. Laramie the Assistant Assessor, and Leandro DiFillipo, who have been invited to come.

It is clear from the transcripts that the behavior of Matthew Provencher falls short of the mark when he misled the Chair during the 24 August 2024 hearing; perhaps successfully deceiving the Chair. I reference page 14, lines 12-24, and page 15, 1-24, and page 16, 1-9 where he states:

> The difficultly the town has had and the Board of Assessors has had, is both the Shrine and Egypt House are very reluctant to provide any information concerning what activities actually take place at the property. We were here on motion in a previous matter in which the Shrine –

Page 2 of 6

Egypt House, excuse me, reserved the right to withhold the identity under a claim of privilege of any of the individuals who actually resided at the property. Whether they were renters, whether they were leasing. So, frankly, from my perspective, this is a case in which the Board of Assessors has been trying to do its due diligence. It is seeking information on what the actual use of the properties are. And my sister, Ms. Stockton, has taken the position that she is essentially entitled to claim the exemption, assert that it is a religious organization, and that's the end of the matter. There can be no further investigations to what actually takes place on the property. So that's why I think discovery is necessary, because even in the previous case, we weren't given a clear idea as to what actually transpires on the property. Whether services are held. How often they are held. If there's any attendance. I think that's a matter for another day, but that's why we need to do discovery in this case.

And then you respond, Mr. Chairman:

Well, it certainly seems to be relevant. Whether or not individuals have to identified is another question. But certainly I would think any leases that are in place giving people a right to live in the property, even if you redacted their names, that's certainly relevant information.

It is my understanding that the preceding is false. Neither Ms. Bertolino or the Board asked if there was a lease when the initial applications for the exemption were filed, albeit they did ask questions. That question only occurred on appeal, and when Mr. Provencher asked the question, it was answered. There are no leases. How could there be when we visited and were accommodated. More importantly, it is against canon law for a sacred space to be leased. The only people who stayed in the property were Father Andrew, the iconographer Dr. George Kordis, and pilgrims coming to visit in the tradition of monastic hospitality. Even St. Benedict of Nursia says that a monastery must have guests. So, this issue is without merit.

The question of an oral lease is incomprehensible, if not astonishing, how could it be enforced? Additionally, wanting the names of people who came to visit for marriage counseling, spiritual direction, or any spiritual nature is incomprehensible. It was then that Father declined to violate the Holy Canons and provided this Board a letter from a bishop of the Ecumenical Patriarchate, Bishop Theophan.

Moreover, in the past a list of names of people who have attended services has been provided and the names have been redacted as the Chairman has suggested. It is my opinion that Father Andrew did not need to do the preceding. Would the same be asked of a synagogue, mosque, or another Christian faith? Fr. Andrew has explained "what exactly transpires on the property": religious services, spiritual counseling, and housing for clergy and pilgrims. Further, in the case of St. Nicholas' property, it is my understanding that Mr. Provencher knows exactly what has been going on because St. Nicholas has been under construction and <u>his own law firm has represented the Town on no less than seven actions where the State has overturned it as they have attempted to prevent St. Nicholas' construction – and he prevented the Building Commissioner from testifying to that fact</u>. In fact, the Select Board of the Town voted to recognize the occupancy as a religious exemption.

It is my understanding that the reason why St. Nicholas and Egypt House went through the trouble and expense to have a Court Reporter at these hearings is because Attorney Provencher has a habit of

misleading the tribunal and such actions need to be recorded and displayed for everyone, if necessary, for the entire nation, to read.

Here are three examples:

First, contrary to Mr. Provencher's "free speech" the Board of Assessors did not attempt any due diligence prior to denying the tax exemption application for Egypt House. There is an email from Karen Bertolino, the Marblehead Assistant Assessor, to John Kelley, the Chair of the Board of Assessors, that states in pertinent part, "I will be surprised if they try for an exemption to the [12 Conant Road property]." This email was provided to you during our motion for summary judgment which was ignored.

Second, as has been exhaustively documented, Father Andrew invited the consulting assessor Richard Scanlon, for a tour of both properties and even invited Mr. Scanlon to a prayer service if Mr. Scanlon was in good standing. It is my understanding that Mr. Provencher then twisted Father Andrew's words saying that Father Andrew stated that Mr. Scanlon could only go if he was a Catholic in good standing.

Third, you have repeatedly requested an agreed statement of facts; however, Mr. Provencher prevented the Building Commissioner, the Fire Chief, the General Manager of the Municipal Light Department, and the Town Administrator from providing affidavits attesting to their personal knowledge that the properties were used for religious use.

Finally, what is the actual point of an inspection? One would think an inspection would be related to valuation. But valuation is not what is being considered here, only ownership and use. It doesn't require an expert. It doesn't require biased individuals, Matthew Provencher or John Kelley. Anyone with eyes can see the actual use. There is no need to violate the religious sensibilities of the most traditional group of Christians in the United States. Yet, that is exactly what is being undertaken.

Accordingly, I urge the Chairman to modify the Order, which constitutes a government action, to accommodate the Orthodox Faith which has existed for 2,000 years without alteration or change, in the following ways.

First, the Order states that:

> in accordance with GL c. 58A, § 8A, the assessors and any attorneys, experts, or other agents may participate in the inspection of the subject properties, including the interiors of the subject properties

It has been the religious tradition of the Orthodox Church for over 2,000 years that the angel of light who became a demon after his fall from Heaven, is the Prince of Lies, also known as Satan. Anyone who seeks to deceive participates in the works of Satan. This was explained to the Chair at the last hearing by Father Andrew. You disagreed with Father Andrew. You are welcome to disagree with us; however, even the Chair of the Appellate Tax Board cannot determine Orthodox Christian doctrine which is sincerely held religious belief which is protected by the First Amendment. Father Andrew has previously stated that he is happy to have anyone come to inspect who has not lied about us in a court setting or actively worked to harm the church. Forcing the presence of those demonstrably

hostile to the Orthodox Faith into a house of worship is a desecration. You cannot disadvantage a religious group for declining to have their chapel desecrated – it would be like forcing us to allow someone with a defect into the altar area or sanctuary of an Orthodox Church, allowing an assistant assessor into a Chabad Synagogue who insisted on eating a pork sandwich inside the Synagogue, or a man who had given his child to Molech, or a sodomite, as Leviticus says in chapter 20, verses 22 to 26:

> You shall therefore keep all my statutes and all my ordinances and do them; that the land where I am bringing you to dwell may not vomit you out. And you shall not walk in the customs of the nation which I am casting out before you; for they did all these things, and therefore I abhorred them. But I have said to you, 'You shall inherit their land, and I will give it to you to possess, a land flowing with milk and honey.' I am the LORD your God, who have separated you from the peoples. You shall therefore make a distinction between the clean beast and the unclean, and between the unclean bird and the clean; you shall not make yourselves abominable by beast or by bird or by anything with which the ground teems, which I have set apart for you to hold unclean. You shall be holy to me; for I the LORD am holy, and have separated you from the peoples, that you should be mine.

And further, Leviticus chapter 21, verses 16 to 24:

> And the LORD said to Moses, "Say to Aaron, None of your descendants throughout their generations who has a blemish may approach to offer the bread of his God. For no one who has a blemish shall draw near, a man blind or lame, or one who has a mutilated face or a limb too long, or a man who has an injured foot or an injured hand, or a hunchback, or a dwarf, or a man with a defect in his sight or an itching disease or scabs or crushed testicles; no man of the descendants of Aaron the priest who has a blemish shall come near to offer the LORD's offerings by fire; since he has a blemish, he shall not come near to offer the bread of his God. He may eat the bread of his God, both of the most holy and of the holy things, but he shall not come near the veil or approach the altar, because he has a blemish, that he may not profane my sanctuaries; for I am the LORD who sanctify them." So Moses spoke to Aaron and to his sons and to all the people of Israel.

Mr. Provencher and Mr. Kelley have both violated the Ninth Commandment, "Thou shalt no bear false witness against they neighbor." Please note that the Orthodox Catholic Church follows the Septuagint numbering, which is also used by the Talmud and Masoretic text, whereas the Roman Catholic Church and Lutherans follow St. Augustine' numbering so for them it is number 8. Is Mr. Provencher attempting to deceive the tribunal and Mr. Kelley by conspiring with Ms. Bertolino to revoke a valid and subsisting exemption to one of St. Nicholas' properties which is clearly part of a complex with the other, refusing any real dialogue with respect to Egypt House's applications, and encouraging his staff to lie about the status of St. Nicholas' building at 120 Pleasant Street by calling a "professional association" a category held by exactly no organization in Marblehead. Those who behave honestly would be welcome. Those who have behaved dishonestly are engaging is a sacrilege not only to Orthodox Christians, but every religion, including in their professional capacities. The presence of either of them would be a desecration.

We believe that the current Order violates both the Establishment Clause and the Free Exercise Clause because it is neither narrowly tailored nor does it avoid irreparable harm, nor would it survive strict scrutiny. It can and should be modified. It would be the right and honest thing to do.

As Chairman DeFrancisco has previously stated, cf. page 6 and line 8 – 14, and page 12 lines 21 -24, and page 13 lines 3 to 8, in hearing transcript 1 August 2024 attached, the only things which matter in this case are that the properties are owned by the religious organizations, and they are used for religious purposes. We note that Attorney Stockton filed a motion for Summary Judgment with hundreds of pages of third-party verifiable documents which conclusively proves that both properties meet this double test. Did Chairman DeFrancisco and the Board decline to read the Motion, asserting there was a question of fact because the Marblehead Assessors said so?

In 2022, the Supreme Court overturned the Lemon test and said cases should be decided through interpreting the Establishment Clause "by reference to historical practices and understandings." In our instance, laws relative to collecting real property taxes clearly have a neutral secular purpose; however, misapplication of these laws inhibits religion by siphoning resources away from religious groups, forcing entanglement by the Marblehead Board of Assessors where none would naturally exist as in this instance, in order to harass and oppress, as when Mr. Provencher, in the previous appeal relative to Egypt House, filed a motion to compel Father Andrew to reveal the names of those people who came for spiritual direction, confession, and marriage counseling. Has Mr. Provencher has since doubled down on this false narrative to force greater entanglement?

In evaluating whether a particular law or government action violates the "Free Exercise" Clause, the Supreme Court has formulated the following two rules: first, government may never interfere with an individual's right to believe whatever he or she wants; second, in Free Exercise cases, the courts must consider (i) whether the activity was motivated by and rooted in legitimate and sincerely held religious belief, (ii) whether the activity was unduly and substantially burdened by the government's action, and (iii) whether the government has a compelling interest in limiting the religious activity that cannot be accomplished by less restrictive means.

Second, the Order states that they:

      are permitted to photograph the interiors of the subject properties without limitation.

This could be construed to mean that the Assessors could handle and open reliquaries, photograph Holy Objects, and otherwise behave in any manner they see fit. This also would be an impermissible desecration.
We respectfully request the Chair ask the Marblehead Assessors to refrain from touching or photographing the Sacred Objects in the chapel at Egypt House.

Thank you.

                With great love in Christ,

                Very Reverend Nectarios Eben Trevino
    Archpriest/Exorcist, Eastern Diocese of the Russian Orthodox Church Outside of Russia
        Rector, ROC The Holy Innocents and St. Nina, Equal-to-the-Apostles
            Mailing Address: 8665 Sudley Rd, #231, Manassas, VA 20110